1  Donald A. Vaughn, Esq. (Bar No. 110070)
2  Evan J. Topol Esq. (Bar No. 274932)
   VAUGHN & VAUGHN
3  501 West Broadway, Suite 1770
   San Diego, CA  92101
4  Tel: (619) 237-1717
5  Fax: (619) 237-0447

6
7  Attorneys for JACK SCHINDLER

8           **UNITED STATES BANKRUPTCY COURT**

9        **SOUTHERN DISTRICT OF CALIFORNIA – SAN DIEGO**

10  In re                              | Case No. 18-06044-LT11

11                                     | Chapter 11

12  JESSE WAYNE DAWBER,                 | **DECLARATION OF DONALD A. VAUGHN IN SUPPORT OF MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE**

13        Debtor.

14

15                                     | Judge: Hon, Laura Taylor
                                        | Location: Dept. 3, Room 129
16                                     | Date: December 13, 2018
                                        | Time: 2:00 p.m.
17

18

19        I, Donald A. Vaughn, declare and state as follows:

20        1.      I am an attorney licensed to practice before all the Courts of this State,

21  am admitted to practice before the United States District Court for the Southern

22  District of California, and am a member of the law firm of Vaughn & Vaughn,

23  counsel of record for Creditor Jack Schindler in the above-entitled matter. I have

24  also represented Mr. Schindler in litigation in San Diego Superior Court against the

25  Debtor and handled that case from its inception on August 11, 2015, through the

26  Jury Verdict in favor of Mr. Schindler and against the Debtor and California

27  corporation Class War, Inc. ("Class War") on September 25, 2018. Based upon

28  more than three years of handling this litigation, through numerous depositions and

                                        1

1  trial of the case, I know the following facts by personal knowledge, and could

2  competently testify thereto if called upon to do so as a witness.

3      2.    The document attached as Exhibit 1 is a true and correct copy of the

4  Jesse Dawber (a.k.a. Sketchy Tank) Biography. I obtained this document in August

5  2018 from the Lurking Class website which is owned by Class War. The figure at

6  the top of this page is known as the "Lurker," and (as claimed by the Debtor in

7  Docket Document 19 [Dkt. 19, pp. 40-43] this icon is the subject of Intellectual

8  Property registration, and owned of record by Class War, Inc.

9      3.    The document attached as Exhibit 2 is a true and correct copy of the

10  Debtor's June 3, 2014, Fictitious Business Name Filing with the San Diego County

11  Recorder for the d.b.a. "Sketchy Tank."

12      4.    The document attached as Exhibit 3 is a true and correct copy of the

13  Class War January 25, 2016 Fictitious Business Name Filing with the San Diego

14  County Recorder for the d.b.a. "Sketchy Tank." As reflected in Exhibit 2, this Class

15  War d.b.a. filing was made before Mr. Dawber's d.b.a. for "Sketchy Tank" expired.

16      5.    The document attached as Exhibit 4 is a true and correct copy of the

17  August 14, 2015 Partnership Agreement between Jesse Dawber and Jack Schindler

18  [1 page summary and 2 page signed Agreement]. The first page of this exhibit is a

19  true and correct verbatim copy of the language from the two page signed

20  Agreement which follows it. This summary was prepared for ease of review.

21      6.    The document attached as Exhibit 5 is a true and correct copy of the

22  Class War, Inc. Statement of Information filed with the California Secretary of

23  State on May 9, 2017. Mr. Dawber held all Officer positions, and was sole Director.

24      7.    The document attached as Exhibit 6 is a true and correct copy of the

25  Class War, Inc. Statement of Information filed with the California Secretary of

26  State on December 4, 2017. As the Court can see from comparison with Exhibit 5,

27  whereas Mr. Dawber previously held all Officer positions with Class War, and was

28  its sole Director from the inception of this California corporation, Exhibit 6 reflects

2

Mr. Dawber (who is the 100% owner of Class War) made Drew Madacsi the Chief Executive Officer and the sole Director of Class War, and appointed Jeslyn Leong to the Office of both Corporate Secretary and Chief Financial Officer.

8.     The document attached as Exhibit 7 is a true and correct copy of the Debtor's List of Registered Intellectual Property, filed by the Debtor on October 24, 2018 [Dkt. 19, pp. 40-43]. Therein, the Debtor's position is that all Registered Intellectual Property is owned by Class War.

9.     The document attached as Exhibit 8 is a true and correct copy of the "Creative Agreement" license dated June 5, 2017 purportedly between Singapore corporation STFU Pte. Ltd ["STFU"] and Class War. Despite many requests for this type of documentation both during the years before Trial of Mr. Schindler's North San Diego County Superior Court case against Mr. Dawber and Class War (the "Case"), and similar demands for production **at** trial, this document [and Exhibit 9, below] were not produced until Trial of the Case was well underway, and after Mr. Dawber had testified. Both Exhibit 8 and Exhibit 9 were produced by the Debtor during Trial pursuant to direction given by the Honorable Earl Maas III, who was the Trial judge.

10.    The document attached as Exhibit 9 is a true and correct copy of the "Creative Agreement" license dated June 30, 2017 between STFU and Jesse Dawber [but is unsigned by the Debtor]. I have requested, but never received or even seen, a copy of this purported agreement which is actually signed by Mr. Dawber.

11.    As the Court will note, what is actually being "licensed" in Exhibits 8 and 9 is never specified [See Exhibit A to both agreements]. In Exhibit 8, the purported license Class War receives on June 5, 2017, requires payment to Singapore corporation STFU of *one half the profit* on any goods bearing the (unspecified) "Creative Content."   In Exhibit 9, the Debtor (individually) is supposed to receive a payment of $39,000 per month.

12.     The document attached as Exhibit 10 is a true and correct copy of the Class War, Inc. Profit and Loss for 2016. This document was produced and verified by the Debtor in the underlying Case; the "BLG" Bates Stamp stands for "Blumberg Law Group," which represented both the Debtor and Class War until May 15 of 2017.

13.     The document attached as Exhibit 11 is a true and correct copy of the Class War, Inc. Profit and Loss for year 2017. This document was produced and verified by the Debtor in the underlying Case; the "ST-HL" Bates Stamp was utilized by Hogan Lovells US LLP on documents Hogan Lovells produced after assuming the representation of the Debtor and Class War on May 15, 2017.

14.     The document attached as Exhibit 12 is a true and correct copy of the Class War, Inc. Profit and Loss for 2018, through August 31, 2018. This document was produced by the Debtor in the underlying Case right before Trial (which was scheduled to commence on September 7, 2018).

15.     The document attached as Exhibit 13 is a true and correct copy of the Class War, Inc. Profit and Loss for 2018 through September 30, 2018. This document was filed by the Debtor in this Bankruptcy case on October 23, 2018. [Dkt. 18, pp. 24-26].

16.     The document attached as Exhibit 14 is a true and correct copy of the Class War, Inc. Balance Sheet as of September 1, 2018. This document was produced by the Debtor in the underlying Case right before Trial began.

17.     The document attached as Exhibit 15 is a true and correct copy of the Class War, Inc. Balance Sheet as of September 30, 2018. This document was filed by the Debtor in this Bankruptcy case on October 23, 2018. [Dkt. 18, pp. 20-22].

18.     The document attached as Exhibit 16 is a true and correct conformed copy of the September 25, 2018 Verdict against Jesse Dawber and Class War, Inc. in the underlying Superior Court Case.

19.    The document attached as Exhibit 17 is a true and correct copy of the License Agreement dated February 27, 2017 between Class War and Zumiez, executed by Jesse Dawber on behalf of Class War. As corroborated by the "ST-HL" Bates Stamp, this document was produced by the Debtor, through his attorneys at Hogan Lovells, in the underlying Case and was Trial Exhibit 435. As set forth on Exhibit A to this document, the "licensed properties" included all trademarks, characters, designs, etc. of Class War and referenced the Sketchy Tank website.

20.    The document attached as Exhibit 18 is a true and correct copy of the Amended and Restated License Agreement dated March 23, 2018 between Class War and Zumiez, but (instead of Jesse Dawber) executed on behalf of Class War by Drew Madacsi. As corroborated by the "ST-HL" Bates Stamp, this document was produced by the Debtor, through his attorneys at Hogan Lovells and, in fact, was Trial Exhibit 169. As set forth on Exhibit A to this document, the "licensed properties" again included all trademarks, characters, designs, etc. of Class War and referenced the Lurking Class website, which replaced the pre-existing Sketchy Tank website approximately 6 months before this document was signed.

21.    The document attached as Exhibit 19 is a true and correct copy of the Sketchy Tank, LLC Profit and Loss for 2018 through August 31, 2018. This document was filed by the Debtor in this Bankruptcy case on October 23, 2018. [Dkt. 18, p. 9]. Curiously, although the purported after – the – fact "license" by Mr. Dawber to STFU [Exhibit 9] requires payment of $39,000 per month to the Debtor individually, this document shows no payment until April 2018, and after that time a payment of $34,500 per month. I have inquired about this supposed payment, and asked the Debtor's attorneys where the rest of the money (i.e., $4,500 per month) went after April 2018, and who received the purported $39,000 payment prior to April 2018, but have not received this information, nor the great majority of other information I have requested from them.

22.     The document attached as Exhibit 20 is a true and correct copy of certain public information concerning Drew Madacsi, and published with his authority. This particular document was printed from the Alliance Brands Ltd. website; Mr. Madacsi is a principal of Alliance Brands. According to his company publication, Mr. Madacsi is affiliated not only with Alliance Brands in Singapore, but is also Chairman of MMP Resources in Singapore, Director of Allington Advisory Pte. Ltd. in Singapore, and is affiliated with "The House of Machines" which, according to Mr. Madacsi's testimony, has establishments in South Africa and Los Angeles, California.

23.     The document attached as Exhibit 21 is a true and correct copy of Excerpts from the certified transcript of the Deposition of Jesse Dawber taken on October 21, 2015 in the underlying Case.

24.     The document attached as Exhibit 22 is a true and correct copy of Excerpts from the certified transcript of the deposition of Drew Madacsi as Person Most Knowledgeable for Lurking Class, LLC, taken July 26, 2018 in the underlying Case.

25.     The document attached as Exhibit 23 is a true and correct copy of Excerpts from the certified transcript of the deposition of Jesse Dawber as Person Most Knowledgeable for Sketchy Tank, LLC, taken July 26, 2018.

26.     The document attached as Exhibit 24 is a true and correct copy of Excerpts from the certified partial Trial transcript of testimony Jesse Dawber gave on September 17, 2018 at Trial of the underlying Case.

27.     The document attached as Exhibit 25 is a true and correct copy of Excerpts from the certified partial Trial transcript of testimony Jesse Dawber gave on September 18, 2018 at Trial of the underlying Case.

28.     The document attached as Exhibit 26 is a true and correct copy of Excerpts from the certified partial Trial transcript of testimony Drew Madacsi gave on September 20, 2018 at Trial of the underlying Case.

6

29.     The document attached as Exhibit 27 is a true and correct copy of August 11, 2017 email correspondence from Drew Madacsi to numerous other individuals working for the Class War apparel business. This document was produced by the Debtor and was admitted as Exhibit 5 at Trial.

30.     The document attached as Exhibit 28 is a true and correct copy of the Articles of Organization of Lurking Class, LLC, filed September 11, 2017. I obtained this document from the website of the California Secretary of State, and numerous witnesses confirmed that Lurking Class, LLC (like Sketchy Tank, LLC) was formed on September 11 of 2017 at the behest of Drew Madacsi.

31.     The document attached as Exhibit 29 is a true and correct copy of the transcript we have prepared from audio obtained by David Ortiz Esq. of the United States Trustee's office of the First Meeting of Creditors ("First Meeting") which was held on October 30, 2018. Evan Topol of my office was present for the entire First Meeting, and I attended the proceeding approximately ½ hour late. Both Mr. Topol and I, together with our staff, spent numerous hours listening to the audio and providing input into this transcript. I believe this exhibit is a true and correct transcript of the audio but it is possible there are minor transcription errors.

32.     The document attached as Exhibit 30 is a true and correct copy of e-mail correspondence between me and Douglas Flahaut, commencing November 5, 2018 and ending November 9, 2018. I initiated this e-mail exchange on Monday November 5, 2018, as a follow – up to the Informal Status Conference held before this Court on Friday, November 2, 2018. Specifically, Mr. Flahaut had mentioned in court that there was a "potential" transaction whereby intellectual property would be sold to a "potential buyer." After the hearing concluded, I asked the Debtor's counsel in the hallway who the potential buyer was; he confirmed my suspicion that it was STFU. Accordingly, I wrote the November 5, 2018, e-mail to request information about this potential transaction, and associated financial information concerning the Debtor, his assets, and his claimed liabilities. I have received little,

if any, information other than what we already knew, even as of the date this Declaration is signed. A telephone conference was nevertheless set up with the Debtor's counsel to discuss these matters, and a Stipulation for Relief from Stay, on the afternoon of November 7, 2018.

33. On Wednesday November 7, 2018, attorney Evan Topol of my office and I had a telephone conference with Mr. Dawber's attorneys Douglas Flahaut and Aram Ordubegian. One of the issues we discussed was our viewpoint that Class War, Inc. is quite viable and indeed currently profitable as an ongoing operating business, based upon its existing contracts, operations, and revenue in excess of $4,000,000. I specifically pointed out to them that, based upon the financials they actually filed with this Court on the Debtor's behalf, if royalties purportedly paid to STFU and professional fees paid to Hogan Lovell's and "consultants" were subtracted, this would reduce the expenses of Class War by approximately two million dollars ($2,000,000), generating significant seven figure profits which could be used to pay creditors.

34. Another issue which I raised with Mr. Dawber's counsel was that Drew Madacsi, the purported CEO of Class War, was overpaid, spent only a few days a month in California, and had orchestrated a scheme whereby a company owned by his secretary and located in the same exact suite as his office in Singapore (i.e., STFU) was fraudulently being paid millions of dollars, and was on track to be paid nearly two million dollars ("2,000,000") in 2018 in purported "royalties" for Jesse Dawber's art which Class War already used, and had the right to use, without paying anyone. I asserted to Mr. Flahaut and Mr. Ordubegian that Class War should immediately replace Mr. Madacsi with a CEO who knew what he was doing in the apparel business and was not involved in a scheme to send profits outside the United States, and that Jesse Dawber should immediately reject the purported license (a.k.a., Creative Agreement) between him and STFU such that Class War could stop paying an outrageous "royalty" to that company for images it

8

already had the right to use – and had used historically for years. I also asked numerous questions about how the purported multimillion dollar "royalty" Class War paid to STFU was calculated indicating that, based upon the amount represented on the financial statements, it appeared that royalty was being paid on each and every item Class War sold, and perhaps even in excess of that sum.

35. During our telephone conversation neither Mr. Ordubegian or Mr. Flahaut ever stated or inferred that they believed Class War needed "restructuring," and my assertion to them was that this was a very simple business. I specifically advised them that Class War had existing contracts and chains of distribution, and that the problem was that expenses were utterly excessive, including the outrageous payments to Hogan Lovells (based on the financials more than $1 million in legal and "consultant" fees for an eight day trial in September), Mr. Madacsi receiving over a quarter million dollars per year for three days of work per month, and STFU on track to receive more than $2 million in purported royalties in 2018. Mr. Dawber's counsel asserted that they were open to finding an appropriate candidate to replace Mr. Madacsi and I suggested to them that Matt Roberts (who ran Class War before Mr. Madacsi came on board in May of 2017) would be a potential candidate and already knew the business. I also told them that Mr. Schindler – who had previously run this business – could consult with a new CEO, and asked Mr. Dawber's counsel to keep us in the loop about a CEO successor.

36. There was no discussion whatsoever during our telephone conference, or at any other time, about hiring a "restructuring consultant" or anyone else who would *increase* the Class War payroll or add to its extraordinary and unnecessary expenditures. In fact, to reiterate, I informed the Debtor's attorneys that the problem was not with the revenue side, but with excessive expenses, and that the very financial statements they had filed with this Court so verified. My assertion to them was that expenses could quickly and easily be reduced and that, if this was done, the company would return to generating seven figure profits which would

lead to a resolution of the Bankruptcy. I thought my message had gotten through. In fact, the Debtor's counsel even proposed to seek an injunction preventing Class War, Sketchy Tank, LLC, or any other entity affiliated with Mr. Dawber or the Debtor himself from paying the STFU royalty.

37.     Instead, after the close of business on Friday, November 9, 2018, I received an e-mail from Mr. Flahaut, informing me that they had hired a "Chief Re-Structuring Officer" for Class War.  We hastily investigated the background of this newly – disclosed individual whose retention had never even been suggested, and ascertained that he is an attorney who has a large law firm background and is located in Orange County.  My concern, of course, is that this individual will incur inordinate fees to be paid by a corporation which is already suffering under the weight of unnecessary and inordinate billing by numerous others.  Accordingly, as reflected in Exhibit 30, I wrote to Mr. Flahaut and Mr. Ordubegian that same evening, objecting to this turn of events which, from our perspective, is the type of counterproductive conduct which caused Mr. Dawber to end up in bankruptcy court in the first place.  I also sought information from the Debtor's attorneys about the new consultant's fees, but have never received it, or a copy of anything else I asked for.

38.     The document attached as Exhibit 31 is a true and correct copy of photographs of Exhibits 115 and 117 in the underlying Trial. As the Court can see, while the Brand has changed from "Sketchy Tank" to "Lurking Class," the design on this shirt is identical; this is the case for a wide variety of other products sold by the Schindler/Dawber Partnership as well.

I declare, under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I executed this Declaration on November 14, 2018, at San Diego, California.

/s/ DONALD A. VAUGHN

## TABLE OF EXHIBITS SUBMITTED IN SUPPORT OF
## MOTION TO APPOINT TRUSTEE

| EX. NO. | DOCUMENT | PG. NO. |
|---|---|---|
| 1. | Jesse Dawber / Sketchy Tank Biography | 13 |
| 2. | Fictitious Business Name Filing " Sketchy Tank" dated June 3, 2014 [Jesse Dawber] | 15 |
| 3. | Fictitious Business Name Filing " Sketchy Tank" dated January 25, 2016 [Class War, Inc.] | 17 |
| 4. | August 14, 2015 Partnership Agreement between Jesse Dawber and Jack Schindler [1 page summary and 2 page signed Agreement] | 19 |
| 5. | Class War, Inc. Statement of Information filed May 9, 2017 | 23 |
| 6. | Class War, Inc. Statement of Information, filed December 4, 2017 | 25 |
| 7. | List of Registered Intellectual Property [Dkt. 19, pp. 40-43] | 27 |
| 8. | STFU "Creative Agreement" license dated June 5, 2017 with Class War, Inc. | 31 |
| 9. | STFU "Creative Agreement" license dated June 30, 2017 with Jesse Dawber [unsigned] | 42 |
| 10. | Class War, Inc. Profit and Loss - 2016 | 53 |
| 11. | Class War, Inc. Profit and Loss – 2017 | 58 |
| 12. | Class War, Inc. Profit and Loss – 2018 through August | 62 |
| 13. | Class War, Inc. Profit and Loss – through September 30, 2018 [Dkt. 18, pp. 24-26] | 67 |
| 14. | Class War, Inc. Balance Sheet as of September 1, 2018 | 71 |
| 15. | Class War, Inc. Balance Sheet as of September 30, 2018 [Dkt. 18, pp. 20-22] | 76 |
| 16. | September 25, 2018 Verdict against Jesse Dawber and Class War, Inc. | 80 |
| 17. | License Agreement dated February 27, 2017 between Class War, Inc. and Zumiez | 85 |

| | | |
|---|---|---|
| 18. | Amended and Restated License Agreement dated March 3, 2018 between Class War, Inc. and Zumiez | 98 |
| 19. | Sketchy Tank, LLC Profit and Loss – 2018 through August | 113 |
| 20. | Drew Madacsi Information [Alliance Brands Limited, MMP Resources Limited and The House of Machines] | 115 |
| 21. | Excerpts of deposition of Jesse Dawber taken October 21, 2015 | 118 |
| 22. | Excerpts of deposition of Drew Madacsi as Person Most Knowledgeable for Lurking Class, LLC, taken July 26, 2018 | 131 |
| 23. | Excerpts from deposition of Jesse Dawber as Person Most Knowledgeable for Sketchy Tank, LLC, taken July 26, 2018 | 159 |
| 24. | Trial transcript of testimony of Jesse Dawber on September 17, 2018 | 189 |
| 25. | Trial transcript of testimony of Jesse Dawber on September 18, 2018 | 254 |
| 26. | Trial transcript of testimony by Drew Madacsi on September 20, 2018 | 287 |
| 27. | E-mail correspondence dated August 11, 2017 by Drew Madacsi [$20,000,000 business] | 327 |
| 28. | Articles of Organization of Lurking Class, LLC, dated September 11, 2017 | 329 |
| 29. | Transcript of First Meeting of Creditors October 30, 2018 | 332 |
| 30. | E-mail correspondence between Donald Vaughn and Douglas Flahaut commencing November 5, 2018 and ending November 9, 2018 | 371 |
| 31. | Photographs of Trial Exhibits 115 and 117 [Sketchy Tank/Lurking Class products] | 379 |

# EXHIBIT 1

## Jesse Dawber/Sketchy Tank Biography


# ABOUT

SHARE  f 🐦 8+ ✉

Sketchy Tank is an artist. He started out on his darkly humorous path at an early age, often found drawing skulls and dicks in third grade. As an adult, Sketchy collected NSFW images including twisted visuals of terrible tattoos, and pre-meme hilarity. The folder filled up, and Sketchy Tank turned this massive collection of madness in to a blog—TheSketchyTank.com. The blog grew in popularity and Sketchy started adding his own illustrations to the pictorial mix. Soon these graphics and illustrations became the most popular part of the site, eventually becoming the Lurking Class®.



Lurking Class® is a brand based on the artwork of Sketchy Tank. Every illustration has a story behind it or a crass dose of social commentary, meant to "disturb the comfortable, and comfort the disturbed". Lurking Class is made for a growing union of like-minded individuals for whom normalcy is not an option. The underground meets the masses.

# EXHIBIT 2

**Fictitious Business Name Filing "Sketchy Tank" dated June 3, 2014 [Jesse Dawber]**

2014

☐ Identity Copies

Book / Page:

Document Number: 2014-015230

Search Results

File Date: 6/3/2014

Book Type: FBN - Fictitious Business Name Records

Book / Page: /

FBN #: 2014-015230

Secondary #:

Number of Pages:

Doc Type: FBN - FICTITIOUS BUSINESS NAME STATEMENT

# of Businesses: 1

# of Owners: 1

Fictitious Business Names: SKETCHY TANK

Registrant Name & Address: DAWBER JESSE

Business Conducted By: A - An Individual

Expiration Date: 6/3/2019

# EXHIBIT 3

**Fictitious Business Name
Filing "Sketchy Tank" dated
January 25, 2016
[Class War, Inc.]**

N 16

Book / Page:

Document Number: 2016-001978

Search Results

File Date: 1/25/2016

Book Type: FBN - Fictitious Business Name Records

Book / Page:

FBN #: 2016-001978

Secondary #:

Number of Pages: 1

Doc Type: FBN - FICTITIOUS BUSINESS NAME STATEMENT

# of Businesses: 1

# of Owners: 1

Fictitious Business Names: SKETCHY TANK

Registrant Name & Address: CLASS WAR INC

Business Conducted By: A Corporation

Business Begin Date: 5/13/2015

Proofs of Publication: 322533

Expiration Date: 1/25/2021

# EXHIBIT 4

**August 14, 2015 Partnership Agreement between Jesse Dawber and Jack Schindler [1 Page Summary and 2 page Signed Agreement]**

Sketchy Tank X Jack Schindler Distribution/Partnership Agreement

The below document plans to outline the structure and organization of the Distribution Partnership between the Sketchy Tank Brand and Jack Schindler. For any issues no outlined in this agreement standard practice of a vote with 50% Sketchy Tank and 50% Jack Schindler Voting rights will apply.

Brand Equity-

Currently 100% equity in the brand trademark is held by Sketchy Tank (Jesse Dawber). Equity will transfer to Jack Schindler at the rate of 5% for every $50,000 in Gross sales up to 20% and an additional 5% once gross sales hit $350,000 for a maximum of 25% ownership. (this would be $350,000 in lifetime sales for the brand at wholesale)

If at any point Jack Schindler decides to leave the partnership and stop working on the brand, Sketchy Tank will regain 15% of company ownership from Jack Schindler. (In the case that Jack owns less than 15% all shares will be transferred to Sketchy Tank but no debt will be incurred)

Any ownership possessed by Jack Schindler is of the trademark only and does not entitle him to any portion of tax liability or revenue of Sketchy Tank aside for the payments as outlined below (compensation

Compensation-

On each sale 40% of profits, (gross sales less Cost of Goods Sold) will be paid to Sketchy Tank as a royalty. 40% of profits will be paid to Jack Schindler and 20% will be held as as cash flow for the business in the Sketchy Tank Bank account. The balance of the business account will be evaluated no less then ever 3 months and can be distributed to Sketchy Tank and Jack Schindler at a 50%/50% distribution rate pending a unanimous vote for distribution. All expenses to be paid from this account must also have a unanimous vote.

-All Payments will be made at the beginning of each month for the money received the previous month.

-Cost of Goods Sold debt will be paid immediately for all orders shipped and received and any open stock in the warehouse, this payment will occur before any royalty payments are made.

-All inventory in the warehouse is owned 50%/50% between Sketchy Tank and Jack Schindler.

-Commissions- Rep Commissions will be paid at a rate of 10%, these will be paid at the beginning of each month on money received the previous month. This expense will be added to the cost of goods sold and be paid before any royalty payments.

- 100% profit revenue for Sketchytank web store sales are property of Sketchy Tank

Expenses-

Each party is responsible for their respective taskes (Sketchy Tank- Design/Marketing, Jack Schindler- Sales/Operations) any expenses or staffing that directly falls under these responsibilities will be paid for by the responsible party direct. The business account will pay for joint expenses, Website, inventory, advertising, etc. Any joint expense is subject to a unanimous vote.

Term-

This agreement is good for the term of 1 year, after this point parties will re-evaluate the structure and make necessary changes.

Jack Schindler has distribution rights to the sketchy tank brand for a minimum of 3 years provided he reaches sales goales of ( $30,000 year one and minimum of 20% growth each additional year)

Mediation-

Both parties agree to resolve any issues and differences from the 50/50 voting structure with business mediation. A mediator must be agreed upon by both parties and the decision of mediation is binding.

006-001

Sketchy Tank X Jack Schindler Distribution Partnership Agreement

The below document plans to outline the structure and organization of the Distribution Partnership between Jay Sketchy Tank Brand and Jack Schindler. For any issues no outlined in this agreement standard practice of a split will 50% Sketchy Tank and 50% Jack Schindler Voting rights will apply.

## Brand Equity -

Currently 100% equity in the brand trademark is held by Sketchy Tank (Jesse Dawber). Equity will transfer to Jack Schindler at the rate of 5% for every $50,000 in Gross sales up to 20% and an additional 1% once gross sales hit $350,000 for a maximum of 25%. (This would be $250,000 in lifetime sales for the brand at wholesale.

If at any point Jack Schindler decides to leave the partnership and stop working on the brand, Sketchy Tank will regain 15% of company ownership from Jack Schindler. (In the case that Jack owns less than 15% all shares will be transferred to Sketchy Tank but no debt will be incurred.

Any ownership possessed by Jack Schindler is of the trademark only and does not entitle him to any portion of tax liability or revenue of Sketchy Tank aside for the payments as outlined below compensation.

## Compensation -

On each sale 40% of gross sales (gross sales less cost of goods Sold) will be paid to Sketchy Tank as a royalty. 40% of profits will be paid to Jack Schindler and 20% will be held as a cash flow for the business in the Sketchy Tank Bank account. The balance of the business account will be evaluated no less then every 3 months and can be distributed to Sketchy Tank and Jack Schindler at a 50%/50% distribution rate pending a unanimous vote for distribution. All expenses to be paid for a this account must also have a unanimous vote.

-All Payments will be made at the beginning of each month for the money received the previous month.

-Cost of Goods Sold debt will be paid immediately for all orders shipped and received and any open stock in the warehouse, this payment will occur before any royalty payments are made.

-All inventory in the warehouse is owned 50%/50% between Sketchy Tank and Jack Schindler

-Commissions- Rep Commissions will be paid at a rate of 10%, these will be paid at the beginning of each month on money received the previous month. This expense will be added to the cost of goods sold and be paid before any royalty payments.

-100% profit on sales for sketchytank web store sales are property of Sketchy Tank

## Expenses -

Each party is responsible for their respective tasks (Sketchy Tank - Design/Marketing, Jack Schindler - Sales/Operations) any expenses of stating that directly falls under these responsibilities will be paid for by the responsible party direct. The business account will pay for joint expenses. Website, material _____. Any joint expense is subject to a unanimous vote.

## Term-

This agreement is good for the term of 1 year. At this point both parties will re-evaluate the structure and make necessary changes.

Jack Schindler has distribution rights to the sketchy tank brand for a minimum of 3 years provided he matches sales goales of ( $30,000 year one and minimum of 20% growth each additional year.

Mediation-
Both parties agree to resolve any issues and differences from the 50/50 voting structure with business mediation. A mediator must be agreed upon by both parties and the decision of mediation is binding.

8/14/14

Jack Schindler          8/14/14

# EXHIBIT 5

## Class War, Inc. Statement of Information filed May 9, 2017

## State of California
### Secretary of State

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**S**

**FM61866**

# FILED

In the office of the Secretary of State
of the State of California

**MAY-09 2017**

1. CORPORATE NAME

CLASS WAR, INC

2. CALIFORNIA CORPORATE NUMBER   C3787289

*This Space for Filing Use Only*

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 17.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>528 2ND ST ENCINITAS, CA, CA 92024 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>528 2ND ST ENCINITAS, CA, CA 92024 | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>JESSE DAWBER | 468 PUEBLA ST, ENCINITAS, CA 92024 | | | |
| 8. SECRETARY<br>JESSE DAWBER | 468 PUEBLA ST, ENCINITAS, CA 92024 | | | |
| 9. CHIEF FINANCIAL OFFICER/<br>JESSE DAWBER | 468 PUEBLA ST, ENCINITAS, CA 92024 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME<br>JESSE DAWBER | 468 PUEBLA ST, ENCINITAS, CA 92024 | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
MATT ROBERTS

15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL   CITY   STATE   ZIP CODE
245 NEPTUNE AVE, ENCINITAS, CA 92024

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
T-SHIRT SALES

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 05/09/2017 | MATT ROBERTS | OPERATIONS | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013)     Page 1 of 1     APPROVED BY SECRETARY OF STATE

# EXHIBIT 6

# Class War, Inc. Statement of Information filed December 4, 2017

# State of California
## Secretary of State

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

S

**FS67589**

# FILED

In the office of the Secretary of State
of the State of California

**DEC-04 2017**

| 1. CORPORATE NAME |
|---|
| CLASS WAR, INC |

| 2. CALIFORNIA CORPORATE NUMBER | This Space for Filing Use Only |
|---|---|
| C3787289 | |

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 17**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 528 2ND STREET, ENCINITAS, CA 92024 | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | 528 2ND STREET, ENCINITAS, CA 92024 | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ DREW MADACSI | 528 2ND STREET, ENCINITAS, CA 92024 | | | |
| 8. SECRETARY JESLYN LEONG | 528 2ND STREET, ENCINITAS, CA 92024 | | | |
| 9. CHIEF FINANCIAL OFFICER/ JESLYN LEONG | 528 2ND STREET, ENCINITAS, CA 92024 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME DREW MADACSI | 528 2ND STREET, ENCINITAS, CA 92024 | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY   0

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

| 14. NAME OF AGENT FOR SERVICE OF PROCESS |
|---|
| MATT ROBERTS |

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 528 2ND STREET, ENCINITAS, CA 92024 | | | |

**Type of Business**

| 16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION |
|---|
| SALES AND LICENSING |

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT

| 12/04/2017 | TARA PELAN | ATTORNEY | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| Si-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

# EXHIBIT 7

## List of Registered Intellectual Property [Dkt. 19, pp. 40-43]

# EXHIBIT 1
# to Schedule A/B -
# Question 26:
# Intellectual Property

| Country Name | Literal Mark | Mark Type | Application # | Application Date | Registration # | Registration # Date | Publication Date | Applicants | Status | Status Date | Docket # | Class Numbers | Class Descriptions | Clients |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | bottoms, shirts, t-shirts, sweatshirts, hooded sweatshirts, sweatpants, jackets, headwear, socks | Class War, Inc., |
| USPTO | CLASS WAR | Standard character mark | 86955010 | 3/28/2016 | | | 6/21/2016 | Class War, Inc. | Third extension request granted 2/14/2018 | | 20221-T010 | 025, 035 | Online retail store services | Class War, Inc. |
| Australia (AU) | SKETCHY TANK | Standard character mark | 1771506 | 5/18/2016 | 1771506 | 5/5/2017 | 2/2/2017 | Class War, Inc. | AUSTRALIA_REGISTRATION 5/5/2017 | | SK20221-T002-AU | 025 | bottoms, shirts,t-shirts, sweatshirts, hooded | Class War, Inc. Class War, Inc. |
| Brazil (BR) | SKETCHY TANK | Standard character mark | 012479353 | 3/24/2017 | | | 4/11/2017 | Class War, Inc. | OPPOSITION_FILED | 6/7/2017 | 20221-T015-BR | 025 | Costumes, namely, tops, bottoms, t-shirts, hoodies, | Class War, Inc. Class War, Inc. |
| | | | | | | | | | | | | | hooded tops, knit tops, sweat tops, tank tops, short sleeve tops, long sleeve tops, | |
| Canada (CA) | SKETCHY TANK | Standard character mark | 1784495 | 5/27/2016 | TMA984,971 | 11/15/2017 | 6/28/2017 | Class War, Inc. | CANADA_REGISTERED | 11/15/2017 | 150513-TM004-CA | 025 | sweat pants, pants, shirts, t-shirts, sweatshirts, hooded | Class War, Inc. Class War, Inc. |
| China (CN) | SKETCHY TANK | Standard character mark | 20205826 | 6/6/2016 | 20205826 | 7/28/2017 | 4/27/2017 | Class War, Inc. | CHINA_REGISTRATION | 7/28/2017 | 20221-T001-CN | 025 | Clothing, Shirts, T-Shirts, Pants, Jackets [clothing], | Class War, Inc. Class War, Inc. |
| EUIPO (EM) | SKETCHY TANK | Standard character mark | 15452709 | 5/18/2016 | 15452709 | 10/5/2016 | 6/28/2016 | Class War, Inc. | EUROPEAN_UNION_REGISTRATION | 10/5/2016 | 20221-T003-EM | 025 | buttoms, shirts t-shirts, sweatshirts, hooded | Class War, Inc. |
| | | | | | | | | | | | | | Tops, bottoms, shirts, t-shirts; sweatshirts, hooded | Class War, Inc. |
| Japan (JP) | SKETCHY TANK | Standard character mark | 2016-59239 | 6/1/2016 | 5942677 | 4/28/2017 | 5/30/2017 | Class War, Inc. | JAPAN_REGISTRATION | 4/28/2017 | 20221-T035-JP | 025 | sweatshirts, sweatpants. | Class War, Inc |
| | | | | | | | | | | | | | Clothes underwear, pajamas; sweaters, shirts, suits, coats | |
| Taiwan (TW) | SKETCHY TANK | Standard character mark | 105017281 | 3/27/2017 | 1874678 | 10/16/2017 | | Class War, Inc. | TAIWAN_REGISTRATION | 10/16/2017 | 20221-T016-TW | 025 | jackets sportswear, shoes, | |
| | | | | | | | | | | | | | bottoms shirts, jackets sweat pants, hooded | |
| USPTO | SKETCHY TANK | Standard character mark | 86505940 | 4/13/2015 | 5234548 | 7/4/2017 | 4/18/2017 | Jesse Dawber, CLASS WAR, INC. | Registered - Principal Register 7/3/2017 | | 20221-T007 | 025 | sweatshirts headwear First use 1/1/2010 | Class War, Inc., Class War, Inc. |
| | | | | | | | | | | | | | First use 1/1/2014 Use in commerce 1/1/2014 | |
| | | | | | | | | | | | | | Clothing, namely, tops bottoms, t-shirts, hooded sweatshirts, jackets headwear First use 1/1/2010 Use in commerce 1/1/2010 | |
| USPTO | SKETCHY TANK | Standard character mark | 87155086 | 8/30/2016 | 5367477 | 1/2/2018 | 10/17/2017 | Class War, Inc. | Registered - Principal Register 1/1/2018 | | 20221-T008 | 014, 025, 026 | Cloth and embroidered patches for clothing | Class War, Inc., Class War, Inc. |
| | | | | | | | | | | | | | Clothing, namely, tops, bottoms, shirts, t-shirts, sweatshirts hooded sweatshirts, sweatpants, jackets, headwear First use 1/1/2011 | |
| USPTO | ST and Design | Logotype | 85981857 | 2/2/2016 | 5188154 | 4/18/2017 | 6/21/2016 | Class War, Inc. | Registered - Principal Register 4/17/2017 | | 20221-T012 | 025 | Use in commerce 1/1/2011 | Class War, Inc. Class War, Inc. |
| | | | | | | | | | | | | | Online retail store services featuring clothing, cloth and embroidered patches for clothing, insulating sleeve holders for beverage cans, | |
| USPTO | ST and Design | Logotype | 86894447 | 2/2/2016 | | | 6/21/2016 | Class War, Inc. | Third extension request granted 2/19/2018 | | 20221-T011 | 035 | lapel pins | Class War, Inc., Class War, Inc. |

| Country Name | Literal Mark | | Mark Type | Application Application # Data | Registration # | Registration Date | Publication Date | Applicants | Status | Status Date | Docket # | Class Numbers | Class Descriptions | Clients |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Brazil (BR) | Design of Lurk |  | Logo | 912479515   3/24/2017 | | | 4/11/2017 | Class War, Inc., LURKING CLASS, LLC | FILED | 3/24/2017 | 20221-T013-BR | 025 | [translated from Portuguese] Costumes, namely, tops, bottoms, t-shirts, hoodies, jackets, socks, headgear, articles of headgear | Class War, Inc., Class War, Inc. |
| Japan (JP) | Design of Lurk |  | Logo | 2016-103888 9/26/2016 | 5942879 | 4/28/2017 | 5/30/2017 | Class War, Inc., LURKING CLASS, LLC | JAPAN_REGISTRATION | 4/28/2017 | 20221-T009-JP | 025 | [translated from Japanese] Tops, bottoms, shirts, t-shirts, sweatshirts, hooded sweatshirts, sweatpants, jackets, headwear, socks, other clothing | Class War, Inc., Class War, Inc. |
| Taiwan (TW) | Design of Lurk |  | Logo | 106017280   3/27/2017 | 1874677 | 10/16/2017 | | Class War, Inc., LURKING CLASS, LLC | TAIWAN_REGISTRATION | 10/16/2017 | 20221-T014-TW | 025 | [translated from Chinese] Clothes, underwear, pajamas, sweaters, shirts, suits, coats, jackets, sportswear, shoes, scarves, head, towel, bow tie, cold hood, hat, socks, belt First use: 11/1/2015 Use in commerce 3/1/2016 | Class War, Inc., Class War, Inc. |
| USPTO | Design of Lurk |  | Logotype | 87410319 | 4/13/2017 | 5334715 | 11/14/2017 | 8/29/2017 | Class War, Inc., LURKING CLASS, LLC | Registered - Principal Register | 11/13/2017 | 20221-T017 | 009, 014, 025, 026 | lapel pins First use: 2/1/2014 Use in commerce 8/1/2014 | Class War, Inc., Class War, Inc. |

# EXHIBIT 8

**STFU "Creative Agreement" license dated June 5, 2017 with Class War, Inc.**

CREATIVE AGREEMENT

Between

STFU GLOBAL PTE LTD

And

CLASS WAR, INC.

32

# CREATIVE AGREEMENT

THIS CREATIVE AGREEMENT ("Agreement" herein), dated as of June 5, 2017 is entered into by and between **STFU GLOBAL PTE LTD. (the "Creative Partner")**, located at 6 Eu Tong Sen Street, Soho 1 #12-20, Clarke Quay Central, Singapore 059817 and **CLASS WAR, INC.** located at 528 2nd Street, Encinitas CA 92024 (the "**Agent**"), with reference to the following facts:

A. Agent and Creative Partner have agreed that the Agent shall be granted certain rights to, inter alia the name(s), images, artwork, graphics, trade name and trademarks of the Creative Partner as delivered by Creative Partner to the Agent, as attached hereto as Exhibit A (collectively, "the Creative Content") for the consideration and conditions hereinafter set forth.

B. During the Term (as defined in Section 2 below), Creative Partner grants to the Agent, and Agent desires to accept without exception, and subject to the terms and conditions below, an exclusive right to use the Creative Content throughout selected territories, as attached hereto as Exhibit B (the "Territories").

NOW, THEREFORE, in consideration of the mutual covenants and undertakings hereinafter set forth, the Creative Partner and the Agent do hereby respectively grant, covenant and agree as follows:

1. RIGHTS OF USAGE.

1.1 Rights. Subject to the terms and conditions of this Agreement, the Creative Partner hereby grants to the Agent for the Term of this Agreement a limited and exclusive right to (i) use, copy, display and distribute the Creative Content solely on and in connection with the manufacture, import, export, sourcing, marketing, advertising, promotion, distribution and sale in the Territories and (ii) to transfer the rights set forth in this Section 1 to authorized third parties approved by the Creative Partner to the extent necessary for the Agent and its affiliates to exercise the right herein.

1.2 Physical Inventory. Subject to the terms and conditions of this Agreement and the payment of royalties as set forth in Section 6, the Agent shall have a period of twelve (12) months after the termination or expiration of this Agreement ("Sell Off Period") to market, advertise, promote, distribute and sell (i) any products in its inventory at the time of such termination or expiration and (ii) any products that were ordered by customers prior to the expiration or termination of this Agreement (such products, "Inventory"). Upon the Creative Partner's request, the Agent shall provide the Creative Partner with a complete schedule of the Inventory within five (5) business days following the expiration or termination of this Agreement. For the avoidance of doubt, except with respect to the Inventory during the Sell Off Period, the rights granted under Section 1.1 shall end immediately upon the expiration or termination of this Agreement and the Agent shall have no right to any further use of the Creative Content in any form or manner in any part of the Territory after such expiration or termination, and shall cause the complete cessation and discontinuation of any such further use.

1.3 Reservation of Rights. All rights, title and interests not specifically granted herein are expressly reserved by the Creative Partner, as attached hereto as Exhibit A. Unless otherwise agreed in writing between the parties hereto, the Agent shall not have the right to manipulate or alter the character or appearance of the Creative Content (e.g., dissecting a mark) in connection with any use or exploitation hereunder, including, without limitation, for promotional or marketing purposes. No use of the Creative Content shall disparage or reflect adversely upon the Creative Partner or the Creative Content, or place the Creative Partner or the Creative Content, or its brand or goodwill, in a negative light.

2. TERM. Unless sooner terminated by either party in accordance with the provisions of this Agreement, the term of this Agreement (the "Term") and the rights granted hereby shall commence on the date of this Agreement and expire December 31, 2020, if not extended in writing by both the Creative Partner and the Agent or earlier terminated.

3.    PROMOTIONAL OBLIGATIONS.

    3.1    Promotional Activities.  The Creative Partner agrees to provide the following promotional activities to promote and market the Creative Content: (i) participate in mutually agreed upon activities to help merchandise, promote, market, including, without limitation, video and photo shoots, online and social media promotions (including, Facebook, Instagram, & Twitter updates), other promotions and press releases; and (iii) provide the Agent with suitable Creative Content for use on or in connection with the packaging, merchandising, promotion, marketing and sale (both at the trade and consumer level).

    3.2    Social Media.  During the Term, the Creative Partner will, upon the Agent's request, engage in online, and social media promotions for the promotion, including, without limitation, posting pictures, and updates.

    3.3    Joint Press Release.  Prior to the release of products, the Parties may issue a joint press release regarding the transactions contemplated by this Agreement. The final content of such joint press release will be agreed upon by the Parties.

4.    QUALITY CONTROL.

    4.1    Approval.  Before engaging in any manufacture of products, the Agent shall submit to the Creative Partner, for prior approval, all designs and specifications for products to be marketed by the Agent, together with any and all promotional and advertising material associated therewith.  The Creative Partner agrees to approve or disapprove the products in writing (email sufficing) within five (5) business days of the receipt of such submission by the Agent. Such approval shall not be unreasonably withheld, conditioned or delayed. If disapproval of the products is not given by the Creative Partner within such time period, the products shall be deemed approved.

    4.2    Control Standards.  The Agent shall cause the products to be manufactured in accordance with the samples and standards of quality submitted to and approved by the Creative Partner, including, without limitation, in connection with materials, design, workmanship and use ("Control Standards").  The Agent shall not materially depart from the Control Standards without the Creative Partner's advance written consent, which shall not be unreasonably withheld or delayed, it being acknowledged that any necessary substitutions or material changes to the products or the manufacture thereof shall be of a standard of quality at least equal or comparable to the Control Standards.

5.    INTELLECTUAL PROPERTY OWNERSHIP RIGHTS.

    5.1    Ownership of the Creative Content.  The Agent acknowledges, understands and agrees that Creative Partner has sole and exclusive ownership of all right, title, and interest in and to the Creative Content, and all registrations and applications therefor. The Agent further acknowledges, represents, and warrants that it has not acquired, and shall not acquire, whether by operation of law, this Agreement, or otherwise, any right, title, interest, or other ownership in or to the Creative Content or any modifications, improvements or derivatives thereof. Should any such right, title, interest, or other ownership become vested in the Creative Partner by operation of law, this Agreement will be seen to have lapsed. The Creative Partner shall provide notice within five (5) business days to the Agent of any such right, title, interest, or other ownership in the Creative Partner by operation of law.

    5.2    The Agent's Intellectual Property.  The Agent is the sole and exclusive owner of its property including but not limited to its intellectual property, products and the Products excluding the Creative Content.

6. ROYALTIES, ACCOUNTING AND AUDIT.

6.1 Royalties. As consideration for the rights granted hereunder, the Agent shall pay to the Creative Partner royalties equal to the specified amount listed under Exhibit C (the "Royalty Payments"). The Agent shall provide the Creative Partner written accounting, and any specified supporting documentation ("Supporting Documentation"), bi-annually. The Supporting Documentation shall be accompanied by evidence of a wire transfer to the Creative Partner's nominated global account of the amounts due, if any, within Fourteen (14) days from the conclusion of every sixth (6) month of the Agreement.

6.2 Form and Manner of Payments. Unless otherwise specified in writing by the Creative Partner, all payments by the Agent under this Agreement shall be made in United States dollars to the Creative Partner's nominated global account. Payments shall be by wire transfer, unless otherwise agreed by the parties.

6.3 Taxes. The Creative Partner shall have full and exclusive liability for the payment of any taxes related to the payments received under this Agreement. The Agent shall not be entitled to withhold from any payment under this Agreement required to be withheld under the applicable tax laws associated to the Agent.

6.4 Audit. The Agent shall maintain books and records used by it in the calculation of the Royalty Payments payable to the Creative Partner hereunder. The Creative Partner may at its sole cost and expense appoint an independent certified public accountant to examine and audit such books and records, during the Agent's normal business hours, for the purpose of verifying the accuracy of the written accountings rendered hereunder ("Audit"), provided reasonable advance written notice and in no event more than once per year. Any such Audit shall take place during business hours where the Agent maintains such books and records. The Creative Partner shall nominate a representative to oversee all accounts associated to the Creative Works under the control of the Agent, and the Agent will undertake all corporate steps to give the nominated representative full access to all relevant accounts.

7. REPRESENTATIONS AND WARRANTIES

7.1 Creative Partner. The Creative Partner represents and warrants that: (i) it is the sole and exclusive owner of the Creative Content, (ii) as provided to the Agent by the Creative Partner, the Creative Content is original and does not infringe upon or violate the rights of any third party, (iii) the Creative Content is not knowingly confusingly similar to any other trademarks or designs used in the Territories, (iv) the Creative Partner entering into and performing this Agreement will not conflict with or violate any agreements or obligations the Creative Partner may have with any other person or entity and (v) the use of the Creative Content by the Agent as lawfully and permitted under the license grant in this Agreement will not violate or infringe the rights of any third party.

7.2 Agent. The Agent represents and warrants that: (i) it has the full right, authority and power to enter into and fully perform all the terms and provisions of this Agreement, (ii) the Agent entering into and performing this Agreement will not conflict with or violate any agreements or obligations the Agent may have with any other person or entity, (iii) it shall be solely responsible for the manufacture, production, sale and distribution of products and shall bear all related costs associated therewith and (iv) the Agent shall use best efforts to promote, market, sell and distribute the products in compliance with the Control Standards.

8. INDEMNITY.

8.1 At the other party's request, each party hereto ("Indemnitor") shall indemnify and defend the other party and such other party's parent, successors, subsidiaries, affiliates, directors, offices, employees, distributors and agents (jointly and severally, "Indemnitee") against any third party claim or action ("Claim") which would constitute a breach of this Agreement by the Indemnitor, provided that such Claim has resulted in an adverse judgment or settled with the other party's advance written consent, which shall not be unreasonably withheld or delayed. The Indemnitor shall further indemnify and hold the Indemnitee free and harmless from and against any costs, expenses, damages and fees actually incurred by the

Indemnitee in connection with any such Claim, including but not limited to reasonable fees and costs for outside counsel and experts.

8.2     Each party hereto shall provide the other party reasonably prompt notice in writing of any such Claim.

8.3     If the Indemnitor is requested to defend any Claim, the Indemnitee shall permit the Indemnitor to answer and defend such Claim through counsel mutually acceptable to the parties hereto and shall provide Indemnitor with any information, assistance and authority, at Indemnitor's expense, as reasonably necessary and practicable to help Indemnitor defend the Claim. Indemnitee shall retain the right to employ separate counsel to participate in the defense of any Claim at Indemnitee's own expense.

9.     TERMINATION

9.1     Breach of the Agreement.  A party may immediately terminate this Agreement if the other party is in material breach of this Agreement and that party fails to cure that breach within thirty (30) days (or fifteen (15) days for failure to pay monies owed) after receiving written notice of breach from the non-breaching party.

9.2     Effect of Expiration or Termination.  Except with respect to Agent's limited right with respect to the Inventory during the Sell Off Period as set forth in Section 1.2, upon the expiration or termination of this Agreement, all rights in the Creative Content shall automatically revert to the Creative Partner, and the Agent shall cease use of the Creative Content.

9.3     Survivorship.  For the avoidance of doubt, the following provisions shall survive expiration or termination of this Agreement, subject to the terms and conditions hereof:  1.2 (Sell Off Period), 5 (Intellectual Property Rights), 6 (Royalties and Accounting), 7 (Representations and Warranties), 8 (Indemnity), 9.2 (Effect of Expiration or Termination), 9.3 (Survivorship) and 10 (General).

10.     GENERAL

10.1     Confidentiality.  The terms and conditions of this Agreement are confidential and neither party shall disclose such terms to any third party without the consent of the other party, except to the extent as may be required by law or as necessary to effectuate or enforce this Agreement.

10.2     Amendment.  This Agreement may only be amended in a writing signed by both parties.

10.3     Waiver.  The failure of a party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered a waiver or deprive or limit that party's right thereafter to insist upon strict adherence to that provision in the particular instance or that provision or any other provision of this Agreement in any instance.

10.4     No Assignment.  This Agreement is personal to the Creative Partner, and the Creative Partner shall not assign or transfer any of its rights or delegate any of its obligations under this Agreement.  Any attempted assignment, transfer, or delegation in violation of this provision or by virtue of the operation of law shall be void.

10.5     Bind and Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties and their respective successors, and permitted assigns and transferees, if any.

10.6     Independent Contractors.  The Creative Partner and the Agent have entered into this Agreement as independent contractors only.  Nothing contained in this Agreement places or shall be construed to place the parties in the relationship of partners, joint venturers, agent/principal, employer/employee or legal representation, and neither party shall have no authority or power to obligate or bind the other party.

10.7    Severability. If any provision of this Agreement shall be found or be held to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable and the parties shall negotiate, in good faith, a substitute, valid and enforceable provision which most nearly effects their intent in entering into this Agreement.

10.8    Governing Law and Jurisdiction. The parties agree that this Agreement shall be construed, interpreted, governed, and applied in accordance with the laws of Singapore, without regard to its rules with respect to conflicts of laws.

10.9    Attorneys' Fees. All fees and costs incurred (including, without limitation, the reasonable outside attorneys' fees and costs of the prevailing party) in connection with any action or proceeding between the parties hereto to enforce the terms and provisions of this Agreement shall be paid by the non-prevailing party.

10.10   Notices. Any notice shall be in writing and shall be considered delivered (i) upon receipt when delivered personally, (ii) upon signature receipt when delivered by courier or (iii) upon receipt of registered or certified mail with return receipt requested, to the parties at the following addresses (or at such other addresses as a party may specify by notice to the others):

Creative Partner:          STFU Global Pte Ltd
                           6 Eu Tong Sen Street
                           Soho 1 #12-20
                           Clarke Quay Central
                           Singapore 059817
                           Attn: Ms. Jeslyn Leong

Agent:                     Class War, Inc.
                           528 2nd Street
                           Encinitas, CA 92024
                           Attention: Mr. Drew Madacsi

10.11   Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements, understandings, commitments, negotiations, and discussions, whether oral or written. This Agreement may be executed in counterparts and delivery of an executed signature page by email of a PDF file shall constitute delivery of an executed original.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have executed this Agreement as of the date first above written.

CREATIVE PARTNER:                              AGENT:

STFU Global Pte Ltd.                            Class War, Inc.

By: _____                    By: _____

Name: _Jessan Lewis_____                Name: _Drew Madacsi_____

                                                Title: _CEO_____

Date: _5 June 2017_____                 Date: _7 June 2017_____

38

EXHIBIT A

LICENSED CONTENT

1. As selected and mutually approved via the Creative Partner's artistic archives but will not exceed fifteen (15) new art pieces per calendar season.

EXHIBIT B

## TERRITORIES

1. United States of America
2. Canada

EXHIBIT C

## ROYALTY PAYMENTS

1. As consideration for the rights granted hereunder for the Creative Content, the Agent shall pay to the Creative Partner royalties equal to Fifty Percent (50%) of the "Wholesale" profit of products sold bearing the Creative Content. For the avoidance of doubt, if a Tee is sold for $12 to a Wholesale Account, the Cost of Goods being $6.00, the payable royalty would account for $3.00

# EXHIBIT 9

**STFU "Creative Agreement" license dated June 30, 2017 with Jesse Dawber [unsigned]**

CREATIVE AGREEMENT

Between

**STFU GLOBAL PTE LTD**

And

Jesse Dawber, and artist alias "Sketchy Tank"

# CREATIVE AGREEMENT

THIS CREATIVE AGREEMENT ("Agreement" herein), dated as of 30 June, 2017 is entered into by and between Jesse Dawber, and artist alias - Sketchy Tank (the "Creative Partner"), located at 468 Puelba Street, Encinitas, CA 92024 and STFU Global Pte Ltd, located at 6 Eu Tong Sen Street, Soho 1 #12-20, Clarke Quay Central, Singapore 059817 (the "Agent"), with reference to the following facts:

    A.      Agent and Creative Partner have agreed that the Agent shall be granted certain rights to manufacture, distribute, market, promote and sell apparel incorporating, inter alia the name(s), images, artwork, graphics, trade name and trademarks of the Creative Partner as delivered by Creative Partner to the Agent, as attached hereto as Exhibit A (collectively, the "Creative Content") for the consideration and conditions hereinafter set forth.

    B.      During the Term (as defined in Section 2 below), Creative Partner grants to the Agent, and Agent desires to accept without exception, and subject to the terms and conditions below, an exclusive right to use the Creative Content throughout selected territories, as attached hereto as Exhibit B (the "Territories") solely on and in connection with the agreed apparel and accessories (the "Products").

NOW, THEREFORE, in consideration of the mutual covenants and undertakings hereinafter set forth, the Creative Partner and the Agent do hereby respectively grant, covenant and agree as follows:

1.    RIGHTS OF USAGE.

    1.1    Rights.  Subject to the terms and conditions of this Agreement, the Creative Partner hereby grants to the Agent for the Term of this Agreement a limited and exclusive right to (i) use, copy, display and distribute the Creative Content solely on and in connection with the manufacture, import, export, sourcing, marketing, advertising, promotion, distribution and sale of the Products in the Territories and (ii) to transfer the rights set forth in this Section 1 to authorized third parties approved by the Creative Partner to the extent necessary for the Agent and its affiliates to exercise the right herein.

    1.2    Physical Inventory.  Subject to the terms and conditions of this Agreement and the payment of royalties as set forth in Section 6, the Agent shall have a period of two (2) months after the termination or expiration of this Agreement ("Sell Off Period") to market, advertise, promote, distribute and sell (i) any Products in its inventory at the time of such termination or expiration and (ii) any Products that were ordered by customers prior to the expiration or termination of this Agreement (such Products, "Inventory"). Upon the Creative Partner's request, the Agent shall provide the Creative Partner with a complete schedule of the Inventory within five (5) business days following the expiration or termination of this Agreement. For the avoidance of doubt, except with respect to the Inventory during the Sell Off Period, the rights granted under Section 1.1 shall end immediately upon the expiration or termination of this Agreement and the Agent shall have no right to any further use of the Creative Content in any form or manner in any part of the Territory after such expiration or termination, and shall cause the complete cessation and discontinuation of any such further use.

    1.3    Reservation of Rights.  All rights, title and interests not specifically granted herein are expressly reserved by the Creative Partner, as attached hereto as Exhibit A. Unless otherwise agreed in writing between the parties hereto, the Agent shall not have the right to manipulate or alter the character or appearance of the Creative Content (e.g., dissecting a mark) in connection with any use or exploitation hereunder, including, without limitation, for promotional or marketing purposes. No use of the Creative Content shall disparage or reflect adversely upon the Creative Partner or the Creative Content, or place the Creative Partner or the Creative Content, or its brand or goodwill, in a negative light.

2.    TERM.  Unless sooner terminated by either party in accordance with the provisions of this Agreement, the term of this Agreement (the "Term") and the rights granted hereby shall commence on the date of this Agreement and expire **December 31, 2020.**

3.    PROMOTIONAL OBLIGATIONS.

3.1    Promotional Activities.  The Creative Partner agrees to provide the following promotional activities to promote and market the Products: (i) participate in mutually agreed upon activities to help merchandise, promote, market and sell the Products, including, without limitation, video and photo shoots, online and social media promotions (including, Facebook, Instagram, & Twitter updates), other promotions and press releases; and (iii) provide the Agent with suitable Creative Content for use on or in connection with the packaging, merchandising, promotion, marketing and sale (both at the trade and consumer level) of the Products.

3.2    Social Media.  During the Term, the Creative Partner will, upon the Agent's request, engage in online, and social media promotions for the promotion of the Products, including, without limitation, posting pictures, and updates.

3.3    Joint Press Release.  Prior to the release of the Products, the Parties may issue a joint press release regarding the transactions contemplated by this Agreement. The final content of such joint press release will be agreed upon by the Parties.

4.    QUALITY CONTROL.

4.1    Approval.  Before engaging in any manufacture of the Products, the Agent shall submit to the Creative Partner, for prior approval, all designs and specifications for Products to be marketed by the Agent, including at least one (1) complete sample set of all Products which the Agent intends to manufacture, together with any and all promotional and advertising material associated therewith.  The Creative Partner agrees to approve or disapprove the Products in writing (email sufficing) within five (5) business days of the receipt of such submission by the Agent.  Such approval shall not be unreasonably withheld, conditioned or delayed.  If disapproval of the Products is not given by the Creative Partner within such time period, the Products shall be deemed approved.

4.2    Control Standards.  The Agent shall cause the Products to be manufactured in accordance with the samples and standards of quality submitted to and approved by the Creative Partner, including, without limitation, in connection with materials, design, workmanship and use ("Control Standards").  The Agent shall not materially depart from the Control Standards without the Creative Partner's advance written consent, which shall not be unreasonably withheld or delayed, it being acknowledged that any necessary substitutions or material changes to the Products or the manufacture thereof shall be of a standard of quality at least equal or comparable to the Control Standards.

5.    INTELLECTUAL PROPERTY OWNERSHIP RIGHTS

5.1    Ownership of the Creative Content.  The Agent acknowledges, understands and agrees that Creative Partner has sole and exclusive ownership of all right, title, and interest in and to the Creative Content, and all registrations and applications therefor. The Agent further acknowledges, represents, and warrants that it has not acquired, and shall not acquire, whether by operation of law, this Agreement, or otherwise, any right, title, interest, or other ownership in or to the Creative Content or any modifications, improvements or derivatives thereof.  Should any such right, title, interest, or other ownership become vested in the Creative Partner by operation of law, this Agreement will be seen to have lapsed. The Creative Partner shall provide notice within five (5) business days to the Agent of any such right, title, interest, or other ownership in the Creative Partner by operation of law.

5.2    The Agent's Intellectual Property.  The Agent is the sole and exclusive owner of its property including but not limited to its intellectual property, products and the Products excluding the Creative Content.

**45**

6.    FEE, ACCOUNTING AND AUDIT.

6.1    Fee.  As consideration for the rights granted hereunder for the Products, the Agent shall pay to the Creative Partner a Fee equal to the specified amounts listed under Exhibit C (the "Fee Payment"). The Agent will wire transfer to the Creative Partner's nominated global account amounts due, if any, within Fourteen (14) days from the conclusion of each calendar month.

6.2    Form and Manner of Payments.  Unless otherwise specified in writing by the Creative Partner, all payments by the Agent under this Agreement shall be made in United States dollars to the Creative Partner's nominated global account. Payments shall be by wire transfer, unless otherwise agreed by the parties.

6.3    Taxes.  The Creative Partner shall have full and exclusive liability for the payment of any taxes related to the payments received under this Agreement. The Agent shall not be entitled to withhold from any payment under this Agreement required to be withheld under the applicable tax laws associated to the Agent.

6.4    Audit.  The Agent shall maintain books and records used by it in the calculation of the Product Shipped and the Royalty Payments payable to the Creative Partner hereunder. The Creative Partner may at its sole cost and expense appoint an independent certified public accountant to examine and audit such books and records, during the Agent's normal business hours, for the purpose of verifying the accuracy of the written accountings rendered hereunder ("Audit"), provided reasonable advance written notice and in no event more than once per year. Any such Audit shall take place during business hours where the Agent maintains such books and records.

7.    REPRESENTATIONS AND WARRANTIES

7.1    Creative Partner.  The Creative Partner represents and warrants that: (i) it is the sole and exclusive owner of the Creative Content, (ii) as provided to the Agent by the Creative Partner, the Creative Content is original and does not infringe upon or violate the rights of any third party, (iii) the Creative Content is not knowingly confusingly similar to any other trademarks or designs used in the Territories, (iv) the Creative Partner entering into and performing this Agreement will not conflict with or violate any agreements or obligations the Creative Partner may have with any other person or entity and (v) the use of the Creative Content by the Agent as lawfully and permitted under the license grant in this Agreement will not violate or infringe the rights of any third party.

7.2    Agent.  The Agent represents and warrants that: (i) it has the full right, authority and power to enter into and fully perform all the terms and provisions of this Agreement, (ii) the Agent entering into and performing this Agreement will not conflict with or violate any agreements or obligations the Agent may have with any other person or entity, (iii) it shall be solely responsible for the manufacture, production, sale and distribution of the Products and shall bear all related costs associated therewith and (iv) the Agent shall use best efforts to promote, market, sell and distribute the Products in compliance with the Control Standards.

8.    INDEMNITY.

8.1    At the other party's request, each party hereto ("Indemnitor") shall indemnify and defend the other party and such other party's parent, successors, subsidiaries, affiliates, directors, offices, employees, distributors and agents (jointly and severally, "Indemnitee") against any third party claim or action ("Claim") which would constitute a breach of this Agreement by the Indemnitor, provided that such Claim has resulted in an adverse judgment or settled with the other party's advance written consent, which shall not be unreasonably withheld or delayed. The Indemnitor shall further indemnify and hold the Indemnitee free and harmless from and against any costs, expenses, damages and fees actually incurred by the Indemnitee in connection with any such Claim, including but not limited to reasonable fees and costs for outside counsel and experts.

8.2     Each party hereto shall provide the other party reasonably prompt notice in writing of any such Claim.

8.3     If the Indemnitor is requested to defend any Claim, the Indemnitee shall permit the Indemnitor to answer and defend such Claim through counsel mutually acceptable to the parties hereto and shall provide Indemnitor with any information, assistance and authority, at Indemnitor's expense, as reasonably necessary and practicable to help Indemnitor defend the Claim. Indemnitee shall retain the right to employ separate counsel to participate in the defense of any Claim at Indemnitee's own expense.

## 9.    TERMINATION

9.1     Breach of the Agreement.  A party may immediately terminate this Agreement if the other party is in material breach of this Agreement and that party fails to cure that breach within thirty (30) days (or fifteen (15) days for failure to pay monies owed) after receiving written notice of breach from the non-breaching party.

9.2     Effect of Expiration or Termination.  Except with respect to Agent's limited right with respect to the inventory during the Sell Off Period as set forth in Section 1.2, upon the expiration or termination of this Agreement, all rights in the Creative Content shall automatically revert to the Creative Partner, and the Agent shall cease use of the Creative Content.

9.3     Survivorship.  For the avoidance of doubt, the following provisions shall survive expiration or termination of this Agreement, subject to the terms and conditions hereof:  1.2 (Sell Off Period), 5 (Intellectual Property Rights), 6 (Royalties and Accounting), 7 (Representations and Warranties), 8 (Indemnity), 9.2 (Effect of Expiration or Termination), 9.3 (Survivorship) and 10 (General).

## 10.   GENERAL

10.1     Confidentiality.  The terms and conditions of this Agreement are confidential and neither party shall disclose such terms to any third party without the consent of the other party, except to the extent as may be required by law or as necessary to effectuate or enforce this Agreement.

10.2     Amendment.  This Agreement may only be amended in a writing signed by both parties.

10.3     Waiver.  The failure of a party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered a waiver or deprive or limit that party's right thereafter to insist upon strict adherence to that provision in the particular instance or that provision or any other provision of this Agreement in any instance.

10.4     No Assignment.  This Agreement is personal to the Creative Partner, and the Creative Partner shall not assign or transfer any of its rights or delegate any of its obligations under this Agreement. Any attempted assignment, transfer, or delegation in violation of this provision or by virtue of the operation of law shall be void.

10.5     Bind and Benefit.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties and their respective successors, and permitted assigns and transferees, if any.

10.6     Independent Contractors.  The Creative Partner and the Agent have entered into this Agreement as independent contractors only. Nothing contained in this Agreement places or shall be construed to place the parties in the relationship of partners, joint venturers, agent/principal, employer/employee or legal representation, and neither party shall have no authority or power to obligate or bind the other party.

10.7     Severability.  If any provision of this Agreement shall be found or be held to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable and the parties shall negotiate, in good faith, a substitute, valid and enforceable provision which most nearly effects their intent in entering into this Agreement.

10.8    Governing Law and Jurisdiction.  The parties agree that this Agreement shall be construed, interpreted, governed, and applied in accordance with the laws of Singapore, without regard to its rules with respect to conflicts of laws.

10.9    Attorneys' Fees.  All fees and costs incurred (including, without limitation, the reasonable outside attorneys' fees and costs of the prevailing party) in connection with any action or proceeding between the parties hereto to enforce the terms and provisions of this Agreement shall be paid by the non-prevailing party.

10.10    Notices.  Any notice shall be in writing and shall be considered delivered (i) upon receipt when delivered personally, (ii) upon signature receipt when delivered by courier or (iii) upon receipt of registered or certified mail with return receipt requested, to the parties at the following addresses (or at such other addresses as a party may specify by notice to the others):

Agent:                  STFU Global Pte Ltd
                        6 Eu Tong Sen Street
                        Soho 1 #12-20
                        Clarke Quay Central
                        Singapore 059817
                        Attn: Ms. Jeslyn Leong

Creative Partner:       Jesse Dawber
                        468 Puelba Street
                        Encinitas CA 92024
                        Attention: Jesse Dawber

10.11    Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements, understandings, commitments, negotiations, and discussions, whether oral or written. This Agreement may be executed in counterparts and delivery of an executed signature page by email of a PDF file shall constitute delivery of an executed original.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the duly authorized representatives of the parties hereto have executed this Agreement as of the date first above written.

**AGENT:**

STFU Global Pte Ltd.

By: _____

Name: _____JESLYN LEONG_____

Date: ___30 June 2017_____

**CREATIVE PARTNER:**

JESSE DAWBER

By:_____

Name: _____

Title: _____

Date: _____

## EXHIBIT A

## CREATIVE CONTENT

1. 80 New Graphics or alterations to existing graphics, split over four seasons a year, delivered within 60 days prior to the start of a new season.

EXHIBIT B



 Global

## EXHIBIT C

### FEE PAYMENT

1. As consideration for the rights granted hereunder for the Creative Content, the Agent shall pay to the Creative Partner a Fee equal to US$39,000 per month.

# EXHIBIT 10

## Class War, Inc. Profit and Loss - 2016

# Class War Inc.

## PROFIT AND LOSS

### January - December 2016

| | JAN 2016 | FEB 2016 | MAR 2016 | APR 2016 | MAY 2016 | JUN 2016 | JUL 2016 | AUG 2016 | SEP 2016 | OCT 2016 | NOV 2016 | DEC 2016 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | |
| 4000 Sales - Wholesale | 3,329.50 | 152,603.96 | 447,500.69 | 337,340.25 | 368,102.80 | 503,214.65 | 559,647.75 | 697,829.08 | 254,529.43 | 221,940.58 | 811,124.60 | 262,229.49 | $4,619,332.78 |
| 4010 Sales - Retail | 25,710.27 | 20,506.07 | 29,257.36 | 25,600.48 | 19,604.94 | 17,908.89 | 21,868.55 | 17,955.09 | 21,868.99 | 20,528.60 | 31,170.92 | 18,812.64 | $270,792.80 |
| 4020 Sales - Artwork | 1,800.00 | 1,200.00 | 1,500.00 | | 2,150.00 | 440.00 | 1,837.80 | 165.00 | | 6,254.60 | | 2,000.00 | $17,347.40 |
| 4130 Uncategorized Income | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| 4200 Discounts given | -750.00 | -26,225.36 | 33,589.81 | -25,061.10 | -52,972.00 | -91,073.78 | -11,749.25 | -3,923.35 | -292.50 | -512.30 | | | $-346,149.45 |
| 4500 Refunds | -68.00 | -128.00 | -2,773.55 | | -77.47 | -277.76 | -122.78 | -125.28 | -255.00 | -339.28 | -84.00 | -775.13 | $-5,026.23 |
| **Total Income** | $30,021.77 | $147,956.67 | $441,894.69 | $337,879.63 | $336,808.27 | $430,212.00 | $471,482.07 | $711,900.56 | $275,850.92 | $247,872.20 | $842,211.52 | $282,267.00 | $4,556,357.30 |
| **COST OF GOODS SOLD** | | | | | | | | | | | | | |
| 5000 Cost of Goods Sold | | | | | | | | | | | | | $0.00 |
| 5010 Screenprinting | 7,133.75 | 33,735.95 | 308,910.50 | 71,779.50 | 152,107.25 | 251,079.33 | 277,108.25 | 227,902.72 | 123,064.20 | 167,982.61 | 400,291.64 | 135,329.55 | $2,156,395.25 |
| 5020 Supplies & Materials | 0.00 | 1,000.00 | 2,101.20 | 2,055.00 | 2,580.00 | 4,476.00 | 1,755.00 | 4,817.68 | 865.53 | | 7,870.00 | | $27,520.33 |
| 5500 Fulfillment, Freight & Delivery | 7,363.36 | 5,428.95 | 4,803.49 | 6,666.09 | 6,623.75 | 4,135.73 | 5,248.80 | 5,947.34 | 5,076.44 | 5,672.54 | 5,954.59 | 8,279.09 | $71,220.77 |
| **Total 5000 Cost of Goods Sold** | 14,487.11 | 40,164.90 | 315,815.19 | 80,500.59 | 161,311.00 | 259,691.06 | 284,112.05 | 238,666.26 | 129,006.17 | 173,655.15 | 414,116.23 | 143,608.64 | $2,255,136.35 |
| 5100 Merchant Fees | | | | | | | | | | | | | $0.00 |
| 5110 Paypal Fees | 387.30 | 637.67 | 484.66 | 434.17 | 323.44 | 304.03 | 399.47 | 359.99 | 378.17 | 269.40 | 476.19 | 227.55 | $4,682.04 |
| 5120 QuickBooks Payments Fees | 58.30 | 97.68 | 274.57 | 65.12 | 105.90 | 204.71 | 272.29 | 116.32 | 168.36 | 324.45 | 358.22 | 445.42 | $2,491.34 |
| 5130 Shopify Fees | 431.49 | 376.15 | 802.22 | 463.13 | 341.33 | 321.35 | 371.75 | 291.30 | 368.50 | 432.70 | 575.74 | 407.31 | $5,184.97 |
| 5140 Stripe Fees | -1.32 | -2.04 | | | | | | | | | | | $-3.36 |
| **Total 5100 Merchant Fees** | 875.77 | 1,111.46 | 1,561.45 | 962.42 | 770.67 | 830.09 | 1,043.51 | 767.61 | 915.03 | 1,026.55 | 1,410.15 | 1,080.28 | $12,354.99 |
| 5200 Event Expenses | | | | | | | | 1,036.60 | -1,036.60 | | | | $0.00 |
| **Total Cost of Goods Sold** | $15,362.88 | $41,276.36 | $317,376.64 | $81,463.01 | $162,081.67 | $260,521.15 | $285,155.56 | $240,472.47 | $128,884.60 | $174,681.70 | $415,526.38 | $144,688.92 | $2,267,491.34 |
| **GROSS PROFIT** | $14,658.89 | $106,680.31 | $124,518.05 | $256,416.62 | $174,726.60 | $169,690.85 | $186,326.51 | $471,428.09 | $146,966.32 | $73,190.50 | $426,685.14 | $137,578.08 | $2,288,865.96 |
| **EXPENSES** | | | | | | | | | | | | | |
| 6000 Advertising & Marketing | 1,110.55 | 950.09 | 10,850.63 | 3,371.46 | 1,845.28 | 7,117.40 | 17,115.16 | 13,148.44 | 9,811.18 | 32,198.58 | 4,723.82 | 8,449.85 | $128,759.44 |
| 6100 Auto Expense | | | | | | | | | | | | | $0.00 |
| 6103 Fuel | 75.11 | | 65.69 | | 6.84 | 304.60 | 190.75 | 168.81 | 105.09 | 50.13 | 68.75 | 30.00 | $1,065.76 |
| 6108 Parking & Tolls | | 77.23 | 54.25 | | 208.35 | | 111.22 | 7.51 | 4.00 | 96.00 | 9.05 | | $567.71 |
| 6109 Repairs & Maintenance  Auto | | | | 134.50 | 1,622.81 | | | | | | | 2,701.56 | $4,458.87 |
| **Total 6100 Auto Expense** | 75.11 | 77.23 | 119.94 | 134.50 | 1,838.00 | 304.60 | 301.95 | 176.42 | 109.09 | 146.13 | 77.81 | 2,731.56 | $6,092.34 |
| 6200 Bank Service Charges | 131.95 | 54.95 | 82.92 | 108.95 | 35.00 | 123.65 | 34.95 | 72.95 | 72.95 | 34.95 | 96.20 | 119.95 | $969.37 |
| 6150 Contract Labor | 13,149.00 | 100.00 | | 580.00 | 4,798.00 | 13,320.00 | 1,200.00 | 960.00 | 1,737.91 | | 12,000.00 | 1,100.00 | $48,274.91 |
| 6650 Dues & Subscriptions | 397.86 | 103.86 | 178.89 | 366.32 | 500.88 | 604.79 | 915.28 | 812.24 | 807.91 | 790.93 | 1,200.93 | 788.88 | $7,468.77 |
| 6850 Insurance | | | | | | | | | | | | | $0.00 |
| 6852 Business Owners | | | | | | | | | | | | 917.00 | $917.00 |

BLG009082

| | JAN 2016 | FEB 2016 | MAR 2016 | APR 2016 | MAY 2016 | JUN 2016 | JUL 2016 | AUG 2016 | SEP 2016 | OCT 2016 | NOV 2016 | DEC 2016 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Policy | | | | | | | | | | | | | |
| 6856 Commercial Umbrella | | | | | | | | | | | 680.00 | | $680.00 |
| 6875 Workers Comp | | | | | | | 1,338.00 | 453.00 | | | 414.00 | | $2,205.00 |
| Total 6850 Insurance | | | | | | | 1,338.00 | 453.00 | | | 1,094.00 | 917.00 | $3,802.00 |
| 7050 Permits Licenses and Trademarks | | | | | 10,025.00 | 5.00 | 15.00 | | | | | | $10,045.00 |
| 7150 Office Expenses | | 98.41 | 250.00 | 801.53 | 1,882.35 | 0.00 | 64.28 | 57.78 | | 39.75 | 381.90 | 598.98 | $4,174.88 |
| 7160 Office Supplies | | 53.97 | | 654.71 | | 239.18 | 419.59 | 309.17 | | 48.45 | 276.31 | 232.77 | $2,234.15 |
| 7200 Payroll Expenses | | | | | | | | | | | | | $0.00 |
| 7450 Officer Salary | | | | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | $120,000.00 |
| 7510 Wages | 3,670.00 | 6,185.00 | 6,430.00 | 6,942.00 | 6,604.00 | 7,348.00 | 7,180.00 | 11,039.33 | 15,066.66 | 15,066.66 | 15,066.66 | 15,066.66 | $115,664.97 |
| 7650 Taxes | 431.23 | 789.43 | 661.83 | 1,583.06 | 1,270.21 | 1,327.13 | 1,314.27 | 1,746.16 | 2,067.94 | 1,917.60 | 1,917.60 | 4,119.60 | $19,146.06 |
| Total 7200 Payroll Expenses | 4,101.23 | 6,974.43 | 7,091.83 | 18,525.06 | 17,874.21 | 18,675.13 | 18,494.27 | 22,785.49 | 27,134.60 | 26,984.26 | 26,984.26 | 59,186.26 | $254,811.03 |
| 7250 Professional Fees | | | | | | | | | | | | | $0.00 |
| 7255 Accounting Fees | 1,530.00 | 4,537.00 | 1,530.00 | 3,162.50 | 2,868.20 | 3,783.00 | 3,389.80 | 3,271.80 | 3,371.46 | 2,889.65 | 2,494.88 | 2,276.76 | $34,703.05 |
| 7260 Legal Fees | 1,046.73 | 6,611.66 | 775.00 | 11,740.50 | 3,476.08 | 3,110.19 | 21,478.00 | 4,117.50 | 4,411.15 | 13,283.16 | 22,379.52 | 20,125.00 | $112,554.49 |
| 7270 Website Development | | | | 472.50 | | | | | | | | | $472.50 |
| Total 7250 Professional Fees | 2,576.73 | 11,148.66 | 2,305.00 | 15,375.50 | 6,342.28 | 6,893.19 | 24,847.80 | 7,389.30 | 7,482.61 | 16,182.81 | 24,784.40 | 22,401.76 | $147,730.04 |
| 7350 Reimbursements | | 0.00 | | 0.00 | 0.00 | | | | 0.00 | 0.00 | | | $0.00 |
| 7400 Repair & Maintenance | | | | 380.00 | | | | | | | 528.00 | 1,000.00 | $1,908.00 |
| 7430 Rent or Lease | | | | 525.00 | 525.00 | 525.00 | 1,050.00 | 2,000.00 | 2,000.00 | 4,000.00 | | 12,037.00 | $22,662.00 |
| 7440 Research & Development | | | | | | | | | | | | | $0.00 |
| 7441 Art Supplies | 63.84 | | | | 101.48 | 266.27 | | 879.57 | | | | | $1,311.16 |
| 7442 Artwork | 1,000.00 | | 850.00 | | | 175.39 | | | | | | | $2,025.39 |
| 7443 Product Development | 325.24 | 1,215.63 | 114.16 | 161.53 | 1,316.00 | 542.52 | 825.00 | 1,000.01 | 1,570.87 | 165.09 | 423.25 | 60.47 | $7,719.77 |
| Total 7440 Research & Development | 1,389.08 | 1,215.63 | 964.16 | 161.53 | 1,417.48 | 984.18 | 825.00 | 1,879.58 | 1,570.87 | 165.09 | 423.25 | 60.47 | $11,056.32 |
| 7470 Sales Rep Commissions | 7,385.00 | | 2,559.40 | 526.20 | 4,256.45 | 12,390.04 | 17,795.36 | 22,090.53 | | 20,980.70 | 10,585.15 | 38,148.44 | $136,676.29 |
| 7480 Security | | | | | | | | | | | | 41.95 | $41.95 |
| 7500 Pension Plan Contribution | | | | | | | | | 30,000.00 | | | | $30,000.00 |
| 7600 Taxes | | | | | | | | | | | | | $0.00 |
| 7605 Sales Tax | | 3,224.00 | | | 1,407.00 | | | 3,510.00 | 1,313.00 | | | 1,551.00 | $11,005.00 |
| 7610 State Tax | | | | 800.00 | | | | | | | | | $800.00 |
| Total 7600 Taxes | | 3,224.00 | | 800.00 | 1,407.00 | | | 3,510.00 | 1,313.00 | | | 1,551.00 | $11,805.00 |
| 7700 Telephone | | | | | | | | | | | | 11.80 | $11.80 |
| 7800 Travel & Entertainment | | | | | | | | | | | | | $0.00 |
| 7805 Lodging | 741.33 | 48.80 | 378.65 | 352.82 | 1,944.32 | 3,915.99 | 6,705.96 | 1,990.50 | 1,562.96 | 1,259.34 | 1,804.50 | 895.46 | $21,600.65 |
| 7810 Meals & Entertainment | 1,082.85 | 1,439.63 | 1,418.08 | 1,271.94 | 330.39 | 3,447.08 | 2,085.77 | 1,934.60 | 2,424.27 | 1,522.66 | 1,120.94 | 1,612.21 | $20,290.45 |
| 7815 Transportation | 647.65 | 38.91 | | 2,912.46 | 500.24 | 1,283.74 | 3,332.01 | 2,965.34 | 1,971.24 | 753.39 | -32.26 | 992.52 | $15,365.24 |
| Total 7800 Travel & | 2,471.83 | 1,527.37 | 1,796.73 | 4,537.22 | 3,374.95 | 8,646.81 | 12,123.76 | 6,890.44 | 5,958.47 | 3,535.39 | 2,893.18 | 3,500.19 | $57,256.34 |

| | JAN 2016 | FEB 2016 | MAR 2016 | APR 2016 | MAY 2016 | JUN 2016 | JUL 2016 | AUG 2016 | SEP 2016 | OCT 2016 | NOV 2016 | DEC 2016 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Entertainment** | | | | | | | | | | | | | |
| 7845 Small Tools & Equipment | | | | 2,185.32 | 1,437.24 | | | | | | | | $3,622.56 |
| **Total Expenses** | $33,418.34 | $25,534.60 | $25,999.50 | $55,033.30 | $60,558.12 | $70,188.97 | $96,541.42 | $88,795.34 | $57,998.59 | $105,407.04 | $86,050.01 | $182,877.86 | $888,403.09 |
| NET OPERATING INCOME | $ -18,759.45 | $81,145.71 | $98,518.55 | $201,383.32 | $114,168.48 | $99,501.88 | $89,785.09 | $382,632.75 | $88,967.73 | $ -32,216.54 | $340,635.13 | $ -45,299.78 | $1,400,462.87 |
| OTHER INCOME | | | | | | | | | | | | | |
| 8100 Interest Income | | 0.04 | | | | | | | | | | | $0.04 |
| **Total Other Income** | $0.00 | $0.04 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.04 |
| OTHER EXPENSES | | | | | | | | | | | | | |
| 6550 Depreciation Expense | | | | | | | | | | | | 8.818.00 | $8.818.00 |
| 8000 Miscellaneous Expense | | | | | | | | | | | | 825.00 | $825.00 |
| 8500 Loss on Disposal of Asset | | | | | | | | | | | | 10.000.00 | $10,000.00 |
| 8660 Interest Expense | | | 0.16 | 18.66 | | | | | 6.56 | | | | $25.38 |
| 8675 Penalties & Settlements | | | 6.64 | | | | | | | | | | $6.64 |
| 8680 Political Contributions | | | | | | | 300.00 | | | | | | $300.00 |
| 8685 Accrued Interest | | | | | | | | | | | | 271.66 | $271.66 |
| **Total Other Expenses** | $0.00 | $0.00 | $6.80 | $18.66 | $0.00 | $0.00 | $300.00 | $0.00 | $6.56 | $0.00 | $0.00 | $19,914.66 | $20,246.68 |
| NET OTHER INCOME | $0.00 | $0.04 | $ -6.80 | $ -18.66 | $0.00 | $0.00 | $ -300.00 | $0.00 | $ -6.56 | $0.00 | $0.00 | $ -19,914.66 | $ -20,246.64 |
| NET INCOME | $ -18,759.45 | $81,145.75 | $98,511.75 | $201,364.66 | $114,168.48 | $99,501.88 | $89,485.09 | $382,632.75 | $88,961.17 | $ -32,216.54 | $340,635.13 | $ -65,214.44 | $1,380,216.23 |

BLG009083

# EXHIBIT 11

## Class War, Inc. Profit and Loss - 2017

Confidential

# Class War Inc.

PROFIT AND LOSS

January - December 2017

| | JAN 2017 | FEB 2017 | MAR 2017 | APR 2017 | MAY 2017 | JUN 2017 | JUL 2017 | AUG 2017 | SEP 2017 | OCT 2017 | NOV 2017 | DEC 2017 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | | | | | | |
| 4000 Sales - Wholesale | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| 4001 Sales - Specialty | 15,438.50 | 67,170.00 | 69,074.50 | 15,113.00 | 112,758.25 | 110,480.50 | 33,683.00 | 107,754.52 | 66,028.50 | 78,900.00 | 77,706.00 | 60,623.35 | $814,730.12 |
| 4003 Discounts - Specialty | -5,900.43 | -10,366.36 | -2,940.71 | -1,182.45 | -17,161.51 | -13,712.72 | -6,746.55 | -13,132.59 | -15,854.45 | -3,986.00 | -4,854.85 | -6,185.30 | $ -102,023.92 |
| 4004 Refunds - Specialty | | -336.50 | -125.00 | | | -612.50 | | -26.25 | -15.00 | -655.00 | | | $ -1,770.25 |
| 4005 Sales - Majors | 562.50 | 464,133.25 | 280,202.58 | 558,608.14 | 338,631.05 | 536,613.91 | 726,557.42 | 750,103.65 | 296,836.89 | 306,935.50 | 362,610.03 | 605,561.13 | $5,226,789.05 |
| 4007 Discounts - Majors | -112.50 | -93,047.75 | -56,040.58 | -111,721.64 | -67,712.65 | -107,322.81 | -145,311.52 | -150,452.75 | -59,367.39 | -61,273.70 | -72,522.03 | -121,112.33 | $ -1,045,997.65 |
| 4008 Refunds - Majors | | | -398.18 | | | -2,215.22 | | -9,632.20 | | | | | $ -12,245.60 |
| 4009 Sales - AIMS | | | | | | | | | | 452.24 | 6,466.59 | 384.58 | $7,303.41 |
| **Total 4000 Sales - Wholesale** | **9,988.07** | **427,552.64** | **289,772.61** | **460,817.05** | **366,515.14** | **523,231.16** | **608,182.35** | **684,614.38** | **287,628.55** | **319,806.04** | **369,405.74** | **539,271.43** | **$4,886,785.16** |
| 4100 Sales - Retail | | | | | | | | | | | | | $0.00 |
| 4112 Sales - Web | 14,451.85 | 15,968.10 | 19,904.13 | 21,857.10 | 26,919.76 | 20,718.04 | 20,353.29 | 15,441.39 | 25,171.07 | 29,653.23 | 35,575.09 | 25,732.77 | $271,745.82 |
| 4113 Discounts - Web | -72.70 | -81.60 | -209.00 | -335.50 | -366.40 | 0.00 | -210.00 | -265.00 | -593.00 | -1,033.50 | -561.00 | -2,105.50 | $ -5,833.20 |
| 4114 Refunds - Web | -319.94 | -101.00 | -263.39 | -339.87 | -438.59 | -1,318.94 | -340.00 | -345.90 | -352.14 | -249.98 | -656.34 | -943.85 | $ -5,669.94 |
| **Total 4100 Sales - Retail** | **14,059.21** | **15,785.50** | **19,431.74** | **21,181.73** | **26,114.77** | **19,399.10** | **19,803.29** | **14,830.49** | **24,225.93** | **28,369.75** | **34,357.75** | **22,683.42** | **$260,242.68** |
| 4250 Royalty Income | 8,078.78 | 600.00 | | 621.93 | 8,559.60 | | 2,535.33 | -800.00 | 31,460.70 | 334.80 | 97,938.81 | 11,232.29 | $160,562.24 |
| 4300 Shipping Income - Wholesale | 285.67 | 672.63 | 865.85 | 359.68 | 958.79 | 1,952.49 | 709.57 | 1,798.28 | 210.37 | 1,526.07 | 981.74 | 1,203.69 | $11,526.83 |
| 4305 Shipping Income - Retail | 2,665.84 | 3,150.38 | 4,626.26 | 4,468.00 | 4,518.00 | 3,385.00 | 3,832.00 | 3,433.00 | 3,351.00 | 4,615.58 | 5,196.00 | 4,732.00 | $47,973.06 |
| 4600 Sales of Product Income | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| 4610 Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| **Total Income** | **$35,077.57** | **$447,761.15** | **$314,696.46** | **$487,448.39** | **$406,666.30** | **$547,967.75** | **$635,062.54** | **$703,876.15** | **$346,876.55** | **$354,654.24** | **$507,880.04** | **$579,122.83** | **$5,367,089.97** |
| Cost of Goods Sold | | | | | | | | | | | | | |
| 5000 Cost of Goods Sold | | | | | | | | | | | | | $0.00 |
| 5002 Screenprinting Specialty | 64,416.01 | 224,256.70 | 174,968.79 | 218,947.08 | 208,758.75 | 228,517.84 | 295,335.98 | 338,727.81 | 131,659.21 | 140,307.90 | 338,693.58 | 176,052.90 | $2,540,642.55 |
| 5010 Screenprinting Web | | 836.53 | 1,826.65 | | | | 5,864.19 | 4,314.96 | 1,011.84 | 1,072.28 | 2,564.76 | 1,005.30 | $18,496.51 |
| 5012 Screenprinting Print On Demand | | | | | | | | | | 418.08 | 5,241.00 | 349.20 | $6,008.28 |
| 5017 PreProduction Samples | | | | | | | | | | | 662.00 | | $662.00 |
| 5020 Supplies & Materials | 9,972.14 | 688.69 | 8,695.00 | 1,302.00 | 1,321.28 | 1,908.00 | 1,549.60 | 2,374.61 | 1,620.37 | 6,050.00 | 23.00 | | $35,504.69 |
| 5050 Fulfillment, Freight & Delivery | 4,293.56 | 5,056.93 | 3,772.13 | 5,381.07 | 7,160.72 | 5,993.10 | 4,844.69 | 8,070.64 | 7,851.88 | 4,861.44 | 75.00 | 7,621.78 | $64,982.94 |
| **Total 5000 Cost of Goods Sold** | **78,681.71** | **230,002.32** | **188,272.45** | **227,456.80** | **217,240.75** | **236,418.94** | **307,594.46** | **353,488.02** | **142,143.30** | **152,709.70** | **347,259.34** | **185,029.18** | **$2,666,296.97** |
| 5100 Merchant Fees | | | | | | | | | | | | | $0.00 |
| 5105 Amazon Pay Fees | | | | | | | | | | 51.84 | 118.59 | 1.97 | $172.40 |
| 5110 Paypal Fees | 245.77 | 321.58 | 439.05 | 440.61 | 509.80 | 286.14 | 397.55 | 287.55 | 368.72 | 444.51 | 566.35 | 446.22 | $4,753.85 |
| 5120 QuickBooks Payments Fees | 157.24 | 369.03 | 700.46 | 598.60 | 541.00 | 694.23 | 687.77 | 515.81 | 676.66 | 449.31 | 431.43 | 410.07 | $6,231.61 |
| 5130 Shopify Fees | 312.60 | 345.57 | 426.03 | 453.39 | 535.24 | 472.85 | 441.96 | 390.51 | 661.00 | 620.28 | 799.23 | 672.64 | $6,111.30 |
| 5143 Collection Agency Fees | | | | | | | | 105.00 | 1,438.50 | 175.00 | | 140.00 | $1,858.50 |
| **Total 5100 Merchant Fees** | **715.61** | **1,036.18** | **1,565.54** | **1,492.60** | **1,586.04** | **1,453.22** | **1,527.28** | **1,298.87** | **3,144.88** | **1,740.94** | **1,895.60** | **1,670.90** | **$19,127.66** |
| 5300 Royalty Expense | | | | | | | | 177,843.93 | 177,843.93 | 177,843.95 | 151,556.60 | 151,556.80 | $938,202.21 |
| **Total Cost of Goods Sold** | **$79,397.32** | **$231,038.50** | **$189,837.99** | **$228,949.40** | **$218,826.79** | **$237,872.16** | **$486,965.67** | **$532,630.82** | **$323,132.13** | **$306,007.44** | **$500,711.74** | **$338,256.88** | **$3,673,626.84** |
| GROSS PROFIT | $ -44,319.75 | $216,722.65 | $124,858.47 | $258,498.99 | $187,839.51 | $310,095.59 | $148,096.87 | $171,245.33 | $23,744.42 | $48,646.80 | $7,168.30 | $240,865.95 | $1,693,463.13 |
| Expenses | | | | | | | | | | | | | |
| 6000 Advertising & Marketing | | | | | | | | | | | | | $0.00 |

57

ST-HL-0074323

Confidential

| | JAN 2017 | FEB 2017 | MAR 2017 | APR 2017 | MAY 2017 | JUN 2017 | JUL 2017 | AUG 2017 | SEP 2017 | OCT 2017 | NOV 2017 | DEC 2017 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6005 Digital Strategy | 5,075.00 | 3,063.85 | 3,150.00 | 3,000.00 | 7,203.23 | 75.00 | 75.00 | 5,203.24 | 5,417.47 | 5,075.00 | 5,000.00 | 5,453.62 | $47,791.41 |
| 6010 Print Advertising | 1,200.00 | 1,200.00 | 8,700.00 | 1,200.00 | 1,200.00 | 2,200.00 | 8,200.00 | 35,900.00 | 1,200.00 | 2,200.00 | 8,200.00 | 4,000.00 | $75,400.00 |
| 6015 Advertising Production | | 90.00 | | | | 259.80 | | | | | 77.63 | 71.36 | $498.79 |
| 6020 Events | 2,139.22 | 2,933.13 | 1,292.41 | 1,076.79 | 1,380.00 | | 6.31 | 2,110.00 | 1,050.00 | 1,181.30 | 5,711.56 | 6,437.47 | $25,318.19 |
| 6025 Product Giveaways | 571.58 | | | | | 251.94 | 39.56 | | | | | | $863.08 |
| **Total 6000 Advertising & Marketing** | 8,985.80 | 7,286.98 | 13,142.41 | 5,276.79 | 9,783.23 | 2,786.74 | 8,320.87 | 43,213.24 | 7,667.47 | 8,456.30 | 18,989.19 | 15,962.45 | $149,871.47 |
| 6100 Auto Expense | | | | | | | | | | | | | $0.00 |
| 6103 Fuel | 78.39 | 82.17 | 30.13 | 245.37 | 173.66 | 113.60 | 21.16 | 12.00 | | 56.80 | | 53.04 | $866.32 |
| 6106 Parking & Tolls | | | | | | | 82.72 | | 32.00 | 64.00 | 70.00 | 114.25 | $362.97 |
| 6109 Repairs & Maintenance - Auto | 748.00 | | | | 214.05 | | | 226.91 | -61.79 | | 335.00 | 1,895.00 | $3,357.17 |
| **Total 6100 Auto Expense** | 826.39 | 82.17 | 30.13 | 245.37 | 387.71 | 113.60 | 103.88 | 238.91 | -29.79 | 120.80 | 405.00 | 2,062.29 | $4,586.46 |
| 6150 Bad Debts | | | | | | | 297.29 | | | | | 25,699.11 | $25,996.40 |
| 6200 Bank Service Charges | 64.80 | 200.45 | 15.55 | 158.05 | 101.00 | 155.00 | 187.00 | 460.00 | 387.45 | 124.00 | 112.00 | 144.00 | $2,109.30 |
| 6400 Client Gifts | | | | | | | | | | | | 156.24 | $156.24 |
| 6450 Contract Labor | 2,545.88 | 4,015.00 | 5,293.35 | 2,255.00 | 4,300.00 | 5,401.00 | 2,498.64 | 3,200.00 | 3,200.00 | 650.00 | 22,040.04 | 8,433.33 | $63,832.24 |
| 6650 Dues & Subscriptions | 922.87 | 655.46 | 932.47 | 695.12 | 1,562.76 | 9,035.87 | 1,450.18 | 1,508.25 | 3,824.18 | 1,229.30 | 3,091.91 | 982.60 | $25,890.97 |
| 6850 Insurance | | | | | | | | | | | | | $0.00 |
| 6853 Business Owners Policy | | -242.00 | -90.00 | | | | | | | 769.00 | | | $437.00 |
| 6856 Commercial Umbrella | | | | | | | | | | | | 1,360.00 | $1,360.00 |
| 6875 Workers Comp | | | | | | 864.00 | | 442.00 | | 442.00 | 513.00 | 467.00 | $2,728.00 |
| 6880 Auto Insurance | | | | | | | | | 140.50 | 140.50 | 140.50 | 140.50 | $562.00 |
| **Total 6850 Insurance** | | -242.00 | -90.00 | | | 864.00 | | 442.00 | 140.50 | 1,351.50 | 653.50 | 1,967.50 | $5,087.00 |
| 6900 Janitorial | | | | | | | | | 100.00 | 100.00 | 100.00 | 100.00 | $400.00 |
| 7150 Office Expenses | 931.54 | 174.52 | 12.98 | 12.98 | 12.98 | 146.85 | 89.50 | 972.70 | 1,196.33 | 434.35 | 1,859.25 | 442.08 | $6,286.06 |
| 7155 Mileage | | | | | | | 109.14 | | 61.53 | | | 91.49 | $262.16 |
| 7160 Office Supplies | 953.04 | 1,173.31 | 1,082.41 | 504.42 | 355.54 | 384.99 | 251.16 | 340.17 | 291.88 | | 181.82 | 287.21 | $5,805.95 |
| 7200 Payroll Expenses | | | | | | | | | | | | | $0.00 |
| 7450 Officer Salary | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | | | | $90,000.00 |
| 7510 Wages | 15,066.66 | 15,066.66 | 15,066.66 | 41,283.50 | 26,993.52 | 25,066.66 | 26,816.66 | 30,316.79 | 32,275.00 | 32,483.34 | 32,483.34 | 32,483.34 | $325,402.13 |
| 7520 Bonuses | | | | | | | | | | | | 5,000.00 | $5,000.00 |
| 7650 Taxes | 3,326.34 | 2,152.66 | 1,925.80 | 4,210.18 | 2,830.00 | 2,682.61 | 2,888.23 | 3,299.48 | 3,594.50 | 2,698.52 | 2,484.98 | 2,484.97 | $34,578.27 |
| **Total 7200 Payroll Expenses** | 28,393.00 | 27,219.32 | 26,992.46 | 55,493.68 | 39,823.52 | 37,749.27 | 39,704.89 | 43,616.27 | 45,869.50 | 35,181.86 | 34,968.32 | 39,968.31 | $454,980.40 |
| 7225 Postage | | | | | | | 13.78 | | | | | | $13.78 |
| 7250 Professional Fees | | | | | | | | | | | | | $0.00 |
| 7255 Accounting Fees | 2,513.08 | 1,475.00 | 3,020.20 | 5,031.40 | 3,621.75 | 2,685.88 | 4,342.00 | 854.85 | | | | | $23,544.16 |
| 7260 Legal Fees | 25,955.37 | 52,906.47 | 4,925.93 | 11,612.95 | 62,795.09 | 1,718.74 | 5,803.35 | 110,268.61 | 63,821.07 | 13,333.94 | 12,109.16 | 28,508.26 | $393,758.34 |
| 7265 Payroll Service Fees | 55.00 | 55.00 | 55.00 | 55.00 | 55.00 | | | | 190.00 | | 190.00 | | $710.00 |
| 7275 Consulting Services | | | | | | | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | $120,000.00 |
| **Total 7250 Professional Fees** | 28,523.45 | 54,436.47 | 8,000.53 | 16,699.35 | 66,471.84 | 4,459.62 | 30,145.35 | 131,123.46 | 84,011.07 | 33,333.94 | 32,109.16 | 48,698.26 | $538,012.50 |
| 7380 Reimbursements | | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| 7430 Rent or Lease | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,550.00 | 2,550.00 | $30,100.00 |
| 7440 Research & Development | | | | | | | | | | | | | $0.00 |
| 7441 Art Supplies | | 114.86 | 102.31 | 164.79 | | 28.02 | 66.24 | | | | | 91.54 | $567.76 |
| 7442 Artwork | 500.00 | 400.00 | | 700.00 | | | | | | 1,400.00 | -700.00 | | $2,300.00 |
| 7443 Product Development | 401.29 | 191.50 | 698.30 | 73.19 | 248.60 | 737.47 | 186.83 | 1,723.94 | 213.51 | | 2,550.07 | 1,614.32 | $8,639.02 |
| **Total 7440 Research & Development** | 901.29 | 706.36 | 800.61 | 937.98 | 248.60 | 765.49 | 253.07 | 1,723.94 | 213.51 | 1,400.00 | 1,850.07 | 1,705.86 | $11,506.78 |
| 7470 Sales Rep Commissions | 0.00 | 0.00 | 17,662.68 | 9,555.95 | 22,267.87 | | 7,611.44 | 28,417.03 | 8,822.41 | 9,035.73 | 11,198.40 | 41,512.70 | $156,084.21 |
| 7480 Security | | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | | | 135.85 | $471.45 |
| 7700 Telephone | 383.60 | | 191.79 | 271.92 | 192.57 | 192.57 | 192.57 | 192.55 | 262.81 | 192.55 | 192.66 | 192.60 | $2,458.19 |

ST-HL-0074324

58

Confidential

| | JAN 2017 | FEB 2017 | MAR 2017 | APR 2017 | MAY 2017 | JUN 2017 | JUL 2017 | AUG 2017 | SEP 2017 | OCT 2017 | NOV 2017 | DEC 2017 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7800 Travel & Entertainment | | | | | | | | | | | | | $0.00 |
| 7801 Transportation | 1,210.02 | 3,081.08 | 2,973.40 | 7.55 | 97.57 | 3,234.11 | 6,222.25 | 8,879.14 | 2,989.58 | 2,909.26 | 8,878.33 | 18,755.27 | $59,237.56 |
| 7805 Lodging | 663.06 | 1,761.15 | 1,061.96 | | | 2,116.00 | | 3,102.32 | 3,615.10 | 1,372.68 | 648.28 | 5,848.98 | $20,189.53 |
| 7810 Meals | 2,517.68 | 1,218.02 | 1,422.35 | 997.94 | 2,663.58 | 1,284.45 | 2,968.52 | 670.56 | 770.07 | 451.13 | 1,604.05 | 1,183.92 | $17,752.27 |
| Total 7800 Travel & Entertainment | 4,390.76 | 6,060.25 | 5,457.71 | 1,005.49 | 2,761.15 | 6,634.56 | 9,190.77 | 12,652.02 | 7,374.75 | 4,733.07 | 11,130.66 | 25,788.17 | $97,179.36 |
| 7845 Small Tools & Equipment | | 1,831.74 | | | | | 1,080.34 | | 1,045.05 | | | | $3,957.13 |
| 7850 Utilities | 257.02 | 519.20 | 549.59 | 301.71 | 301.80 | 300.22 | 248.84 | 361.81 | 301.17 | 432.76 | 39.20 | 300.28 | $3,913.60 |
| Total Expenses | $80,579.44 | $106,661.18 | $82,616.62 | $95,955.76 | $151,976.52 | $70,667.73 | $104,181.52 | $271,113.44 | $167,281.77 | $99,276.16 | $141,471.18 | $217,180.33 | $1,588,961.65 |
| NET OPERATING INCOME | $ -124,899.19 | $110,061.47 | $42,241.85 | $162,543.23 | $35,862.99 | $239,427.86 | $43,915.35 | $ -99,868.11 | $ -143,537.35 | $ -50,629.36 | $ -134,302.88 | $23,685.82 | $104,501.48 |
| Other Income | | | | | | | | | | | | | |
| 8160 Accounting Income | | | | | | | | | 324.80 | 400.40 | 291.20 | 165.20 | $1,181.60 |
| Total Other Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $324.80 | $400.40 | $291.20 | $165.20 | $1,181.60 |
| Other Expenses | | | | | | | | | | | | | |
| 6550 Depreciation Expense | 98.99 | 98.99 | 98.99 | 98.99 | 98.99 | 98.99 | 98.99 | 98.99 | 98.99 | 892.84 | 892.84 | 892.84 | $3,569.43 |
| 8000 Miscellaneous Expense | 1,874.55 | 1,182.05 | 0.00 | 0.00 | | -3,056.60 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | $0.00 |
| 8660 Interest Expense | | 46.93 | 71.15 | 63.53 | 28.90 | 55.99 | | 216.23 | 567.22 | 730.84 | 792.21 | 592.74 | $3,165.74 |
| 8675 Penalties & Settlements | | | | 435.82 | | | | | | | 2,500.00 | | $2,935.82 |
| Total Other Expenses | $1,973.54 | $1,327.97 | $170.14 | $598.34 | $127.89 | $ -2,901.62 | $98.99 | $315.22 | $666.21 | $1,623.68 | $4,185.05 | $1,485.58 | $9,670.99 |
| NET OTHER INCOME | $ -1,973.54 | $ -1,327.97 | $ -170.14 | $ -598.34 | $ -127.89 | $2,901.62 | $ -98.99 | $ -315.22 | $ -341.41 | $ -1,223.28 | $ -3,893.85 | $ -1,320.38 | $ -8,489.39 |
| NET INCOME | $ -126,872.73 | $108,733.50 | $42,071.71 | $161,944.89 | $35,735.10 | $242,329.48 | $43,816.36 | $ -100,183.33 | $ -143,878.76 | $ -51,852.64 | $ -138,196.73 | $22,365.24 | $96,012.09 |

Note
no assurance is provided

# EXHIBIT 12

## Class War, Inc. Profit and Loss – 2018 through August

Confidential

# Class War Inc.

## PROFIT AND LOSS

January 1 - September 1, 2018

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | | | |
| 4000 Sales - Wholesale | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | | $0.00 |
| 4001 Sales - Specialty | 25,701.00 | 22,946.00 | 750.10 | 24,961.66 | 33,096.50 | 6,858.00 | 40,225.45 | 49,549.00 | | $204,087.71 |
| 4003 Discounts - Specialty | -2,983.30 | -432.00 | | -586.87 | -574.41 | -85.00 | -148.88 | -882.51 | | $ -5,692.97 |
| 4004 Refunds - Specialty | | | | | | -293.98 | | | | $ -293.98 |
| 4005 Sales - Majors | 259,761.38 | 307,974.40 | 325,642.38 | 471,586.22 | 694,347.67 | 979,941.30 | 525,899.57 | 736,937.53 | | $4,302,090.45 |
| 4007 Discounts - Majors | -51,952.28 | -61,615.90 | -65,203.86 | -94,328.46 | -138,849.75 | -199,098.30 | -105,179.97 | -147,387.53 | | $ -863,616.05 |
| 4008 Refunds - Majors | | | | -132.50 | | | | -36,290.00 | | $ -36,422.50 |
| 4009 Sales - AIMS | -228.82 | | 9,867.70 | 4,705.36 | 2,481.38 | 3,406.35 | 17,339.22 | | | $37,571.19 |
| **Total 4000 Sales - Wholesale** | **230,297.98** | **268,872.50** | **271,056.32** | **406,205.41** | **590,501.39** | **790,728.37** | **478,135.39** | **601,926.49** | | **$3,637,723.85** |
| 4100 Sales - Retail | | | | | | | | | | $0.00 |
| 4112 Sales - Web | 15,762.49 | 45,235.68 | 12,668.89 | 31,868.85 | 39,406.61 | 64,711.52 | 31,873.50 | 38,232.80 | 781.75 | $280,542.09 |
| 4113 Discounts - Web | -338.00 | -1,618.22 | -247.82 | -529.79 | -408.45 | -1,018.30 | -259.40 | -109.85 | | $ -4,529.83 |
| 4114 Refunds - Web | -501.80 | -1,388.55 | -751.31 | -349.62 | -1,069.48 | -396.35 | -74.29 | -921.46 | | $ -5,452.86 |
| 4135 Sales - Samples | | | | 19,492.00 | | | | | | $19,492.00 |
| **Total 4100 Sales - Retail** | **14,922.69** | **42,228.91** | **11,669.76** | **50,481.44** | **37,928.68** | **63,296.87** | **31,539.81** | **37,201.49** | **781.75** | **$290,051.40** |
| 4250 Royalty Income | 486.61 | 155,097.81 | 4,544.32 | 2,013.10 | 69,614.63 | 7,282.53 | 279.00 | 43,720.94 | | $283,038.94 |
| 4300 Shipping Income - Wholesale | 540.19 | 872.55 | 16.02 | 544.54 | 1,324.41 | 248.01 | 1,713.60 | 771.50 | | $6,030.82 |
| 4305 Shipping Income - Retail | 1,881.00 | 6,745.00 | 2,339.00 | 5,803.00 | 6,464.00 | 7,744.00 | 5,795.00 | 6,653.00 | 136.00 | $43,560.00 |
| 4600 Sales of Product Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | $0.00 |
| 4610 Uncategorized Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |
| **Total Income** | **$248,128.47** | **$473,816.77** | **$289,625.42** | **$465,047.49** | **$705,833.11** | **$869,299.78** | **$517,462.80** | **$690,273.42** | **$917.75** | **$4,260,405.01** |
| Cost of Goods Sold | | | | | | | | | | |
| 5000 Cost of Goods Sold | | | | | | | | | | $0.00 |
| 5002 Screenprinting Specialty | 5,269.70 | 5,002.93 | 16,604.79 | 787.33 | 17,555.18 | 40,572.85 | 21,562.66 | 19,930.18 | | $127,285.62 |
| 5005 Screenprinting Majors | 131,651.41 | 167,196.50 | 157,889.55 | 75,017.50 | 190,128.92 | 330,795.12 | 162,827.81 | 78,448.15 | | $1,293,954.96 |
| 5010 Screenprinting Web | 12,115.54 | 4,811.73 | 37,690.51 | 12,521.96 | 17,244.82 | 46,202.01 | 1,405.12 | 7,185.29 | | $139,176.98 |
| 5012 Screenprinting Print On Demand | | 60.00 | 7,934.61 | | 6,061.49 | 3,979.25 | 9,746.34 | | | $27,781.69 |
| 5015 Production Samples | | 197.50 | 594.68 | | 332.29 | 160.59 | 140.32 | 8.40 | | $1,433.78 |
| 5017 PreProduction Samples | | 310.00 | | 627.25 | 76.38 | 510.92 | 65.20 | 108.00 | | $1,697.75 |
| 5018 Print On Demand | | | 739.35 | 1,502.00 | 20.00 | | 50.20 | | | $2,311.55 |

ST-HL-0074326

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Samples | | | | | | | | | | |
| 5020 Supplies & Materials | 5,848.86 | | 1,468.00 | 2,310.12 | 1,357.33 | | | 14,014.14 | | $24,998.45 |
| 5050 Fulfillment, Freight & Delivery | 7,199.44 | 863.59 | 8,750.55 | 8,335.45 | 9,406.47 | 6,351.75 | 14,579.76 | 8,664.27 | | $64,151.28 |
| **Total 5000 Cost of Goods Sold** | **162,084.95** | **178,442.25** | **231,672.04** | **101,101.61** | **242,182.88** | **428,572.49** | **210,377.41** | **128,358.43** | | **$1,682,792.06** |
| 5100 Merchant Fees | | | | | | | | | | $0.00 |
| 5105 Amazon Pay Fees | | 94.11 | 18.72 | 78.30 | 104.96 | 118.46 | 96.20 | 102.85 | 3.58 | $617.18 |
| 5110 Paypal Fees | 208.69 | 843.78 | 177.43 | 562.85 | 581.56 | 738.31 | 483.43 | 501.93 | 12.46 | $4,110.44 |
| 5120 QuickBooks Payments Fees | 484.45 | 733.08 | 100.04 | 61.28 | 220.29 | 409.11 | 175.77 | 780.18 | | $2,964.20 |
| 5130 Shopify Fees | 339.60 | 892.22 | 284.67 | 691.29 | 1,412.43 | 1,055.34 | 629.95 | 831.68 | | $6,137.18 |
| 5143 Collection Agency Fees | | | 245.00 | | | | | | | $245.00 |
| **Total 5100 Merchant Fees** | **1,032.74** | **2,563.19** | **825.86** | **1,393.72** | **2,319.24** | **2,321.22** | **1,385.35** | **2,216.64** | **16.04** | **$14,074.00** |
| 5200 Cost of E-goods | | | | | | | | 326.00 | | $326.00 |
| 5300 Royalty Expense | 82,280.00 | 82,779.99 | 82,279.99 | 197,473.18 | 197,473.18 | 197,473.18 | 290,000.00 | 303,024.00 | | $1,432,783.52 |
| 5400 Inventory Storage | 525.00 | | 525.00 | | | | | 525.00 | | $1,575.00 |
| 5500 Cost of Goods Sold-1 | | | | | | | 0.00 | | | $0.00 |
| **Total Cost of Goods Sold** | **$245,922.69** | **$263,785.43** | **$315,302.89** | **$299,968.51** | **$441,975.30** | **$628,366.89** | **$501,762.76** | **$434,450.07** | **$16.04** | **$3,131,550.58** |
| GROSS PROFIT | $2,205.78 | $210,031.34 | $ -25,677.47 | $165,078.98 | $263,857.81 | $240,932.89 | $15,700.04 | $255,823.35 | $901.71 | $1,128,854.43 |
| Expenses | | | | | | | | | | |
| 6000 Advertising & Marketing | | | | | | | | | | $0.00 |
| 6005 Digital Strategy | 8,220.35 | 8,250.00 | 5,631.62 | 5,579.09 | 5,623.39 | 8,160.27 | 5,715.42 | 4,014.00 | | $51,194.14 |
| 6010 Print Advertising | | | | 7,500.00 | | | | 7,500.00 | | $15,000.00 |
| 6015 Advertising Production | | | 6,775.00 | | 3,525.00 | | 370.00 | 11.00 | | $10,681.00 |
| 6020 Events | 3,901.86 | 981.43 | | | 1,350.00 | 28.73 | 1,107.98 | | | $7,370.00 |
| 6025 Product Giveaways | | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | 170.00 | | | $1,020.00 |
| 6090 Job Advertisements | | | | 350.23 | 94.77 | 32.12 | | | | $477.12 |
| **Total 6000 Advertising & Marketing** | **12,122.21** | **9,401.43** | **12,576.62** | **13,599.32** | **10,763.16** | **8,391.12** | **7,363.40** | **11,525.00** | | **$85,742.26** |
| 6100 Auto Expense | | | | | | | | | | $0.00 |
| 6103 Fuel | 85.94 | 129.20 | 140.00 | | 70.29 | | 231.55 | 71.94 | | $728.92 |
| 6106 Parking & Tolls | 160.00 | 111.00 | 96.00 | 227.76 | 32.00 | 255.00 | 256.00 | 325.00 | | $1,462.76 |
| 6109 Repairs & Maintenance - Auto | | 545.00 | | | | | | | | $545.00 |
| **Total 6100 Auto Expense** | **245.94** | **785.20** | **236.00** | **227.76** | **102.29** | **255.00** | **487.55** | **396.94** | | **$2,736.68** |
| 6200 Bank Service Charges | 154.00 | 145.93 | 144.00 | 145.00 | 162.00 | 175.00 | 164.00 | 259.00 | | $1,348.93 |
| 6450 Contract Labor | 8,833.33 | 8,333.33 | 8,333.33 | 13,333.00 | 13,833.00 | 13,741.33 | 13,333.33 | 13,333.33 | | $93,073.98 |
| 6650 Dues & Subscriptions | 1,631.52 | 1,556.88 | 1,792.59 | 1,679.53 | 1,185.51 | 1,862.51 | 1,485.84 | 1,167.26 | 52.99 | $12,414.63 |
| 6850 Insurance | | | | | | | | | | $0.00 |

Accrual Basis Thursday, September 6, 2018 01:10 PM GMT-7

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 6875 Workers Comp | | | | | | | 1,652.00 | | | $1,652.00 |
| 6880 Auto Insurance | 140.50 | 140.50 | 140.50 | 140.50 | 140.50 | 140.50 | 140.50 | 140.50 | | $1,124.00 |
| **Total 6850 Insurance** | **140.50** | **140.50** | **140.50** | **140.50** | **140.50** | **140.50** | **1,792.50** | **140.50** | | **$2,776.00** |
| 6900 Janitorial | | 100.00 | 200.00 | 100.00 | | 100.00 | 100.00 | 120.00 | | $720.00 |
| 7150 Office Expenses | 886.56 | 194.40 | 24.98 | 254.50 | 38.85 | 294.50 | 689.41 | 549.56 | 190.00 | $3,122.76 |
| 7155 Mileage | | | 132.25 | | | | | | | $132.25 |
| 7160 Office Supplies | 326.42 | 115.71 | | 387.10 | 518.64 | 67.07 | 277.41 | | | $1,692.35 |
| 7200 Payroll Expenses | | | | | | | | | | $0.00 |
| 7510 Wages | 39,735.49 | 32,483.34 | 38,316.67 | 33,874.37 | 35,540.00 | 40,429.01 | 40,123.34 | 40,123.34 | | $300,625.56 |
| 7650 Taxes | 5,491.06 | 2,923.47 | 2,939.43 | 2,626.22 | 2,868.06 | 3,396.20 | 3,155.99 | 3,069.43 | | $26,469.86 |
| **Total 7200 Payroll Expenses** | **45,226.55** | **35,406.81** | **41,256.10** | **36,500.59** | **38,408.06** | **43,825.21** | **43,279.33** | **43,192.77** | | **$327,085.42** |
| 7250 Professional Fees | | | | | | | | | | $0.00 |
| 7255 Accounting Fees | | | | | 2,907.25 | 7,897.73 | | | | $10,804.98 |
| 7260 Legal Fees | 2,510.81 | 32,225.00 | 48,920.88 | 55,175.25 | 27,049.00 | 13,031.50 | 2,434.50 | 23,149.82 | | $204,496.76 |
| 7265 Payroll Service Fees | 42.00 | 42.00 | 42.00 | 42.00 | 44.00 | 46.00 | 46.00 | 46.00 | | $350.00 |
| **Total 7250 Professional Fees** | **2,552.81** | **32,267.00** | **48,962.88** | **55,217.25** | **30,000.25** | **20,975.23** | **2,480.50** | **23,195.82** | | **$215,651.74** |
| 7380 Reimbursements | | | 0.00 | | 567.70 | -567.70 | 0.00 | 0.00 | | $0.00 |
| 7430 Rent or Lease | 2,550.00 | 2,550.00 | 2,550.00 | 2,550.00 | 2,550.00 | 4,850.00 | 3,950.00 | 3,950.00 | 1,400.00 | $26,900.00 |
| 7440 Research & Development | | | | | | | | | | $0.00 |
| 7441 Art Supplies | | | | | | | 223.98 | | | $223.98 |
| 7442 Artwork | 452.91 | | | | | | | | | $452.91 |
| 7443 Product Development | 25.00 | 8.38 | 382.38 | | 14.00 | | | | | $429.76 |
| **Total 7440 Research & Development** | **477.91** | **8.38** | **382.38** | | **14.00** | | **223.98** | | | **$1,106.65** |
| 7470 Sales Rep Commissions | 17,686.47 | 9,538.13 | 4,807.50 | 4,334.20 | 7,053.30 | 8,855.28 | | 2,505.95 | | $54,780.83 |
| 7480 Security | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | 41.95 | | $335.60 |
| 7700 Telephone | 276.28 | 192.63 | | | | | | | | $468.91 |
| 7800 Travel & Entertainment | | | | | | | | | | $0.00 |
| 7801 Transportation | 5,094.44 | 19,490.89 | 13,038.46 | 18,917.05 | 20,670.63 | 32,266.34 | 35,595.53 | 35,366.50 | 581.45 | $181,021.29 |
| 7805 Lodging | 492.32 | 1,272.71 | 1,013.62 | 238.43 | 1,211.28 | 2,653.88 | 1,521.14 | 722.23 | | $9,125.61 |
| 7810 Meals | 919.49 | 1,555.22 | 1,185.26 | 677.60 | 3,615.63 | 806.74 | 4,299.99 | 945.16 | 28.44 | $14,033.53 |
| **Total 7800 Travel & Entertainment** | **6,506.25** | **22,318.82** | **15,237.34** | **19,833.08** | **25,497.54** | **35,726.96** | **41,416.66** | **37,033.89** | **609.89** | **$204,180.43** |
| 7845 Small Tools & Equipment | | 753.17 | | 2,414.04 | | 229.99 | | | | $3,397.20 |
| 7850 Utilities | 298.52 | 249.10 | 369.08 | 249.23 | 249.08 | 249.08 | 249.08 | 249.02 | | $2,162.19 |
| 7900 Charitable Contributions | | | | | 1,000.00 | | | | | $1,000.00 |
| **Total Expenses** | **$99,957.22** | **$124,099.37** | **$137,187.50** | **$151,007.05** | **$132,125.83** | **$139,213.03** | **$117,334.94** | **$137,660.99** | **$2,252.88** | **$1,040,838.81** |
| NET OPERATING INCOME | $ -97,751.44 | $85,931.97 | $ -162,864.97 | $14,071.93 | $131,731.98 | $101,719.86 | $ -101,634.90 | $118,162.36 | $ -1,351.17 | $88,015.62 |

Confidential

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Other Expenses | | | | | | | | | | |
| 6550 Depreciation Expense | 1,095.33 | 1,095.33 | 1,095.33 | 1,095.33 | 1,095.33 | 1,095.33 | 1,152.88 | 1,152.88 | | $8,877.74 |
| 8000 Miscellaneous Expense | | 0.00 | | | | 0.00 | | 85.79 | | $85.79 |
| 8660 Interest Expense | 602.95 | 1,165.02 | 544.57 | 511.31 | 478.63 | 477.67 | 445.89 | | | $4,226.04 |
| **Total Other Expenses** | **$1,698.28** | **$2,260.35** | **$1,639.90** | **$1,606.64** | **$1,573.96** | **$1,573.00** | **$1,598.77** | **$1,238.67** | **$0.00** | **$13,189.57** |
| NET OTHER INCOME | $ -1,698.28 | $ -2,260.35 | $ -1,639.90 | $ -1,606.64 | $ -1,573.96 | $ -1,573.00 | $ -1,598.77 | $ -1,238.67 | $0.00 | $ -13,189.57 |
| NET INCOME | $ -99,449.72 | $83,671.62 | $ -164,504.87 | $12,465.29 | $130,158.02 | $100,146.86 | $ -103,233.67 | $116,923.69 | $ -1,351.17 | $74,826.05 |

**Note**
no assurance is provided

# EXHIBIT 13

**Class War, Inc. Profit and Loss – through September 30, 2018 [Dkt. 18, pp. 24-26]**

# Class War Inc.

## PROFIT AND LOSS

January - September, 2018

|  | TOTAL |
|---|---|
| **Income** | |
| 4000 Sales - Wholesale | 0.00 |
| 4001 Sales - Specialty | 227,051.71 |
| 4003 Discounts - Specialty | -6,812.57 |
| 4004 Refunds - Specialty | -293.98 |
| 4005 Sales - Majors | 4,974,569.95 |
| 4007 Discounts - Majors | -998,110.95 |
| 4008 Refunds - Majors | -36,422.50 |
| 4009 Sales - AIMS | 37,571.19 |
| **Total 4000 Sales - Wholesale** | **4,197,552.85** |
| 4100 Sales - Retail | |
| 4112 Sales - Web | 330,632.30 |
| 4113 Discounts - Web | -4,535.20 |
| 4114 Refunds - Web | -5,884.85 |
| 4135 Sales - Samples | 19,492.00 |
| **Total 4100 Sales - Retail** | **339,704.25** |
| 4250 Royalty Income | 325,928.89 |
| 4300 Shipping Income - Wholesale | 6,899.33 |
| 4305 Shipping Income - Retail | 51,740.64 |
| 4600 Sales of Product Income | -847.50 |
| 4610 Uncategorized Income | -260.00 |
| **Total Income** | **$4,920,718.46** |
| Cost of Goods Sold | |
| 5000 Cost of Goods Sold | 3,208.40 |
| 5002 Screenprinting Specialty | 158,816.58 |
| 5005 Screenprinting Majors | 1,698,436.25 |
| 5010 Screenprinting Web | 171,949.61 |
| 5012 Screenprinting Print On Demand | 27,781.69 |
| 5015 Production Samples | 2,608.78 |
| 5017 PreProduction Samples | 1,697.75 |
| 5018 Print On Demand Samples | 2,311.55 |
| 5020 Supplies & Materials | 25,084.24 |
| 5050 Fulfillment, Freight & Delivery | 65,063.54 |
| **Total 5000 Cost of Goods Sold** | **2,156,958.39** |
| 5100 Merchant Fees | |
| 5105 Amazon Pay Fees | 698.68 |
| 5110 Paypal Fees | 4,893.23 |
| 5120 QuickBooks Payments Fees | 3,288.43 |
| 5130 Shopify Fees | 7,433.60 |
| 5143 Collection Agency Fees | 245.00 |
| **Total 5100 Merchant Fees** | **16,558.94** |
| 5200 Cost of E-goods | 326.00 |
| 5300 Royalty Expense | 852,072.13 |

| | TOTAL |
|---|---|
| 5400 Inventory Storage | 4,200.00 |
| 5500 Cost of Goods Sold-1 | 0.00 |
| **Total Cost of Goods Sold** | **$3,030,115.46** |
| GROSS PROFIT | **$1,890,603.00** |
| Expenses | |
| 6000 Advertising & Marketing | |
| 6005 Digital Strategy | 59,860.60 |
| 6010 Print Advertising | 15,000.00 |
| 6015 Advertising Production | 10,681.00 |
| 6020 Events | 7,370.00 |
| 6025 Product Giveaways | 1,020.00 |
| 6090 Job Advertisements | 477.12 |
| **Total 6000 Advertising & Marketing** | **94,408.72** |
| 6100 Auto Expense | |
| 6103 Fuel | 745.33 |
| 6106 Parking & Tolls | 1,494.76 |
| 6109 Repairs & Maintenance - Auto | 735.00 |
| **Total 6100 Auto Expense** | **2,975.09** |
| 6200 Bank Service Charges | 1,636.93 |
| 6450 Contract Labor | 102,573.98 |
| 6650 Dues & Subscriptions | 12,929.33 |
| 6850 Insurance | |
| 6853 Business Owners Policy | 804.00 |
| 6875 Workers Comp | 1,652.00 |
| 6880 Auto Insurance | 1,124.00 |
| **Total 6850 Insurance** | **3,580.00** |
| 6900 Janitorial | 720.00 |
| 7150 Office Expenses | 4,555.81 |
| 7155 Mileage | 132.25 |
| 7160 Office Supplies | 1,784.96 |
| 7200 Payroll Expenses | |
| 7510 Wages | 341,248.90 |
| 7650 Taxes | 29,577.54 |
| **Total 7200 Payroll Expenses** | **370,826.44** |
| 7250 Professional Fees | |
| 7255 Accounting Fees | 15,959.20 |
| 7260 Legal Fees | 694,521.24 |
| 7265 Payroll Service Fees | 394.00 |
| 7275 Consulting Services | 490,392.00 |
| **Total 7250 Professional Fees** | **1,201,266.44** |
| 7380 Reimbursements | 439.10 |
| 7430 Rent or Lease | 33,300.00 |
| 7440 Research & Development | |
| 7441 Art Supplies | 223.98 |
| 7442 Artwork | 452.91 |
| 7443 Product Development | 429.76 |
| **Total 7440 Research & Development** | **1,106.65** |
| 7470 Sales Rep Commissions | 59,188.93 |
| 7480 Security | 402.55 |

|  | TOTAL |
|---|---|
| 7700 Telephone | 468.91 |
| 7800 Travel & Entertainment | |
| 7801 Transportation | 222,231.95 |
| 7805 Lodging | 12,960.44 |
| 7810 Meals | 15,831.48 |
| **Total 7800 Travel & Entertainment** | **251,023.87** |
| 7845 Small Tools & Equipment | 5,224.74 |
| 7850 Utilities | 2,840.29 |
| 7900 Charitable Contributions | 1,000.00 |
| **Total Expenses** | **$2,152,384.99** |
| NET OPERATING INCOME | $ -261,781.99 |
| Other Expenses | |
| 6550 Depreciation Expense | 8,877.74 |
| 8000 Miscellaneous Expense | 52.69 |
| 8660 Interest Expense | 5,096.26 |
| **Total Other Expenses** | **$14,026.69** |
| NET OTHER INCOME | $ -14,026.69 |
| NET INCOME | $ -275,808.68 |

**Note**
no assurance is provided

# EXHIBIT 14

## Class War, Inc. Balance Sheet as of September 1, 2018

# Class War Inc.

## BALANCE SHEET

As of September 1, 2018

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | |
| 1000 Bill.com Money Out Clearing | 0.00 | 0.00 | 146.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1001 Paypal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1004 Paypal Class War Inc | 407.37 | 18,278.44 | 9,869.14 | 23,750.59 | 38,025.08 | 22,103.63 | 27,970.26 | 40,519.67 | 40,895.64 |
| 1007 Amazon Pay Clearing | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1015 Petty Cash | 0.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| 1020 City National Chk *3301 Retail | 184,475.01 | 211,842.57 | 229,877.92 | 88,627.19 | 37,387.86 | 94,035.80 | 62,734.77 | 85,532.24 | 85,528.66 |
| 1021 City National Chk *3484 Wholesale | 121,192.87 | 471,093.79 | 313,033.23 | 312,882.30 | 76,509.96 | 177,570.48 | 112,182.98 | 28,764.29 | 152,529.09 |
| 1022 City National Chk *7153 Operating | 393,328.00 | 347,764.43 | 494,647.63 | 494,647.63 | 494,647.63 | 312,279.07 | 735,279.07 | 585,279.07 | 585,279.07 |
| **Total Bank Accounts** | **$699,403.25** | **$1,049,179.23** | **$1,047,774.77** | **$920,107.71** | **$646,770.53** | **$606,188.98** | **$938,367.08** | **$740,295.27** | **$864,432.46** |
| **Accounts Receivable** | | | | | | | | | |
| 1200 Accounts Receivable | 358,632.45 | 139,515.25 | 59,045.92 | 379,071.56 | 659,532.55 | 1,023,458.92 | 476,205.51 | 849,814.83 | 726,050.03 |
| **Total Accounts Receivable** | **$358,632.45** | **$139,515.25** | **$59,045.92** | **$379,071.56** | **$659,532.55** | **$1,023,458.92** | **$476,205.51** | **$849,814.83** | **$726,050.03** |
| **Other Current Assets** | | | | | | | | | |
| 1300 Inventory | | | | | | | | | |
| 1305 Production Inventory-Wholesale | 10,111.64 | 5,109.16 | 6,037.55 | 15,616.30 | 34,245.83 | 80,244.73 | 60,011.02 | 76,046.87 | 76,046.87 |
| 1310 Production Inventory-Web | 15,310.93 | 15,555.17 | 10,158.91 | 5,352.04 | 8,033.09 | 6,561.73 | 18,246.00 | 16,872.17 | 16,872.17 |
| 1330 Promo Inventory | 1,050.00 | 880.00 | 710.00 | 540.00 | 370.00 | 200.00 | 30.00 | 353.97 | 353.97 |
| 1335 AIMS Inventory | | | | | | | | 0.00 | 0.00 | 0.00 |
| **Total 1300 Inventory** | **26,472.57** | **21,544.33** | **16,906.46** | **21,508.34** | **42,648.92** | **87,006.46** | **78,287.02** | **93,273.01** | **93,273.01** |
| 1400 Prepaid Expenses | 1,315.53 | -2,157.30 | -5,630.13 | 7,397.00 | 10,446.50 | 7,016.00 | 6,335.50 | 50,007.00 | 50,259.00 |
| 1440 Undeposited Funds | 0.00 | 0.00 | 0.00 | 67.90 | 842.30 | 15,237.72 | 751.21 | 2,249.76 | 2,786.56 |
| 1476 Loan to/from Lighthouse Strategic | | 762.11 | 50,379.35 | 56,980.95 | 272,484.68 | 280,006.10 | 284,131.02 | 330,995.83 | 330,995.83 |
| 1480 Loan to/from STFU Inc | 8,272.27 | 8,272.27 | 9,347.92 | 10,564.55 | 10,864.55 | 13,659.55 | 13,659.55 | 15,645.05 | 15,645.05 |
| 1485 Loan to/from Sketchy | 3,084.92 | 5,958.00 | 5,833.74 | 7,963.74 | 8,498.29 | -3,156.92 | -3,134.94 | -2,582.98 | -2,582.98 |

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Tank LLC | | | | | | | | | |
| 1490 Loan to/from THOM | 60,000.00 | 60,189.10 | 60,189.10 | 84,689.10 | 114,689.10 | 114,689.10 | 140,689.10 | 140,689.10 | 140,689.10 |
| 1900 Security Deposits | 15,500.00 | 15,500.00 | 15,500.00 | 15,500.00 | 15,500.00 | 15,500.00 | 15,500.00 | 20,500.00 | 20,500.00 |
| **Total Other Current Assets** | **$114,645.29** | **$110,068.51** | **$152,526.44** | **$204,671.58** | **$475,974.34** | **$529,958.01** | **$536,218.46** | **$650,776.77** | **$651,565.57** |
| **Total Current Assets** | **$1,172,680.99** | **$1,298,762.99** | **$1,259,347.13** | **$1,503,850.85** | **$1,782,277.42** | **$2,159,605.91** | **$1,950,791.05** | **$2,240,886.87** | **$2,242,048.06** |
| Fixed Assets | | | | | | | | | |
| 1500 Vehicles | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 | 108,680.46 |
| 1520 Computers & Equipment | 19,796.34 | 19,796.34 | 19,796.34 | 19,796.34 | 19,796.34 | 23,249.26 | 23,249.26 | 23,249.26 | 23,249.26 |
| 1700 Accumulated Depreciation | -14,823.76 | -15,919.09 | -17,014.42 | -18,109.75 | -19,205.08 | -20,300.41 | -21,453.29 | -22,606.17 | -22,606.17 |
| **Total Fixed Assets** | **$113,653.04** | **$112,557.71** | **$111,462.38** | **$110,367.05** | **$109,271.72** | **$111,629.31** | **$110,476.43** | **$109,323.55** | **$109,323.55** |
| Other Assets | | | | | | | | | |
| 1550 Intellectual Property | 210,572.34 | 225,572.34 | 240,572.34 | 240,572.34 | 240,572.34 | 240,572.34 | 240,572.34 | 240,572.34 | 240,572.34 |
| 1560 Leasehold Improvements | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 | 6,338.63 |
| **Total Other Assets** | **$216,910.97** | **$231,910.97** | **$246,910.97** | **$246,910.97** | **$246,910.97** | **$246,910.97** | **$246,910.97** | **$246,910.97** | **$246,910.97** |
| **TOTAL ASSETS** | **$1,503,245.00** | **$1,643,231.67** | **$1,617,720.48** | **$1,861,128.87** | **$2,138,460.11** | **$2,518,146.19** | **$2,308,178.45** | **$2,597,121.39** | **$2,598,282.58** |
| **LIABILITIES AND EQUITY** | | | | | | | | | |
| Liabilities | | | | | | | | | |
| Current Liabilities | | | | | | | | | |
| Accounts Payable | | | | | | | | | |
| 2000 Accounts Payable | 1,343,970.90 | 1,405,807.07 | 1,544,241.32 | 1,790,869.52 | 1,938,820.46 | 2,252,486.11 | 2,140,948.85 | 2,328,735.18 | 2,330,135.18 |
| **Total Accounts Payable** | **$1,343,970.90** | **$1,405,807.07** | **$1,544,241.32** | **$1,790,869.52** | **$1,938,820.46** | **$2,252,486.11** | **$2,140,948.85** | **$2,328,735.18** | **$2,330,135.18** |
| Credit Cards | | | | | | | | | |
| 2100 City National *6790 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2103 City National Bank 2532 Visa | 5,195.91 | 5,299.72 | 6,674.06 | 0.00 | 14.00 | 14.00 | 0.00 | 50.00 | 50.00 |
| 2105 Amex CC 1006 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2110 Amex Delta Skymiles 61005 | 1,113.01 | 4,476.86 | 5,171.94 | 3,283.17 | 4,384.16 | 85.00 | 7,420.65 | 41.42 | 1,146.30 |
| **Total Credit Cards** | **$6,308.92** | **$9,776.58** | **$11,846.00** | **$3,283.17** | **$4,398.16** | **$99.00** | **$7,420.65** | **$91.42** | **$1,196.30** |
| Other Current Liabilities | | | | | | | | | |
| 2200 Payroll Liabilities | | | | | | | | | |
| 2210 Federal Taxes (941/944) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2230 CA PIT / SDI | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2231 CA SUI / ETT | 1,088.67 | 1,463.00 | 1,470.00 | 29.73 | 157.13 | 416.12 | 73.88 | 73.88 | 73.88 |
| 2250 Federal | 186.63 | 250.80 | 252.00 | 257.10 | 278.94 | 323.33 | 336.00 | 336.00 | 336.00 |

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Unemployment (940) | | | | | | | | | |
| 2260 Employee Advance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2265 Repayment | | | | | | | | | |
| 2268 Cash Advance Repayment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total 2265 Repayment** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total 2200 Payroll Liabilities** | **1,275.30** | **1,713.80** | **1,722.00** | **286.83** | **436.07** | **739.45** | **409.88** | **409.88** | **409.88** |
| 2300 Sales Tax Payable | 1,410.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2305 StitchTaxAgency Payable | 4,113.18 | 4,414.22 | 4,695.84 | 3,341.39 | 4,320.81 | 4,869.95 | 4,869.95 | -4.20 | -4.20 |
| 2310 CA BOE Payable | | | | | | 846.20 | 1,661.42 | 1,597.72 | 1,605.20 |
| **Total 2300 Sales Tax Payable** | **5,523.45** | **4,414.22** | **4,695.84** | **3,341.39** | **4,320.81** | **5,716.15** | **6,531.37** | **1,593.52** | **1,601.00** |
| 2320 Accrued Sales Rep Comm | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2400 Amex Clearing | 44,038.62 | 39,946.65 | 39,946.65 | 39,946.65 | 39,946.65 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2405 Loan to/from Matt Roberts | 2,700.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2410 CW to/from JD Creative | 17,578.57 | 17,578.57 | 17,578.57 | 17,578.57 | 17,578.57 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2411 CW to/from Sketchy Tank | 31,934.61 | 31,934.61 | 31,934.61 | 31,934.61 | 31,934.61 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2500 Loan to/from Shareholder - Jesse Dawber | -59,210.97 | -59,303.88 | -59,612.21 | -60,956.17 | -60,956.17 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3000 Persion Plan Payable | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3020 Gift Certificates Outstanding | | | | | | | 50.00 | 50.00 | 50.00 |
| **Total Other Current Liabilities** | **$43,839.58** | **$36,283.97** | **$36,265.46** | **$32,131.88** | **$33,260.54** | **$6,455.60** | **$6,991.25** | **$2,053.40** | **$2,060.88** |
| **Total Current Liabilities** | **$1,394,119.40** | **$1,451,867.62** | **$1,592,352.78** | **$1,826,284.57** | **$1,976,479.16** | **$2,259,040.71** | **$2,155,360.75** | **$2,330,860.00** | **$2,333,392.36** |
| Long-Term Liabilities | | | | | | | | | |
| 3050 City National Loan | 94,275.54 | 92,842.37 | 91,350.89 | 88,362.20 | 85,340.83 | 82,318.50 | 79,264.39 | 75,764.39 | 75,764.39 |
| **Total Long-Term Liabilities** | **$94,275.54** | **$92,842.37** | **$91,350.89** | **$88,362.20** | **$85,340.83** | **$82,318.50** | **$79,264.39** | **$75,764.39** | **$75,764.39** |
| **Total Liabilities** | **$1,488,394.94** | **$1,544,709.99** | **$1,683,703.67** | **$1,914,646.77** | **$2,061,819.99** | **$2,341,359.21** | **$2,234,625.14** | **$2,406,644.39** | **$2,409,156.75** |
| Equity | | | | | | | | | |
| 3100 Opening Balance Equity | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3200 Owner Distribution | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 | -1,595,432.49 |
| 3500 Retained Earnings | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 | 1,709,732.27 |

ST-HL-0074305

Confidential

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 1, 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Net Income | -99,449.72 | -15,778.10 | -180.282.97 | -167,817.68 | -37,659.66 | 62,487.20 | -40,746.47 | 76,177.22 | 74,826.05 |
| Total Equity | $14,850.06 | $98,521.68 | $ -65,983.19 | $ -53,517.90 | $76,640.12 | $176,786.98 | $73,553.31 | $190,477.00 | $189,125.83 |
| TOTAL LIABILITIES AND EQUITY | $1,503,245.00 | $1,643,231.67 | $1,617,720.48 | $1,861,128.87 | $2,138,460.11 | $2,518,146.19 | $2,308,178.45 | $2,597,121.39 | $2,598,282.58 |

**Note**
no assurance is provided

# EXHIBIT 15

## Class War, Inc. Balance Sheet as of September 30, 2018 [Dkt. 18, pp. 20-22]

# Class War Inc.

## BALANCE SHEET

As of September 30, 2018

|  | TOTAL |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| 1000 Bill.com Money Out Clearing | 0.00 |
| 1001 Paypal | 0.00 |
| 1004 Paypal Class War Inc | 21,942.39 |
| 1007 Amazon Pay Clearing | 0.00 |
| 1015 Petty Cash | 200.00 |
| 1020 City National Chk *3301 Retail | 34,629.35 |
| 1021 City National Chk *3484 Wholesale | 163,663.93 |
| 1022 City National Chk *7153 Operating | 35,279.07 |
| **Total Bank Accounts** | **$255,714.74** |
| Accounts Receivable | |
| 1200 Accounts Receivable | 564,532.43 |
| **Total Accounts Receivable** | **$564,532.43** |
| Other Current Assets | |
| 1300 Inventory | |
| 1305 Production Inventory-Wholesale | 76,046.87 |
| 1310 Production Inventory-Web | 16,872.17 |
| 1330 Promo Inventory | 353.97 |
| 1335 AIMS Inventory | 0.00 |
| Total 1300 Inventory | 93,273.01 |
| 1400 Prepaid Expenses | 52,803.26 |
| 1440 Undeposited Funds | 20,914.99 |
| 1476 Loan to/from Lighthouse Strategic | 0.00 |
| 1480 Loan to/from STFU Inc | 45,000.00 |
| 1485 Loan to/from Sketchy Tank  LLC | -2,920.23 |
| 1490 Loan to/from THOM | 158,689.10 |
| 1900 Security Deposits | 170,500.00 |
| **Total Other Current Assets** | **$538,260.13** |
| **Total Current Assets** | **$1,358,507.30** |
| Fixed Assets | |
| 1500 Vehicles | 108,680.46 |
| 1520 Computers & Equipment | 23,249.26 |
| 1700 Accumulated Depreciation | -22,606.17 |
| **Total Fixed Assets** | **$109,323.55** |
| Other Assets | |
| 1550 Intellectual Property | 195,572.34 |
| 1560 Leasehold Improvements | 6,338.63 |
| **Total Other Assets** | **$201,910.97** |
| **TOTAL ASSETS** | **$1,669,741.82** |

|  | TOTAL |
|---|---|
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 2000 Accounts Payable | 1,735,768.80 |
| **Total Accounts Payable** | **$1,735,768.80** |
| Credit Cards | |
| 2100 City National *6790 | 0.00 |
| 2103 City National Bank 2532 Visa | 50.00 |
| 2105 Amex CC 1006 | 0.00 |
| 2110 Amex Delta Skymiles 61005 | 19,068.66 |
| **Total Credit Cards** | **$19,118.66** |
| Other Current Liabilities | |
| 2200 Payroll Liabilities | |
| 2210 Federal Taxes (941/944) | 0.00 |
| 2230 CA PIT / SDI | 0.00 |
| 2231 CA SUI / ETT | 73.88 |
| 2250 Federal Unemployment (940) | 336.00 |
| 2260 Employee Advance | 0.00 |
| 2265 Repayment | |
| 2268 Cash Advance Repayment | 0.00 |
| **Total 2265 Repayment** | **0.00** |
| **Total 2200 Payroll Liabilities** | **409.88** |
| 2300 Sales Tax Payable | 0.00 |
| 2305 StitchTaxAgency Payable | -4.20 |
| 2310 CA BOE Payable | 2,772.97 |
| **Total 2300 Sales Tax Payable** | **2,768.77** |
| 2320 Accrued Sales Rep Comm | 0.00 |
| 2400 Amex Clearing | 0.00 |
| 2405 Loan to/from Matt Roberts | 0.00 |
| 2410 CW to/from JD Creative | 0.00 |
| 2411 CW to/from Sketchy Tank | 0.00 |
| 2500 Loan to/from Shareholder - Jesse Dawber | 0.00 |
| 3000 Pension Plan Payable | 0.00 |
| 3020 Gift Certificates Outstanding | 50.00 |
| **Total Other Current Liabilities** | **$3,228.65** |
| **Total Current Liabilities** | **$1,758,116.11** |
| Long-Term Liabilities | |
| 3050 City National Loan | 73,134.61 |
| **Total Long-Term Liabilities** | **$73,134.61** |
| **Total Liabilities** | **$1,831,250.72** |
| Equity | |
| 3100 Opening Balance Equity | 0.00 |
| 3200 Owner Distribution | -1,595,432.49 |
| 3500 Retained Earnings | 1,709,732.27 |
| Net Income | -275,808.68 |
| **Total Equity** | **$ -161,508.90** |

|  | TOTAL |
|---|---|
| **TOTAL LIABILITIES AND EQUITY** | **$1,669,741.82** |

**Note**
no assurance is provided

# EXHIBIT 16

# September 25, 2018 Verdict against Jesse Dawber and Class War, Inc.

F I L E D
Clerk of the Superior Court

SEP 25 2018

BY Noreen McKinley, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, NORTH COUNTY REGIONAL CENTER

| | |
|---|---|
| JACK SCHINDLER, an individual, | Case No. 37-2015-00026810-CU-BT-NC |
| Plaintiff, | **VERDICT FORM** |
| vs. | |
| JESSE DAWBER, an individual, and DOES 1-50, inclusive, | Judge: Earl H. Maas, III<br>Dept.: N-28 |
| Defendants. | |
| AND RELATED CROSS-ACTION. | |

We, the jury, answer the questions submitted to us as follows:

[For Questions 1 – 5, select one of the two options listed and, if the first option is selected, fill in the appropriate sum.]

      1.    On Jack Schindler's claim for Breach of Contract:

           ✓ We find in favor of Jack Schindler and against Jesse Dawber and Class War, Inc. in the sum of $ 5,391,041 .

           _____ We find in favor of Jesse Dawber and Class War, Inc. against Jack Schindler.

///

1

2. On Jack Schindler's claim for Breach of the Duty of Good Faith and Fair Dealing:

_✓_ We find in favor of Jack Schindler and against Jesse Dawber and Class War, Inc. in the sum of $ _O_____.

_____ We find in favor of Jesse Dawber and Class War, Inc. against Jack Schindler.

3. On Jack Schindler's claim for Intentional Interference with Contractual Relations:

_✓_ We find in favor of Jack Schindler and against Class War, Inc. in the sum of $_O_____.

_____ We find in favor of Class War, Inc. against Jack Schindler.

4. On Jack Schindler's claim for Breach of Fiduciary Duty:

_✓_ We find in favor of Jack Schindler and against Jesse Dawber in the sum of $_O_____.

_____ We find in favor of Jesse Dawber against Jack Schindler.

5. On Jack Schindler's claim for Constructive Fraud:

_✓_ We find in favor of Jack Schindler and against Jesse Dawber in the sum of $_C_____.

_____ We find in favor of Jesse Dawber against Jack Schindler.

///
///
///
///
///
///
///
///

2

[Answer Question 6 below only if you find in favor of Plaintiff on *at least* one of his claims in Questions 2, 3, 4, or 5.]

  6. Do you find by clear and convincing evidence that Jesse Dawber or Class War, Inc. acted with malice, oppression, or fraud?

As to Jesse Dawber:

  ✓ Yes

  _____ No

As to Class War, Inc.:

  ✓ Yes

  _____ No

[For Questions 7 – 10, select one of the two options listed and, if the first option is selected, fill in the appropriate sum.]

  7. On Jesse Dawber's claim for Breach of Contract:

    _____ We find in favor of Jesse Dawber and against Jack Schindler in the sum of $_____.

    ✓ We find in favor of Jack Schindler and against Jesse Dawber.

  8. On Jesse Dawber's claim for Breach of the Fiduciary Duty:

    ✓ We find in favor of Jesse Dawber and against Jack Schindler in the sum of $ 5,581.

    _____ We find in favor of Jack Schindler against Jesse Dawber.

  9. On Jesse Dawber's claim for Conversion:

    _____ We find in favor of Jesse Dawber and against Jack Schindler and Major Award Distribution, Inc. in the sum of $_____.

    ✓ We find in favor of Jack Schindler and Major Award Distribution, Inc. against Jesse Dawber.

3

1       10.    On Jesse Dawber's claim for Breach of Implied Covenant of Good Faith and Fair
                     Dealing:

2

3              _____ We find in favor of Jesse Dawber and against Jack Schindler and Major

4              Award Distribution, Inc. in the sum of $_____.

5              ✓ We find in favor of Jack Schindler and Major Award Distribution, Inc.

6              against Jesse Dawber.

7

8 [Answer Question 11 below only if you find in favor of Cross-Complainant on *at least* one of his
    claims in Questions 8, 9 or 10.]

9

10       11.    Do you find by clear and convincing evidence that Jack Schindler or Major Award
                     Distribution, Inc. acted with malice, oppression, or fraud towards Jesse Dawber?

11              As to Jack Schindler:

12

13              _____ Yes

14              ✓ No

15              As to Major Award Distribution, Inc.:

16              _____ Yes

17              ✓ No

18

19 Signed: _____
                 Presiding Juror

20

21 Dated: 9/25/18

22 [After this verdict form has been signed, notify the bailiff that you are ready to present your
    verdict in the courtroom.]

23

24

25

26

27

28

4

GENERAL VERDICT FORM

# EXHIBIT 17

## License Agreement dated February 27, 2017 between Class War, Inc. and Zumiez

# LICENSE AGREEMENT

This License Agreement (**"Agreement"**) dated as of February 27, 2017 (the **"Effective Date"**), is entered into by and between Class War Inc. (**"Licensor"**), a corporation operating the business named "Sketchy Tank" with a principal place of business at 391 Ocean View Avenue, Encinitas, California 92024, and Zumiez Services Inc. (**"Zumiez"**), a Washington corporation with its principal place of business at 4001 204th Street SW, Lynnwood, Washington 98036 (each a **"Party"** and collectively, the **"Parties"**).

## RECITALS

A. Licensor is the owner of or otherwise has all rights to the trademarks, characters, designs, images, photos and logos, as set forth on, or otherwise described in, Exhibit A (the **"Licensed Properties"**).

B. Licensor has used certain of the Licensed Properties in connection with the Sketchy Tank name or related derivations of the Sketchy Tank name.

C. Zumiez desires to use the Licensed Properties in the **"Territory"** (as defined below) through all of its channels of distribution and sale in connection with the categories of products specified in Exhibit B (the **"Licensed Products"**).

D. Licensor is willing to allow Zumiez to use the Licensed Properties on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and for such other good and valuable consideration, receipt of which is hereby acknowledged, Licensor and Zumiez do hereby respectively grant, covenant, and agree as follows:

1. Definitions.

**"Confidential Information"** has the meaning as set forth in Section 10.

**"Effective Date"** means the date of this Agreement as set forth in the preamble.

**"Licensed Products"** means the categories of products listed in Exhibit B and any other categories of products that may be agreed upon in writing by Licensor and Zumiez from time to time.

**"Licensed Properties"** means all intellectual property, including, but not limited to, the trademarks, characters, designs, images, photos and logos, as set forth on, or otherwise described in, Exhibit A, which are all owned or licensed by Licensor.

**"Licensor Sales"** has the meaning set forth in Section 2.1.

**"Net Sales"** means the gross invoice price of Licensed Products sold by or on behalf of Zumiez less taxes, returns, customary markdowns and sales and trade discounts (e.g., employee discounts), insurance and freight.

1

ST-HL-037305
435-0C

**"Person"** means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

**"Produced Licensed Products"** has the meaning set forth in Exhibit C.

**"Sell-Off Period"** has the meaning given to it in Section 8.4.

**"Term"** has the meaning given to it in Section 2.2

**"Territory"** means any location worldwide where Zumiez or any of its subsidiaries or affiliates operates and/or sells products.

2.    License Granted.

2.1    Grant of License. Licensor hereby grants to Zumiez an *exclusive* license throughout the Territory to use the Licensed Properties for the purpose of manufacturing, importing, exporting, marketing, distributing, promoting, advertising, and selling Produced Licensed Products in all of Zumiez' and/or its subsidiaries and affiliates' online and brick and mortar retail channels of distribution and sale, subject to the limitations, terms and conditions set forth herein.

Notwithstanding the foregoing exclusive licenses, Licensor does reserve the right to conduct the following with respect to Produced Licensed Products: Licensor may sell Produced Licensed Products on Licensor's owned websites (including, for example, www.sketchytank.com) and any owned retail stores that Licensor  may operate from time to time (the foregoing, **"Licensor Sales"**).

2.2    Term. The term of this Agreement and the license granted hereunder will commence upon the Effective Date and will continue until two (2) years after the first receipt of Licensed Products by Zumiez. unless sooner terminated as provided herein (the **"Term"**). This Agreement will automatically be renewed for one (1) year periods after the initial term, unless either Party gives to the other Party written notice of intention to terminate the Agreement thirty (30) days prior to the termination date.

3.    Licensor Obligations

3.1    Marketing Obligations. Licensor agrees to reasonably cooperate with efforts by Zumiez with respect to the creation of marketing materials and web assets for Licensed Products.

3.2    Prohibited Distribution/Licensing. Except for approved Licensor Sales, Licensor agrees during the term of this Agreement, or within a six (6) month period after the expiration of the term of this Agreement, Licensor will not sell, distribute, or license any Produced Licensed Products.

3.3    Licensor Obligations. Licensor and its representatives will not take any action that damages the reputation of Zumiez or reflects negatively upon Zumiez or the products or merchandise of Zumiez, including the Licensed Products. Additionally, Licensor will not

2

ST-HL-037306

435-0C

commit any act or be involved in any occurrence which violates widely-held principles of public morality or decency, constitutes a criminal misdemeanor or a felony in the jurisdiction in which it is committed, or reflects unfavorably on Licensor, Zumiez or the Licensed Products.

4.      Royalties, Statements, and Examination of Books.

4.1     Royalties. As consideration for the license herein granted, Zumiez agrees to pay Licensor royalties equal to ten percent (10%) of the Net Sales of Produced Licensed Products sold by or on behalf of Zumiez. Such royalties will be payable within thirty (30) days following the close of each calendar quarter for sales during such quarter, beginning with the calendar quarter in which the first sale or disposition of Produced Licensed Products occurs.

4.2     Statements. Zumiez will maintain accurate records showing the quantity and sales price of Licensed Products sold by Zumiez. Within 30 days after the end of each calendar quarter, Zumiez will deliver to Licensor a statement in writing, relating to the preceding calendar quarter which will state: (i) the quantity of Licensed Products sold during the preceding quarter; (ii) the Net Sales price of all Licensed Products sold during such quarter; (iii) the amount of any credit against accrued royalties for such quarter permitted under this Section 4; and (iv) an itemized statement of royalties due Licensor for sales made during such quarter.

4.3     Examination of Books and Records. Licensor, at its own expense, may have a qualified, independent third party examine the books and records of Zumiez, once per calendar year, during normal business hours and at reasonable times to obtain or verify the information described in Sections 4.1 and 4.2.

5.      Design and Production Procedures. The Parties agree to use the design and production procedures with respect to the Licensed Products as set forth on Exhibit C.

6.      Use of the Licensed Properties; Other Obligations.

6.1     No Other Marks. Apart from the Licensed Properties, no other trademark or logo may be affixed to, or used in connection with, the Licensed Products except that Zumiez may use its trademarks and logos, and those of its suppliers, on packaging, advertising and promotional materials for the Licensed Products, unless the Parties agree otherwise as provided in this Agreement.

6.2     Acknowledgement of Ownership. Zumiez acknowledges that Licensor represents that Licensor is the owner of the Licensed Properties worldwide, including any trademarks, characters, design, images, photos, or logos that are later filed or applied for by Licensor which will become subject to this Agreement. Any goodwill derived from the use by Zumiez of such Licensed Properties shall inure to the benefit of Licensor. If Zumiez acquires any rights in the Licensed Properties, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by of the Parties. Zumiez agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Properties or the validity of the Licensed Properties. Licensor agrees not to dispute or challenge or assist any Person in disputing or challenging Zumiez' rights in and to Zumiez trademarks or the validity of Zumiez trademarks.

3

6.3     Zumiez Restrictions. Zumiez agrees that it shall not, during the Term, directly or indirectly:

    (a)     take any action that damages the reputation of Licensor or reflects negatively upon Licensor or the Licensor Properties or which will or may invalidate or jeopardize any registration or protection of the Licensed Properties; or

    (b)     apply for, or obtain, or assist any Person in applying for or obtaining any intellectual property protection, including, but not limited to, registration of the Licensed Properties, or any trademark, service mark, trade name or other indicia confusingly similar to the Licensed Properties in the Territory.

6.4     No Encumbrances. Zumiez shall not grant or attempt to grant a security interest in, or otherwise encumber, the Licensed Properties or record any such security interest or encumbrance against any application or registration regarding the Licensed Properties, including, but not limited to, in the United States Patent and Trademark Office or elsewhere.

6.5     Compliance With Laws. In exercising its rights under this Agreement, Zumiez shall comply with, and shall ensure that each Licensed Product sold or otherwise supplied by Zumiez or a sublicensee complies with, all applicable legal rules and laws.

6.6     Damaged or Defective Products. Zumiez shall not sell, market, distribute or use for any purpose, or permit any third party to sell, market, distribute or use for any purpose, any Licensed Products which are damaged or defective.

6.7     Subcontracting. Zumiez shall have the right to subcontract the manufacture of the Licensed Products provided that:

    (a)     Zumiez shall be liable for all acts and omissions of any subcontractor and shall indemnify, defend and hold harmless Licensor against all costs, expenses, claims, losses or damages (whether direct, indirect or consequential and including without limitation any economic loss or other loss of profits, business or goodwill) incurred or suffered by Licensor, or for which Licensor may become liable arising out of any act or omission of any subcontractor, including but not limited to any product liability claim relating to the Licensed Products manufactured by the subcontractor.

6.8     Product Recall. Zumiez agrees to take all reasonable steps, which may include, without limitation, product recalls, to abate any health or safety risks posed by the Licensed Products as expeditiously as possible. Zumiez shall have complete responsibility for determining if a product recall is required and Zumiez shall bear responsibility for all costs and expenses associated with any recall of the Licensed Products.

7.     Indemnity

7.1     By Zumiez. Zumiez hereby agrees to indemnify and hold harmless Licensor from and against any third party losses, expenses, damages, injuries, liabilities and claims (including

4

reasonable attorneys' fees, costs and expenses) whether based upon strict liability, negligence, tort, contract or otherwise, arising out of or relating to (i) the manufacture, sale, use, advertising, promotion, offering for sale, or distribution of Licensed Products; (ii) the merchantability, quality, design, nonconformity or fitness for a particular purpose of the Licensed Products; and (iii) the breach by Zumiez of any of the terms or conditions of this Agreement.

7.2     By Licensor. Licensor hereby agrees to indemnify, defend, and hold harmless Zumiez from and against any third party losses, expenses, damages, injuries, liabilities and claims (including reasonable attorneys' fees, costs and expenses) whether based upon strict liability, negligence, tort, contract or otherwise, arising out of or relating to (i) any claim that the use of the Licensed Properties violates any copyright, trademark, right of privacy, or similar right; and (ii) the breach by Licensor of any of the terms or conditions of this Agreement.

7.3     Indemnification Procedures. In the event of a potential indemnity obligation under this Section 7, the indemnified Party will: (a) promptly notify the indemnifying Party in writing of such claim, provided that the failure to provide such notice will not relieve the indemnifying Party of its obligations hereunder except to the extent such failure prejudices its ability to defend the claim; (b) allow the indemnifying Party to have sole control of the defense and settlement of the claim, provided however that all settlements will be subject to the indemnified Party's written approval, which will not be unreasonably withheld, conditioned, or delayed; and (c) upon request of the indemnifying Party, cooperate in all reasonable respects, at the indemnifying Party's cost and expense, with the indemnifying Party in the investigation, trial, and defense of such claim and any appeal arising therefrom.

8.      Termination.

8.1     Termination by Licensor. In addition to the termination provisions set forth in Section 2.2, Licensor will have the right to terminate this Agreement and the license granted hereunder: (i) upon a breach by Zumiez of any of the terms or conditions of this Agreement, which breach is not cured within thirty (30) days after delivery of notice specifying such breach; or (ii) in the event Zumiez will apply for or consent to the appointment of a receiver, trustee or liquidator or will otherwise be the subject of any bankruptcy, reorganization, or insolvency proceedings, or makes an assignment for the benefit of creditors, or becomes insolvent or discontinues substantially all its business, or a receiver is appointed for it or its business.

8.2     Termination by Zumiez. In addition to the termination provisions set forth in Section 2.2, Zumiez will have the right to terminate this Agreement and the license granted hereunder: (i) upon a breach by Licensor of any of the terms or conditions of this Agreement, which breach is not cured within thirty (30) days after delivery of notice specifying such breach; or (ii) in the event Licensor will apply for or consent to the appointment of a receiver, trustee or liquidator or will otherwise be the subject of any bankruptcy, reorganization, or insolvency proceedings, or makes an assignment for the benefit of creditors, or becomes insolvent or discontinues substantially all its business, or a receiver is appointed for it or its business.

8.3     Sale of Licensed Products Following Expiration or Termination. Except as provided in Section 8.4, Zumiez will cease to manufacture or sell the Licensed Products following expiration or termination of this Agreement.

8.4 <u>Sell-Off Period</u>. Zumiez shall for a period of one (1) year after the date of termination have the right to dispose of all Licensed Products in its possession at the time of termination in accordance with the terms of this Agreement (the "**Sell-Off Period**"). For all products sold during this Sell-Off Period, Zumiez shall provide Licensor with royalty payments as set forth in Section 4.1. Within thirty (30) days following any expiration or termination of this Agreement, Zumiez will advise Licensor in writing of the type and quantity of any inventory of Licensed Products still held by Zumiez.

8.5 <u>Effect of Termination</u>. On expiration or termination of this Agreement for any reason and subject to any express provisions set out elsewhere in this Agreement:

      (a)    All rights and licenses granted pursuant to this Agreement shall cease;

      (b)    Zumiez shall cease all use of the Licensed Properties except as expressly permitted pursuant to Section 8.4.

9.     <u>Representations and Warranties</u>.

9.1     <u>By Licensor</u>. Licensor represents and warrants that it: (i) has an ownership interest or other basis for its control of the Licensed Properties; (ii) has the right to grant the license granted by this Agreement without infringing or violating any third party rights; (iii) Zumiez can exercise all of the rights granted to it by Licensor according to the terms and conditions of this Agreement without infringing any third party rights; and (iv) has the corporate or limited liability company authority to enter into and be bound by the terms and conditions of this Agreement.

9.2     <u>By Zumiez</u>. Zumiez represents and warrants that it: (i) will use commercially reasonable efforts to market and sell the Licensed Products; and (ii) has the corporate authority to enter into and be bound by the terms and conditions of this Agreement.

10.     <u>Confidentiality</u>

10.1     <u>Zumiez Obligations</u>. Zumiez and Licensor each agree:

      (a)    Not to disclose or otherwise make available to any third party any information that is treated as confidential by the other Party, including without limitation, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing and marketing (collectively the "**Confidential Information**") without the prior written consent of the disclosing Party; *provided however*, that the receiving Party may disclose the Confidential Information to its officers, employees, consultants and legal advisors who have a "need to know," who have been apprised of this restriction and who are themselves bound by nondisclosure restrictions at least as restrictive as set forth in this Section 10.

      (b)    to use the Confidential Information only as permitted under this Agreement; and

      (c)    to immediately notify the disclosing Party in the event it becomes aware of any loss or disclosure of any Confidential Information.

6

ST-HL-037310
435-00

10.2 Exceptions. Confidential Information shall not include information that:

(a)    is already known to the receiving Party without restriction on use or disclosure prior to receipt of such information from Licensor;

(b)    is or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, the receiving Party;

(c)    is received by the receiving Party from a third party who is not under any obligation to Licensor to maintain the confidentiality of such information; or

(d)    is required to be disclosed by Law, including without limitation, pursuant to the terms of a court order; provided that the receiving Party has given the disclosing Party prior written notice of such disclosure and an opportunity to contest such disclosure.

It shall be the obligation of the receiving Party to prove that such an exception to the definition of Confidential Information exists.

11.    Miscellaneous.

11.1    Notices. All notices and reports in connection with this Agreement and payments required hereunder, will be in writing and will be given by postpaid registered or certified mail, return receipt requested, addressed to the addresses set forth in the preamble hereof, or to such other address as either Party may notify in writing to the other Party. Notice will be deemed given when mailed.

11.2    Entire Agreement; Amendment. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any pre-existing or contemporaneous agreement and any oral or written communications between the parties. The provisions of this Agreement may not be waived, modified, altered or amended except by a written document signed by duly authorized representatives of both parties.

11.3    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11.4    Governing Law; Forum. This Agreement will be construed and interpreted in accordance with the laws of the State of Washington. Any litigation or other proceeding to interpret or enforce the provisions of this Agreement or the parties' rights and liabilities arising hereunder will be maintained only in the courts in King County, Washington, U.S.A.

11.5    Waivers. Failure of either Party to insist upon strict performance of any covenants, terms or conditions of this Agreement, or to exercise any rights or remedies upon default, will not

constitute a waiver or relinquishment of its right to insist upon strict compliance with this Agreement and to enforce all legal and equitable rights as to any such default or breach, whether of like or unlike kind.

11.6    Relationship of Parties. This Agreement does not constitute, and will not be construed as, an agency, partnership, or joint venture between Licensor and Zumiez.

11.7    Successors and Assigns: Assignment. This Agreement will be binding upon and inure to the benefit of each Party, its successors and assigns. Neither Patty may transfer, assign or encumber this Agreement or any rights hereunder, or delegate its duties hereunder, without the prior written consent of the other Party, which consent may not be unreasonably withheld, delayed or conditioned.

11.8    Headings. Section headings used in this Agreement are for convenience only and will not be used in the construction or interpretation of this Agreement.

11.9    Construction. The language in all parts of this Agreement will be in all cases construed according to its fair meaning and not strictly for or against any of the parties hereto.

11.10   Counterparts. This Agreement may be executed in any number of identical counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same instrument when each Party has signed one such counterpart.

*\*\*\*the remainder of this page intentionally left blank\*\*\**

8

ST-HL-037312
435-009

# LICENSE AGREEMENT

IN WITNESS WHEREOF, the parties, through their duly authorized representatives, have executed this Agreement as of the date first set forth above.

LICENSOR:

CLASS WAR INC.

By: _____

Its: FOUNDER / CEO

ZUMIEZ SERVICES INC.:

By: _____

Its: SR Director

## EXHIBIT A

### Licensed Properties

All trademarks, characters, designs, images, photos and logos of the Licensor, whether previously created or created during the term of the Agreement, including, without limitation, all trademarks, characters, designs, images, photos and logos of Licensor displayed and otherwise referenced on Licensor's website at https://www.sketchytank.com or any website of Licensor.

ST-HL-037314
435-01

## **EXHIBIT B**

### Licensed Products

Zumiez may use the Licensed Properties in connection with any of the following categories or items, each of which will be considered Licensed Products:

- Men's apparel

- Women's apparel

- Accessories

ST-HL-037315
435-01

## EXHIBIT C

### Design and Production Procedures

Unless the Parties otherwise agree, the following design and production procedures will apply:

- Licensor will continue to design its product lines consistent with current product offerings and send AI files of each collection to Zumiez. In connection therewith, upon the request of Zumiez, Licensor agrees to provide Zumiez within 5 business days of such request, all styling ideas, artwork necessary for styles, any specific artwork pantone callouts, artwork scale requirements, and/or trim qualities, each in connection with a requested Licensed Product.

- Zumiez will scale the artwork and further develop the Licensed Product from a fit and finish perspective.

- After the design steps set forth above, Zumiez will provide a sample of the Licensed Product not correct for fit and finish, but which will be styled in a similar manner to the desired final product. The aforementioned sample will also be accompanied by correct fabrics and pantone colors. During this process Zumiez will send images of major design features to the Licensor, for example if the item being designed is a jacket with an embroidery, then, as samples are available Zumiez will send imagery of the feature unless proof samples are otherwise requested. This will ensure proper opportunity for design oversight in the beginning of the process. There will be opportunity to refine designs in this design finalization process, however major changes will impact delivery dates and collection drops.

- Styles for a Licensed Product will be finalized by Zumiez and CADs will be sent to Licensor for approval, which approval will not be unreasonably, withheld, delayed or conditioned. If Licensor has not communicated to Zumiez in connection with such style within 5 business days of receiving the Zumiez submission, then Licensor will be deemed to have approved the styles for that particular submitted Licensed Product. Licensor will also indicate the quantity for any Licensor Sales as discussed further in the 6th bullet point of this Exhibit C.

- Such products, as revised and finalized in accordance with these procedures are referred to **"Produced Licensed Products"** and will be licensed and produced pursuant to the terms of the Agreement.

- At the time of selection of Produced Licensed Products, Zumiez will provide a cost quote to Licensor in the event that Licensor desires to order a quantity of such products for Licensor Sales (as defined in Section 2.1 of the Agreement). Licensor will indicate the quantity for Licensor Sales in the time frame discussed above in the 4th bullet point of this Exhibit C.

ST-HL-037316
435-01

# EXHIBIT 18

**Amended and Restated License Agreement dated March 23, 2018 between Class War, Inc. and Zumiez**

<u>**AMENDED AND RESTATED LICENSE AGREEMENT**</u>

This Amended and Restated License Agreement (the "**Agreement**") dated as of March 23, 2018 (the "**Effective Date**") is entered into by and among Class War Inc. ("**Licensor**"), a corporation with a principal place of business at 391 Ocean View Avenue, Encinitas, California 92024, Zumiez Services Inc. ("**Zumiez**"), a Washington corporation with its principal place of business at 4001 204th Street SW, Lynnwood, Washington 98036 and Jesse Dawber, an individual ("**Artist**") (each a "**Party**" and collectively, the "**Parties**") and it amends and restates in its entirety the prior License Agreement by and between Licensor and Zumiez dated February 27, 2017 (the "**Prior Agreement**").

<strong>RECITALS</strong>

A. Licensor is the owner of or otherwise has all rights to the trademarks, characters, designs, images, photos and logos, as set forth on, or otherwise described in, Exhibit A (the "**Licensed Properties**").

B. Licensor is using the Licensed Properties in connection with the "Lurking Class," "Lurking Class by Sketchy Tank" and "Lurking Class by ST" names or related derivations thereof.

C. In the Prior Agreement the Licensed Properties encompassed the use by Licensor of the brand name "Sketchy Tank" and related derivations of the Sketchy Tank name.

D. Now, and as contemplated in this Agreement, (i) Artist desires to use the "Sketchy Tank" name only as identification of himself as the artist associated with the Licensed Properties and potentially other licensed properties not subject to this Agreement; (ii) Artist and Licensor, and their respective affiliates, will not use the "Sketchy Tank" name as a brand name or in connection with any licensed property that they either own or have the ability to license, except as contemplated in the prior point (i) as a mere identifier of the Artist as the creator or artist of the licensed property in question.

E. Zumiez desires to use the Licensed Properties in the "**Territory**" (as defined below) through all of its channels of distribution and sale in connection with the categories of products specified in Exhibit B (the "**Licensed Products**").

F. Licensor is willing to allow Zumiez to use the Licensed Properties on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and for such other good and valuable consideration, receipt of which is hereby acknowledged, Licensor and Zumiez do hereby respectively grant, covenant, and agree as follows:

1. Definitions.

"**Artist**" has the meaning ascribed to it in the preamble.

"**Confidential Information**" has the meaning as set forth in Section 10.

1

HL-0074285

169-001

"**Effective Date**" means the date of this Agreement as set forth in the preamble.

"**Licensed Products**" means the categories of products listed in Exhibit B and any other categories of products that may be agreed upon in writing by Licensor and Zumiez from time to time.

"**Licensed Properties**" means all intellectual property, including, but not limited to, the trademarks, characters, designs, images, photos and logos, as set forth on, or otherwise described in, Exhibit A, which are all owned or licensed by Licensor.

"**Licensor Sales**" has the meaning set forth in Section 2.1.

"**Net Sales**" means the gross invoice price of Produced Licensed Products sold by or on behalf of Zumiez less taxes, returns, customary markdowns and sales and trade discounts (e.g., employee discounts), insurance and freight.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

"**Prior Agreement**" has the meaning ascribed to it in the preamble.

"**Produced Licensed Products**" has the meaning set forth in Exhibit C.

"**Reversion**" has the meaning given to it in Section 12.

"**Sell-Off Period**" has the meaning given to it in Section 8.4.

"**Term**" has the meaning given to it in Section 2.2

"**Territory**" means any location worldwide where Zumiez or any of its subsidiaries or affiliates operates and/or sells products.

2.     License Granted.

2.1     Grant of License.  Licensor hereby grants to Zumiez an *exclusive* license throughout the Territory to use the Licensed Properties for the purpose of manufacturing, importing, exporting, marketing, distributing, promoting, advertising, and selling *Produced Licensed Products* (as defined in Exhibit C) in all of Zumiez' and/or its subsidiaries and affiliates' online and brick and mortar retail channels of distribution and sale, subject to the limitations, terms and conditions set forth herein.

Notwithstanding the foregoing exclusive license, Licensor does reserve the right to conduct the following with respect to Produced Licensed Products:  Licensor may sell Produced Licensed Products on Licensor's owned websites (including, for example, www.lurkingclass.com) and any

2

owned retail stores that Licensor may operate from time to time (the foregoing, "**Licensor Sales**").

Furthermore, notwithstanding the foregoing exclusive license, Licensor reserves the right to grant to sell, market, promote and advertise the Licensed Properties via the Licensor's specialty retail accounts, provided such accounts are direct to retail and not in connection with any wholesale business or sales; provided, however, that effective as of January 31, 2019 such license will not extend to Persons who are Competitors. For the purposes of this Agreement, a "**Competitor**" means any retailer that either (i) operates more than five (5) physical store locations or (ii) operates with a primary focus on ecommerce as compared to physical stores or (iii) operates physical stores in a shopping mall location without the prior written approval of Zumiez. For purposes of clarity, if Licensor has such a license with a Competitor prior to January 31, 2019, then Licensor may continue to grant a license to such Competitor after January 31, 2019.

Furthermore, notwithstanding the foregoing exclusive license, Licensor reserves the right to sell, market, promote and advertise the Licensed Properties via the Licensor's specialty retail accounts located outside of North America irrespective of whether or not such accounts are Competitors.

2.2     Term. The term of this Agreement and the license granted hereunder will commence upon the Effective Date and will continue until January 31, 2021, unless sooner terminated as provided herein (the "**Term**"). This Agreement will automatically be renewed for one (1) year periods after the initial term, unless either Party gives to the other Party written notice of intention to terminate the Agreement thirty (30) days prior to the termination date.

3.      Licensor and Artist Obligations

3.1     Marketing Obligations. Licensor agrees to reasonably cooperate with efforts by Zumiez with respect to the creation of marketing materials and web assets for Produced Licensed Products.

3.2     Prohibited Distribution/Licensing. Except for approved Licensor Sales, Licensor and Artist each agrees during the term of this Agreement, or within a six (6) month period after the expiration of the term of this Agreement, not to sell, distribute, or license any Produced Licensed Products.

3.3     Licensor and Artist Obligations. Licensor, Artist and their respective representatives will not take any action that damages the reputation of Zumiez or reflects negatively upon Zumiez or the products or merchandise of Zumiez, including the Produced Licensed Products. Additionally, Licensor and Artist will not commit any act or be involved in any occurrence which violates widely-held principles of public morality or decency (i.e., a crime of moral turpitude, constitutes a criminal felony in the jurisdiction in which it is committed, or reflects unfavorably on Licensor, Artist, Zumiez or the Produced Licensed Products. Examples of crimes of moral turpitude include, but are not limited to, murder, rape, child abuse, incest,

3

kidnaping and fraud. For purposes of clarity, criminal charges related to possession of marijuana would not be viewed as a crime of moral turpitude.

3.4     Use of the Sketchy Tank Name. As referenced in the recitals, during the Term of this Agreement, (i) Artist agrees to use the "Sketchy Tank" name only as identification of himself as the artist associated with the Licensed Properties and potentially other licensed properties not subject to this Agreement; (ii) Artist and Licensor each agree, and agree to cause their respective affiliates, not to use the "Sketchy Tank" "or "ST" names (or similar derivations thereof) as a brand name or in connection with any licensed property that they either own or have the ability to license, except as contemplated in 3.4(i) as a mere identifier of the Artist as the creator or artist of the licensed property in question.

4.     Royalties, Statements, and Examination of Books.

4.1     Royalties. As consideration for the license herein granted, Zumiez agrees to pay Licensor royalties equal to ten percent (10%) of the Net Sales of Produced Licensed Products sold by or on behalf of Zumiez during the Term through January 30, 2019. From January 31, 2019 through the end of the Term, Zumiez agrees to pay Licensor royalties equal to fifteen percent (15%) of the Net Sales of Produced Licensed Products sold by or on behalf of Zumiez. Such royalties will be payable within thirty (30) days following the close of each calendar quarter for sales during such quarter, beginning with the calendar quarter in which the first sale or disposition of Produced Licensed Products occurs.

4.2     Statements. Zumiez will maintain accurate records showing the quantity and sales price of Produced Licensed Products sold by Zumiez. Within 30 days after the end of each calendar quarter, Zumiez will deliver to Licensor a statement in writing, relating to the preceding calendar quarter which will state: (i) the quantity of Produced Licensed Products sold during the preceding quarter; (ii) the Net Sales price of all Produced Licensed Products sold during such quarter; (iii) the amount of any credit against accrued royalties for such quarter permitted under this Section 4; and (iv) an itemized statement of royalties due Licensor for sales made during such quarter.

4.3     Examination of Books and Records. Licensor, at its own expense, may have a qualified, independent third party examine the books and records of Zumiez, once per calendar year. during normal business hours and at reasonable times to obtain or verify the information described in Sections 4.1 and 4.2.

5.     Design and Production Matters.

5.1     Design and Production Procedures. The Parties agree to use the design and production procedures with respect to the Produced Licensed Products as set forth on Exhibit C.

5.2     Zumiez Provided Resources. During the Term, Zumiez agrees to staff a product designer whose primary focus will be to focus on the design and manufacturing of Produced Licensed Products. This product designer will be the primary point of contact for design related matters with respect to the Produced Licensed Products and Zumiez will be solely responsible for the compensation and otherwise related expenses associated with this product designer.

4

ST-HL-0074288
100
169-004

6.    Use of the Licensed Properties; Other Obligations.

6.1    No Other Marks. Apart from the Licensed Properties, no other trademark or logo may be affixed to, or used in connection with, the Produced Licensed Products except that Zumiez may use its trademarks and logos, and those of its suppliers, on packaging, advertising and promotional materials for the Produced Licensed Products, unless the Parties agree otherwise as provided in this Agreement.

6.2    Acknowledgement of Ownership. Zumiez acknowledges that Licensor represents that Licensor is the owner of the Licensed Properties worldwide, including any trademarks, characters, design, images, photos, or logos that are later filed or applied for by Licensor which will become subject to this Agreement. Any goodwill derived from the use by Zumiez of such Licensed Properties shall inure to the benefit of Licensor. If Zumiez acquires any rights in the Licensed Properties, by operation of law, or otherwise, such rights shall be deemed and are hereby irrevocably assigned to Licensor without further action by of the Parties. Zumiez agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed Properties or the validity of the Licensed Properties. Licensor agrees not to dispute or challenge or assist any Person in disputing or challenging Zumiez' rights in and to Zumiez trademarks or the validity of Zumiez trademarks.

6.3    Zumiez Restrictions. Zumiez agrees that it shall not, during the Term, directly or indirectly:

    (a)    take any action that damages the reputation of Licensor or reflects negatively upon Licensor or the Licensor Properties or which will or may invalidate or jeopardize any registration or protection of the Licensed Properties; or

    (b)    apply for, or obtain, or assist any Person in applying for or obtaining any intellectual property protection, including, but not limited to, registration of the Licensed Properties, or any trademark, service mark, trade name or other indicia confusingly similar to the Licensed Properties in the Territory.

6.4    No Encumbrances. Zumiez shall not grant or attempt to grant a security interest in, or otherwise encumber, the Licensed Properties or record any such security interest or encumbrance against any application or registration regarding the Licensed Properties, including, but not limited to, in the United States Patent and Trademark Office or elsewhere.

6.5    Compliance With Laws. In exercising its rights under this Agreement, Zumiez shall comply with, and shall ensure that each Licensed Product sold or otherwise supplied by Zumiez or a sublicensee complies with, all applicable legal rules and laws.

6.6    Damaged or Defective Products. Zumiez shall not sell or market any Produced Licensed Products which are damaged or defective.

6.7    Subcontracting. Zumiez shall have the right to subcontract the manufacture of the Produced Licensed Products provided that:

5

101-HL-0074289

169-005

(a)     Zumiez shall be liable for all acts and omissions of any subcontractor and shall indemnify, defend and hold harmless Licensor against all costs, expenses, claims, losses or damages (whether direct, indirect or consequential and including without limitation any economic loss or other loss of profits, business or goodwill) incurred or suffered by Licensor, or for which Licensor may become liable arising out of any act or omission of any subcontractor, including but not limited to any product liability claim relating to the Produced Licensed Products manufactured by the subcontractor.

6.8     Product Recall. Zumiez agrees to take all reasonable steps, which may include, without limitation, product recalls, to abate any health or safety risks posed by the Produced Licensed Products as expeditiously as possible. Zumiez shall have complete responsibility for determining if a product recall is required and Zumiez shall bear responsibility for all costs and expenses associated with any recall of the Produced Licensed Products.

7.     Indemnity

7.1     By Zumiez. Zumiez hereby agrees to indemnify and hold harmless Licensor from and against any third party losses, expenses, damages, injuries, liabilities and claims (including reasonable attorneys' fees, costs and expenses) whether based upon strict liability, negligence, tort, contract or otherwise, arising out of or relating to (i) the manufacture, sale, use, advertising, promotion, offering for sale, or distribution of Produced Licensed Products; (ii) the merchantability, quality, design, nonconformity or fitness for a particular purpose of the Produced Licensed Products; and (iii) the breach by Zumiez of any of the terms or conditions of this Agreement.

7.2     By Licensor. Licensor hereby agrees to indemnify, defend, and hold harmless Zumiez from and against any third party losses, expenses, damages, injuries, liabilities and claims (including reasonable attorneys' fees, costs and expenses) whether based upon strict liability, negligence, tort, contract or otherwise, arising out of or relating to (i) any claim that the use of the Licensed Properties violates any copyright, trademark, right of privacy, or similar right; and (ii) the breach by Licensor of any of the terms or conditions of this Agreement.

7.3     Indemnification Procedures. In the event of a potential indemnity obligation under this Section 7, the indemnified Party will: (a) promptly notify the indemnifying Party in writing of such claim, provided that the failure to provide such notice will not relieve the indemnifying Party of its obligations hereunder except to the extent such failure prejudices its ability to defend the claim; (b) allow the indemnifying Party to have sole control of the defense and settlement of the claim, provided however that all settlements will be subject to the indemnified Party's written approval, which will not be unreasonably withheld, conditioned, or delayed; and (c) upon request of the indemnifying Party, cooperate in all reasonable respects, at the indemnifying Party's cost and expense, with the indemnifying Party in the investigation, trial, and defense of such claim and any appeal arising therefrom.

8.     Termination.

8.1     Termination by Licensor. In addition to the termination provisions set forth in Section 2.2, Licensor will have the right to terminate this Agreement and the license granted hereunder:

6

(i) upon a breach by Zumiez of any of the terms or conditions of this Agreement, which breach is not cured within thirty (30) days after delivery of notice specifying such breach; or (ii) in the event Zumiez will apply for or consent to the appointment of a receiver, trustee or liquidator or will otherwise be the subject of any bankruptcy, reorganization, or insolvency proceedings, or makes an assignment for the benefit of creditors, or becomes insolvent or discontinues substantially all its business, or a receiver is appointed for it or its business.

8.2    Termination by Zumiez. In addition to the termination provisions set forth in Section 2.2, Zumiez will have the right to terminate this Agreement and the license granted hereunder: (i) upon a breach by Licensor of any of the terms or conditions of this Agreement, which breach is not cured within thirty (30) days after delivery of notice specifying such breach; or (ii) in the event Licensor will apply for or consent to the appointment of a receiver, trustee or liquidator or will otherwise be the subject of any bankruptcy, reorganization, or insolvency proceedings, or makes an assignment for the benefit of creditors, or becomes insolvent or discontinues substantially all its business, or a receiver is appointed for it or its business.

8.3    Sale of Produced Licensed Products Following Expiration or Termination. Except as provided in Section 8.4, Zumiez will cease to manufacture or sell the Produced Licensed Products following expiration or termination of this Agreement.

8.4    Sell-Off Period. Zumiez shall for a period of one (1) year after the date of termination have the right to dispose of all Produced Licensed Products in its possession at the time of termination in accordance with the terms of this Agreement (the "**Sell-Off Period**"). For all products sold during this Sell-Off Period, Zumiez shall provide Licensor with royalty payments as set forth in Section 4.1. Within thirty (30) days following any expiration or termination of this Agreement, Zumiez will advise Licensor in writing of the type and quantity of any inventory of Produced Licensed Products still held by Zumiez. For purposes of clarity, the Parties each acknowledge and agree that Zumiez has the right to dispose of all Produced License Products as defined as such in the Prior Agreement (i.e., the "Sketchy Tank" branded products).

8.5    Effect of Termination. On expiration or termination of this Agreement for any reason and subject to any express provisions set out elsewhere in this Agreement:

(a)    All rights and licenses granted pursuant to this Agreement shall cease;

(b)    Zumiez shall cease all use of the Licensed Properties except as expressly permitted pursuant to Section 8.4.

9.    Representations and Warranties.

9.1    By Licensor. Licensor represents and warrants that it: (i) has an ownership interest or other basis for its control of the Licensed Properties; (ii) has the right to grant the license granted by this Agreement without infringing or violating any third party rights; (iii) Zumiez can exercise all of the rights granted to it by Licensor according to the terms and conditions of this Agreement without infringing any third party rights; and (iv) has the corporate or limited liability company authority to enter into and be bound by the terms and conditions of this Agreement.

7

ST-HL-0074291
103    169-007

9.2    By Artist. Artist represents and warrants that: (i) Artist has an ownership interest or other basis for its control of the "Sketchy Tank" name; (ii) Licensor has the right to grant the license granted by this Agreement without infringing or violating any third party rights; (iii) Zumiez can exercise all of the rights granted to it by Licensor according to the terms and conditions of this Agreement without infringing any third party rights; and (iv) Artist has the authority to enter into and be bound by the terms and conditions of this Agreement

9.3    By Zumiez. Zumiez represents and warrants that it: (i) will use commercially reasonable efforts to market and sell the Produced Licensed Products; and (ii) has the corporate authority to enter into and be bound by the terms and conditions of this Agreement.

10.    Confidentiality

10.1    Zumiez Obligations. Zumiez and Licensor each agree:

(a)    Not to disclose or otherwise make available to any third party any information that is treated as confidential by the other Party, including without limitation, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing and marketing (collectively the "**Confidential Information**") without the prior written consent of the disclosing Party; *provided however*, that the receiving Party may disclose the Confidential Information to its officers, employees, consultants and legal advisors who have a "need to know," who have been apprised of this restriction and who are themselves bound by nondisclosure restrictions at least as restrictive as set forth in this Section 10.

(b)    to use the Confidential Information only as permitted under this Agreement; and

(c)    to immediately notify the disclosing Party in the event it becomes aware of any loss or disclosure of any Confidential Information.

10.2    Exceptions. Confidential Information shall not include information that:

(a)    is already known to the receiving Party without restriction on use or disclosure prior to receipt of such information from Licensor;

(b)    is or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, the receiving Party;

(c)    is received by the receiving Party from a third party who is not under any obligation to Licensor to maintain the confidentiality of such information; or

(d)    is required to be disclosed by Law, including without limitation. pursuant to the terms of a court order; provided that the receiving Party has given the disclosing Party prior written notice of such disclosure and an opportunity to contest such disclosure.

It shall be the obligation of the receiving Party to prove that such an exception to the definition of Confidential Information exists.

8

11.    Miscellaneous.

11.1    Notices. All notices and reports in connection with this Agreement and payments required hereunder, will be in writing and will be given by postpaid registered or certified mail, return receipt requested, addressed to the addresses set forth in the preamble hereof, or to such other address as either Party may notify in writing to the other Party. Notice will be deemed given when mailed.

11.2    Entire Agreement; Amendment. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any pre-existing or contemporaneous agreement and any oral or written communications between the parties. The provisions of this Agreement may not be waived, modified, altered or amended except by a written document signed by duly authorized representatives of both parties.

11.3    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11.4    Governing Law; Forum. This Agreement will be construed and interpreted in accordance with the laws of the State of Washington. Any litigation or other proceeding to interpret or enforce the provisions of this Agreement or the parties' rights and liabilities arising hereunder will be maintained only in the courts in King County, Washington, U.S.A.

11.5    Waivers. Failure of either Party to insist upon strict performance of any covenants, terms or conditions of this Agreement, or to exercise any rights or remedies upon default, will not constitute a waiver or relinquishment of its right to insist upon strict compliance with this Agreement and to enforce all legal and equitable rights as to any such default or breach, whether of like or unlike kind.

11.6    Relationship of Parties. This Agreement does not constitute, and will not be construed as, an agency, partnership, or joint venture between Licensor and Zumiez.

11.7    Successors and Assigns; Assignment. This Agreement will be binding upon and inure to the benefit of each Party, its successors and assigns. Neither Party may transfer, assign or encumber this Agreement or any rights hereunder, or delegate its duties hereunder, without the prior written consent of the other Party, which consent may not be unreasonably withheld, delayed or conditioned.

11.8    Headings. Section headings used in this Agreement are for convenience only and will not be used in the construction or interpretation of this Agreement.

11.9    Construction. The language in all parts of this Agreement will be in all cases construed according to its fair meaning and not strictly for or against any of the parties hereto.

Confidential

STHL-0074293

169-009

11.10 Counterparts. This Agreement may be executed in any number of identical counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same instrument when each Party has signed one such counterpart.

12.     Reversion. In the event that Licensor's rights to the Licensed Properties terminate prior to the end of the Term of this Agreement (a "**Reversion**"), the rights granted hereunder by Licensor to Zumiez will continue uninterrupted, with Artist being deemed to assume and undertake all obligations of Licensor upon such Reversion. Artist will indemnify, defend, and hold harmless Licensee of any claim arising out of Zumiez' use of the Licensed Properties after the date of the Revision. In the event of a Reversion, Artist agrees to reaffirm in writing to Zumiez its obligation to assume and undertake all obligations of Licensor as set forth in this Agreement. including all representations, warranties, and indemnification obligations

\*\*\**the remainder of this page intentionally left blank*\*\*\*

10

AMENDED AND RESTATED LICENSE AGREEMENT

IN WITNESS WHEREOF, the parties, through their duly authorized representatives, have executed this Agreement as of the date first set forth above.

LICENSOR:

CLASS WAR INC.

By: _____

Its: _____CEO_____

ARTIST

_____

Jesse Dawber

ZUMIEZ SERVICES INC.:

By: _____

Its: _____

AMENDED AND RESTATED LICENSE AGREEMENT—SIGNATURE PAGE

ST-HL-0074295

169-011

## EXHIBIT A

### Licensed Properties

All trademarks, characters, designs, images, photos and logos of the Licensor, whether previously created or created during the term of the Agreement, associated with or related to the brand names "Lurking Class," "Lurking Class by Sketchy Tank," or "Lurking Class by ST" or similar derivations related thereto, including, without limitation, all trademarks, characters, designs, images, photos and logos of Licensor displayed and otherwise referenced on Licensor's website at https://www.lurkingclass.com or any website of Licensor related to the aforementioned Lurking Class brand and related names.

## **EXHIBIT B**

### Licensed Products

Zumiez may use the Licensed Properties in connection with any of the following categories or items, each of which will be considered Licensed Products:

- Men's apparel

- Women's apparel

- Men's and Women's non-athletic footwear

- Hardgoods

- Accessories

STHL-0074297

169-013

## EXHIBIT C

### Design and Production Procedures

Unless the Parties otherwise agree, the following design and production procedures will apply:

- Licensor will continue to collaborate in regards to the design of its seasonal and holiday product lines consistent with current product offerings and send AI files of each collection to Zumiez. In connection therewith, upon the request of Zumiez, Licensor agrees to provide Zumiez within 5 business days of such request, all styling ideas, artwork necessary for styles, any specific artwork pantone callouts, artwork scale requirements, and/or trim qualities, each in connection with a requested Licensed Product.

- Zumiez will scale the artwork and further develop the Licensed Product from a fit and finish perspective. In the event of such adjustments, Zumiez will submit the relevant adjustments to Licensor for approval.

- After the design steps set forth above, Zumiez will provide a sample of the Licensed Product not correct for fit and finish, but which will be styled in a similar manner to the desired final product. The aforementioned sample will also be accompanied by comments/details of the inconsistencies with the desired final product. During this process Zumiez will send images of major design features to the Licensor, for example if the item being designed is a jacket with an embroidery, then, as samples are available Zumiez will send imagery of the feature unless proof samples are otherwise requested and available. This will ensure proper opportunity for design oversight in the beginning of the process. There will be opportunity to refine designs in this design finalization process, however major changes will impact delivery dates and collection drops.

- Styles for a Licensed Product will be finalized by Zumiez and CADs will be sent to Licensor for approval, which approval will not be unreasonably, withheld, delayed or conditioned. If Licensor has not communicated to Zumiez in connection with such style within 5 business days of receiving the Zumiez submission, then Licensor will be deemed to have approved the styles for that particular submitted Licensed Product. Licensor will also indicate the quantity for any Licensor Sales as discussed further in the 6th bullet point of this Exhibit C.

- Such products, as revised and finalized in accordance with these procedures are referred to "**Produced Licensed Products**" and will be licensed and produced pursuant to the terms of the Agreement.

- At the time of selection of Produced Licensed Products, Zumiez will provide a cost quote to Licensor in the event that Licensor desires to order a quantity of such products for Licensor Sales (as defined in Section 2.1 of the Agreement). Licensor will indicate the quantity for Licensor Sales in the time frame discussed above in the 4th bullet point of this Exhibit C.

ST-HL-0074298

169-014

# EXHIBIT 19

# Sketchy Tank, LLC Profit and Loss – 2018 through August

# Sketchy Tank LLC

### PROFIT AND LOSS

January - September, 2018

| | JAN 2018 | FEB 2018 | MAR 2018 | APR 2018 | MAY 2018 | JUN 2018 | JUL 2018 | AUG 2018 | SEP 2018 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Income | | | | | | | | | | |
| Sales | | | | 34,500.00 | 34,500.00 | 34,500.00 | 34,500.00 | 34,500.00 | 34,500.00 | $207,000.00 |
| **Total Income** | $0.00 | $0.00 | $0.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $207,000.00 |
| GROSS PROFIT | $0.00 | $0.00 | $0.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $34,500.00 | $207,000.00 |
| Expenses | | | | | | | | | | |
| Advertising & Marketing | | | | | | | | 5.13 | 295.28 | $300.41 |
| Art Supplies | | | | | | | | 409.33 | | $409.33 |
| Auto | | | | | | | | | | $0.00 |
| Parking & Tolls | | | | | 31.95 | | | | | $31.95 |
| **Total Auto** | | | | | 31.95 | | | | | $31.95 |
| Bank Charges & Fees | | 30.00 | 30.00 | 115.00 | 208.52 | 127.53 | 207.50 | 378.35 | 142.11 | $1,239.01 |
| Charitable Contributions | | | | | | | | 52.00 | | $52.00 |
| Contractors | 15,000.00 | 15,250.00 | 15,000.00 | 19,000.00 | 19,000.00 | 19,000.00 | 19,000.00 | 19,000.00 | 19,000.00 | $159,250.00 |
| Design Development | | | | | | 945.63 | 352.37 | | | $1,298.00 |
| Dues & Subs | | 49.99 | 49.99 | 49.99 | 49.99 | 114.99 | 114.99 | 167.98 | 167.98 | $765.90 |
| Meals & Entertainment | | | | | 72.35 | | | 320.13 | 435.68 | $828.16 |
| Office Supplies & Software | | | | | 0.00 | 15.97 | 0.00 | 32.33 | | $48.30 |
| Payroll Expenses | | | | | | | | | | $0.00 |
| Taxes | | | | 144.38 | 288.75 | 288.75 | 350.00 | 411.25 | 339.50 | $1,822.63 |
| Wages | | | | 1,750.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | $19,250.00 |
| **Total Payroll Expenses** | | | | 1,894.38 | 3,788.75 | 3,788.75 | 3,850.00 | 3,911.25 | 3,839.50 | $21,072.63 |
| Postage & Shipping | | | | | | | | 86.97 | | $86.97 |
| Reimbursable Expenses | | | | | 187.04 | | 14,761.89 | 280.00 | | $15,228.93 |
| Travel | | | | | 588.66 | | | 5,855.18 | | $6,443.84 |
| Utilities | | | | 119.54 | 119.54 | | 311.73 | 1,004.76 | 226.41 | $1,781.98 |
| **Total Expenses** | $15,000.00 | $15,329.99 | $15,079.99 | $21,178.91 | $24,046.80 | $23,992.87 | $38,598.48 | $31,503.41 | $24,106.96 | $208,837.41 |
| NET OPERATING INCOME | $ -15,000.00 | $ -15,329.99 | $ -15,079.99 | $13,321.09 | $10,453.20 | $10,507.13 | $ -4,098.48 | $2,996.59 | $10,393.04 | $ -1,837.41 |
| NET INCOME | $ -15,000.00 | $ -15,329.99 | $ -15,079.99 | $13,321.09 | $10,453.20 | $10,507.13 | $ -4,098.48 | $2,996.59 | $10,393.04 | $ -1,837.41 |

112

# EXHIBIT 20

# Drew Madacsi Information [Alliance Brands Limited, MMP Resources Limited and the House of Machines]



REATIVE



— — — — — — —

# ABL ————
# STRATEGY.

### THE BUSINESS TEAM

DREW MADACSI
Advisor (Global Strategy)

Drew has over two decades of senior experience assisting private and international companies, providing key oversight, specialty skill sets in corporate restructuring, broad-based business strategy and established relationships within key markets; primarily Asia, North America and Africa. During this time, he has forged a proven track record of leading multidimensional corporate structures, with diversified investments, having built a reputation for developing business strategies, incubating new business models, and revenue-generating mechanisms.

Drew's personal career has spanned retail, services and operations, with international organisations such as Toyota and Oakley, through to high net worth private companies, allowing him to gain an unusually broad base of experience with which to realign corporate business structures. Drew currently holds several leadership positions, including Non-Executive Chairman of Singapore Mainboard (SGX) MMP Resources Limited, and as a Director of Allington Advisory Pte Ltd (Allington), a Singapore-based corporate advisory firm.

Outside of his corporate career, Drew provides strategic assistance to internationally focused brand development companies and existing retail operations, on global execution strategies, growth trends and partnership synergies. Additionally, he has created several successful brands, from concept through to profitable trading models, providing free carry equity opportunities for younger startup operators within this sector.

info@alliancebrandslimited.com



114



O U R ————————
P R O J E C T S .

<| BACK

NEXT |>

THE HOUSE OF MACHINES.

Designed and tested as the quintessential home base
for those with a passion for riding and the life that
surrounds it, The House of Machines has a simple and
bold credo — to create the environment where man
and machine co-exist. A single-minded, accessible
environment that fosters this symbiotic relationship
that has been woven into our DNA ever since our
forefathers first strapped an engine to a two-wheeled
frame — freedom.

Each iconic city location is the fine purveyor of the
elements associated to the rider's lifestyle, a

SCOPE OF WORK:

Brand Development
Concept Development
Interior Design
Product Development
Brand Strategy
Brand Communication
Apparel Design

Production
Operations
Branding
Social Media

115

# EXHIBIT 21

## Excerpts of Deposition of Jesse Dawber taken on October 21, 2015

```
1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        COUNTY OF SAN DIEGO - NORTH COUNTY REGIONAL CENTER

3

4    JACK SCHINDLER, an individual,

5

                           Plaintiff,
6
     vs.                                    CASE NO. 37-2015-
7                                                00026810-
                                                 CU-BT-NC
8
     JESSE DAWBER, an individual,
9    Aka "Sketchy Tank;" and DOES 1-50,
     Inclusive,
10

11                         Defendants.

12

13

14

15            DEPOSITION OF JESSE DAWBER, VOLUME I

16                   San Diego, California

17                     October 21, 2015

18

19

20

21

22   Reported By:

23   Kathryn Winningham

24   RPR, CSR NO. 14065

25   Job No.: 10019862
```

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2       COUNTY OF SAN DIEGO - NORTH COUNTY REGIONAL CENTER

 3

 4   JACK SCHINDLER, an individual,

 5
                          Plaintiff,
 6
     vs.                                  CASE NO. 37-2015-
 7                                            00026810-
                                              CU-BT-NC
 8
     JESSE DAWBER, an individual,
 9   Aka "Sketchy Tank;" and DOES 1-50,
     Inclusive,
10
11                        Defendants.

12

13

14

15

16

17

18

19

20            Deposition of JESSE DAWBER, taken on behalf of

21   Plaintiff, at 501 West Broadway, Suite 750, San Diego,

22   California, beginning at 10:02 a.m., and ending at 3:43

23   p.m., on Wednesday, October 21, 2015, before Kathryn

24   Winningham, RPR, Certified Shorthand Reporter No. 14065.

25
```

```
 1   APPEARANCES:

 2   For Plaintiff:

 3           LAW OFFICES OF VAUGHN & VAUGHN
             BY:  DONALD A. VAUGHN, ESQ.
 4           501 West Broadway
             Suite 1770
 5           San Diego, California  92101
             619.237.1717
 6           619.237.0047 Fax
             Business@vv-law.com
 7

 8
     FOR DEFENDANT:
 9
             BLUMBERG LAW GROUP, LLP
10           By:  RONALD H. BLUMBERG, ESQ.
             137 North Acacia Avenue
11           Solana Beach, California  92075
             858.509.0600
12           858.509.0699 Fax
             Rhb@blumberglawgroup.com
13

14   ALSO PRESENT:  JEFFREY HERMAN, ESQ.
                     LAW OFFICES OF VAUGHN & VAUGHN
15

16

17

18

19

20

21

22

23

24

25
```

1      Q      Zumiez is the largest retail seller of Sketchy

2    Tank apparel, true?

3      A      I don't know.

4      Q      Can you think of another seller of Sketchy Tank

5    apparel that sells more of it than Zumiez?

6      A      Zumiez, yes.

7      Q      Who sells more than Zumiez?

8      A      No, Zumiez sells the most, yes.

9      Q      Who approached Zumiez about selling Sketchy Tank

10   apparel?

11     A      Jack.

12     Q      Jack Schindler?

13     A      Who else?

14     Q      Jack Schindler is the one who approached Zumiez,

15   the largest seller of Sketchy Tank apparel, to carry Sketchy

16   Tank apparel, right?

17     A      Right.  Before he met them, they already said they

18   would buy from me because they already knew who I was.  The

19   buyer from Zumiez was already getting shirts from me.

20     Q      Why didn't you sell Sketchy Tank apparel --

21     A      I wasn't sure.

22     Q      Hold on.  Only one of us can talk at a time.  I

23   will ask a question.  If Jack Schindler was the one who

24   approached Zumiez about selling Sketchy Tank apparel, but

25   you knew about Zumiez beforehand, why didn't you sell

1    Sketchy Tank apparel through Zumiez?

2    A    I was unsure if I even wanted to go the wholesale

3    route.

4    Q    Okay.  So you don't dispute, though, that Jack

5    Schindler is the one who initiated Zumiez buying wholesale

6    Sketchy Tank apparel and selling it retail, correct?

7    A    Yeah, he bridged the gap to Zumiez, as a

8    distribution agent should.

9         MR. VAUGHN:  Move to strike as nonresponsive after

10   the "yeah."

11        MR. BLUMBERG:  Of course.

12   BY MR. VAUGHN:

13   Q    Now, after Black Hand, did you sell any -- strike

14   that.

15        After Black Hand, what is the next brand under

16   which you told apparel with your designs on it?

17   A    2001, I started a brand with my father called

18   "Soul Surf."

19   Q    And did Soul Surf produce apparel for sale?

20   A    Yes.

21   Q    How was Soul Surf apparel sold?

22   A    It was sold just locally within the surf

23   community.

24   Q    Through what type of outlet?

25   A    Through word of mouth, just --

1   not asking how much; I'm just asking how it was determined.

2   Was it by article?  Was it per design?  How was it

3   determined, is the question.

4       A    It was through Vivid Minds.

5       Q    So Vivid Minds is the company that was compensated

6   for your designs?

7       A    Yes.

8       Q    And other than the money that Vivid Minds paid

9   you, you were not compensated for those designs by Nike

10  directly; is that true?

11      A    Yes.

12      Q    So between 2002 and 2010, you did not sell

13  yourself any apparel with your designs on it; is that true?

14      A    Yes.

15      Q    And you began selling Sketchy Tank apparel to

16  friends in 2010, correct?

17      A    Correct.

18      Q    When was there a trademark, if ever, obtained for

19  Sketchy Tank?

20      A    There is no trademark for Sketchy Tank to this

21  day.

22      Q    Even today?

23      A    Yep.

24      Q    All right.  Have you attempted to register a

25  trademark for Sketchy Tank?

1      A     Yes.

2      Q     **And have you been successful in doing so?**

3      A     No.

4      Q     **Why not, if you know?**

5      A     There's --

6            MR. BLUMBERG:  Calls for legal conclusion, calls

7      for speculation, no foundation.

8      BY MR. VAUGHN:

9      Q     **That's why I said "if you know."  You may answer,**

10     **sir.**

11           MR. BLUMBERG:  Same objections.

12           MR. VAUGHN:  Yeah, there's objections, but unless

13     instructed not to answer, the rule is that you answer if you

14     understand.

15           MR. BLUMBERG:  He knows.  He's thinking.

16           MR. VAUGHN:  All of my questions are "if you know"

17     questions.  If you don't know, don't make it up.

18           THE WITNESS:  Yeah, repeat the question.

19     BY MR. VAUGHN:

20     Q     **The question was:  Why, if you know, is there no**

21     **trademark for Sketchy Tank despite your efforts to register?**

22           MR. BLUMBERG:  Also speculation, no foundation,

23     calls for a legal conclusion.

24           Go ahead.

25           THE WITNESS:  There was conflicting marks.

1    BY MR. VAUGHN:

2        Q     Did you yourself attempt to register a trademark

3    for Sketchy Tank?

4        A     Yes.

5        Q     In the federal system?

6        A     Through a lawyer.

7        Q     And your understanding is that that trademark will

8    not be issued because there are conflicting marks?

9        A     It's still in the works, still trying to get it.

10       Q     Got it.  Where did the name "Sketchy Tank" come

11   from?

12       A     It's, Sketchy Tank was a folder on my computer

13   when I was working at Vivid Minds, and while I was searching

14   for inspiration for design work in graphics, I had a folder

15   called "Sketchy Tank," and anything that was, like, that I

16   found interesting, I put into this folder called "Sketchy

17   Tank."

18       Q     Sketchy Tank is just a phrase that you created?

19       A     Yeah.

20       Q     Doesn't come from anything?

21       A     It's like a tank, like a propane tank.  It holds

22   something, and then "sketchy," like, just filled with

23   sketchy stuff.

24       Q     Sketchy in the sense of sketches, or sketchy in

25   the sense of not definite?

1       Q     One to two times?

2       A     (Witness nodded head up and down.)

3       Q     Mr. Schindler came to your house during that

4  period of time?

5       A     Sure.

6       Q     And had you invited him over?

7       A     Yeah.

8       Q     How did you and Mr. Schindler meet?

9       A     He sent me an e-mail through my website.

10      Q     What's that website?

11      A     Sketchytank.com.

12      Q     When did you obtain the sketchytank.com domain?

13      A     2011.

14      Q     And did you at some point in time file a

15  fictitious business name with the County of San Diego for

16  Sketchy Tank?

17      A     Yes.

18      Q     When did you file that, do you recall?

19      A     I think in June.

20      Q     Of?

21      A     2014.

22      Q     I saw from some documentation in the case that you

23  also go by the name of Sketchy Tank.  Is that true also?

24      A     Yes.  It is my artist name.

25      Q     How long have you used the name Sketchy Tank as

1    your alias?

2        A    Since 2011.

3        Q    **Have you had any other artist names other than**

4    **Sketchy Tank?**

5        A    No.

6        Q    **Mr. Schindler received a Sketchy Tank e-mail**

7    **address, correct?**

8        A    He received a Sketchy Tank e-mail address?

9        Q    **Yes.**

10       A    I opened up a salesatsketchytank.com, and he had

11   access to it.

12       Q    **Was that for Mr. Schindler?**

13       A    No, it was for whoever was doing sales for Sketchy

14   Tank.

15       Q    **Who other than Mr. Schindler and perhaps you have**

16   **used the salesatsketchytank.com e-mail address?**

17       A    Who has used it besides him?

18       Q    **And you?**

19       A    My wife, my wife's sister.

20       Q    **When did your wife first use**

21   **salesatsketchytank.com?**

22            MR. BLUMBERG:  Calls for speculation, no

23   foundation.

24            THE WITNESS:  Not sure.

25   BY MR. VAUGHN:

1    I want an answer to the question.

2          MR. BLUMBERG:  He doesn't need to have my

3    instruction to choose not to answer a question.

4          MR. VAUGHN:  That's a new one on me.  I've only

5    been doing this 32 years, but that's a new one.  So now the

6    witness gets to object himself as well as the lawyer.

7    That's a new one.  Good luck with that.

8    BY MR. VAUGHN:

9    **Q     Here is my question:  Will you tell me in any year**

10   **what the magnitude was of online sales of Sketchy Tank**

11   **products?**

12         MR. BLUMBERG:  Same objection, same instruction.

13         MR. VAUGHN:  Great, okay.

14   BY MR. VAUGHN:

15   **Q     Would it be accurate to state that the wholesale**

16   **sales of Sketchy Tank products generally increased from the**

17   **time that the distribution/partnership agreement with Mr.**

18   **Schindler was signed up through June of 2015?**

19   A     Yes.

20   **Q     And what is the last month that you can recall**

21   **what is the gross sales of Sketchy Tank products through the**

22   **wholesale chain in the last month, that you can recall?**

23   A     I don't know.

24   **Q     Can you tell me how much in Sketchy Tank products**

25   **had been sold wholesale in 2015 to date?**

1      I, Kathryn Winningham, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken before

4  me at the time and place herein set forth; that any

5  witnesses in the foregoing proceedings, prior to testifying,

6  were duly sworn; that a record of the proceedings was made

7  by me using machine shorthand, which was thereafter

8  transcribed under my direction; that the foregoing

9  transcript is a true record of the testimony given.

10      Further, that if the foregoing pertains to the

11  original transcript of a deposition in a federal case,

12  before completion of the proceedings, review of the

13  transcript [X] was [ ] was not requested.

14

15      I further certify I am neither financially

16  interested in the action nor a relative or employee of any

17  attorney or party to this action.

18

19      IN WITNESS WHEREOF, I have this subscribed

20  my name.

21  Dated: November 2, 2015

22

23      _Kathryn Win_____

24      Kathryn Winningham

25      RPR, CSR No. 14065

128

# EXHIBIT 22

**Excerpts of Deposition of Drew Madacsi as Person Most Knowledgeable for Lurking Class, LLC, dated July 26, 2018**

1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

2

3         COUNTY OF SAN DIEGO, NORTH COUNTY REGIONAL CENTER

4

5

6    JACK SCHINDLER, an individual,  )
                                     )
7                   Plaintiff,       )
                                     )Case No.
8         vs.                        )37-2015-00026810-
                                     )CU-BT-NC
9    JESSE DAWBER, an individual;    )
     aka "SKETCHY TANK;" and         )
10   DOES 1-50, inclusive,           )
                                     )
11                  Defendants.      )
                                     )
12                                   )
     AND ALL RELATED CROSS-ACTIONS.  )
13                                   )

14

15                   DEPOSITION OF DREW MADACSI

16   AS THE PERSON MOST KNOWLEDGEABLE FOR LURKING CLASS, LLC

17                     San Diego, California
                       Thursday, July 26, 2018
18

19

20

21   Reported by: Stefanie A. Landa
                  C.S.R. No. 7332
22   Job No.:     204203

23

24

25

                                                              1

```
 1                           I N D E X

 2     DEPOSITION OF DREW MADACSI

 3          July 26, 2018

 4     EXAMINATION                                    PAGE

 5          By Mr. Vaughn                              5

 6     DEPOSITION EXHIBITS                           MARKED

 7          1 - Copy of an amended notice of taking    28
                 deposition, 14 pages
 8
            2 - Copy of a photocopy of two T-shirts,   38
 9              1 page

10          3 - Copy of a license agreement, 13 pages  44

11          4 - Copy of a license agreement, 13 pages  65

12          5 - Copy of a license agreement, 13 pages  66

13          6 - Copy of a license agreement, 12 pages  67

14          7 - Copy of a screenshot of the Lurking Class 128
                 "about" web page, 1 page
15
       INSTRUCTIONS NOT TO ANSWER:              PAGE   LINE
16
            By Mr. Turrill                         30    25
17                                                31     8
                                                  43    17
18                                                44    14
                                                  49     8
19                                                57    12
                                                  63    12
20                                                66     6
                                                  68     4
21                                                74     5
                                                  87    25
22                                                90     1

23     TRANSCRIPT MARKED                       PAGE   LINE

24          By Mr. Vaughn                         128    11

25
```

                                                                    2

131

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2

3        COUNTY OF SAN DIEGO, NORTH COUNTY REGIONAL CENTER

4

5    JACK SCHINDLER, an individual,    )
                                       )
6                 Plaintiff,           )
                                       )Case No.
7          vs.                         )37-2015-00026810-
                                       )CU-BT-NC
8    JESSE DAWBER, an individual;      )
     aka "SKETCHY TANK;" and           )
9    DOES 1-50, inclusive,             )
                                       )
10                Defendants.          )
                                       )
11                                     )
     AND ALL RELATED CROSS-ACTIONS.    )
12                                     )

13

14

15

16        DEPOSITION OF DREW MADACSI, taken on behalf of the

17    Plaintiff, on the 26th day of July, 2018, commencing at

18    9:32 a.m. and ending at 1:25 p.m., at 501 West Broadway,

19    Suite 1770, in the City of San Diego, County of

20    San Diego, before me, Stefanie A. Landa, Certified

21    Shorthand Reporter, State of California.

22

23

24

25

                                                            3

```
 1    APPEARANCES

 2

 3    FOR THE PLAINTIFF:

 4         VAUGHN & VAUGHN
           By:  DONALD A. VAUGHN, ESQ.
 5         501 West Broadway
           Suite 1770
 6         San Diego, California  92101
           (619) 237-1717
 7

 8

 9    FOR THE DEFENDANTS:

10         HOGAN LOVELLS
           By:  MICHAEL L. TURRILL, ESQ.
11         1999 Avenue of the Stars
           Suite 1400
12         Los Angeles, California  90067
           (310) 785-4600

13

14

15    ALSO PRESENT:

16         JESSE DAWBER
           MATT ROBERTS
17         JACK SCHINDLER

18

19

20

21

22

23

24

25
```

4

133

1     If you could wait until I finish the question.  In

2     normal conversation people jump in on each other.  You

3     probably know where I'm going, but because the court

4     reporter can only take down one person at a time, it's

5     important that we try not to talk at the same time.  If

6     I have to remind you now and then or even remind myself

7     not to jump in on an answer or a question, no disrespect

8     is intended.  It's just the nature of the process.

9                     Do you understand that?

10          A.    Understood.

11          Q.    And so you graduated from what would be the

12    equivalent of high school in Australia, correct?

13          A.    Correct.

14          Q.    And what year would that have been?

15          A.    1992.

16          Q.    And when did you come to the United States

17    to stay for more than a week?

18          A.    1999.

19          Q.    Have you resided as your primary residence

20    in the United States since 1999?

21          A.    No.

22          Q.    Do you currently reside in the United States

23    as your primary residence?

24          A.    No.

25          Q.    Where do you reside?

9

134

```
 1          A.    Singapore.

 2          Q.    Do you have a role in the limited liability

 3   company known as Lurking Class, LLC?

 4          A.    No.

 5          Q.    Do you have a role in any business in which

 6   T-shirts with designs created by Jesse Dawber are sold?

 7          A.    Yes.

 8          Q.    What role do you have in such a business?

 9          A.    I'm the director of Class War, Inc.

10          Q.    When you say "director of Class War, Inc.,"

11   can you be more specific?

12          A.    I'm the current interim CEO of Class War,

13   and I'm the sole director of Class War, Inc.

14          Q.    And when did you become the sole director of

15   Class War, Inc.?

16          A.    In June 2017.

17          Q.    When did you become the interim CEO of Class

18   War, Inc.?

19          A.    May 2017.

20          Q.    Is Class War, Inc., a member of the LLC

21   known as Sketchy Tank?

22          A.    No.

23          Q.    Who, if you know, are the members of the

24   limited liability company known as Lurking Class?

25          A.    It's a sole subsidiary of Class War, Inc.
```

                                                          10

135

1          Q.    Are you telling me that Class War, Inc., is

2     a member of Lurking Class, LLC?

3          A.    Yes.

4          Q.    Are there any other members of Lurking

5     Class, LLC, other than Class War, Inc.?

6          A.    No.

7          Q.    Who are the shareholders of Class War, Inc.?

8          A.    Jesse Dawber.

9          Q.    Any others?

10         A.    No.

11         Q.    I'm going to mark as Exhibit 1 -- actually,

12    before we do that, let me make sure I'm finished with

13    your educational background.  I think I understood you

14    to say no post high school education in a formal sense;

15    is that true?

16         A.    That's correct.

17         Q.    No college or university?

18         A.    That's correct.

19         Q.    And what was the first job that you had

20    after graduating from the equivalent of high school in

21    Australia, please?

22         A.    I worked for Toyota.

23         Q.    Doing what?

24         A.    I was a retail manager.

25         Q.    Where?

                                                            11

136

1           A.    Currently I sit as a nonexecutive chairman

2      of a Singapore listed Main Board construction company.

3           Q.    What's a Main Board construction company?

4           A.    The exchange in Singapore has multiple

5      listings.   They have catalyst markets and they have the

6      Main Board listed markets.

7           Q.    When you say "Main Board," you mean that is

8      the main stock exchange in Singapore.

9           A.    That's correct.

10          Q.    So are you still in that role?

11          A.    I am.

12          Q.    So from 2014 until the present, you have

13     been in what role for this construction company?

14          A.    The nonexecutive chairman's role, and prior

15     to that, I was the executive director.

16          Q.    When you started with this construction

17     company that's listed on the Main Board in Singapore,

18     were you executive director?

19          A.    I came on as executive director in

20     February 2015.

21          Q.    And since that time your job title has

22     changed to executive chairman or have you added that

23     title?

24          A.    No.   I swapped from being the executive

25     director to the nonexecutive chairman.

26

1              Q.    And you're still the nonexecutive chairman

2       for this construction company in Singapore?

3              A.    That's correct.

4              Q.    What is the name of the company?

5              A.    MMP Resources.

6              Q.    What type of construction do they do?

7              A.    They do commercial construction globally.

8              Q.    Not just in Singapore?

9              A.    No.

10             Q.    Since 2014 have you been engaged in any

11      other activities in terms of gainful employment other

12      than what you've described for me with this construction

13      company that's listed on the big board or the Main Board

14      of Singapore?

15             A.    Yes.

16             Q.    What job did you next acquire after going to

17      this construction company in 2014?

18             A.    More clarity.

19             Q.    I'm asking in 2014 you came on with this

20      Main Board construction company.  Have you acquired any

21      other roles in any businesses since doing that?

22             A.    Not since doing that.

23             Q.    What is your role currently with Lurking

24      Class, if any?

25             A.    Nothing actually involved in Lurking Class.

27

138

1      sketchytank.com website, true?

2              A.      True.

3              Q.      Are any items currently offered for sale on

4       the sketchytank.com website?

5              A.      I'm unsure.

6              Q.      Who owns the sketchytank.com website?

7              A.      Class War.

8              Q.      Was a decision made to change branding from

9       Sketchy Tank to Lurking Class for products that

10      previously were sold under the brand name Sketchy Tank?

11             A.      I'm unsure.

12             Q.      Are any items offered for sale today on the

13      sketchytank.com website?

14             A.      I'm unsure.

15             Q.      Were any items offered for sale on the

16      sketchytank.com website previously?

17             A.      Yes.

18             Q.      What items were offered for sale on the

19      sketchytank.com website previously?

20             A.      Apparel and accessories.

21             Q.      Are any of the -- strike that.

22                     Were any of the items offered for sale on

23      the sketchytank.com website subsequently offered for

24      sale on the lurkingclass.com website?

25             A.      Yes.

                                                                        53

1          Q.    What percentage, if you can tell me, of

2    items marketed for sale on the lurkingclass.com website

3    were previously marketed for sale on the sketchytank.com

4    website?

5          A.    I'm unsure.

6          Q.    Can you estimate?

7          A.    No.

8          Q.    Who created the content of the

9    sketchytank.com website?

10         A.    Class War, Inc.

11         Q.    Who created the content of the

12   lurkingclass.com website?

13         A.    Class War.

14         Q.    Have you been party to any conversation as

15   to why items are not currently offered for sale on the

16   sketchytank.com website?

17         MR. TURRILL:   Just before my client answers that

18   question, I caution him not to reveal any conversations

19   he may have had with counsel.   Otherwise, you can

20   answer.

21         THE WITNESS:   Please ask me that question again.

22   BY MR. VAUGHN:

23         Q.    Have you been a participant or did you

24   overhear any conversation in which it was discussed why

25   the sketchytank.com website no longer offers product for

                                                          54

```
 1    them?

 2         A.    I am.

 3         Q.    And do such agreements exist?

 4         A.    Yes.

 5         Q.    Who are the agreements for the sale,

 6    marketing, licensing or distribution of Lurking Class

 7    products between?

 8         A.    Class War, Inc., and Lurking Class.

 9         Q.    Does Class War, Inc., have any contracts or

10    other agreements concerning the distribution of Lurking

11    Class products?

12         A.    No.

13         Q.    T-shirts such as that depicted on the left

14    side of Exhibit 2 are currently sold in Zumiez, correct?

15         A.    Correct.

16         Q.    Does anybody that you're aware of have a

17    contract with Zumiez for sale of T-shirts like the one

18    on the left side of Exhibit 2?

19         A.    Yes.

20         Q.    Who does?

21         A.    Class War, Inc.

22         Q.    Class War, Inc., has an agreement with the

23    store Zumiez for sale, marketing, licensing or

24    distribution of Lurking Class products, true?

25         A.    Yes.
```

141

1          Q.    And when was that -- strike that.

2                When was the currently effective agreement

3     between Class War and Zumiez for the sale, marketing,

4     licensing or distribution of Lurking Class products

5     created?

6          A.    That's Class War, Inc., business.

7          Q.    Sounds like you're objecting.

8          A.    I am, yes.

9          Q.    Your lawyer does that.

10               So tell me when that agreement was created,

11    please?

12         MR. TURRILL:   I'll object on the grounds that it

13    is beyond the scope of the deposition notice, and

14    instruct the witness not to answer.

15    BY MR. VAUGHN:

16         Q.    No. 4 asks for someone knowledgeable on the

17    matter of contracts, license agreements and other

18    agreements for sale, marketing, licensing or

19    distribution of Lurking Class products; so I don't agree

20    at all.

21               And my question -- and I know that makes no

22    difference to you gentlemen, at least not right now.

23               My question to you is -- I want to make sure

24    we're clear on the record here -- who is any agreement

25    between for the sale of Lurking Class products?

                                                              63

1          Q.    Has an agreement between Class War and

2     Zumiez for sale or distribution of Lurking Class

3     products been entered into since September 11 of 2017?

4          A.    No.

5          Q.    So would it be correct to state, then, that

6     any agreement between Class War and Zumiez pre-existed

7     September 11 of 2017?

8          A.    Yes.

9          Q.    Let's take a look at what I'll mark as

10    Exhibit 4 here.  Do you recognize Exhibit 4?

11         A.    I do.

12         (Exhibit 4 was marked for Identification.)

13    BY MR. VAUGHN:

14         Q.    This is not a signed version.  Have you ever

15    seen a signed version of Exhibit 4?

16         A.    I'm unable to answer that question.

17         MR. VAUGHN:  Could I have that answer reread,

18    please?

19         (The record was read.)

20    BY MR. VAUGHN:

21         Q.    Why?

22         A.    Because this is a draft copy.

23         Q.    Have you ever seen a signed one?  That was

24    the question.

25         A.    Of this agreement or an agreement?

1              Did you do anything else to locate any

2     documentation that would be responsive to Category 40?

3          A.   I did.

4          Q.   You did?

5          A.   I did.

6          Q.   What else did you do?

7          A.   I checked the filing cabinets inside the

8     company.

9          Q.   What company?

10         A.   Class War, Inc.

11         Q.   Where is the office of Class War, Inc.?

12         A.   528 -- currently 528 Second Street,

13    Encinitas.

14         Q.   How often are you there?

15         A.   Approximately four to five days -- three to

16    five days a month.

17         Q.   Is there any particular schedule that you

18    keep in terms of when you're in the Class War office?

19         A.   Yes.

20         Q.   What schedule do you keep?

21         A.   I keep from early morning to close of

22    business.

23         Q.   I guess what I'm saying is, is it Tuesdays

24    or every other Wednesday?  Nothing like that?

25         A.   No.

144

1   wait for your next question, then I'm going to object.

2        MR. VAUGHN:  I think it's quite relevant how the

3   witness who was put up as the PMK first met Mr. Dawber,

4   but you do whatever you want.

5   BY MR. VAUGHN:

6        Q.   What brand were you interested in having

7   Mr. Dawber do art for?

8        A.   Our personal brand.

9        Q.   What brand is that?

10       A.   Thehouseofmachines.com.

11       Q.   How are you affiliated with that brand?

12       A.   I'm the strategy director.

13       Q.   Are you an owner of it?

14       A.   No longer, no.

15       Q.   Were you at the time?

16       A.   Yes.

17       Q.   Have there ever been any discussions between

18   you and Mr. Dawber concerning any investment into any of

19   his businesses?

20       MR. TURRILL:  Objection; vague and ambiguous.

21       THE WITNESS:  No.

22   BY MR. VAUGHN:

23       Q.   Have you had any involvement in attempting

24   to obtain venture capital or other financing for Lurking

25   Class or any other company that Mr. Dawber is affiliated

                                                              117

1              A.    That's incorrect.

2              Q.    What other additional training or experience

3       do you have in the contractual field that you haven't

4       already disclosed on the record?

5              A.    I have a global consulting company that I

6       also deal with based out of Singapore and it does

7       corporate restructuring.

8              Q.    What's the name of it?

9              A.    Lighthouse Strategic Group.

10             Q.    How would your involvement with Lighthouse

11      Strategic Group assist the business Mr. Roberts was

12      involved with on the contractual side?

13             A.    We have a global suite of lawyers that we

14      use on cross-border transactions, so pretty clear.

15             Q.    That's how Hogan Lovells became involved?

16             A.    That's correct.

17             Q.    Any other discussion between you and

18      Mr. Roberts concerning how you might assist on the

19      contractual side?

20             A.    I've just answered that.

21             Q.    That's why I asked if there's anything else.

22             A.    No, there's not.

23             Q.    On the operational side, what did you and

24      Mr. Roberts discuss about how you could assist on the

25      operational side?

                                                            124

1            A.    To be looking with a new set of eyes looking

2     at the current structure of Class War, Inc.

3            Q.    Was there any more detail with respect to

4     what you would do in that regard?

5            A.    No.

6            Q.    What did you understand Mr. Roberts to mean

7     when you gentlemen were discussing how you could assist

8     on the current structure of Class War, Inc.?

9            A.    Potential subsidiaries, how it could branch

10    out.

11           Q.    Was it your recommendation to form Lurking

12    Class, LLC?

13           A.    Yes, it was.

14           Q.    And was it your recommendation to form

15    Sketchy Tank, LLC?

16           A.    Yes, it was.

17           Q.    And I understand what you've told me about

18    the purpose for Lurking Class, LLC.  What was the

19    purpose of forming Sketchy Tank, LLC?

20           MR. TURRILL:  I'll just -- I'm not going to

21    instruct him not to answer, but I will interpose an

22    objection that we have another person designated as the

23    person most knowledgeable for Sketchy Tank, LLC, who you

24    will be conducting very soon.  That said, if Mr. Madacsi

25    has information, he can provide it.

125

147

1           THE WITNESS:  Pretty easy.  Mr. Dawber had no

2    day-to-day operation inside Class War.  He was obviously

3    the sole member of it.  It was difficult as part of the

4    restructure to remove him as the sole shareholder and

5    member because you have to replace him with someone

6    else.  But he had no day-to-day operation running of the

7    company and it was getting less and less and less as

8    company was evolving into other things, and that is,

9    other things of an agency-based business, other

10   production-based businesses.

11          So my advice for Mr. Dawber was to start

12   going out to find other sources of income, because long

13   term, it wasn't -- he wouldn't be able to -- there

14   wouldn't be enough work to support him long term.  For

15   where he had his own financial goals that he wanted to

16   go to, the company was only paying him on retainer to do

17   art to present to Class War, and that was all it was

18   ever going to be.  And as the company outgrew or changed

19   direction, it wouldn't need him in the same capacities

20   that it was using him originally, i.e., we wanted to

21   look at and are looking at new artists to come onto the

22   brand.  It's been for a long time Mr. Dawber's artwork,

23   we see an expansion of Class War, Inc., so my

24   recommendation to him was to form Sketchy Tank, LLC, and

25   go out and do other contractual work for other companies

126

148

```
 1    as well.

 2    BY MR. VAUGHN:

 3         Q.   Your concept in recommending that Sketchy

 4    Tank, LLC, be formed was that Mr. Dawber could pursue

 5    things on the personal side, not related to the Lurking

 6    Class brand through that vehicle?

 7         A.   There's no Lurking Class brand.

 8         Q.   There isn't?

 9         A.   There is no Lurking Class brand.

10         Q.   Lurking Class is not a brand?

11         A.   It's a community; hence, why the logo is on

12    the brand, which is Class War, Inc.

13         Q.   Is there a Lurking Class brand or not?

14         A.   In terminology, but not as a physical

15    company or a living entity, no.

16         Q.   I'm not asking about a physical company or

17    living entity.  I'm asking is there a brand named

18    Lurking Class?

19         A.   It's a community.

20         Q.   Is there a brand name Lurking Class?

21         A.   Again, it's a community.

22         Q.   I respectfully submit that the answer to

23    that question --

24         A.   I'm very aware of what's on the website.  It

25    refers to a community.  The brand is the community.
```

                                                            127

149

1          Q.    It's great what you're telling me, but I

2    just need an answer to this question, and I'm going to

3    ask that you answer it yes or no.  There's nothing I can

4    do today to make you do so.

5                Is Lurking Class a brand?

6          A.    It's a community.

7          Q.    Can you answer yes or no to my question?

8          A.    No, I can't.

9          Q.    You can't say whether it's a brand or not?

10         A.    That's correct.

11         MR. VAUGHN:   Mark the transcript right there,

12    please.

13    BY MR. VAUGHN:

14         Q.    Here's Exhibit 7.   What's Exhibit 7?

15         A.    It's a screenshot of the Lurking Class

16    website.

17         Q.    I'm going to read the second paragraph, the

18    first sentence, begin quote, Lurking Class, R symbol, is

19    a brand based on the artwork of Sketchy Tank, close

20    quote.

21                Did I read that right?

22         A.    You certainly did.

23         (Exhibit 7 was marked for Identification.)

24    BY MR. VAUGHN:

25         Q.    Is Lurking Class a brand?

128

1        Q.    I'll leave this alone in a minute here.  I'm

2    going to read this again and ask you a question.

3    Lurking Class, R symbol, is a brand based on the artwork

4    of Sketchy Tank.  Closed quote.  Is that a true

5    statement?

6        A.    It is a brand referring to community, yes.

7        Q.    I didn't see any reference there to

8    community.

9        A.    Then it's not a brand.  And the answer to

10   that is no.

11       Q.    In your discussion with Mr. Roberts in early

12   2017, have you told me everything you've discussed with

13   him concerning how you might assist on the operational

14   side?

15       A.    I believe I have, yes.

16       Q.    And what discussion did you have with

17   Mr. Roberts concerning how you might assist on the legal

18   side?

19       A.    That they needed external counsel a little

20   more versed in commercial litigation.

21       Q.    Anything else?

22       A.    No.

23       Q.    Now, you said Mr. Dawber had little --

24   actually, first I think you said he had no, and then

25   very little, day-to-day involvement.  Here's my

                                                           131

1    question.  Isn't it true that at the time you were

2    having these discussions in early 2017 that Mr. Dawber

3    was the sole shareholder of Class War?

4          A.    Correct.

5          Q.    And so any profits that came out of Class

6    War went to him, correct?

7          A.    I would imagine it would have, but I'm not

8    sure that was the case.

9          Q.    Did you ever interview with Mr. Dawber for a

10   job either with Class War or later Lurking Class?

11         A.    No.

12         Q.    Who brought you onboard to be interim CEO of

13   Class War?

14         A.    Mr. Roberts.

15         Q.    And when did that occur?

16         A.    In May 2017.

17         Q.    Is there a written document that

18   memorializes your retention?

19         A.    Yes.

20         Q.    And is there -- I'm not asking for the

21   amount, but if there's some sort of agreement whereby

22   you're compensated for that role?

23         A.    I am, yes.

24         Q.    Is the compensation lump sum or hourly or

25   some other fashion?

1         A.    It's based on a monthly retainer to our

2    consulting company.

3         Q.    Are you required to expend any particular

4    amount of time in order to satisfy your obligations

5    under that agreement, such as, is that term as needed, a

6    certain amount of hours or some other term?

7         A.    As needed.

8         Q.    And the need, I think you told me, has been

9    two to three days per month?

10         A.    Between three to five.

11         Q.    You've been working about three to five days

12    in your interim CEO role for Class War since May of 2017

13    up to now?

14         A.    That's correct.

15         Q.    I expect that you're not in the

16    United States for the entirety of a given month?

17         A.    That's correct.

18         Q.    So when you're in the U.S., do you work on

19    things other than your interim CEO role for Class War?

20         A.    No.

21         Q.    You come here to discharge those duties and

22    that's the only reason you come to the U.S.?

23         A.    No.    That's not true.

24         Q.    What else?

25         A.    My wife's from the U.S.

133

1        Q.   Good for you.  Where do you spend the rest

2    of your time typically in a month?  Singapore?

3        A.   Tokyo.  I have a place in Tokyo and a place

4    in Cape Town.

5        Q.   Has your role -- strike that.

6             Has what you do for Class War, Inc., changed

7    from the time you first came on in May of 2017 to now?

8        A.   No.

9        Q.   Pretty much the same?

10       A.   Yes.

11       Q.   Have you had involvement in negotiating any

12   contracts with anybody in your role as interim CEO of

13   Class War?

14       A.   I have.

15       Q.   What contracts?

16       A.   Zumiez, Vans and Stance.

17       Q.   What's the third one?

18       A.   S-t-a-n-c-e.

19       Q.   Who are they?

20       A.   They're a sock manufacturer.

21       Q.   As in shoes and socks?

22       A.   That's it.

23       Q.   With regard to Zumiez, is the contract that

24   you assisted in negotiating the one we spoke of

25   previously where there is an agreement for Zumiez to

                                                        134

```
 1    STATE OF CALIFORNIA      )
                               ) ss:
 2    COUNTY OF SAN DIEGO      )

 3

 4              I, STEFANIE A. LANDA, do hereby certify;

 5              That I am a duly qualified Certified Shorthand

 6    Reporter, in and for the State of California, holder of

 7    certificate number 7332, which is in full force and

 8    effect and that I am authorized to administer oaths and

 9    affirmation;

10              That the foregoing deposition testimony of the

11    herein named witness was taken before me at the time and

12    place herein set forth;

13              That prior to being examined, the witness named

14    in the foregoing deposition, was duly sworn or affirmed

15    by me, to testify the truth, the whole truth, and

16    nothing but the truth;

17              That the testimony of the witness and all

18    objections made at the time of the examination were

19    recorded stenographically by me, and were thereafter

20    transcribed under my direction and supervision;

21              That the following pages contain a full, true

22    and accurate record of the proceedings and testimony to

23    the best of my skill and ability.

24

25
```

138

1          I further certify that I am not a relative or

2     employee or attorney or counsel of any of the parties,

3     nor am I a relative or employee of such attorney or

4     counsel, nor am I financially interested in the outcome

5     of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8     this  1st  day of   August         ,   2018 .

9

10

11

12                    _____

13          STEFANIE A. LANDA, CSR NO. 7332

14

15

16

17

18

19

20

21

22

23

24

25

139

156

# EXHIBIT 23

**Excerpts of Deposition of Jesse Dawber as Person Most Knowledgeable for Sketchy Tank, LLC, dated July 26, 2018**

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2

3        COUNTY OF SAN DIEGO, NORTH COUNTY REGIONAL CENTER

4

5

6    JACK SCHINDLER, an individual,   )
                                      )
7                   Plaintiff,        )
                                      )Case No.
8         vs.                         )37-2015-00026810-
                                      )CU-BT-NC
9    JESSE DAWBER, an individual;     )
     aka "SKETCHY TANK;" and          )
10   DOES 1-50, inclusive,            )
                                      )
11                  Defendants.       )
                                      )
12                                    )
     AND ALL RELATED CROSS-ACTIONS.   )
13                                    )

14

15                 DEPOSITION OF JESSE DAWBER

16    AS THE PERSON MOST KNOWLEDGEABLE FOR SKETCHY TANK, LLC

17                    San Diego, California
                      Thursday, July 26, 2018
18

19

20

21   Reported by: Stefanie A. Landa
                   C.S.R. No. 7332
22   Job No.:      204204

23

24

25

                                                                      1

```
 1                      I N D E X

 2    DEPOSITION OF JESSE DAWBER

 3          July 26, 2018

 4    EXAMINATION                                          PAGE

 5          By Mr. Vaughn                                    5

 6    DEPOSITION EXHIBITS                                  MARKED

 7          1 - Copy of an amended notice of taking          5
                  deposition, 14 pages
 8

 9    INSTRUCTIONS NOT TO ANSWER:                   PAGE   LINE

10          By Mr. Turrill                           14      5
                                                     14     23
11                                                   16      9
                                                     17      2
12                                                   28     13
                                                     52      1
13                                                   66     12
                                                     67      9
14

15

16

17

18

19

20

21

22

23

24

25

                                                                  2
```

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2

 3        COUNTY OF SAN DIEGO, NORTH COUNTY REGIONAL CENTER

 4

 5   JACK SCHINDLER, an individual,   )
                                      )
 6                   Plaintiff,       )
                                      )Case No.
 7            vs.                     )37-2015-00026810-
                                      )CU-BT-NC
 8   JESSE DAWBER, an individual;     )
     aka "SKETCHY TANK;" and          )
 9   DOES 1-50, inclusive,            )
                                      )
10                   Defendants.      )
                                      )
11                                    )
     AND ALL RELATED CROSS-ACTIONS.   )
12                                    )

13

14

15

16        DEPOSITION OF JESSE DAWBER, taken on behalf of the

17   Plaintiff, on the 26th day of July, 2018, commencing at

18   1:35 p.m. and ending at 2:57 p.m., at 501 West Broadway,

19   Suite 1770, in the City of San Diego, County of

20   San Diego, before me, Stefanie A. Landa, Certified

21   Shorthand Reporter, State of California.

22

23

24

25
```

3

160

```
1                          APPEARANCES

2

3        FOR THE PLAINTIFF:

4                VAUGHN & VAUGHN
                 By:  DONALD A. VAUGHN, ESQ.
5                501 West Broadway
                 Suite 1770
6                San Diego, California  92101
                 (619) 237-1717
7

8

         FOR THE DEFENDANTS:
9
                 HOGAN LOVELLS
10               By:  MICHAEL L. TURRILL, ESQ.
                 1999 Avenue of the Stars
11               Suite 1400
                 Los Angeles, California  90067
12               (310) 785-4600

13

14

         ALSO PRESENT:
15
                 DREW MADACSI
16               MATT ROBERTS
                 JACK SCHINDLER
17

18

19

20

21

22

23

24

25

                                                           4
```

1          A.    Sketchy Tank, LLC, is my business for art.

2          Q.    And who owns Sketchy Tank, LLC?

3          A.    I do.

4          Q.    What intellectual property, if any, are you

5     aware of that Sketchy Tank, LLC, owns?

6          A.    I know they own -- it's a balaclava ski mask

7     logo.

8          Q.    The one with an inverted five-pointed star

9     and then the hooded figure superimposed on the front of

10    it?

11         A.    Correct.

12         Q.    What does Sketchy Tank, LLC, do in terms of

13    business pursuits?

14         A.    Sketchy Tank, LLC, as far as business

15    pursuits.  Can be you more specific?

16         Q.    What kind of business does it do, if any?

17         A.    I sell artwork.

18         Q.    When did Sketchy Tank, LLC, begin selling

19    artwork?

20         A.    When it was formed, I guess.  I don't know

21    the exact date when it was formed.

22         Q.    September 11, 2017?

23         A.    Sounds good.

24         Q.    What has the total sales of Sketchy

25    Tank, LLC, been since inception?

6

162

```
 1          A.    I'm not sure.

 2          Q.    Do you have in an order of magnitude, $10, a

 3    hundred, a thousand?

 4          A.    I would guess -- since September 11, 2017, I

 5    would guess over $50,000.

 6          Q.    But under a hundred?

 7          A.    Yeah.  I'd say under a hundred.

 8          Q.    Has Sketchy Tank, LLC, sold any artwork

 9    which previously was offered for sale on the

10    sketchytank.com website?

11          A.    Can you repeat one more time?

12          Q.    What I'm trying to find out is whether or

13    not the Sketchy Tank, LLC, business involves any of the

14    designs that previously were marketed on the website,

15    the sketchytank.com website, or whether there are new

16    things that you've done?

17          A.    So Sketchy Tank is me as an artist, so

18    everything I've created up until this day is technically

19    Sketchy Tank, my artwork.

20          Q.    My question, though, is:  Has Sketchy

21    Tank, LLC, the entity formed last September, sold any

22    designs that were previously offered for sale on the

23    sketchytank.com website?

24          A.    I don't think so.

25          Q.    What I'm trying to differentiate is whether
```

7

163

1    the things that you've sold in the Sketchy Tank, LLC,

2    are new designs, new things you've drawn, rather than

3    selling things which already existed before this LLC was

4    formed?

5          A.    New.

6          Q.    It's new stuff?

7          A.    Yes.

8          Q.    So, for instance, the T-shirt "Pie till I

9    die."  Have you sold any of those through Sketchy

10   Tank, LLC?

11         A.    I don't sell clothing.

12         Q.    What do you sell?

13         A.    I sell artwork.

14         Q.    What type of artwork?

15         A.    Hand-illustrated artwork.

16         Q.    Pen and ink?

17         A.    Sure.

18         Q.    Color and black and white?

19         A.    Yeah.

20         Q.    What types of media?

21         A.    Illustrations with pen and ink and then

22   vector art, graphic design.

23         Q.    Any oil paintings?

24         A.    No.  I don't mess with oil.

25         Q.    Watercolor?

8

164

1    after the LLC was created through the LLC?

2          A.    No.

3          Q.    So it's all new things that you've created,

4    not goods that previously existed?

5          A.    Yeah.  I don't sell goods.

6          Q.    And not art that previously existed?

7          A.    Correct.  All new art.

8          Q.    So some company is currently selling those

9    designs that I mentioned that were previously marketed

10   on the sketchytank.com website, true?

11         A.    One more time.

12         Q.    Those designs that I mentioned --

13         A.    Which ones?

14         Q.    "Pie till I die," "Wolves don't lose sleep,"

15   "Good times bad friends," "Trust no suits," and others,

16   those are still being sold -- T-shirts with those

17   phrases and illustrations on them are still being sold

18   today, correct?

19         A.    Yes.

20         Q.    And by what company?

21         A.    Class War.

22         Q.    Those designs that I mentioned, the examples

23   that I gave, are currently being offered for sale on the

24   lurkingclass.com website, true?

25         A.    I have to look.  I haven't checked it out.

                                                          10

1         A.    Why was it deactivated?

2         MR. TURRILL:   Objection; calls for speculation.

3         THE WITNESS:   I don't think it was deactivated.

4    BY MR. VAUGHN:

5         Q.    Is anything for sale today on the

6    sketchytank.com website?

7         A.    I'm not sure.

8         Q.    Did you look for the sketchytank.com website

9    so you could testify to these matters in Paragraph 3

10   here?

11        A.    It redirects to Lurking Class.

12        Q.    So, as far as you know, based on the efforts

13   you made, the sketchytank.com website doesn't itself

14   offer anything for sale today?

15        A.    Sketchytank.com does not offer anything for

16   sale.

17        Q.    And the sketchytank.com website redirects to

18   the lurkingclass.com website, right?

19        A.    Correct.

20        Q.    Why?

21        MR. TURRILL:   Objection; calls for speculation.

22        THE WITNESS:   I'm not sure.

23   BY MR. VAUGHN:

24        Q.    Were you involved in any discussions, I

25   guess outside the presence of counsel, as to why the

                                                          20

166

1    sketchytank.com website would not itself offer goods for

2    sale anymore?

3         A.   No.  I have nothing to do with anything.

4         Q.   The goods that were offered for sale on the

5    sketchytank.com website, were those goods owned by Class

6    War, Inc.?

7         A.   Are we talking about between September 2017

8    until now?

9         Q.   No.  Because the sketchytank.com website, I

10   thought we established, doesn't offer anything for sale

11   now.  So my question is:  Before it stopped offering

12   things for sale, who owned the goods that were being

13   offered for sale on the sketchytank.com website?

14        A.   It was all presale so there was no goods

15   owned.

16        Q.   Whose goods were they that were offered for

17   sale on the sketchytank.com website?

18        A.   So there was actually no goods, so there's

19   no, like, inventory of anything.  It's all presale.

20        Q.   Whether there is a warehouse full of things

21   or not, would you agree with me that, for instance,

22   people who used to log onto the sketchytank.com website

23   could order a T-shirt that had for instance "Pie till I

24   die" on it?

25        A.   I don't know if that was available.

                                                           21

```
 1               When the sketchytank.com website offered
 2    goods for sale --
 3               Are you with me so far?
 4        A.    Yeah.
 5        Q.    When it offered goods for sale, were you the
 6    owner of the designs that were offered?
 7        MR. TURRILL:  Objection; calls for a legal
 8    conclusion; calls for speculation.
 9        THE WITNESS:  When?  Give me a date.
10    BY MR. VAUGHN:
11        Q.    Anytime before sketchytank.com --
12        A.    Did I own the artwork?
13        Q.    -- forward it to Lurking Class.
14        A.    Ask the question one more time.
15        Q.    I want to know who owned the things that
16    were offered for sale on the sketchytank.com website?
17        MR. TURRILL:  Same objections.
18        THE WITNESS:  I owned the artwork.  Class War
19    sells the artwork that's on the clothes.
20    BY MR. VAUGHN:
21        Q.    So your answer is either you or Class War?
22        A.    Class War.
23        Q.    Class War was the owner?
24        A.    Yes.
25        Q.    And the goods that are now sold on the
```

                                                                24

168

1    lurkingclass.com website, Class War is the owner,

2    correct?

3          A.    Yes.

4          Q.    So when goods were sold through the

5    sketchytank.com website, Class War was the owner and

6    it's still the owner of those goods sold through the

7    Lurking Class website, right?

8          A.    One more time.  Sorry.

9          Q.    Class War owned goods sold on the

10   sketchytank.com website and the lurkingclass.com

11   website, true?

12         A.    No.  Class War -- there is no goods to be

13   owned.  I don't want to keep going in circles on that

14   one.

15         Q.    You may not want to, and believe me, I don't

16   want to either.  I'm trying to make a clear record.  I'm

17   going to stick with it until we get an agreement on

18   this.

19               You already told me that the designs that

20   were offered on things sold through the sketchytank.com

21   website were owned either by you or Class War, right?

22         A.    Yes.

23         Q.    And the designs that are on -- goods offered

24   for sale through the lurkingclass.com website are owned

25   by Class War, correct?

                                                            25

1          A.    Yes.

2          Q.    Do you own any of the designs that are

3    currently being marketed through the lurkingclass.com

4    website?

5          A.    One more time.  Sorry.

6          MR. VAUGHN:  Please reread the question.

7          (The record was read.)

8          THE WITNESS:  Do I own any of the artwork?

9    BY MR. VAUGHN:

10         Q.    Yeah.  The design.

11         A.    Yeah.  I own all the artwork.

12         Q.    And how was that that you owned that

13   artwork?

14         MR. TURRILL:  Objection; vague and ambiguous.

15         THE WITNESS:  My intellectual property.

16   BY MR. VAUGHN:

17         Q.    I guess what I'm saying is I thought Class

18   War owned it.

19         A.    Class War doesn't own artwork.  I own

20   artwork.

21         Q.    So what arrangement, if any, do you have,

22   you, Jesse Dawber, with Class War that allows

23   lurkingclass.com to sell those designs through the

24   Lurking Class website?

25         A.    Class War pays me a retainer to deliver

                                                              26

1    graphics.

2         Q.   What about graphics that have existed for

3    years such as "Pie till I die," do you still get paid on

4    those?

5         A.   No.  It's not new graphics.

6         Q.   So are you individually receiving any

7    compensation for T-shirts sold through the Lurking Class

8    website which designs existed two years ago?

9         A.   No.

10        Q.   Things sold through the lurkingclass.com

11   website, though, the money that's realized on that, goes

12   to Class War, correct?

13        MR. TURRILL:  Objection; calls for speculation.

14        THE WITNESS:  Yes.

15   BY MR. VAUGHN:

16        Q.   And if there's profits from Class War, that

17   goes to you, right?

18        A.   No.

19        Q.   Where do the profits from Class War go?

20        MR. TURRILL:  Objection; calls for speculation.

21        THE WITNESS:  I don't know.  It's all with Class

22   War.  It's running that business.  That would be a Matt

23   and Drew question.

24   BY MR. VAUGHN:

25        Q.   Right.  But you're sole shareholder,

                                                            27

171

```
 1    correct?

 2         A.    But I'm not involved in the day-to-day

 3    business and haven't been for a long time.

 4         Q.    I'm just asking who gets the money from

 5    profits that Class War makes?

 6         A.    Who gets the profits?

 7         MR. TURRILL:   Objection; calls for speculation.

 8         THE WITNESS:   The profits are used for running

 9    the company.

10    BY MR. VAUGHN:

11         Q.    Is there money that Class War gets over and

12    above its expenses?

13         MR. TURRILL:   Objection; calls for speculation;

14    outside the scope of this deposition of Sketchy

15    Tank, LLC, and I'll instruct the witness not to answer.

16              I've given quite a bit of leeway for the

17    last 20 or 30 minutes, but it's really outside of what

18    we're here to talk about today.

19    BY MR. VAUGHN:

20         Q.    Does Sketchy Tank, LLC received any

21    distributions of money from either Lurking Class, LLC,

22    or Class War, Inc.?

23         A.    Yes.

24         Q.    What money is that?

25         A.    I just told you.  I get a retainer every
```

1    month.

2           Q.    How much is it?

3           A.    18,000 or 19,000.

4           Q.    Is there any performance-based criteria

5    under which Sketchy Tank, LLC, is compensated, meaning,

6    is there anything that's tied to the amount of sales or

7    figure of goods sold?

8           A.    No.

9           Q.    It's a flat figure?

10          A.    Uh-huh.

11          Q.    18 or 19?

12          A.    I think it's 19.

13          Q.    Who's that arrangement between?

14          A.    Class War.

15          Q.    And who?

16          A.    And Sketchy Tank, LLC.

17          Q.    Which way does the money flow?  Class War

18   pays Sketchy Tank, LLC --

19          A.    Yes.

20          Q.    -- for your services?

21          A.    For artwork.

22          Q.    So you do the artwork for Sketchy Tank, LLC,

23   which is then, if you know, transferred in title over to

24   Class War, Inc., or is it licensed?

25          A.    Honestly, I have no clue.

29

1          Q.    The designs that you draw for Sketchy

2    Tank, LLC, and for which Class War, Inc., pays Sketchy

3    Tank, LLC, who owns them, if you know?

4          A.    Who owns the artwork?

5          Q.    Yes.

6          A.    The artwork is owned by me.

7          Q.    Individually?

8          A.    I don't know how that works.

9          Q.    You don't know whether you are the owner of

10   the artwork that you create or Sketchy Tank, LLC, is?

11         A.    I don't know the answer to that.

12         Q.    In any event, the artwork that you create is

13   used by Class War, Inc.; would that be true?

14         A.    Some of it, yeah.

15         Q.    I don't mean to say they have to use

16   everything you draw, but if somebody decides that it's

17   beneficial or desirable, then Class War, Inc., under

18   this arrangement you're describing with Sketchy

19   Tank, LLC, can utilize those designs, true?

20         A.    Yes.

21         Q.    And Class War, Inc., can utilize those

22   designs to put one or more of them on products which

23   Class War, Inc., will sell, correct?

24         A.    Yes.

25         Q.    And do you know how much Class War, Inc.,

                                                              30

174

1    Class doesn't have a bank account, so I'll ask anyway.

2    Does Lurking Class, LLC, have a bank account, to your

3    knowledge?

4         A.   No, not to my knowledge.

5         Q.   Other than what you've told me about so far,

6    does Sketchy Tank, LLC, have any contracts with anybody

7    other than the one between it and Class War, Inc.?

8         A.   One, but I have an NDA.

9         Q.   Understand so I won't explore it too deeply.

10   There's a nondisclosure agreement with respect to some

11   type of contract between Sketchy Tank, LLC, and some

12   third party?

13        A.   Yes.

14        Q.   And is the subject of that contract, without

15   telling me who, does it relate to the use of artwork?

16        A.   Yes.

17        Q.   So Sketchy Tank, LLC, has some type of

18   contract with a third party for use of artwork that you

19   create?

20        A.   Yes.

21        Q.   And you're not at liberty to say who it is?

22        A.   Yes.

23        Q.   Is it a collaboration would you describe?

24        MR. TURRILL:   Objection; vague and ambiguous.

25        THE WITNESS:   No.

                                                           33

1    Class War.  Is there any relationship other than what

2    we've already talked about?

3           A.    Just what we've already -- yeah.

4           Q.    Nothing else?

5           A.    No.

6           Q.    In No. 13 here on Page 3 of Exhibit 1 asks

7    about the means by which Sketchy Tank, LLC, obtained the

8    right to use or to sell, license or distribute apparel

9    with certain phrases on them, one of them being "Pie

10   till I die."  And I bet your answer is going to be they

11   don't have the right to do so.  Would that be true?

12           That's a bad question.  Look on Page 3,

13   please, of Exhibit 1.

14          A.    Right.

15          Q.    See the bottom category there, 13?

16          A.    I do.

17          Q.    Do you have any knowledge concerning whether

18   or not that has taken place; in other words, that

19   Sketchy Tank, LLC, has the right to use those designs?

20          A.    Yes, they do.

21          Q.    How did they obtain that right?

22          A.    How did they obtain that right?

23          Q.    Yes.

24          A.    I don't know.

25          Q.    Is there any agreement where Sketchy

                                                                          36

1    Tank, LLC, got the right to use these phrases, "Pie till

2    I die," "Good times bad friends," et cetera?

3         A.    No.

4         Q.    Does Sketchy Tank, LLC, utilize those

5    designs, the ones listed there in Paragraph 13?

6         A.    One more time?  Repeat the question.

7         Q.    Does Sketchy Tank, LLC, use, meaning sell,

8    the designs one example of which is "Pie till I die," or

9    phrases?

10        A.    I've used that phrase on a few different

11   shirts.  I've used a lot of these phrases multiple times

12   too.  So I'm not sure what artwork you're talking about

13   specifically.  But they're allowed to use my previous

14   artwork, and then under my retainer, I provide the new

15   artwork.

16        Q.    Does Sketchy Tank, LLC, use any of the

17   previous artwork?

18        A.    I believe so.

19        Q.    I'm confused because I thought previously

20   that what you indicated -- I'm not trying to give you a

21   hard time.  I'm just trying to figure out what the truth

22   is.  I thought I previously heard that the only things

23   that Sketchy Tank, LLC, had the right to use were new

24   things that you created?

25        A.    I'm being paid for supplying new artwork.

37

1          Q.   So does Sketchy Tank, LLC, nevertheless, as

2     you understand it, have the right to manufacture

3     products or anything with these phrases, for instance,

4     "Pie till I die," on it?

5          A.   Sure.

6          Q.   Is there an agreement where those rights are

7     given over to Sketchy Tank, LLC?

8          A.   No.

9          Q.   How did, if you understand here -- as the

10    person most knowledgeable or person most qualified for

11    Sketchy Tank, LLC, how is it that Sketchy Tank, LLC, has

12    the right to use those prior designs?

13         A.   I guess kind of an unspoken understanding.

14         Q.   Next question is:  Does Sketchy Tank, LLC,

15    use any of those prior designs?

16         A.   Does Sketchy Tank, LLC, use any prior

17    designs?

18         Q.   Yes.

19         A.   The ones that are referred to up top.

20         Q.   Or any others that previously were in

21    existence before September 11 of 2017?

22         A.   No.  Same thing.  I've already answered the

23    question.  I don't.  What I'm being paid for is

24    providing new graphics.

25         Q.   But that's not the question.  The question

                                                          38

178

1          Q.    Yeah.

2          A.    It's my name.  I don't know if you can own

3     it.  I don't know the answer to that.

4          Q.    Isn't it true that Sketchy Tank, LLC,

5     registered for a trademark the name Sketchy Tank that it

6     owns?

7          A.    I'm not sure.

8          Q.    Did you cause that trademark registration

9     for the phrase "Sketchy Tank" to be filed?

10         A.    No.

11         Q.    Is the bottom line, as we sit here today,

12    you're not sure who, if anyone, owns the phrase "Sketchy

13    Tank" and the right to use it in commerce?

14         A.    I'm honestly -- it sounds horrible, but I'm

15    pretty naive to a lot of this and how this has all gone

16    down, but I don't know how it all got set up to be

17    honest.

18         Q.    Did you have legal advice on that subject?

19         A.    Yes.

20         Q.    Would it be correct to state that the

21    intellectual property lawyers that you have used include

22    a Tara Pelan?

23         A.    Yes.

24         Q.    Does Sketchy Tank, LLC, have a general

25    ledger?

                                                          44

 1            THE WITNESS:  No.

 2    BY MR. VAUGHN:

 3            Q.   So since there never was one, asking why it

 4    no longer exists or is being conducted under a different

 5    name, makes no sense, right?

 6            A.   Yes.

 7            Q.   Now, does Sketchy Tank, LLC, have any

 8    relationship with Zumiez?

 9            A.   No.

10            Q.   Has Sketchy Tank, LLC, ever been a party to

11    an agreement with any retailer?

12            A.   No.

13            Q.   I'm over to Page 5 now on Exhibit 1.  Has

14    there been any appraisal or other assessment of the

15    current or future value of the Sketchy Tank, LLC, in a

16    formal way?

17            A.   No.

18            Q.   Is there -- I'm looking at Question No. 2.

19    Is there an organizational chart on which Sketchy

20    Tank, LLC, appears?

21            A.   No.

22            Q.   Request No. 3, are there any Sketchy

23    Tank, LLC, financial statements?

24            A.   No.

25            Q.   And it does not have a general ledger; is

                                                              46

1          Q.    Has Sketchy Tank, LLC, actually sold

2    products?

3          A.    No.

4          Q.    So this concept that you're telling me

5    about, about Sketchy Tank, LLC, selling paintings that

6    you create or new artwork, no actual tangible artwork

7    has been produced yet on behalf of Sketchy Tank, LLC?

8          A.    None that's been sold.

9          Q.    So you've created some and you have

10   paintings somewhere?

11         A.    Sure.

12         Q.    Where are they?

13         A.    At my house, drawings, originals.

14         Q.    Have there been -- has there been artwork

15   that you've created on behalf of Sketchy Tank, LLC, that

16   Class War has used?

17         A.    One more time.  Sorry.

18         Q.    I think we're at the point where you haven't

19   sold any artwork that you've created since September 11

20   of 2017, and so I got that.  My question is:  Even if

21   you haven't sold it independently, have you created new

22   designs which have been forwarded to Class War to see if

23   they wanted to use them or not?

24         A.    Yeah.

25         Q.    Can you give me an idea of how many such

                                                              61

181

1    designs you've created that Class War has had a look at?

2         A.   Since September?

3         Q.   Yes, sir.

4         A.   Over 50.

5         Q.   And how many of them, if you know, has Class

6    War elected to attempt to sell?

7         A.   I don't know.

8         Q.   Do you know of any?

9         A.   I know -- yeah.  They use a lot of them, but

10   I don't know how many.

11        Q.   You know that at least one original piece of

12   art you've created since September 11, 2017, and which

13   has been made available to Class War, they have run with

14   that and used it to try and sell it?

15        A.   Are you talking about on product, not

16   artwork, right?

17        Q.   I'm asking for any designs you've created

18   and given over to Class War, has Class War used any of

19   them?

20        A.   Yes, to sell on products.

21        Q.   Mass produced?

22        A.   Yes.

23        Q.   And how many such items has Class War mass

24   produced which you created since September 11 of 2017?

25        MR. TURRILL:  Objection; asked and answered.

                                                              62

182

1    Sketchy Tank, LLC, since September of 2017?

2            A.    No.

3            Q.    So it's a one-off kind of thing?

4            A.    Yeah.    That's probably the plan.

5            MR. VAUGHN:    I think that's all I have.    Let's

6    take a five-minute break, and then I'll kind of regroup.

7    If I have a few more questions, we'll come back, and

8    then everybody can go on their merry way.

9            MR. TURRILL:    Sure.

10           THE WITNESS:    Awesome.

11           (Recess taken.)

12           MR. VAUGHN:    Back on the record.

13   BY MR. VAUGHN:

14           Q.    We're back on the record, Mr. Dawber.    I

15   just want to be as clear as I can.    Does Sketchy

16   Tank, LLC, own the prior designs, for instance, "Pie

17   till I die," "Good times bad friends," that sort of

18   thing?

19           MR. TURRILL:    Objection; asked and answered;

20   calls for a legal conclusion.

21           THE WITNESS:    Do they own it?

22   BY MR. VAUGHN:

23           Q.    Yes.

24           A.    No.

25           Q.    Who does, if you know?

                                                              64

183

1          A.    I don't know who owned it.

2          Q.    Were you ever paid for anybody to use those

3     prior designs?

4          A.    No.

5          Q.    Is there any sort of deal, I guess I would

6     say, in place for restructuring or sale of the business

7     of Class War or Lurking Class?

8          A.    One more time.

9          Q.    Is there any sort of deal in place for

10    investment into or sale of the business of Class War or

11    Lurking Class, as far as you know?

12         A.    No, not that I know of.

13         Q.    Have you been paid any sum of money for any

14    interest in Class War, Lurking Class, or Sketchy

15    Tank, LLC?

16         A.    No.

17         Q.    Is there any sort of buyout agreement in

18    place to acquire any of your interest in those three

19    businesses I named?

20         A.    Any buyout?

21         Q.    Yes.

22         A.    I don't think so, no.

23         Q.    Is there any sort of agreement at all with

24    respect to your ownership interest in Class War or its

25    ownership interest in Lurking Class that will be

                                                                          65

184

1    STATE OF CALIFORNIA       )
                               ) ss:
2    COUNTY OF SAN DIEGO       )

3

4         I, STEFANIE A. LANDA, do hereby certify

5         That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 7332, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmation;

10        That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13        That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17        That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21        That the following pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability.

24

25

69

1          I further certify that I am not a relative or

2     employee or attorney or counsel of any of the parties,

3     nor am I a relative or employee of such attorney or

4     counsel, nor am I financially interested in the outcome

5     of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8     this 1st day of August, 2018.

9

10

11

12     _____

13          STEFANIE A. LANDA, CSR NO. 7332

14

15

16

17

18

19

20

21

22

23

24

25

70

# EXHIBIT 24

**Trial transcript of testimony of Jesse Dawber on September 17, 2018**

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2       COUNTY OF SAN DIEGO, NORTH COUNTY DIVISION

3    DEPARTMENT 28        HON. EARL H. MAAS III, JUDGE

4

5                              )
     JACK SCHINDLER, an       )
6    individual,              )
                              )
7          Plaintiff,         )
                              )  Case No.
8              vs.            )  37-2015-00026810
                              )  CU-BT-NC
9                              )
     JESSE DAWBER, an         )
10   individual, and DOES 1-50, )
     inclusive,               )
11                             )
           Defendant.         )
12   _____)
                              )
13   AND RELATED CROSS-ACTIONS. )
     _____)
14

15

16

17      REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

18             MONDAY, SEPTEMBER 17, 2018

19            WITNESS:   JESSE DAWBER

20

21

22

23

24

25

26   REPORTED BY:  JULIE A. McKAY, CSR 9059
     OFFICIAL REPORTER PRO TEMPORE
27

28

1

188

1    **APPEARANCES:**

2
      **FOR PLAINTIFF AND CROSS-DEFENDANT JACK SCHINDLER**
3     **AND CROSS-DEFENDANT MAJOR AWARD DISTRIBUTION:**

4            **VAUGHN & VAUGHN**
             **BY: DONALD A. VAUGHN, ESQ.**
5                **EVAN J. TOPOL, ESQ.**
             **501 West Broadway, Suite 1770**
6            **San Diego, California    92101**
             **(619) 237-1717**
7            **dav@vv-law.com**

8

9     **FOR DEFENDANT AND CROSS-COMPLAINANT JESSE DAWBER AND**
      **CROSS-COMPLAINANT CLASS WAR, INC.**
10
             **HOGAN LOVELLS US LLP**
11           **BY:   MICHAEL L. TURRILL, ESQ.**
                 **GABRIEL R. ULMAN, ESQ.**
12           **1999 Avenue of the Stars, Suite 1400**
             **Los Angeles, California   90067**
13           **(310) 785-4600**
             **michael.turrill@hoganlovells.com**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

```
1                CHRONOLOGICAL INDEX OF WITNESSES

2                     SEPTEMBER 17, 2018

3    WITNESS:

4    JESSE DAWBER

5
     DIRECT BY MR. VAUGHN  . . . . . . . . . 382    20      3
6
     CROSS BY MR. TURRILL  . . . . . . . . . 529    2       3
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1              **ALPHABETIC INDEX OF WITNESSES**

2                  **SEPTEMBER 17, 2018**

3    **WITNESS:**

4    **DAWBER, JESSE**

5                                    **Page    Line    Vol**

6    **DIRECT BY MR. VAUGHN**   . . . . . . . . . **382      20       3**

7    **CROSS BY MR. TURRILL**   . . . . . . . . . **529      2        3**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

1    Q.   You are the sole shareholder of a corporation
2    known as Class War, correct?
3    A.   Correct.
4    Q.   When was Class War formed?
5    A.   I believe it was in May of 2015.
6    Q.   Could we look at Exhibit 100, please.  Do you
7    have it there handy, sir.
8         Is it in that notebook?
9    A.   Is it this one?
10        MR. VAUGHN:  May I approach, Your Honor?
11        THE COURT:  It's in Volume 10, sir.
12        THE WITNESS:  I'm not seeing a 10.
13        THE COURT:  All right.  You can approach.
14        THE WITNESS:  Oh, here it is.  You said 100?
15   BY MR. VAUGHN:
16   Q.   Yes, please.
17   A.   Okay.
18   Q.   The first page of Exhibit 100 is the articles
19   of incorporation for your company, Class War, correct?
20   A.   I believe so, yes.
21   Q.   And it was formed on May 13 of 2015, correct?
22   A.   Correct.
23   Q.   And that's before Mr. Schindler was out of the
24   Sketchy Tank partnership, correct?
25   A.   Correct.
26   Q.   Second page of Exhibit 100 is a statement of
27   information that was filed on your behalf, correct?
28   A.   Yes.

7

```
1       Q.   And that statement of information was filed
2    June 2, 2015.   True?
3       A.   Yes.
4       Q.   Now, you didn't sign it.   Someone did on your
5    behalf, correct?
6       A.   Yes.
7       Q.   And was it Ms. Greco who did so?
8       A.   Correct.
9       Q.   She was your attorney at the time, right?
10      A.   Yes.
11      Q.   You held all of the officer positions in
12   Class War, the company that you only owned, as of June
13   of 2015 within a few weeks after the company was formed,
14   correct?
15      A.   Yes.
16      Q.   You were CEO, secretary, and CFO.   True?
17      A.   Correct.
18      Q.   That address there on Ocean View Avenue, what
19   address was that?
20      A.   That was my home address.
21      Q.   So you were running the business out of your
22   home at the time?
23      A.   Yes.
24      Q.   And Class War was formed in order to conduct
25   the Sketchy Tank apparel business.   True?
26      A.   It was --
27      Q.   Is that true, sir?
28      A.   No.   Can you repeat the question actually?
```

8

193

1      Q.   Yes.  Class War was formed -- you caused that
2   corporation to be formed in order to conduct the
3   Sketchy Tank apparel business, correct?
4      A.   No.
5      Q.   Have you conducted the Sketchy Tank apparel
6   business through Class War?
7      A.   Yes.  Now it is.  But originally it was not
8   formed for that.
9      Q.   When did you start conducting the Sketchy Tank
10  apparel business through Class War?
11     A.   I believe in October of 2015.
12     Q.   What did Class War do in the meantime between
13  end of May and October of 2015?
14     A.   Class War was an S Corp. set up to put me in a
15  better tax position so I wasn't paying a sole proprietor
16  15 percent tax.
17     Q.   The question was what was it doing during that
18  time period?
19     A.   It was stagnant, nothing.
20     Q.   Dormant?
21     A.   Yes.
22     Q.   No operations at that time?
23     A.   No.
24     Q.   In October of 2015, you started using it to
25  conduct the Sketchy Tank apparel business?
26     A.   Yes.
27     Q.   Was there a business selling apparel under the
28  name of Sketchy Tank in existence in 2015?

```
 1    A.   Was there -- say it one more time.

 2    Q.   Was there a Sketchy Tank apparel business in

 3    2015?

 4    A.   Yes.

 5    Q.   Was there a Sketchy Tank apparel business in

 6    2014?

 7    A.   Yes.

 8    Q.   Now, when you started using Class War, that was

 9    after Mr. Schindler had left the Sketchy Tank apparel

10    business, correct?

11    A.   Correct.

12    Q.   Mr. Schindler was your partner in the

13    Sketchy Tank apparel business, correct?

14         MR. TURRILL:  Objection, Your Honor.  Calls for

15    a legal conclusion.

16         THE COURT:  Overruled.

17         You can answer.

18         THE WITNESS:  He was a distribution partner,

19    yes.

20    BY MR. VAUGHN:

21    Q.   He was your partner, correct?

22    A.   He was a distribution partner.

23    Q.   Did you ever describe him solely as your

24    partner without that qualifier "distribution"?

25    A.   There's probably times where I referred to him

26    as a partner, but it was referring to distribution only.

27    Q.   You referred to Mr. Schindler as your partner

28    without calling him distribution or any other qualifying
```

10

1   **word?**

2      **A.   I have said that before, yes.**

3      **Q.   To your mother, right?**

4      **A.   Yes.**

5      **Q.   You introduced Mr. Schindler to your mother as**

6   **your partner, correct?**

7      **A.   That's correct.**

8      **Q.   Now, take a look at page 4, please, of**

9   **Exhibit -- sorry.  I skipped one.  Page 3 of**

10  **Exhibit 100.**

11          **That is a statement of information that you**

12  **caused to be filed on May 11 of 2016, right?**

13     **A.   It is, yes.**

14     **Q.   And you told the State of California at that**

15  **time that nothing had changed.  You were still the**

16  **person in all of the officer positions.  True?**

17     **A.   I believe so.**

18     **Q.   Then turn to page 4 of Exhibit 100, please.**

19          **And that's a statement of information that you**

20  **caused anyway to be filed with the State of California**

21  **on May 9 of 2017.  True?**

22     **A.   It appears to be that way, yes.**

23     **Q.   And as of that time Matt Roberts had come on in**

24  **the Sketchy Tank business, correct?**

25     **A.   Correct.**

26     **Q.   And Matt Roberts worked for Class War, correct?**

27     **A.   Yes.**

28     **Q.   As of this time, May of 2017, Class War was**

11

196

1    conducting the Sketchy Tank business.  True?

 2         A.   Yeah.  He was conducting Class War.

 3         Q.   Right.  Class War, though, was selling the

 4    Sketchy Tank apparel, correct?

 5         A.   Yes.

 6         Q.   To Zumiez and other buyers, correct?

 7         A.   Yes.

 8         Q.   Now, as of this time, May 9 of 2017, you were

 9    still CEO, secretary, and CFO, chief financial officer.

10    True?

11         A.   Correct.

12         Q.   But the address for the business had changed to

13    528 2nd Street, correct?

14         A.   Yes.

15         Q.   And that is the office location where Class War

16    was conducting the Sketchy Tank business in May of 2017?

17         A.   Yes.

18         Q.   All right.  And then it shows you as the

19    officer in each of these positions at Puebla Street in

20    Encinitas.  Was that a change of location for you as

21    well?

22         A.   Yes.

23         Q.   You had moved?

24         A.   Yes.

25         Q.   Also, it appears that you were the sole

26    director of Class War at this time in May of 2017,

27    correct?

28         A.   Yes.

1      Q.   Now, again, that's May of 2017.  Right?

2      A.   Yes.

3      Q.   When did Drew Madacsi become involved with the

4   Sketchy Tank business?

5      A.   I believe in April of 2017.

6      Q.   And when did Mr. Madacsi, if ever, become the

7   CEO of Class War?

8      A.   In April '17, he became the interim CEO of

9   Class War.

10     Q.   What day?

11     A.   In April of '17 sometime.  I don't know what

12  the exact day was.

13     Q.   Why does the statement of information filed in

14  May show you as the CEO?

15     A.   I may have my dates wrong.  I don't know.

16     Q.   And you brought -- strike that.

17          You were still the sole shareholder of

18  Class War in May of 2017, correct?

19     A.   Correct.

20     Q.   So it was your decision to make Mr. Madacsi the

21  CEO, correct?

22     A.   Yes.

23     Q.   And --

24     A.   Along with -- sorry -- along with Matt Roberts

25  too.

26     Q.   You held all the shares, right?

27     A.   Yes.

28     Q.   You were the only director in May of 2017,

1  right?

     2       A.   Yes.

     3       Q.   You were the only one who voted to bring

     4  Mr. Madacsi on as CEO true?

     5       A.   Correct.

     6       Q.   Now, Mr. Madacsi, you understood at the time,

     7  had a background in international sales of apparel,

     8  correct?

     9            MR. TURRILL:  Objection.  Lacks foundation.

    10            THE COURT:  You want to lay a foundation for

    11  what his knowledge is.

    12            MR. VAUGHN:  Yes.

    13  BY MR. VAUGHN:

    14       Q.   Did you know Mr. Madacsi's background at the

    15  time that you brought him on as CEO of Class War in May

    16  of 2017?

    17       A.   Yes.

    18       Q.   And did you know that his background was that

    19  he had done international business for different brands

    20  of apparel prior to that time?

    21       A.   Yes.

    22       Q.   And is that one of the reasons why you brought

    23  him on board?

    24       A.   Yes.

    25       Q.   Now, did you also make some other people

    26  officers of the corporation in place of yourself?

    27       A.   I believe so, yes.

    28       Q.   You made a woman named Jeslyn Leong secretary

                                                          14

```
 1   of Class War, correct?

 2        A.    That or CFO.  I can't recall.

 3        Q.    Is it your recollection she held both

 4   officerships?

 5        A.    What do you mean?

 6        Q.    Was she both -- strike that.

 7              Did you make Ms. Leong both secretary and CFO,

 8   chief financial officer, of Class War?

 9        A.    I think it was just CFO.

10        Q.    All right.  When did you bring Ms. Leong on

11   board?

12        A.    Right around the same time Drew came on.

13        Q.    Who is STFU Global PTE?

14        A.    Who is it?

15        Q.    Yeah.

16        A.    Drew introduced me to a global art licensing

17   team that I am now licensing art through.

18        Q.    All right.  When you say you're licensing art

19   through them, what do you mean?

20        A.    Basically they work with artists that -- they

21   buy art and then they license it out to other people.

22        Q.    Have you sold your art to STFU?

23        A.    I have not sold art.  I've licensed it,

24   basically.

25        Q.    There's a royalty -- strike that.

26              You were here when Ms. Piskur testified on

27   Thursday, right?

28        A.    I was, yes.
```

```
 1      Q.   Ms. Piskur said there's a royalty being paid to
 2   STFU.  Did you hear that?
 3      A.   Yes.
 4      Q.   Is she correct?
 5      A.   I believe so, yes.
 6      Q.   Why is a royalty being paid to STFU?
 7           MR. TURRILL:  Your Honor, interpose a relevance
 8   objection.
 9           THE COURT:  I'll give you a standing objection.
10   Overruled.
11   BY MR. VAUGHN:
12      Q.   You can answer.
13      A.   Repeat the question.
14      Q.   Why is Class War paying STFU a royalty?
15      A.   I believe for artwork.
16      Q.   What artwork?
17      A.   Artwork from -- or I don't know the exact
18   answer to that.
19      Q.   Is it your artwork?
20      A.   Some of it is, yes.
21      Q.   How did STFU get ownership of your artwork?
22      A.   They don't have ownership.  They license it.
23      Q.   Why is Class War paying a royalty to a company
24   that licenses your art?
25      A.   You will have to talk to Drew Madacsi about
26   that.  He's the one who set up the corporate structure.
27      Q.   I would love to.
28      A.   Yeah.
```

1      Q.   Will he come in?

 2           MR. TURRILL:  Objection.  Lacks foundation.

 3           THE COURT:  Overruled.  If he knows.

 4           THE WITNESS:  I'm not sure.

 5   BY MR. VAUGHN:

 6      Q.   Have you talked to Mr. Madacsi in the last

 7   month about whether he intends to appear to testify at

 8   this trial?

 9      A.   I haven't spoke to Mr. Madacsi about this

10   trial.

11      Q.   Have you spoken to Mr. Madacsi about whether or

12   not he intends to appear to testify here today?

13           MR. TURRILL:  Objection.  Hearsay.

14           THE WITNESS:  I haven't spoken to him about

15   that.

16           THE COURT:  He said no.  Overruled.

17   BY MR. VAUGHN:

18      Q.   So is there a document that exists outlining

19   any relationship between this STFU company and

20   Class War?

21      A.   I'm not sure.

22      Q.   Did you sign any such document?

23      A.   I'm not sure.

24      Q.   What artwork is it that STFU licenses from you?

25      A.   A lot of artwork.  I'm not sure.

26      Q.   Take a look at the T-shirts in front of you.

27   They're Exhibits 115 through 121.

28      A.   These guys here?

17

```
 1      Q.   Yes, sir.

 2      A.   Yup.

 3      Q.   Tell the jury whether or not STFU has the

 4  rights to any of the artwork on those T-shirts.

 5      A.   Yeah, they have the rights to all of these.

 6      Q.   How did STFU get the rights to those designs?

 7      A.   They -- I licensed them to them.

 8      Q.   And is Class War then getting payment for the

 9  license?

10      A.   I'm not sure.

11      Q.   I guess my question is this, Mr. Dawber:  If

12  STFU got the rights to these designs, did STFU pay you

13  for them?

14      A.   Yes.

15      Q.   How much?

16      A.   I have -- I'm on a retainer for, I believe,

17  18,000 a month for producing a certain amount of

18  artwork.

19      Q.   That arrangement, is it in writing?

20      A.   I believe so.

21      Q.   Has that writing been produced in this case?

22      A.   I don't know.

23      Q.   I would like to have it produced.

24           MR. TURRILL:  Objection.  Argumentative,

25  Your Honor.

26           THE COURT:  We'll take that up at another time.

27  BY MR. VAUGHN:

28      Q.   Sir, do you have a copy of that agreement?
```

18

203

1    A.    I'm not sure.

2    Q.    When was that agreement entered into?

3    A.    I'm not sure.

4    Q.    Was it in 2017?

5    A.    If I had to guess, I would say at the end of

6    2017, maybe early 2018.

7    Q.    There was no royalty paid to anybody for the

8    artwork on those T-shirts, Exhibits 115 through 121, in

9    2015.  True?

10    A.    True.

11    Q.    There was no royalty paid to anybody for that

12    artwork in 2016.  True?

13    A.    In 2016, artwork royalties, I'm not sure.

14    Q.    Who owned -- well, strike that.

15          There was no royalty paid before you met

16    Mr. Madacsi, right?

17    A.    I'm not sure.

18    Q.    Mr. Madacsi came on as CEO in May of 2017

19    according to your testimony, correct?

20    A.    I believe I said April, but my dates are wrong.

21    I'm assuming -- yeah.  I would say -- yeah, May.

22    Q.    Before you met Mr. Madacsi, did Class War pay a

23    license fee to anybody for the designs on those T-shirts

24    that are Exhibits 115 through 121?

25    A.    I don't believe so, no.

26    Q.    Who owned those designs, the ones that are on

27    the T-shirts, 115 through 121, before they were

28    licensed?

1      A.    Who owned them?

2      Q.    Yes, sir.

3      A.    It's my intellectual property.

4      Q.    Was it you or Class War that owned them?

5      A.    It's my artwork so it's my -- I owned them.

6      Q.    So your perspective is that they were your

7   personal ownership, those designs, wolves, "Pie Till I

8   Die," "Good Times Bad Friends," for example, correct?

9      A.    Yes.

10     Q.    So you, Jesse Dawber, not Class War, you,

11  Jesse Dawber, decided to license those designs to STFU,

12  correct?

13     A.    Drew Madacsi set up the corporate structure and

14  put that in place to where he allowed me to be an artist

15  and that's what I wanted to do.  I wanted to step away

16  from running a business.

17     Q.    That's not the pending question.  The question

18  is you, as an individual, licensed those designs to

19  STFU, correct?

20     A.    Yes.

21     Q.    Now, STFU is down in Singapore, correct?

22     A.    Yes.

23     Q.    You entered into this license agreement while

24  this lawsuit was pending.  True?

25     A.    Yes.

26     Q.    Now, you said that you're paid $18,000 per

27  month for licensing these designs?

28     A.    Yes.

```
 1        Q.    And STFU pays you, correct?

 2        A.    Yes.

 3        Q.    What does STFU do with the designs, if you

 4     know?

 5        A.    What do they do with them?

 6        Q.    Yeah.

 7        A.    They license them out.

 8        Q.    To who?

 9        A.    To Class War, Charlie's Trading Company in

10     Japan.  We're working on Taiwan.  We're trying to expand

11     to more global markets.

12        Q.    I want to make sure I get this right.  These

13     designs that were sold by the Sketchy Tank business,

14     right?

15        A.    Uh-huh.

16        Q.    "Yes"?

17        A.    Say it again.

18        Q.    Let me start again.

19              The designs on these T-shirts was sold by the

20     Sketchy Tank business in 2014, right?

21        A.    Yes.

22        Q.    And 2015, correct?

23        A.    Yes.

24        Q.    And 2016, correct?

25        A.    I believe so, yes.

26        Q.    And that business was conducted through

27     Class War, correct?

28        A.    Yes.
```

```
 1      Q.   Did you have an agreement with Class War where
 2   you would get a royalty?
 3      A.   I think for a short period of time maybe.  I'm
 4   not sure.
 5      Q.   You were the sole shareholder of Class War when
 6   it was selling those T-shirts, correct?
 7      A.   Yes.
 8      Q.   So if there were profits that came to the
 9   bottom line, they went to you, correct?
10      A.   No.
11      Q.   If Class War made profits off of these
12   T-shirts, where did they go?
13      A.   Back into the business and pay for employees
14   and -- I was out of the day to day of the business.  I
15   was allowed --
16      Q.   Sir, that's not the question.
17           The question is, where did the profits go?
18      A.   Back into the business.
19      Q.   You never took any distributions of profit from
20   Class War?
21      A.   I don't know.
22      Q.   Do you remember taking a $600,000 distribution
23   in 2015?
24      A.   I do.
25      Q.   Okay.  So that was profits from the sale of,
26   among other things, these T-shirts, correct?
27      A.   I believe that was a royalty paid for artwork.
28      Q.   To who?
```

1    **A.    To myself.**

2        **Q.    Okay.  The royalty was paid by Class War to**

3    **you, correct?**

4        **A.    Yes.**

5        **Q.    That sum of $600,000 was from the profits of**

6    **Class War, correct?**

7        **A.    I believe so, yes.**

8        **Q.    Class War had the right to sell these T-shirts**

9    **during the time period that generated those profits,**

10   **correct?**

11       **A.    Yes.**

12       **Q.    And the way that you got paid was by**

13   **distributions from your company that you wholly owned,**

14   **correct?**

15       **A.    Yes.**

16       **Q.    Now, you individually now receive $18,000 a**

17   **month from STFU, correct?**

18       **A.    Yes.**

19       **Q.    So Class War doesn't own the designs for these**

20   **T-shirts, Exhibits 115 through 121, correct?**

21       **A.    I don't know.**

22       **Q.    Well --**

23       **A.    The designs?**

24       **Q.    Yes.**

25       **A.    The designs are my intellectual property.**

26   **They're owned by me still.**

27       **Q.    Okay.  But you license them out to STFU,**

28   **correct?**

```
 1      A.   Yes.

 2      Q.   And then STFU licenses them to Class War?

 3      A.   Yes.  I believe.

 4      Q.   Pardon me?

 5      A.   I think so, yes.

 6      Q.   It didn't work that way until Mr. Madacsi came

 7   on the scene, correct?

 8      A.   Yes.

 9      Q.   So now you receive $18,000 per month for

10   licensing these designs to STFU?

11      A.   Yes.

12      Q.   Was STFU, if you know, specifically created to

13   do this license agreement for these designs?

14      A.   I'm not sure.

15      Q.   Who have you spoken with other than counsel

16   regarding this STFU company?

17           MR. TURRILL:  Objection.  Hearsay.  Lacks

18   foundation.

19           THE COURT:  It's just identity.  It's not

20   information.  Overruled.

21           THE WITNESS:  Drew Madacsi.

22   BY MR. VAUGHN:

23      Q.   Anybody else?

24      A.   Matt Roberts.

25      Q.   Anybody else?

26      A.   That's all I can recall.

27      Q.   How about Jeslyn Leong?

28      A.   Yes, Jeslyn Leong.
```

24

```
 1      Q.    In fact, Jeslyn Leong is the one who owns STFU,
 2  correct?
 3      A.    Yes.
 4      Q.    And STFU was created -- strike that.
 5            Do you know when it was created?
 6      A.    Do I know when it was created?
 7      Q.    Yes, sir.
 8      A.    I don't know the exact date.
 9      Q.    Was it created in 2017?
10      A.    Possibly at the end of 2017.  Maybe early 2018.
11  I'm not positive on dates.
12      Q.    The license agreement that you're talking about
13  where STFU gets these designs that you say are yours,
14  was that created before or after the end of 2017?
15      A.    I'm not sure.
16      Q.    So how much does Class War pay to license back
17  from STFU the designs that it used to sell itself
18  without licensing them?
19      A.    I don't know.
20      Q.    Well, is it more or less than the $18,000 a
21  month that you get?
22      A.    I'm not sure.
23      Q.    What's the basis of STFU's license?  What I'm
24  asking, is it per T-shirt?  Is it per month?
25      A.    It's just a flat fee.
26      Q.    All right.  And the money that you get now for
27  this license to STFU, does that come to you individually
28  through Class War or some other company?
```

```
 1       A.    It comes to Sketchy Tank, LLC.

 2       Q.    I see.  And you created that company on

 3   September 11 of 2017, correct?

 4       A.    I'm not sure.

 5       Q.    You created that company after this litigation

 6   was filed, right?

 7       A.    Yes.

 8       Q.    This case was filed in August of 2015, correct?

 9       A.    Yeah.

10       Q.    So more than two years after the case was filed

11   you created this Sketchy Tank, LLC, correct?

12       A.    Yes.

13       Q.    And did you discuss the subject of creating

14   that new LLC with Mr. Madacsi?

15       A.    I believe so, yeah.

16       Q.    So whereas Class War used to receive the money

17   for sale of the T-shirts with these designs on it, now

18   it does not, correct?

19       A.    One more time.  I'm sorry.

20       Q.    Class War -- before this STFU company came into

21   existence, Class War received the money from sales of

22   T-shirts with these designs that are on Exhibits 115

23   through 121, correct?

24       A.    Yes.

25       Q.    Now Class War does not?

26       A.    I don't -- I'm not sure about that.  I think

27   they do.

28       Q.    So Class War still sells those T-shirts?
```

1     **A.    Yes.**

2        **Q.    How much does Class War pay STFU for those**

3     **sales?**

4        **A.    I'm not sure.**

5        **Q.    And you don't know the basis under which that's**

6     **calculated?**

7        **A.    I don't.**

8        **Q.    So have you -- strike that.**

9            **You were here when we looked at those**

10    **financials with Ms. Piskur, correct?**

11       **A.    Yes.**

12       **Q.    And you saw that in 2017 there was a sum in the**

13    **amount of $900,000 that Class War paid to STFU for this**

14    **royalty, correct?**

15       **A.    I believe so.**

16       **Q.    And you saw in 2018 -- let's just take a look**

17    **if we can.**

18       **A.    Okay.**

19            **MR. VAUGHN:   Could we look at 641 and 642.**

20    **First at 641, please, Oliver.**

21            **If we can scroll down to the next page where I**

22    **think it talks about royalty.**

23    **BY MR. VAUGHN:**

24       **Q.    Let me switch gears, Mr. Dawber, because I**

25    **can't read it up there.   I'll be better prepared in just**

26    **a moment.**

27            **Now, Mr. Madacsi and Ms. Leong are now the only**

28    **officers of Class War.   True?**

```
 1     A.   I don't know.

 2     Q.   Well, take a look --

 3          MR. VAUGHN:   Let's go back to Exhibit 100,

 4   please.

 5   BY MR. VAUGHN:

 6     Q.   Page 5, please, of Exhibit 100.  That's the

 7   statement of information that was filed on December 4,

 8   2017, correct?

 9     A.   Yes.

10     Q.   In this corporation where you still own a

11   hundred percent of the shares, you made Mr. Madacsi CEO,

12   right?

13     A.   I did, yes.

14     Q.   Ms. Leong is both secretary and CFO?

15     A.   Yup.

16     Q.   Instead of you being the director, Mr. Madacsi

17   is the director.  True?

18     A.   Yes.

19     Q.   This was filed, looks like, by an attorney

20   named Tara Pelan, correct?

21     A.   Yes.

22     Q.   Who is she?

23     A.   She is a trademark attorney.

24     Q.   Did she do work for Class War?

25     A.   I believe so, I think so, yeah.

26     Q.   She's the one that got the Sketchy Tank

27   trademark for Class War, correct?

28     A.   I think so, yeah.
```

```
1      Q.   That trademark, you had sought a U.S. trademark
2   on Sketchy Tank back in 2015, correct?
3      A.   Yes.
4      Q.   Through a lawyer named Brian Kinder?
5      A.   Yes.
6      Q.   And Mr. Schindler is the one that introduced
7   you to Mr. Kinder, correct?
8      A.   Yes.
9      Q.   And then there were problems with obtaining
10  that trademark.  Took a while, correct?
11     A.   I don't think we ever -- yeah, never got it.
12     Q.   Ms. Pelan, though, got the Sketchy Tank
13  trademark for you?
14     A.   Yes.
15     Q.   And Class War owns the trademark Sketchy Tank,
16  correct?
17     A.   I'm not sure.  I believe -- I think that's
18  correct.  I'm not sure.
19     Q.   Would it be correct to say that Ms. Pelan does
20  the intellectual property work for Class War?
21     A.   I'm not sure.  I know she has done some, but I
22  don't know if she's a sole --
23     Q.   Does Class War own the Sketchy Tank trademark?
24     A.   I'm not sure.  I'm not sure.
25     Q.   Does Ms. Pelan do IP trademark work for STFU?
26          MR. TURRILL:  Your Honor, objection.
27  Attorney-client privilege.
28          THE COURT:  Overruled as to whether she does
```

1  the work.  As to the subject of that work, I would

 2  agree.  So that question can stand.

 3          MR. VAUGHN:  Thank you, Your Honor.

 4          THE WITNESS:  One more time.  I'm sorry.

 5  BY MR. VAUGHN:

 6     Q.  Does Ms. Pelan do intellectual property work

 7  obtaining trademarks for STFU?

 8     A.  I don't know.

 9     Q.  Is the amount that Class War pays to STFU for

10  royalty more than the amount STFU pays you for

11  licensing?

12     A.  I don't know.

13     Q.  All right.

14          MR. VAUGHN:  Could we look at 641, please.

15  Bottom of the first page.  Let's blow up the line there

16  that talks about the royalty.  All the way across,

17  please.

18          There we go.

19  BY MR. VAUGHN:

20     Q.  Now, in 2017, 988,000 paid in royalty to STFU,

21  correct?

22     A.  I believe so, yeah.

23     Q.  And if you're getting $18,000 a month times 12,

24  that's about $216,000, correct?

25     A.  Sounds right.

26     Q.  So Class War pays STFU multiple times what STFU

27  pays you, correct?

28     A.  I'm not sure.

                                                        30

```
 1    Q.   Well, is $216,000 less than $988,000?

 2    A.   Definitely, but I'm not sure what all the

 3  royalties are on this document.

 4    Q.   I understand.

 5         Assume that that royalty there is the royalty

 6  paid to STFU.  Will you do that, please?

 7    A.   Okay.

 8    Q.   You heard Ms. Piskur say that, right?

 9    A.   Yes.

10    Q.   So, of course, she's your bookkeeper so she

11  should know, right?

12    A.   I would hope so.

13    Q.   Yes.  So if she said that royalty of 988,000

14  and some odd dollars is the royalty paid to STFU, you

15  would accept that, correct?

16    A.   Yes.

17    Q.   And that is more than four times the amount

18  that you're being paid for the license, correct?

19    A.   I guess so, yes.

20    Q.   216 times four would be under $900,000,

21  wouldn't it?

22    A.   Sure.

23    Q.   Did you negotiate these sums?

24         In other words, did you look into the issue of

25  whether or not Class War was going to be losing money in

26  this type of arrangement before you entered into it?

27    A.   No.

28    Q.   And the purpose of entering into this
```

31

216

```
 1   arrangement was to make sure that Mr. Schindler could

 2   not obtain any money from Class War because the money

 3   was being sent down to Singapore, right?

 4          MR. TURRILL:  Objection, Your Honor.  Lacks

 5   foundation.  Argumentative.

 6          THE COURT:  Overruled.  It's cross.

 7          You can answer.

 8          THE WITNESS:  That's not true at all.

 9   BY MR. VAUGHN:

10      Q.   Do you own any portion of STFU?

11      A.   No.

12      Q.   Do you know what else STFU owns?

13      A.   I don't.

14      Q.   In any event, as we know from Exhibit 100,

15   page 5, you made Mr. Madacsi, Ms. Leong the officers and

16   Mr. Madacsi alone the director of your company Class War

17   on December 4, 2017.  True?

18      A.   Yes.

19          MR. VAUGHN:  I would offer Exhibit 100 into

20   evidence, Your Honor.

21          MR. TURRILL:  No objection to 100, Your Honor.

22          THE COURT:  Received.

23          (Exhibit No. 100 was received in

24          evidence.)

25   BY MR. VAUGHN:

26      Q.   Now, Mr. Dawber, you filed a dba, meaning a

27   fictitious business name, for the name Sketchy Tank,

28   correct?
```

32

| 1  | **A.** | **Yes.** |
|----|--------|----------|
| 2  | **Q.** | **You did so because Mr. Schindler suggested you** |
| 3  | **do so, correct?** | |
| 4  | **A.** | **No.** |
| 5  | **Q.** | **You did that -- filed that dba on what date?** |
| 6  | **A.** | **I believe it was in maybe April 2014.** |
| 7  | **Q.** | **Let's take a look, please, at Exhibit 103.** |
| 8  |        | **Do you have it there in that same book?** |
| 9  |        | **What is 103, sir?** |
| 10 | **A.** | **San Diego public record fictitious business** |
| 11 | **name. Looks like June 3rd.** | |
| 12 | **Q.** | **Does that refresh your recollection as to when** |
| 13 | **you first filed the dba for?** | |
| 14 | **A.** | **Yes.** |
| 15 | **Q.** | **So you filed it on June 3rd?** |
| 16 | **A.** | **That's correct.** |
| 17 | **Q.** | **How long was it good for?** |
| 18 | **A.** | **Says here expires June 3rd, 2019.** |
| 19 | **Q.** | **So good for five years?** |
| 20 | **A.** | **Yes.** |
| 21 | **Q.** | **Now, take a look at Exhibit 104, please.** |
| 22 | **A.** | **Okay.** |
| 23 | **Q.** | **What is 104?** |
| 24 | **A.** | **It's another San Diego public record fictitious** |
| 25 | **business statement for Sketchy Tank.** | |
| 26 | **Q.** | **And you filed that on or about December --** |
| 27 | **January 25, 2016, correct?** | |
| 28 | **A.** | **Yes.** |

33

218

1    Q.   And you did that before the dba for you to do
2    business as Sketchy Tank expired, right?
3    A.   I believe so, yes.
4         MR. VAUGHN:  I would offer Exhibit 103,
5    Your Honor.
6         MR. TURRILL:  Your Honor, these exhibits lack
7    foundation, they're screen shots of unknown origin.
8         THE COURT:  Sustained.
9         I think you have the testimony but getting the
10   actual document is --
11        MR. VAUGHN:  I would offer Exhibit 104.
12        MR. TURRILL:  Same objection.
13        THE COURT:  Same ruling.
14   BY MR. VAUGHN:
15   Q.   Now, as of June third, 2014, when you filed the
16   first dba, you had already met Mr. Schindler, correct?
17   A.   Yes.
18   Q.   And the two of you had discussed that you
19   needed to have a dba in order to open a bank account,
20   correct?
21   A.   Yes.
22   Q.   And that bank account was to be for the
23   Sketchy Tank business that you and Mr. Schindler entered
24   into, correct?
25   A.   Yes.
26   Q.   And you had already received a proposed draft
27   of the distribution/partnership agreement between you
28   and Mr. Schindler as of June 3rd, 2015, when you filed

34

219

1  that dba, correct?

2      A.    Yes.

3      Q.    Is it your testimony that no discussion with

4  Mr. Schindler had any bearing on your decision to file

5  that dba on June 3rd?

6      A.    Yeah, I mean, he didn't tell me to open a dba.

7      Q.    You did it in order to open a bank account,

8  correct?

9      A.    Yes.

10      Q.    And the bank account was to be for the business

11  that you and Mr. Schindler were going to conduct,

12  correct?

13      A.    Yes.

14      Q.    And you, in fact, did open that bank account?

15      A.    Yes.

16      Q.    And it was at -- was that the one at

17  City National?

18      A.    It was at Chase Bank.

19      Q.    At Chase.  Understood.

20          And the statements on that Chase bank account,

21  business account for the Sketchy Tank partnership that

22  you had with Mr. Schindler, those statements came to

23  your house, correct?

24      A.    Yes.

25      Q.    So every month you received a statement on that

26  bank account, correct?

27      A.    I don't know.  Maybe it might have been an

28  email or something like that.  I don't know if it was a

1    **paper copy.**

2         **Q.   You received statements from that bank account**
3    **to your home every month.   True?**

4         **A.   Maybe to an email but not a paper copy.**

5         **Q.   You didn't get hard copies but you received an**
6    **email statement every month, right?**

7         **A.   I would guess I got an email saying a monthly**
8    **statement, yes.**

9         **Q.   And also, Mr. Dawber, with respect to that, can**
10   **we call it the business bank account?**

11        **A.   Can we call it the business bank account?**

12        **Q.   Yes, if I call it the business bank account,**
13   **will you know what I mean?**

14        **A.   For -- yeah.   When I was in distribution with**
15   **Jack, is that what you mean?**

16        **Q.   I just want to have the convention between you**
17   **and me so everybody will understand that this Chase Bank**
18   **account that we're talking about, we'll call it the**
19   **business bank account.   Is that okay with you?**

20        **A.   Whatever you want, yes.**

21        **Q.   Business bank account, that's what we mean.**
22   **All right, sir?**

23             **And whenever there was a problem with that**
24   **business bank account, the notifications would come to**
25   **you, correct?**

26        **A.   I believe so, yes.**

27        **Q.   Like when there was a bounced check, that would**
28   **come to you, correct?**

1          **You may proceed.**

2          **MR. VAUGHN:  Thank you, Your Honor.**

3   **BY MR. VAUGHN:**

4      **Q.   Mr. Dawber, when we were talking about this**

5   **license deal with STFU, you said something about**

6   **Charlie Trading Company.  Does Charlie Trading Company**

7   **pay Class War for selling any designs such as those on**

8   **T-shirt Exhibits 115 through 121?**

9      **A.   I believe they pay STFU, but I'm not sure.**

10     **Q.   Who introduced you to Charlie Trading Company**

11  **in Japan?**

12     **A.   I knew them from my previous employment at**

13  **Electric.  They distributed through Electric.**

14     **Q.   Isn't it true that Mr. Schindler is the one who**

15  **initiated Charlie Trading Company selling Sketchy Tank**

16  **products?**

17     **A.   Not true at all.**

18     **Q.   You sold wholesale Sketchy Tank goods to**

19  **Charlie Trading Company before you and Mr. Schindler**

20  **partnered up?**

21     **A.   No.**

22     **Q.   What's the name of the person who you talk with**

23  **at Charlie Trading Company if you talk with anybody?**

24     **A.   I don't really handle that.  But Charlie**

25  **himself, the owner, Mikoto, who is their on-ground L.A.**

26  **guy, and Taro is who I deal with.**

27     **Q.   Who?**

28     **A.   This guy named Taro.**

1      Q.   Okay.  I think what you're telling us is that
2   on the financials that we've looked at, Exhibit 37, 38,
3   641, and 642, that the financials for 2017 and 2018 for
4   Class War don't contain money from sales of Sketchy Tank
5   products by Charlie Trading Company.  Is that true?
6      A.   That's not true.
7      Q.   So does Charlie Trading Company, for sales of
8   Sketchy Tank products in Japan, pay Class War?
9      A.   They have in the past, but now they're on a
10  licensing instead.
11     Q.   So when STFU came into the picture whereas
12  Charlie Trading Company used to pay Class War, now they
13  pay STFU?
14     A.   I believe so, yes.
15     Q.   And that changed after Mr. Madacsi came on the
16  scene?
17     A.   Correct.
18     Q.   And that changed in 2017, correct?
19     A.   I believe so.
20     Q.   So the financials that we've looked at, 641 and
21  642, that show annual gross sales, don't include sales
22  in 2017 of Sketchy Tank products down in Japan, correct?
23     A.   I'm not sure.
24     Q.   Well, does Charlie Trading Company -- let's
25  just take 2018 so far, Exhibit 642 up through August of
26  2018.  Does Charlie Trading Company sell Sketchy Tank
27  products in Japan in 2018?
28     A.   In 2018, did they sell Sketchy Tank products?

49

223

1  **Yes.**

2     **Q.   In Japan, correct?**

3     **A.   Yes.**

4     **Q.   In 2018, did Charlie Trading Company pay**
5  **Class War for selling those Sketchy Tank products in**
6  **Japan?**

7     **A.   I'm not sure.**

8     **Q.   Do you know who they did pay?**

9     **A.   Either Class War or STFU, but I don't know.**

10    **Q.   I thought I heard you say that they license**
11 **from STFU now?**

12    **A.   They do.**

13    **Q.   So is it your understanding that today STFU**
14 **owns the right to distribute the T-shirts that are**
15 **Exhibits 115 through 121?**

16    **A.   STFU distributes the art and then the Japanese**
17 **distribution is able to print in Japan themselves.**

18    **Q.   Understood.  But I guess what I'm saying is --**
19 **let me go back for a moment.**

20         **Anybody today who wants to sell a T-shirt like**
21 **those Exhibits 115 through 121 has to have a license**
22 **from STFU, correct?**

23    **A.   I'm not sure.**

24    **Q.   Well, Class War has a license from STFU for**
25 **this artwork on those T-shirts, right?**

26    **A.   I believe so, yes.**

27    **Q.   Charlie Trading Company has a license from STFU**
28 **for the artwork on those T-shirts, correct?**

1     **A.    Yes.**

2        **Q.    Who else has a license, if you know, from STFU**
3     **for the artwork on these T-shirts that you used to own?**

4        **A.    I'm not sure.  I don't think any.**

5        **Q.    You don't think today you have the right to**
6     **license the artwork on those T-shirts unless you get it**
7     **from STFU, correct?**

8        **A.    No.**

9        **Q.    Am I correct you don't have the right?**

10       **A.    I do have the right.**

11       **Q.    Because you license it back from STFU, correct?**

12       **A.    No.  I mean, I own the artwork so I can do what**
13    **I want with it basically.**

14       **Q.    Okay.  So is the license agreement that you**
15    **talked about with STFU nonexclusive?**

16             **MR. TURRILL:  Objection, Your Honor.  Calls for**
17    **a legal conclusion.  Lacks foundation.**

18             **THE COURT:  If the witness knows, he can**
19    **answer.**

20             **THE WITNESS:  I'm not sure.**

21    **BY MR. VAUGHN:**

22       **Q.    As you sit here today, do you think without**
23    **paying a license fee to STFU that you can sell those**
24    **T-shirts?**

25             **MR. TURRILL:  Same objection, Your Honor.**
26    **Calls for a legal conclusion.  Lacks foundation.**

27             **THE COURT:  Same ruling.  Only if he knows.**

28             **THE WITNESS:  That I can sell T-shirts?**

1   **BY MR. VAUGHN:**

2       **Q.   Yes, sir.**

3       **A.   I just do the art now.**

4       **Q.   You own Class War still?**

5       **A.   Yes.**

6       **Q.   Class War still sells T-shirts, right?**

7       **A.   Correct.**

8       **Q.   Could Class War sell those T-shirts -- again,**

9   **this is if you know.**

10          **Could Class War sell those T-shirts without**

11  **paying the royalty to STFU?**

12      **A.   I don't know.**

13      **Q.   Class War used to be able to sell those**

14  **T-shirts without paying STFU, right?**

15      **A.   Yes.**

16      **Q.   Today it pays STFU to license back that art,**

17  **correct?**

18      **A.   I'm not sure.  Say that again.**

19      **Q.   Does Class War today sell any of the T-shirts**

20  **that are Exhibits 115 through 121 without paying a**

21  **license fee to STFU?**

22      **A.   I'm not sure.**

23      **Q.   So we know that Charlie Trading Company pays**

24  **STFU money for the right to sell these shirts, right?**

25      **A.   I believe so, yes.**

26      **Q.   And Charlie Trading Company used to pay**

27  **Class War for that, right?**

28      **A.   Yes.**

52

```
 1        Q.   So the financials that we looked at, 2017 and
 2   2018, Exhibits 641 and 642, don't contain any sales
 3   money from Charlie Trading Company selling those
 4   T-shirts, right?
 5        A.   One more time?  What's the question?
 6        Q.   That was a really bad question.  I'm sorry.
 7             Charlie Trading Company doesn't pay Class War
 8   for selling these shirts anymore, right?
 9        A.   I don't think so, no.
10        Q.   They pay STFU?
11        A.   I believe so, yes.
12        Q.   Did anybody other than counsel tell you why
13   STFU was set up in Singapore?
14        A.   I spoke with Drew about it and -- Madasci and
15   it was the way he wanted it set up.
16        Q.   So you did it the way he wanted it?
17        A.   Yes.
18        Q.   And his base is in Singapore, right?
19        A.   One of his bases is in Singapore, yes.
20        Q.   Where else?
21        A.   Tokyo, Capetown, South Africa, and I think
22   there might be a couple others, I'm not sure.
23        Q.   Has Mr. Madacsi told you that STFU is acquiring
24   a series of brands around the globe?
25        A.   No.
26        Q.   Do you know whether STFU has the right to any
27   brands other than Sketchy Tank?
28        A.   I don't know.
```

```
1        Q.   All right.  Now, does Class War own any
2   intellectual property with respect to the Sketchy Tank
3   brand?
4        A.   I don't think so.  I'm not sure.
5        Q.   Wasn't there a trademark filed for "The
6   Lurker"?
7        A.   Possibly, yes.
8        Q.   What's "The Lurker"?
9        A.   This little guy here.
10       Q.   Show the jury, please.
11            And that Lurker is also on the neck label
12  Lurking Class, correct?
13       A.   Yes.
14       Q.   Now, was there a figure called "The Lurker"
15  that you utilized on your artwork during the time you
16  and Mr. Schindler were in business together?
17       A.   Yes.
18       Q.   So The Lurker preexists Lurking Class, correct?
19       A.   The Lurker preexists Lurking Class, yes.
20       Q.   It exists before Lurking Class?
21       A.   Yes, it did.
22       Q.   Just to make sure I'm getting through here, the
23  Lurking Class brand came into being in September of
24  2017, correct?
25       A.   Sounds right, yeah.
26       Q.   Just about a year ago?
27       A.   True.
28       Q.   And then at that time Sketchy Tank -- strike
```

```
 1  that.
 2            At that time, Class War operated a website
 3  called SketchyTank.com, correct?
 4       A.   Yes.
 5       Q.   And then before the end of 2017 the
 6  SketchyTank.com website ceased to be functional,
 7  correct?
 8       A.   Not true.
 9       Q.   Pardon me?
10       A.   No.  It redirected, so you could type in
11  SketchyTank.com, it went to LurkingClass.com.
12       Q.   Right.  So if one tries to go to the
13  SketchyTank.com website that existed before the end of
14  2017, now it gets forwarded automatically to the
15  Lurking Class website, correct?
16       A.   Yeah.  Lurking Class by Sketchy Tank.
17       Q.   And the Lurking Class website displays for sale
18  many of the same items that were sold under the
19  Sketchy Tank brand, correct?
20       A.   Yes.
21       Q.   So, for instance, the T-shirts that are up
22  there, let's just take wolves.  I think you guys call
23  that "Opinions," right?
24       A.   Yes.
25       Q.   "Wolves Don't Lose Sleep Over the Opinions of
26  Sheep"?
27       A.   Yeah.
28       Q.   We can call that the "Opinions" shirt, right?
```

55

229

1    **A.**   **Sure.**

2        **Q.**   **So the "Opinions" shirt was sold by the**

3    **Sketchy Tank business while you and Mr. Schindler were**

4    **in business together, correct?**

5        **A.**   **Yes.**

6        **Q.**   **As well as "Pie Till I Die" was sold during**

7    **that same time period when you and Mr. Schindler were**

8    **together, correct?**

9        **A.**   **Which one?  There's been a couple of them.**

10       **Q.**   **Was a shirt "Pie Till I Die" sold?**

11       **A.**   **One of them was, yes.**

12       **Q.**   **And when did you create the design for "Pie**

13   **Till I Die"?**

14       **A.**   **I would guess in June of 2015 maybe.**

15       **Q.**   **It's true that the "Pie Till I Die" design came**

16   **into being while you and Mr. Schindler were in business**

17   **together, correct?**

18       **A.**   **Correct.  Not in -- I don't think within our**

19   **year contract but before we started working together.**

20       **Q.**   **I'm sorry?**

21       **A.**   **Not within our year contract, but before that.**

22       **Q.**   **Well, you mean before August of 2014?**

23       **A.**   **Yes.**

24       **Q.**   **Was Mr. Schindler -- strike that.**

25            **Was it after April of 2014 when you had met**

26   **Mr. Schindler that you created the "Pie" shirt?**

27       **A.**   **Yes.**

28       **Q.**   **And you and Mr. Schindler had discussions about**

56

230

```
 1   create that shirt, correct?

 2       A.   Yes.

 3       Q.   Mr. Schindler said create something that

 4   relates to pizza, right?

 5       A.   Yes.

 6       Q.   And you did so?

 7       A.   Yes.

 8       Q.   And "Pie Till I Die," that shirt, is a

 9   bestseller, correct?

10       A.   It's -- actually, I don't think -- I don't even

11   think we've had an order for that in a long time.

12       Q.   Well, you don't make it available at all times,

13   correct?

14       A.   Correct.

15       Q.   There are certain times when you decide to make

16   that one available, correct?

17       A.   Yes.

18       Q.   And you heard Mr. Alband talk about the shirts

19   that are the classics?

20       A.   Yes.

21       Q.   Was "Pie Till I Die" a classic?

22       A.   I would say so, yes.

23       Q.   How about "Opinions," is that a classic?

24       A.   Yes.

25       Q.   You heard Mr. Alband say that the classics are

26   the bestsellers, right?

27       A.   Yes.

28       Q.   And you agree with that, right?
```

1       **A.    Yes.**

2           **Q.    So "Pie Till I Die" as a classic is one of the**

3       **bestsellers, correct?**

4           **A.    It's -- like I said, it's trickled down.    I**

5       **wouldn't even say it's a bestseller nowadays, no, but at**

6       **one point it definitely was.**

7           **Q.    How about "Good Times Bad Friends"?**

8           **A.    I would say it's my bestseller, yes.**

9           **Q.    That shirt was sold by the**

10      **Jack Schindler/Jesse Dawber/Sketchy Tank partnership?**

11          **A.    Yeah, I've been selling that shirt since 2012.**

12          **Q.    And it was sold under the Sketchy Tank when you**

13      **and Mr. Schindler were in business together?**

14          **A.    It was, yes.**

15          **Q.    Now, after you and Mr. Schindler had**

16      **discussions about going forward, you and he agreed to**

17      **form a business together for wholesale sales of**

18      **Sketchy Tank apparel.    True?**

19          **A.    It was distribution.**

20          **Q.    Wholesale sales of Sketchy Tank apparel.    True?**

21          **A.    Wholesale sales distribution, yes.**

22          **Q.    "Distribution" means sales, right?**

23          **A.    Not necessarily.**

24          **Q.    You think there can be distribution without**

25      **sales?**

26          **A.    Yeah.**

27          **Q.    The point of the business that you and**

28      **Mr. Schindler formed was to sell Sketchy Tank apparel,**

```
1    correct?

2        A.    Correct, yeah.

3        Q.    And you formed a partnership to do that,

4    correct?

5        A.    Yes.

6        Q.    That's why you called Mr. Schindler your

7    partner, right?

8            MR. TURRILL:  Objection.  Calls for a legal

9    conclusion.

10           THE COURT:  Overruled.  Just his understanding.

11           Go ahead.

12           THE WITNESS:  Yes, he was a distribution

13   partner.

14   BY MR. VAUGHN:

15       Q.    That's why you called him your partner when you

16   introduced him to your mother?

17       A.    That's why I called him my partner because he

18   was my distribution partner within that year.

19       Q.    I understand that's what you say, sir.

20           Let's take a look now at the first draft of

21   that agreement if you can.  Would you take a look at the

22   first exhibit up there, Exhibit Number 2.

23       A.    Is that Volume I, I take it?

24       Q.    It would be, yes, sir.

25       A.    How do you guys deal with these?

26           MR. VAUGHN:  Your Honor, may I -- there you go.

27   Exhibit 2, please.

28           THE WITNESS:  All right.
```

```
 1   agreement Exhibit 1?

 2       A.    What it says, the brand trademark.

 3       Q.    Okay.  And there was no brand trademark at the

 4   time?

 5       A.    We were still trying to acquire it.

 6       Q.    So then that's not a true statement, right?

 7   Hundred percent equity in the brand trademark is held by

 8   Sketchy Tank/Jesse Dawber?

 9       A.    I would assume that under like -- like no one

10   else owns that name.  So I would say yes.

11       Q.    You assume yes what?

12       A.    Sorry.  Ask the question again.

13       Q.    Did you own a hundred percent of the brand

14   trademark at that time?

15       A.    Not legally, no.

16       Q.    And the same designs that were sold under the

17   Sketchy Tank brand were then sold and are today sold

18   under Lurking Class, correct?

19       A.    Yes.  Same artwork.

20       Q.    The name of the brand was changed, right?

21       A.    Lurking Class by Sketchy Tank now.

22       Q.    Now it's Lurking Class is the brand, correct?

23       A.    Lurking Class by Sketchy Tank.

24       Q.    Does the neck label say Lurking Class by

25   Sketchy Tank?

26       A.    It does.

27       Q.    In the T-shirts that you have right there?

28       A.    Not these ones.  Now they do.
```

1    **sales, which you already had some of, were not going to**

2    **be part of this partnership, correct?**

3         **A.    Correct.**

4         **Q.    And you subsequently, though, told**

5    **Mr. Schindler that if he would help you out with web**

6    **sales, that you would go ahead and wrap those into the**

7    **partnership, correct?**

8         **A.    No.**

9         **Q.    Never said that to him?**

10        **A.    Never.**

11        **Q.    Was there ever a time, let's say in 2015, where**

12   **you asked Mr. Schindler to help you out with managing**

13   **the web sales?**

14        **A.    No, I didn't need help with web sales.**

15        **Q.    You needed no help with web sales?**

16        **A.    I needed no help with web sales.**

17        **Q.    Was Mr. Lianti the one who was fulfilling those**

18   **web orders?**

19        **A.    Yes.**

20        **Q.    You gentlemen were friends, right?**

21        **A.    I thought we were, yeah.**

22        **Q.    Better friends than you were with**

23   **Mr. Schindler?**

24        **A.    No.  Same kind of thing.  It was like, you**

25   **know, maybe a business level like I said.  I never hung**

26   **out with Paul outside of talking work stuff.**

27        **Q.    Did Ms. Piskur tell you in November of 2017**

28   **that Mr. Lianti had admitted to her that he destroyed**

1    evidence in this case?

2        A.   I found out through my legal, yeah.

3        Q.   Pardon me?

4        A.   I found out other ways, but yes, I knew that.

5        Q.   My question, though, was whether Ms. Piskur

6    told you that?

7        A.   No, she did not.

8        Q.   So Ms. Piskur worked for Class War, right?

9        A.   Yes.

10       Q.   You were working in the business at the time,

11   correct?

12       A.   Yes.

13       Q.   But she never told that you Mr. Lianti had

14   admitted in an email that he destroyed evidence?

15       A.   She did not tell me that, no.

16       Q.   You found out later?

17       A.   Yes.

18       Q.   After it became an issue in this litigation?

19       A.   Yeah.

20       Q.   Do you remember the email there about going up

21   to pick up those back patches in November of 2017?

22       A.   I do.

23       Q.   And did you go pick them up?

24       A.   I didn't.

25       Q.   Why not?

26       A.   I think I had other things going on or I might

27   have been out of town, I'm not sure.

28       Q.   Do you have any communication with Mr. Lianti

1  between the time where Ms. Piskur got that email when he
    2  said he destroyed evidence and that was in November of
    3  2017, did you have any communication with Mr. Lianti
    4  after that time?

    5      A.   Just through emailing him to get some back
    6  patches made and I think he might have reached out one
    7  time to tell me that he had like got a place in
    8  Costa Rica or something like that.  But nothing about
    9  that, no.

   10      Q.   From the time that Mr. Lianti destroying
   11  evidence became an issue in this litigation up until
   12  this morning, you have not had a conversation with him?

   13      A.   No.

   14      Q.   You never talked about this lawsuit with him?

   15      A.   No.

   16      Q.   He never told you he had destroyed evidence?

   17      A.   No.

   18      Q.   You never asked him why did you do that?

   19      A.   No.

   20      Q.   Now --

   21           THE COURT:  Is that a good place to break,
   22  Counsel?

   23           MR. VAUGHN:  Yes, Your Honor.

   24           THE COURT:  Okay.  Ladies and gentlemen, we'll
   25  break for lunch.  Plan on being back at 1:30 and we'll
   26  continue on in the afternoon.

   27           (Jurors exit the courtroom.)

   28           THE COURT:  We're still on the record.

```
1              MONDAY, SEPTEMBER 17, 2018, 1:32 P.M.

2                    SAN DIEGO, CALIFORNIA

3           DEPARTMENT 28   HON. EARL H. MAAS III, JUDGE

4

5              (Jurors enter the courtroom.)

6              THE BAILIFF:  Please be seated and come to

7    order.   Court is now in session.

8              THE COURT:  Welcome back, everybody.

9              For the record, all jurors are present, counsel

10   and clients are present.  Defendant is returning to the

11   stand.

12             Sir, you are still under oath.

13             And you may continue.

14             MR. VAUGHN:  Thank you, Your Honor.

15   BY MR. VAUGHN:

16       Q.   Mr. Dawber, I just wanted to wrap up an issue,

17   if I could.  Where today in the world are Sketchy Tank

18   goods sold other than in the USA and Japan?

19       A.   They're sold in Canada.  I believe Mexico.

20   Australia.  I think that might be it.

21       Q.   The sales in Canada, does the distributor in

22   Canada pay Class War for those sales?

23       A.   We don't have a distributor at the moment in

24   Canada.

25       Q.   Whoever sells those goods in Canada, do they

26   pay Class War?

27       A.   Yeah.  Zumiez is the store.

28       Q.   Do they pay Class War?
```

```
 1      A.   Yes.

 2      Q.   They don't pay STFU?

 3      A.   No.

 4      Q.   What about Australia, do they pay Class War?

 5      A.   I'm not sure.

 6      Q.   What about Europe, are Sketchy Tank goods sold

 7   in Europe?

 8      A.   No.

 9      Q.   Not today?

10      A.   Huh-uh.  Actually, sorry.  Yes, they are

11   through a group called Blue Tomato, which is through

12   Zumiez.

13      Q.   And payment for those goods comes to Class War?

14      A.   I believe so, yes.

15      Q.   So the only place that you can think of right

16   now where goods such as the T-shirts that are admitted

17   in evidence here are sold and where payment doesn't come

18   to Class War is Japan?

19      A.   I'm not sure, but to my best, I would say

20   Japan, yeah.

21      Q.   How much in Sketchy Tank goods has been sold in

22   Japan for 2018 so far?

23      A.   No clue.

24      Q.   Pardon me?

25      A.   I have no clue.

26      Q.   How about 2017, do you know?

27      A.   I don't know.

28      Q.   2016?
```

```
 1     A.   I don't know.

 2     Q.   Sketchy Tank goods have been sold in Japan

 3  since 2015, correct?

 4     A.   No.

 5     Q.   When were they first sold in Japan?

 6     A.   I would say maybe end of -- or middle 2016,

 7  summer 2016.

 8     Q.   Not until then?

 9     A.   Yes.

10     Q.   All right.  So as far as you know, those

11  balance -- pardon me, those profits and losses in

12  evidence as 641 and 642, they would include sales of

13  Sketchy Tank goods except those in Japan in 2018,

14  correct?

15     A.   Can you say the question one more time?

16     Q.   You remember Exhibit 641, 642?

17     A.   I don't offhand, no.

18          MR. VAUGHN:  Let's go ahead and put them up.

19  BY MR. VAUGHN:

20     Q.   641.  The top, tell us what that is, 641 is

21  Class War, Inc., profit and loss.  You remember me

22  questioning Ms. Piskur about this, right?

23     A.   2017?

24     Q.   Yes.

25     A.   Yeah.

26     Q.   Would this P&L contain the money made on

27  selling Sketchy Tank goods in 2017 wherever they're sold

28  with the exception of Japan?
```

1     A.    I'm not sure if it was -- I'm not sure,

2     actually, the --

3         Q.    Who would know that?

4         A.    Drew Madasci, Matt Roberts, Gina maybe.

5         Q.    Can you think of any other places where

6     Sketchy Tank goods were sold in 2017 where the money for

7     those sales did not come to Class War other than Japan?

8         A.    I can't think of any.

9         Q.    Should that P&L contain all the gross sales of

10    Sketchy Tank goods other than in Japan?

11        A.    I'm not sure.

12        Q.    Can you think of any locations other than Japan

13    where Sketchy Tank goods were sold in 2018 where the

14    money did not find its way on to the P&L that is

15    actually 642?

16        A.    I don't know.

17        Q.    Can't think of any?

18        A.    I can't honestly answer.

19        Q.    Now, do these two P&Ls that we've looked at

20    also contain money from Zumiez for license income?

21        A.    I believe so, yes.

22        Q.    So there's at least two ways Zumiez sells

23    Sketchy Tank goods, correct?

24        A.    Yes.

25        Q.    One is by Class War producing T-shirts and

26    Zumiez selling them after they're purchased at

27    wholesale, correct?

28        A.    Yes.

```
 1      Q.   The other is there was a license agreement that
 2  was entered into between Class War and Zumiez where
 3  Zumiez actually does the goods and remits a royalty to
 4  Class War, correct?
 5      A.   Yes.
 6      Q.   Okay.  Now, does Zumiez buy from STFU?
 7      A.   No, I don't think so.  No.
 8      Q.   Is there any distributor in the USA of
 9  Sketchy Tank goods today other than Class War, Inc.?
10      A.   No.
11      Q.   Is Sketchy Tank a brand?
12           MR. TURRILL:  Objection.  Asked and answered,
13  Your Honor.
14           THE COURT:  I think we did go over that, didn't
15  we?
16  BY MR. VAUGHN:
17      Q.   Have you ever described it as a brand?
18      A.   I don't recall.  I don't think so.  I mean,
19  we've been over that before, but yeah, it's my artist
20  name, so it's like --
21      Q.   My question is, though, have you ever called
22  Sketchy Tank goods a brand?
23      A.   Probably, yeah.
24      Q.   And do you think Lurking Class is also a brand?
25      A.   Lurking Class is -- I like to think of it as an
26  anti-brand.  It's more like a community of people.
27      Q.   And you've, in fact, put that on the
28  Lurking Class website, that observation?
```

```
 1              "Question:  The necessary change

 2          you made was to eliminate

 3          Mr. Schindler?

 4              "Answer:  Correct.

 5   BY MR. VAUGHN:

 6      Q.   Now, you saw the numbers that we referred to on

 7   Exhibits -- the P&Ls that Ms. Piskur was asked to look

 8   at, correct?

 9      A.   Yes.

10      Q.   And those numbers, as far as you know, as far

11   as overall sales go, are roughly accurate, correct?

12      A.   I would assume so, yes.

13      Q.   That's why you have Ms. Piskur doing that work,

14   correct?

15      A.   Yes.

16      Q.   Now, are there accountants that do the work --

17   the accounting work for the business now?

18      A.   For what business?

19      Q.   For the business that sells Sketchy Tank goods.

20      A.   Class War?

21      Q.   Yeah, Class War.

22      A.   Is there an accountant?

23      Q.   Yes.

24      A.   Yeah.

25      Q.   Who is it?

26      A.   Gina.

27      Q.   Is there an outside accounting firm known as

28   VDO?
```

```
 1        A.    Yes, I think they're helping Class War too.
 2        Q.    Are there audited financial statements for
 3   Class War?
 4        A.    I'm not sure.
 5        Q.    What does VDO do?
 6        A.    I think they are tax -- like tax prepping to
 7   make sure that we're abiding tax laws.
 8        Q.    Who brought them in?
 9        A.    Drew Madasci.
10        Q.    When were they brought in?
11        A.    I don't know the exact date.
12        Q.    Now, Mr. Dawber, you're suing Mr. Schindler in
13   this case as well for money for TGIC, correct?
14        A.    Yes.
15        Q.    And you're saying in this lawsuit you want back
16   half of the profits that were made from TGIC, correct?
17        A.    Yes.
18        Q.    And when is the first time you ever asked
19   Mr. Schindler, if you ever did, for that money?
20        A.    We've been in litigation for almost three and a
21   half years.
22              MR. VAUGHN:  Move to strike as nonresponsive,
23   Your Honor.
24              THE COURT:  Sustained.  It's not responsive.
25   BY MR. VAUGHN:
26        Q.    When, if ever, did you ask for that money?
27        A.    When we saw Judge Enright.
28              THE COURT:  So excluding times where you may
```

144

```
 1   have had meetings with judges.

 2              THE WITNESS:  Oh, okay.  I don't recall.

 3   BY MR. VAUGHN:

 4         Q.   Have you ever said to Mr. Schindler, Hey, how

 5   about my money from TGIC?

 6         A.   Excluding that, no.

 7         Q.   And, in fact, there have been two mediations in

 8   this case, right?

 9         A.   After being --

10         Q.   Two mediations in this case, "yes" or "no"?

11         A.   Yes.

12         Q.   Are you still holding money that Mr. Schindler

13   earned?

14         A.   There is money owed to Mr. Schindler still,

15   yes.

16         Q.   And have you paid it to him?

17         A.   No.

18         Q.   How much is owed?

19         A.   I think roughly around $35,000.

20         Q.   And how did you calculate that?

21         A.   I don't know the exact number, so I don't want

22   to say.

23         Q.   How much are you suing Mr. Schindler for in

24   this case?

25         A.   I think around the same.  I think around

26   38,000.

27         Q.   Are you willing to call it even?

28         A.   I would, yes.
```

1     Q.    In terms of the amounts that you owe
2   Mr. Schindler for money that he earned and the amounts
3   that you say he owes you, those are about the same
4   magnitude, correct?

5     A.    I would say so, yes.

6     Q.    Now, have you ever added up, assuming that
7   Mr. Schindler was still a member of the Sketchy Tank
8   partnership business and assuming he had 25 percent
9   ownership of that, have you ever added up how much money
10  that comes out to?

11    A.    Never.

12    Q.    Do you know how much you've taken out of the
13  business?

14    A.    I don't know.

15    Q.    It's more than a million dollars, right?

16    A.    I'm not sure.

17    Q.    You don't know if you've taken more than a
18  million?

19    A.    I actually don't know.

20    Q.    How often do you get paid?

21    A.    Monthly or bimonthly.  I'm not sure.

22    Q.    And how much?

23          MR. TURRILL:  Objection, Your Honor.  Lacks
24  foundation and unclear by whom he's asking he's being
25  paid by.

26          MR. VAUGHN:  I'm asking about payment out of
27  the business which sells Sketchy Tank goods.

28          MR. TURRILL:  Okay.

146

246

```
 1              THE COURT:  All right.  Can you answer that
 2    question?
 3              THE WITNESS:  Well, yeah, one more time.  I'm
 4    sorry.
 5    BY MR. VAUGHN:
 6         Q.   How much do you get paid out of the business
 7    that sells Sketchy Tank goods?
 8         A.   I think it's $18,000 a month right now.
 9         Q.   And how long has that been the case?
10         A.   I think for the last, I don't know, maybe three
11    months, four months, five months, six months.
12         Q.   That didn't come into existence, that payment
13    to you of 18,000 a month, until 2018?
14         A.   I would say that, yeah.
15         Q.   So was there an agreement, then, that was
16    signed in 2018 while this lawsuit was pending for
17    distribution of monies to you?
18         A.   I don't recall.
19         Q.   What other agreements, if any, have you signed
20    with respect to the Sketchy Tank brand in the last year?
21         A.   Nothing with the Sketchy Tank brand.
22         Q.   Well, is there anything with respect to, let's
23    just say with your artwork, have you licensed your
24    artwork to anybody other than STFU?
25         A.   Yes.
26         Q.   Who else?
27         A.   I did a capsule with Vans shoes.
28         Q.   I'm asking, though, is that the Sketchy Tank
```

```
 1   brand?

 2       A.   It's me personally Sketchy Tank.

 3       Q.   Great.  So what I'm asking, though, is the

 4   brand that's characterized by those shirts there --

 5       A.   Yeah.

 6       Q.   -- have you licensed or sold any interest in

 7   those designs to anybody other than STFU in the last

 8   year?

 9       A.   I don't believe so, no.

10       Q.   Now, The Lurker that we talked about, that's

11   the skull figure peering over a fence.

12       A.   Somewhat, yes.

13       Q.   Pardon me?

14       A.   Yes.

15       Q.   Is that the wrong way to describe it?

16       A.   There's no fence, but it doesn't matter.

17       Q.   What's he peering over?

18       A.   Whatever you want to make him peer over.

19       Q.   So it's the skull peering over something?

20       A.   Yes.

21       Q.   The Lurker design, who owns it?

22       A.   I don't know.

23       Q.   There's a trademark that's been registered for

24   that, correct?

25       A.   I don't know.

26       Q.   Do you remember attributing that trademark to

27   Lurking Class, LLC?

28       A.   No.  I don't remember that, no.
```

1   **Q.   Who owns Lurking Class, LLC?**

2   **A.   I don't know the answer to that either.  I**

3   **think Class War.**

4   **Q.   Whose idea was it to set that up, if it came**

5   **from other than a licensed attorney?**

6   **A.   Drew Madasci.**

7   **Q.   So Mr. Madacsi is the one who conceived the**

8   **creation of Lurking Class, LLC, correct?**

9   **A.   Yes.**

10  **Q.   The one who conceived the creation of**

11  **Sketchy Tank, LLC, correct?**

12  **A.   I think so.  I'm not sure.**

13  **Q.   The one who hired the outside accountants,**

14  **correct?**

15  **A.   Yes.**

16  **Q.   The one who came up with the license agreement**

17  **where you gave -- conveyed your designs to STFU and then**

18  **licensed then back, right?**

19  **A.   I believe so, yeah.**

20  **Q.   And was there anything paid to you for**

21  **licensing those designs to STFU in terms of a lump sum**

22  **or was it just that 18,000 a month?**

23  **A.   It was just the 18,000 a month.**

24  **Q.   Do you have any other arrangement as it sits**

25  **right now for sale of any interest in Class War?**

26  **A.   Absolutely none.**

27  **Q.   Sale of any interest in any of your designs**

28  **other than that license to STFU?**

```
 1      A.    Sorry.  One more time.  Sales of designs?

 2      Q.    I'm trying to find out if you have any other

 3   agreements, written agreements or oral agreements for

 4   that matter, with anybody concerning the designs that

 5   are embodied on those shirts that are in evidence as 115

 6   to 121 other than the one that we talked about with

 7   STFU?

 8      A.    Right.  And then Zumiez as well, yeah.

 9      Q.    That's still in existence?

10      A.    Yes.

11      Q.    And the money from that does go into the P&Ls?

12      A.    I'm not sure.

13      Q.    Who is it that licenses to Zumiez?

14      A.    I'm assuming Class War, but I don't know.

15      Q.    Does Class War have a relationship with Zumiez

16   today?

17      A.    Yes.

18      Q.    Does STFU, to your knowledge, have a

19   relationship with Zumiez today?

20      A.    No, I don't believe so.

21      Q.    Zumiez is indeed the best customer of

22   Sketchy Tank goods, correct?

23      A.    Yes.

24      Q.    ProGraphics, you continued to use them after

25   August 14 of 2015.  True?

26      A.    Yes.

27      Q.    And they were charging you $5 a shirt after

28   that time, correct?
```

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF CALIFORNIA )
                         )
4    COUNTY OF SAN DIEGO )

5

6

7            I, JULIE A. McKAY, CSR NO. 9059, AN OFFICIAL

8    REPORTER PRO TEMPORE IN THE SUPERIOR COURT OF THE STATE

9    OF CALIFORNIA, IN AND FOR THE COUNTY OF SAN DIEGO,

10   HEREBY CERTIFY THAT I REPORTED IN SHORTHAND THE RECORD

11   OF THE PROCEEDINGS HAD IN THE WITHIN CASE AND LATER

12   TRANSCRIBED SAID RECORD AND THAT THE FOREGOING

13   TRANSCRIPT IS A FULL, TRUE, AND CORRECT TRANSCRIPTION OF

14   THE PROCEEDINGS IN THIS CASE.

15            DATED THIS 27th DAY OF OCTOBER, 2018.

16

17   _____

18   JULIE A. McKAY, CSR NO. 9059
     OFFICIAL REPORTER PRO TEMPORE

19

20

21

22

23

24

25

26

27

28
```

# EXHIBIT 25

# Trial transcript of testimony of Jesse Dawber on September 18, 2018

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2           COUNTY OF SAN DIEGO, NORTH COUNTY DIVISION

3     DEPARTMENT 28      HON. EARL H. MAAS III, JUDGE

4

5                     )
     JACK SCHINDLER, an      )
6     individual,          )
                     )
7         Plaintiff,    )
                     ) Case No.
8           vs.         ) 37-2015-00026810-CU-BT-NC
                     )
9     JESSE DAWBER, an       )
     individual, and DOES 1-50, )
10    inclusive,          )
                     )
11        Defendants.   )
    _____)

12

13

14

15

16

17       REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

18           TUESDAY, SEPTEMBER 18, 2018

19          WITNESS:   JESSE DAWBER

20

21

22

23

24

25

26    REPORTED BY:  JULIE A. McKAY, CSR 9059
      OFFICIAL REPORTER PRO TEMPORE
27

28

1

```
 1   APPEARANCES:

 2

 3       FOR THE PLAINTIFF:

 4           VAUGHN & VAUGHN
             BY: DONALD A. VAUGHN, ESQ.
 5               EVAN J. TOPOL, ESQ.
             501 West Broadway, Suite 1770
 6           San Diego, California  92101
             (619) 237-1717
 7           dav@vv-law.com

 8

 9       FOR THE DEFENDANTS:

10           HOGAN LOVELLS US LLP
             BY:  MICHAEL L. TURRILL, ESQ.
11               GABRIEL R. ULMAN, ESQ.
             1999 Avenue of the Stars, Suite 1400
12           Los Angeles, California  90067
             (310) 785-4600
13           michael.turrill@hoganlovells.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1          **CHRONOLOGICAL INDEX OF WITNESSES**

2                 **SEPTEMBER 18, 2018**

3                              **Page   Line   Vol**
    **WITNESS:**
4
    **JESSE DAWBER**
5

6    **CROSS BY MR. TURRILL  . . . . . . . . . . . 6    23      1**

7    **REDIRECT BY MR. VAUGHN  . . . . . . . . .24    13      1**

8    **RECROSS BY MR. TURRILL  . . . . . . . . 101    22      1**

9    **REDIRECT BY MR. VAUGHN  . . . . . . . . 107    25      1**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1                   ALPHABETIC INDEX OF WITNESSES

2                      SEPTEMBER 18, 2018

3                                    Page    Line    Vol
     WITNESS:

4    DAWBER, JESSE

5

6    CROSS BY MR. TURRILL  . . . . . . . . . . 6       23        1

7    REDIRECT BY MR. VAUGHN  . . . . . . . . .24       13        1

8    RECROSS BY MR. TURRILL  . . . . . . . . 101       22        1

9    REDIRECT BY MR. VAUGHN  . . . . . . . . 107       25        1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

```
 1    abroad.  Starting with Class War, Inc., and I'm not
 2    going to go back over what Mr. Vaughn asked you, but are
 3    you still the sole shareholder of that entity?
 4         A.   I am, yes.
 5         Q.   Do you have -- hold any role in the company
 6    other than that?
 7         A.   No.
 8         Q.   Are you involved at all in any day-to-day
 9    operations of Class War, Inc. at this time?
10         A.   No.
11         Q.   And who is?
12         A.   Matt Roberts, Drew Madacsi, Gina.
13         Q.   Gina Piskur?
14         A.   Yeah, and there are probably four or five
15    employees.
16         Q.   We also heard discussion of a company called
17    Lurking Class LLC.  Are you a member in that company?
18         A.   No.
19         Q.   Do you have any day-to-day role in that
20    company?
21         A.   No.
22         Q.   We spoke about a company called STFU.
23              Do you recall that?
24         A.   Yes.
25         Q.   Do you have any role in that company?
26         A.   No.
27         Q.   Are you an officer or director?
28         A.   No.
```

```
1      Q.   Do you have any knowledge of the day-to-day
2   runnings of that company?
3      A.   No.
4      Q.   Who would have the knowledge regarding that
5   entity?
6      A.   Drew Madacsi and probably Jeslyn Leong.
7      Q.   Other than Class War, Inc., were any of these
8   entities formed while Mr. Schindler was working with
9   Sketchy Tank?
10     A.   Sorry.  One more time.
11     Q.   Other than Class War, Inc., were any of these
12  entities formed, in other words, come into being while
13  Mr. Schindler was working with Sketchy Tank?
14     A.   No.
15     Q.   And generally time frame-wise, when did they
16  come into existence?
17          MR. VAUGHN:  The question is compound,
18  Your Honor, and no foundation.
19          THE COURT:  Overruled.
20          THE WITNESS:  Years after.
21  BY MR. TURRILL:
22     Q.   Do you have at this point any plan to sell the
23  business Class War, Inc.?
24     A.   No.
25     Q.   Do you have any plans to sell Sketchy Tank?
26     A.   No.
27     Q.   And finally, Mr. Dawber, if at any point you
28  decided to stop making art, would there be a Sketchy
```

23

1    **didn't happen, right?  That it was Sketchy Tank money,**
2    **not TGIC money, correct?**
3        **A.    Yes.**
4        **Q.    And the cost of the goods there, the 8,083.58,**
5    **is that the total cost of goods or 50 percent?**
6        **A.    That was the total.  So 18- minus 8,000 is**
7    **roughly, let's just say 10,000.  Then the 40 percent of**
8    **that is 3,966.**
9        **Q.    Very well.  So the percentage, then, of profit**
10   **from TGIC was over 50 percent, correct?**
11       **A.    Yes.**
12       **Q.    And that was the same profit percentage that**
13   **you gentlemen enjoyed in producing Sketchy Tank goods,**
14   **right?**
15       **A.    Correct, yeah.**
16       **Q.    And you heard Ms. Piskur testify to those**
17   **various profit margins the first day of trial, right?**
18       **A.    Yeah.**
19       **Q.    And her testimony was accurate as far as you**
20   **know?**
21       **A.    As far as I know, yes.**
22           **MR. VAUGHN:  Let's turn to the last chart, if**
23   **we can, Oliver, without the heading, please.  It's on**
24   **the third page.**
25   **BY MR. VAUGHN:**
26       **Q.    All right, sir.  Now, you have a sum there for**
27   **$3300.  Looks like a nice round number.  Where did that**
28   **number come from?**

```
 1          MR. VAUGHN:  I'm looking for the amount that
 2   this man has been paid prior to him paying anything out
 3   for any reason.
 4          THE COURT:  If you can answer, go ahead.
 5          THE WITNESS:  I don't know.
 6   BY MR. VAUGHN:
 7     Q.   Do you remember me asking you yesterday was it
 8   more than a million dollars?
 9     A.   Yes.
10     Q.   And your answer was you didn't know?
11     A.   Yeah, I don't know.
12     Q.   Is that still your answer?
13     A.   Yes.
14     Q.   You don't know whether you've been paid more
15   than a million dollars?
16          MR. TURRILL:  Objection, Your Honor.  Asked and
17   answered now multiple times.
18          THE COURT:  Sustained.
19   BY MR. VAUGHN:
20     Q.   Mr. Dawber, do you remember answering written
21   questions in this lawsuit?
22     A.   Possibly.
23     Q.   Interrogatories?
24     A.   I'm not sure.
25     Q.   Do you remember answering under penalty of
26   perjury and signing a verification form saying that
27   these were true under penalty of perjury?
28     A.   Yes.
```

1     Q.    You do remember?

2     A.    Yes.

3     Q.    Let's take a look at Exhibit 64, please.  Do

4     you have it there, sir?  It will be in the other books

5     up there.  Volume I, I believe.  I'm sorry.  It's

6     Volume III.

7     A.    Okay.

8     Q.    Now, sir, turn to page 4 of Exhibit 64, please.

9     Do you see that question number 59?

10    A.    On 4?

11    Q.    Page 4.

12    A.    Yeah.

13    Q.    Special interrogatory number 59?

14    A.    Yeah.

15    Q.    It says, begin quote, "Please list by

16    recipient, date and amount all individuals and entities

17    to whom/which any profits from sales of Sketchy Tank

18    products have been disbursed since August 1, 2014."

19          I read that question correctly, right?

20    A.    Yes.

21    Q.    You gave a further supplemental response under

22    oath.  True?

23    A.    Yes.

24    Q.    And your supplemental response runs from

25    line 20 there on page 4 of Exhibit 64 through line 7 and

26    a half, I guess I would say, on page 7 of that exhibit,

27    correct?

28    A.    Yes.

1          Q.    And these numbers were as of March 20 of 2017,
 2     correct?
 3          A.    Appears that way, yes.
 4          Q.    And since then you've received additional
 5     amounts, right?
 6          A.    Yes.
 7          Q.    Have you ever added up the amounts shown for
 8     you in these columns as of March 20, 2017?
 9          A.    No, sir.
10          Q.    If I told you it was $993,782.65, would you
11     disagree?
12                MR. TURRILL:  Objection.  Lacks foundation.
13     Calls for speculation.
14                THE COURT:  Overruled.
15                You can answer.
16                THE WITNESS:  Sure.
17     BY MR. VAUGHN:
18          Q.    You can add the numbers up if you want, but
19     that's my calculation.
20          A.    I trust your calculation.
21          Q.    Fair enough.  And if I am wrong, Mr. Turrill
22     can bring it up tomorrow or the next day, any time he
23     wants.
24                Does that refresh your recollection that as of
25     a year and a half ago you received personally -- at
26     least you said so under oath -- $7,000 -- $6,300 or so
27     short of a million dollars?
28          A.    Sure.

48

262

1     Q.    And since then, how much money have you
2  received from the sales of Sketchy Tank products?
3     A.    I don't know.
4     Q.    Now, certainly enough to take it over a million
5  dollars, correct?
6     A.    I would say so, yeah.
7     Q.    And how much more?
8     A.    I don't know.
9     Q.    Do you know the magnitude?
10        MR. TURRILL:  Objection, Your Honor.  Lacks
11  foundation.  Asked and answered.
12        THE COURT:  Overruled.
13  BY MR. VAUGHN:
14     Q.    So you don't know if it's another 2,000,
15  another 20,000, or another 2 million, anything of that
16  nature?
17     A.    I don't know.
18     Q.    Now, let's also take a look at this number --
19  the numbers that you gave for amounts received by
20  Mr. Schindler.  And those were also in your chart here
21  in Exhibit 64, which you answered under oath, correct?
22     A.    I believe so, yes.
23     Q.    And Mr. Schindler of course didn't receive any
24  distributions from the Sketchy Tank business after
25  July 1 of 2015.  True?
26     A.    That's true.
27     Q.    That's reflected on page 5 of Exhibit 64,
28  right?

```
 1      Q.   Was there an intent between you and
 2  Mr. Schindler that down the road, after we'd determined
 3  whether sales benchmarks were met, that you gentlemen
 4  would form an LLC or entity together to conduct the
 5  partnership business?
 6      A.   It was a possibility if we made it through the
 7  year and worked well together, yes.
 8      Q.   And that's what this email refers to, correct?
 9      A.   I'm not sure.
10      Q.   Well, Mr. Schindler says he's going to set his
11  company up either way?
12      A.   Yeah, he was going to set up Major Award --
13      Q.   You understood him to mean that he was going to
14  create an entity on his side whether you did or not,
15  correct?
16      A.   He was going to set up his distribution
17  company.
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   And then Mr. Schindler said that you should
21  consider the pros and cons of also creating your own
22  entity, right?
23      A.   Yes.
24      Q.   And you did.  It was Class War, right?
25      A.   I did, yeah.
26      Q.   A little less than a year later?
27      A.   Yeah.
28      Q.   Now, the intent of this email was talking about
```

70

1   **what the future structure of the partnership business**

2   **would be, correct, as you understood it?**

3       **A.   I don't know.**

4       **Q.   Did you understand that to be the case, that**

5   **that's what that email was referring to?**

6       **A.   No.**

7           **MR. VAUGHN:   Now let's look at the second page**

8   **if we could put it up on the screen, please, of**

9   **Exhibit 472 in evidence.   Just the part from below the**

10  **second line there, Oliver, where it says, "From Jack**

11  **Schindler."**

12  **BY MR. VAUGHN:**

13      **Q.   Now, this is the email that we had talked about**

14  **previously where Mr. Schindler had asked if you could**

15  **create a T-shirt with regard to pizza, correct?**

16      **A.   Correct.**

17      **Q.   And the T-shirt, one of the bestsellers there,**

18  **Pie Till I Die, was created after Mr. Schindler sent**

19  **this email to you, correct?**

20      **A.   I believe so, yeah.**

21      **Q.   And you had actually created a pizza-focused, I**

22  **guess I would say, design as of this time Mr. Schindler**

23  **was giving you constructive criticism on it, correct?**

24      **A.   Yes.**

25      **Q.   And after you received this email, you went**

26  **ahead and revised that design into the one that we have**

27  **in evidence and it became a bestseller, right?**

28      **A.   Yes.**

```
 1      A.    Right, but for Vans.

 2      Q.    Right is good enough for me.

 3            Now, yesterday I thought you told -- strike

 4   that.  That might be argumentative.

 5            Yesterday, Mr. Dawber, did you tell the jury

 6   that your Sketchy Tank brand is for the masses?

 7      A.    I don't recall.

 8      Q.    Do you recall telling the jury that it is

 9   something that appeals to a wide cross-section of

10   people?

11      A.    Yes.

12      Q.    I would like to read a portion of your

13   biographical information there in that bottom email

14   since you wrote it.  Reading from the second -- pardon

15   me -- third sentence.  "My art is definitely not for

16   everyone and that's probably the point."

17            That's what you said back in January of 2017,

18   correct?

19      A.    Yes.

20      Q.    And one of the phrases that you've used

21   throughout the Sketchy Tank brand is that it's meant to

22   disturb the comfortable and comfort the disturbed,

23   correct?

24      A.    Correct.

25      Q.    And you referred to the Sketchy Tank brand as a

26   brand here in this email, correct?

27      A.    Correct.

28      Q.    You told the recipients, "Here is some bio
```

1   **stuff about me and the brand," correct?**

 2      **A.   Yes.**

 3      **Q.   The brand you were referring to was**

 4   **Sketchy Tank?**

 5      **A.   Yes.**

 6      **Q.   Let's take a look, please, at Exhibit 15 now.**

 7   **It's a very large exhibit.  I'll be looking at a few of**

 8   **the pages or asking you to, Mr. Dawber, inside**

 9   **Exhibit 15.**

10         **MR. TURRILL:  Your Honor, if I may pose an**

11   **objection to this exhibit.  It includes 700 separate**

12   **emails in one exhibit, 700 pages of emails.**

13         **MR. VAUGHN:  I don't think I'll offer the whole**

14   **thing, Your Honor.**

15         **THE COURT:  All right.  That is going to make**

16   **it a little tricky for Noreen to keep track of.**

17         **MR. VAUGHN:  I probably won't be offering any**

18   **of them.  I just want to refer the witness to certain**

19   **emails in it, which he'll have the foundation to**

20   **discuss.**

21         **THE COURT:  All right.**

22   **BY MR. VAUGHN:**

23      **Q.   Take a look, please, in Exhibit 15 at page 127.**

24   **What is Exhibit [sic] 127?**

25      **A.   It looks like a request for inside hat woven**

26   **labels.**

27      **Q.   On June 11 of 2015 Mr. Schindler asked you if**

28   **you could do art and size correctly for ST and TGIC and**

```
 1   about who owns the artwork if I can.  Yesterday you told
 2   the jury that the designs that are on those T-shirts in
 3   evidence, 115 through 121, are now owned by STFU, right?
 4        A.   No.
 5        Q.   Who owns those designs?
 6        A.   I do.  They're my intellectual property.
 7        Q.   What does STFU have to do with them?
 8        A.   I licensed it to them.
 9        Q.   And then licensed it back?
10        A.   I'm not sure.
11             MR. TURRILL:  Objection, Your Honor.  We
12   covered this yesterday in some great detail.  It's
13   cumulative at this point.
14             THE COURT:  Sustained.
15             MR. VAUGHN:  We did cover it, but I just want
16   to make sure I understand.
17   BY MR. VAUGHN:
18        Q.   Other than what you've testified to so far, do
19   you have any other explanation for why Class War is
20   paying STFU a royalty?
21        A.   I don't know.
22        Q.   Best you know, you still own the artwork,
23   correct?
24        A.   I do.
25        Q.   And you own all the artwork, correct?
26        A.   I do.
27        Q.   And it's Class War that pays you a retainer to
28   design graphics, right?
```

```
 1            MR. TURRILL:  Objection.  Asked and answered.
 2    Cumulative.
 3            MR. VAUGHN:  The answer is different than what
 4    we heard yesterday.
 5            THE COURT:  Is the answer different?
 6            THE WITNESS:  No.
 7    BY MR. VAUGHN:
 8        Q.    I thought -- maybe I missed something.  The
 9    $18,000 a month that you get --
10        A.    Yeah.
11        Q.    -- doesn't come from STFU?
12        A.    It does.
13        Q.    I would like to read from your PMK deposition,
14    please.  And it is page 28, line 25.
15            MR. TURRILL:  Your Honor, we'll object on the
16    grounds that this deposition transcript was taken of
17    Mr. Dawber in his capacity as a person most
18    knowledgeable for an entity that's no longer a party to
19    this matter.
20            MR. VAUGHN:  Under oath in this case.
21            THE COURT:  Twenty-eight, line what?
22            MR. VAUGHN:  It's page 28, line 20, through 29,
23    line 3.
24            THE COURT:  All right.  Go ahead.
25            MR. VAUGHN:  I'm okay?
26            THE COURT:  Yeah.
27            MR. VAUGHN:
28            "Question:  Does Sketchy Tank LLC
```

```
 1              receive any distributions of money

 2              from either Lurking Class LLC or

 3              Class War, Inc.?

 4                  "Answer:  Yes.

 5                  "Question:  What money is that?

 6                  "Answer:  I just told you.  I get

 7              a retainer every month.

 8                  "Question:  How much is it?

 9                  "Answer:  18,000 or 19,000."

10  BY MR. VAUGHN:

11      Q.   So do you get two payments of 18,000 or 19,000

12  a month?

13      A.   I don't.

14      Q.   Does it come from Class War or Lurking Class or

15  does it come from STFU?

16      A.   It used to come from Class War.  Now it comes

17  from STFU.

18      Q.   When did that happen?

19      A.   I'm not sure.

20      Q.   Your deposition was taken July 26 of this year,

21  less than a month ago?

22              MR. TURRILL:  Your Honor, argumentative.

23              THE COURT:  The question is not, though the

24  tone slightly is.

25              MR. VAUGHN:  If Mr. Turrill wants to object to

26  my tone, I'll tone it down.

27              THE COURT:  Let's tone it -- ask a question.

28              MR. VAUGHN:  Yes, Your Honor.
```

BY MR. VAUGHN:

 2      Q.    Your deposition that I just read from under
 3  oath was taken what day?

 4      A.    I'm not sure.

 5      Q.    Does July 26, 2018 sound right?

 6      A.    Sure.

 7      Q.    And that was less than a month ago.  True?

 8      A.    Yes.

 9      Q.    Less than a month ago you testified under oath
10  that the payment you get comes from Class War or Lurking
11  Class, correct?

12      A.    Yes.

13      Q.    Before this jury you testified and you just did
14  that it comes from STFU, right?

15      A.    I believe there was an NDA that I couldn't
16  speak of.

17      Q.    That's not the pending question, sir.  My
18  question is this.  You told the jury something different
19  than you said in your deposition less than a month ago
20  about where the money comes from, right?

21      A.    Sure.

22      Q.    Was there some new deal made in the few weeks
23  between -- you know what?  I'm wrong when I'm doing
24  dates.  It's July, not August.  So we're talking about
25  less than two months ago.  So I stand corrected on that.

26            Was there some new deal with regard to your
27  compensation for this art made in the last two months?

28      A.    I don't believe so.

1      Q.   So why did you testify one way in court here

2  and another way in the deposition?

3      A.   I'm not sure.

4      Q.   Did somebody other than counsel tell you what

5  to say in this deposition?

6      A.   No.  I think it was just an oversight.

7      Q.   Did you discuss your deposition with

8  Mr. Madacsi at the time?

9      A.   No.

10     Q.   Have you discussed this lawsuit with

11 Mr. Madacsi?

12          MR. TURRILL:  Objection, Your Honor.

13 Relevance.

14          THE COURT:  As to discussing it with

15 Mr. Madacsi?  Overruled.

16 BY MR. VAUGHN:

17     Q.   Your answer?

18     A.   Yes.

19     Q.   Has Mr. Madacsi given you any strategy advice

20 on how to handle this case?

21     A.   He put me in touch with Hogan Lovells.

22     Q.   You had a different attorney before that,

23 correct?

24     A.   Yes.

25     Q.   Did Hogan Lovells draft that agreement that you

26 talked about yesterday?

27          MR. TURRILL:  Objection.  Calls for

28 attorney-client privileged communications, attorney work

```
 1   product potentially.
 2           MR. VAUGHN:  It's not a confidential
 3   communication, Your Honor.
 4           THE COURT:  Which document are we talking
 5   about?
 6           MR. VAUGHN:  The document that Mr. Dawber
 7   described yesterday where intellectual property, the
 8   designs were given to STFU and then licensed back, the
 9   one that I've asked the court and I'm going to get.
10           MR. TURRILL:  Same objection, Your Honor.
11           THE COURT:  So your question is, did they
12   create it or did they forward it to him?
13           MR. VAUGHN:  Did they create it?
14           THE COURT:  I'll sustain the objection.
15   BY MR. VAUGHN:
16       Q.   Do you know who created the agreement that you
17   testified to yesterday?
18       A.   Which one?
19       Q.   The one that conveyed -- what you told the jury
20   conveyed your designs to STFU?
21       A.   I'm not sure.
22       Q.   Did you discuss that agreement with
23   Mr. Madacsi, the one I'm referring to, before you signed
24   it?
25       A.   I'm not sure.
26       Q.   Did you have separate counsel from STFU at the
27   time you entered into that agreement?
28       A.   No, I don't think so.
```

```
 1      Q.   Same lawyers represented both you and STFU?

 2      A.   No.

 3      Q.   Who represented you in that transaction?

 4           MR. TURRILL:  Objection, Your Honor.

 5   Attorney-client privilege.

 6           THE COURT:  Identity of a representative is not

 7   privileged.

 8   BY MR. VAUGHN:

 9      Q.   Go ahead.

10      A.   I'm not sure.

11      Q.   Was it an arm's length transaction when you

12   entered into this transaction which gave, which you told

13   the jury yesterday, your designs over to STFU over in

14   Singapore?

15           MR. TURRILL:  Objection.  Vague and ambiguous.

16   Calls for a legal conclusion as to arm's length.

17           THE COURT:  I think the arm's length is a legal

18   position, if you want to rephrase.

19           MR. VAUGHN:  Understood, Your Honor.  I'll

20   rephrase.

21   BY MR. VAUGHN:

22      Q.   Did STFU have counsel separate from you when

23   you entered into that agreement that you described for

24   the jury yesterday?

25      A.   I'm not sure.

26      Q.   Who represented you --

27           MR. TURRILL:  Asked and answered.

28
```

```
1    BY MR. VAUGHN:

2        Q.    -- in that transaction?

3              MR. TURRILL:  Objection.  Asked and answered.

4              THE COURT:  Overruled.

5              THE WITNESS:  I don't know.

6    BY MR. VAUGHN:

7        Q.    You don't know?

8        A.    I've paid tons of firms.  I don't know.

9        Q.    You have used Attorney Tara Pelan for

10   intellectual property, correct?

11       A.    Yes.

12       Q.    Now, there was never a business called

13   Sketchy Tank, correct?

14       A.    No.  There's a business called Sketchy Tank

15   right now.

16       Q.    Page 42, line 15 of the PMK deposition.

17             MR. VAUGHN:  I'll get the exact line reference

18   here in just a moment, Your Honor.  It's page 42, lines

19   13 through 15.

20             THE COURT:  Go ahead.

21             MR. VAUGHN:

22                  "Question:  Was there ever a

23             business that you called Sketchy

24             Tank?

25                  "Answer:  No."

26   BY MR. VAUGHN:

27       Q.    That's the answer you gave under oath less than

28   two months ago, right?  Yes?  That's the answer you
```

1  **gave?**

2  **A.  It was the wrong answer.  There was Sketchy**
3  **Tank LLC.**

4  **Q.  Now, in fact, there was and is a business**
5  **called Sketchy Tank, correct?**

6  **A.  Sketchy Tank LLC, yes.**

7  **Q.  Did you ever enter into a contract on behalf of**
8  **a business known as Sketchy Tank before you created the**
9  **LLC on September 11, 2017?**

10  **A.  Sketchy Tank as an artist, yes.**

11  **Q.  What about Sketchy Tank as a business?**

12  **MR. TURRILL:  I'm sorry, Your Honor, objection.**
13  **Asked and answered.  Repetitive.  Cumulative.  We went**
14  **over this yesterday.**

15  **THE COURT:  I'm going to allow it, but --**

16  **MR. VAUGHN:  I'm pretty close to the end,**
17  **Your Honor.**

18  **THE COURT:  Good, because I sense we're kind of**
19  **getting caught on the side.**

20  **MR. VAUGHN:  I understand.  I'm pretty focused**
21  **on where I'm going.  I'm down to two pages.**

22  **BY MR. VAUGHN:**

23  **Q.  Mr. Dawber, the question is this.  Did you ever**
24  **enter into a contract on behalf of a business known as**
25  **Sketchy Tank before the LLC was created about a year**
26  **ago?**

27  **A.  No.**

28  **Q.  Let's look at Exhibit 475, please.  475 has**

```
 1   notes on it, but do you nevertheless recognize that

 2   document, Mr. Dawber?

 3       A.   Sorry.  What number is it?

 4       Q.   475, sir.  You know what?  That's not signed.

 5   Let's look at 495 instead.  Should be in the same

 6   binder.

 7       A.   Okay.

 8       Q.   You signed Exhibit 495 on page 10, correct?

 9       A.   Yes.

10       Q.   And this license agreement you entered into

11   with Zumiez on behalf of Class War, correct?

12       A.   Yes.

13       Q.   And you indicated -- or it is indicated in the

14   first paragraph of the license agreement that Class War

15   was operating the business named Sketchy Tank, correct?

16       A.   Yes.

17       Q.   And that business had a principal place of

18   business at 391 Ocean View Avenue in Encinitas, correct?

19       A.   Yes.

20       Q.   That's your home address at the time?

21       A.   It is.

22       Q.   526 next, sir.

23       A.   526?

24       Q.   Yes, sir.  526 is another license agreement

25   with Zumiez, correct?

26       A.   What page?

27       Q.   It should be the first one.

28       A.   Got it.
```

```
 1        Q.    Do you have it there, sir?  Not the email
 2    that's the first page.  Second page of Exhibit 526 is
 3    another license agreement with Zumiez, correct?
 4        A.    Yes.
 5        Q.    And you signed it on page 10, right?
 6        A.    Yes.  Pretty sure.  Yes.
 7        Q.    You signed it as founder and CEO of Class War.
 8    True?
 9        A.    Yes.
10        Q.    And this one was dated February 27, 2017,
11    right?
12        A.    Yes.
13        Q.    And in the first paragraph, just like the
14    previous exhibit, it indicates that the agreement is
15    between Class War, a corporation operating the business
16    named Sketchy Tank, and Zumiez Services, Inc., right?
17        A.    Yes.
18        Q.    So at this time there was a business named
19    Sketchy Tank, right?
20        A.    No.
21        Q.    You nevertheless signed a document that says
22    there was, right?
23        A.    It was Class War --
24        Q.    You nevertheless signed --
25              MR. TURRILL:  Objection, Your Honor.  The
26    witness is trying to answer the question.
27              THE COURT:  Actually, the witness isn't
28    answering the question, which is why this is taking so
```

98

278

1    **long.**

2         **If you can't answer his question, you can say**

3    **that, but you can't start down a different path.**

4         **THE WITNESS:  I'm sorry.**

5    **BY MR. VAUGHN:**

6    **Q.   Let me make it this simple.  You signed this**

7    **agreement in 2017 indicating that there was a business**

8    **named Sketchy Tank with a principal place of business at**

9    **your home address.  True?**

10   **A.   Yes.**

11   **Q.   Now, today you don't really know who owns the**

12   **old designs that are on those T-shirts that are in**

13   **evidence, right?**

14   **A.   No.**

15   **Q.   Am I correct you do not know?**

16   **A.   I do know.**

17   **Q.   Let's read from page 65 of your PMK deposition,**

18   **please.  And that would be -- pardon me.  Start on**

19   **page 64 and I would like to read from lines 14 through**

20   **page 65, line 1.**

21        **MR. TURRILL:  And, Your Honor, I'll just note**

22   **that there is an objection interposed in these questions**

23   **here which I would reassert.**

24        **MR. VAUGHN:  Does the Court wish to rule now?**

25        **THE COURT:  Well, that's an objection to form**

26   **that it's asked and answered within the deposition.  So**

27   **just I'm going to overrule that objection.  Are you**

28   **raising the same objection now?**

MR. TURRILL:  The legal conclusion part,
Your Honor.

         THE COURT:  Okay.  So same ruling as before.
This is his understanding, not a legal definition.  You
can go ahead.  You can exclude the objection.

         MR. VAUGHN:  Thank you, Your Honor.

         Line 14.  "We're back on the record,
Mr. Dawber.  I just want to be as clear as I can.  Does
Sketchy Tank LLC own the prior designs, for instance,
Pie Till I Die, Good Times Bad Friends, that sort of
thing?

         "The witness:  Do they own it?

                "Question:  Yes.

                "Answer:  No.

                "Question:  Who does, if you
         know?

                "Answer:  I don't know who owned
         it."

BY MR. VAUGHN:

    Q.   Now, were you ever paid for anybody to use
those prior designs, the ones that are in evidence on
those T-shirts?

    A.   Was I paid for someone to use these?

    Q.   Yes.

    A.   Yes.

    Q.   Let's read from page 65, lines 2 through 4.

         THE COURT:  Go ahead.

         MR. VAUGHN:

```
 1                "Question:  Were you ever paid

 2           for anybody to use those prior

 3           designs?

 4                "Answer:  No.

 5   BY MR. VAUGHN:

 6      Q.   Now, is there a restructuring deal that has

 7   been in play the last year or so for who owns this

 8   artwork?

 9      A.   I'm not sure.

10      Q.   It's page 65, lines 9 through 12.

11                "Question:  Is there any sort of

12           deal in place for investment into or

13           sale of the business of Class War or

14           Lurking Class as far as you know?

15                "Answer:  No, not that I know

16           of."

17           MR. VAUGHN:  That's all I have, Your Honor.

18           THE COURT:  Thank you.  Back to you?

19           MR. TURRILL:  Very briefly, Your Honor.

20

21                   RECROSS-EXAMINATION

22   BY MR. TURRILL:

23      Q.   Mr. Dawber, Mr. Vaughn asked you very early on

24   today about some of the items in the expense report that

25   was -- sorry -- the damages summary that showed certain

26   expenses.

27           Do you recall that?

28      A.   Yes.
```

1    number of questions in that regard.

         2            Do you recall that?

         3       A.   Yeah.

         4       Q.   And he quoted from your deposition testimony.

         5    Do you, as you sit here today, feel like you have an

         6    understanding of the various corporate structures that

         7    now are involved with Sketchy Tank?

         8       A.   I don't really know what's going on on the

         9    day-to-day, but I have no oversight, no.

        10       Q.   And you provide art, too.  Whatever entities

        11    they are, your job is to provide the art.  Is that fair?

        12       A.   Solely art, yes.

        13       Q.   And was anything you said today to this jury

        14    meant to mislead or misquote previous testimony?

        15       A.   Never.

        16            MR. TURRILL:  I don't have any further

        17    questions, Your Honor.

        18            THE COURT:  Thank you.

        19            MR. VAUGHN:  I think just two.  Might be

        20    couple.

        21            THE COURT:  That's your promise.

        22            MR. VAUGHN:  I'll stick to it, Your Honor.

        23

        24                   REDIRECT EXAMINATION

        25    BY MR. VAUGHN:

        26       Q.   You say you found out about this royalty,

        27    kickback, commission situation through the emails?

        28       A.   Yes.

```
 1        Q.    You had full access to that email account the

 2   entire time, right?

 3        A.    Yes.

 4        Q.    And with regard to your not knowing what's

 5   going on with your business on a day-to-day basis --

 6        A.    Yes.

 7        Q.    -- as you just testified to --

 8        A.    Yes.

 9        Q.    -- why did you testify to it under oath if you

10   didn't know?

11             MR. TURRILL:    Your Honor, argumentative.

12             THE COURT:    Overruled.

13             You may answer that.

14             THE WITNESS:    I don't know how to answer that,

15   Mr. Vaughn.

16             MR. VAUGHN:    Nothing else.    See, it was two

17   questions.

18             MR. TURRILL:    Nothing further, Your Honor.

19             THE COURT:    Thank you, sir.    You can step down.

20             (Further proceedings were held but not

21             transcribed.)

22             (11:37 a.m.)

23

24

25

26

27

28
```

1                      **CERTIFICATE OF REPORTER**

2

3    **STATE OF CALIFORNIA )**
                            **)**

4    **COUNTY OF SAN DIEGO )**

5

6

7           **I, JULIE A. McKAY, CSR NO. 9059, AN OFFICIAL**

8    **REPORTER PRO TEMPORE IN THE SUPERIOR COURT OF THE STATE**

9    **OF CALIFORNIA, IN AND FOR THE COUNTY OF SAN DIEGO,**

10   **HEREBY CERTIFY THAT I REPORTED IN SHORTHAND THE RECORD**

11   **OF THE PROCEEDINGS HAD IN THE WITHIN CASE AND LATER**

12   **TRANSCRIBED SAID RECORD AND THAT THE FOREGOING**

13   **TRANSCRIPT IS A FULL, TRUE, AND CORRECT TRANSCRIPTION OF**

14   **THE PROCEEDINGS IN THIS CASE.**

15           **DATED THIS 27th DAY OF OCTOBER, 2018.**

16

17

                   **JULIE A. McKAY, CSR NO. 9059**

18                 **OFFICIAL REPORTER PRO TEMPORE**

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 26

# Trial transcript of testimony of Drew Madacsi on September 20, 2018

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             COUNTY OF SAN DIEGO, NORTH COUNTY DIVISION

3          DEPARTMENT 28          HON. EARL H. MAAS III, JUDGE

4

5                                 )
   JACK SCHINDLER, an             )
6  individual,                    )
                                  )
7             Plaintiff,          )
                                  ) Case No.
8             vs.                 ) 37-2015-00026810-CU-BT-NC
                                  )
9  JESSE DAWBER, an               )
   individual, and DOES 1-50,     )
10 inclusive,                     )
                                  )
11            Defendants.         )
   _____)

12

13

14

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               THURSDAY, SEPTEMBER 20, 2018

19                 WITNESS:  DREW MADACSI

20

21

22

23

24

25

26 REPORTED BY:  JULIE A. McKAY, CSR 9059
   OFFICIAL REPORTER PRO TEMPORE
27

28

1  APPEARANCES:

2

3     FOR THE PLAINTIFF:

4          VAUGHN & VAUGHN
             BY: DONALD A. VAUGHN, ESQ.
5               EVAN J. TOPOL, ESQ.
             501 West Broadway, Suite 1770
6            San Diego, California  92101
             (619) 237-1717
7            dav@vv-law.com

8

9     FOR THE DEFENDANTS:

10         HOGAN LOVELLS US LLP
             BY:  MICHAEL L. TURRILL, ESQ.
11              GABRIEL R. ULMAN, ESQ.
             1999 Avenue of the Stars, Suite 1400
12           Los Angeles, California  90067
             (310) 785-4600
13           michael.turrill@hoganlovells.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

```
 1              CHRONOLOGICAL INDEX OF WITNESSES

 2                    SEPTEMBER 20, 2018

 3                                      Page    Line    Vol
       WITNESS:
 4
       DREW MADACSI
 5
 6     DIRECT BY MR. VAUGHN  . . . . . . . . . . 6      21       1

 7     CROSS BY MR. TURRILL  . . . . . . . . . .36       8       1

 8     REDIRECT BY MR. VAUGHN  . . . . . . . . .38      17       1

 9     RECROSS BY MR. TURRILL  . . . . . . . . .40       3       1

10     REDIRECT BY MR. VAUGHN  . . . . . . . . .40      18       1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
1              THURSDAY, SEPTEMBER 20, 2018, 9:03 A.M.

2                      VISTA, CALIFORNIA

3          DEPARTMENT 28    HON. EARL H. MAAS III, JUDGE

4

5              (Prior proceedings were held but not

6              transcribed.)

7              (9:26 a.m.)

8

9                          DREW MADACSI,

10      having been first duly sworn, testified as follows:

11

12             THE CLERK:  Thank you.  Please have a seat.

13    Please state your full name and spell your last name for

14    the record.

15             THE WITNESS:  Drew Madacsi, M-a-d-a-c-s-i.

16             THE COURT:  Good morning.

17             THE WITNESS:  Morning.  How are you?

18             THE COURT:  Good, thank you.

19

20                      DIRECT EXAMINATION

21    BY MR. VAUGHN:

22      Q.    Good morning, Mr. Madacsi.

23      A.    Good day, Mr. Vaughn.

24      Q.    You are not a U.S. citizen, correct?

25      A.    That's correct.

26      Q.    You're a citizen of the country of Australia?

27             MR. TURRILL:  Objection.  Relevance,

28    Your Honor.
```

```
 1            THE COURT:  Background.  I'll allow it.

 2   BY MR. VAUGHN:

 3       Q.   Australian citizen?

 4       A.   I am, yes.

 5       Q.   And you are the chief executive officer of

 6   Class War, correct?

 7       A.   I am, yes.

 8            MR. VAUGHN:  And let's take a look, please,

 9   Oliver -- I believe Exhibit 100 is in evidence.  Can we

10   pull up the third or fourth page, the one that has

11   Mr. Madacsi on the statement of information.  Can we

12   enlarge, please, the portion there which has those --

13   excuse me.  That's not right.  It would be page 5.  And

14   that portion -- yes, right under the bold bar there.

15   Perfect.

16   BY MR. VAUGHN:

17       Q.   Now, Mr. Madacsi, that shows you as the chief

18   executive officer of Class War, a California

19   corporation, correct?

20       A.   It does.

21       Q.   You don't live in the U.S. either, correct?

22       A.   No, I don't.

23       Q.   You come to the United States for about three

24   or four days a month to do any work that you do on Class

25   War, correct?

26       A.   That's correct.

27       Q.   All right, sir.  Now, Jeslyn Leong is the

28   secretary and chief financial officer, correct?
```

```
 1        A.    That's correct.

 2        Q.    Do you know her?

 3        A.    I do.

 4        Q.    And how do you know her?

 5        A.    We've had various business dealings.  She's the

 6   CFO of a company that I'm doing restructuring work in

 7   Singapore.

 8        Q.    What company is that?

 9        A.    MMP Resources.

10        Q.    I see.  Do you know the company STFU Global

11   PTE?

12        A.    I do.

13        Q.    What does that company do?

14        A.    It's an agency and distribution company.

15        Q.    Now, you are the nonexecutive chairman of this

16   MMP Resources in Singapore, correct?

17        A.    That's correct.

18        Q.    And Jeslyn Leong is the shareholder, sole

19   shareholder of this STFU company, correct?

20        A.    That's correct.

21        Q.    And, in fact, the office of STFU is in the same

22   suite, same building in Singapore as MMP Resources,

23   right?

24        A.    That's correct, yes.

25        Q.    Is Ms. Leong a U.S. citizen?

26              MR. TURRILL:  Objection, Your Honor.

27   Relevance.

28              THE COURT:  Overruled.
```

```
 1              THE WITNESS:  No, she's not.

 2   BY MR. VAUGHN:

 3       Q.   So on -- I think this is in December of 2017,

 4   we have a CEO, secretary and chief financial officer who

 5   are not U.S. citizens, yet they hold those officerships

 6   in a California corporation, correct?

 7              MR. TURRILL:  Your Honor, relevance.

 8              THE COURT:  I'm inclined to sustain that.  It's

 9   not relevant to the dispute.

10   BY MR. VAUGHN:

11       Q.   Mr. Madacsi --

12       A.   I'm happy to answer it.  Yes.

13       Q.   Why do we have --

14              THE COURT:  Well, then there's that.

15              MR. VAUGHN:  I missed something, Your Honor.

16   BY MR. VAUGHN:

17       Q.   Mr. Madacsi, what caused you and Ms. Leong to

18   take over being officers of Class War in 2017?

19       A.   One was contractual and one was my role in the

20   company.

21       Q.   What role is that?

22       A.   As the CEO.

23       Q.   You have other jobs you do at the same time

24   outside the country, correct?

25       A.   That's correct.

26       Q.   Does Ms. Leong work regularly in the USA?

27       A.   No, she doesn't.

28       Q.   Prior to you and Ms. Leong becoming the
```

1    officers of Class War, Mr. Dawber was the sole officer

        2    and director, correct?

        3        A.    Correct.

        4        Q.    Now, let's take a look, please -- actually, let

        5    me get a little background on you, sir.

        6              You have a high school education from

        7    Australia, correct?

        8        A.    I do unfortunately, yes.

        9        Q.    No postgraduate education, right?

       10        A.    No.

       11        Q.    Prior to the time I took your deposition as a

       12    person most knowledgeable, you had been deposed 23

       13    times, correct?

       14        A.    Twenty-four now, yes.

       15        Q.    Twenty-four.  You have worked in various

       16    positions over your adult life, correct?

       17        A.    I have, yes.

       18        Q.    And your testimony is that there has never been

       19    a business known as Sketchy Tank, correct?

       20        A.    To my knowledge, yes, that is correct.

       21        Q.    And you're unsure if there's a brand called

       22    Lurking Class, correct?

       23        A.    Yes, I'm unsure.

       24        Q.    And there was never a brand known as Sketchy

       25    Tank, correct?

       26        A.    Not in a corporate sense, no.

       27        Q.    There was never a brand known as Sketchy Tank,

       28    right?

1    A.   I've just answered that question, Mr. Vaughn.

          2    Q.   You said -- you kind of qualified it, not in a

          3    corporate sense.   There was never a brand known as

          4    Sketchy Tank in any sense, right?

          5    A.   I've just answered that, Mr. Vaughn.   Not

          6    corporately, no, it's not.

          7    Q.   In any sense, right?

          8    A.   I'm not going to answer that, Mr. Vaughn.   I've

          9    answered the question.   I can't say in any sense because

         10    if it's a personal brand and someone appears for it to

         11    be a brand, then it can be a brand.   But in a corporate

         12    sense I'm unaware of anything that trades as Sketchy

         13    Tank corporation.

         14         MR. VAUGHN:   I would like to read from

         15    Mr. Madacsi's deposition as PMK here July 26, 2018.

         16    It's page 48.

         17         THE COURT:   Slow down.

         18         MR. VAUGHN:   Lines 22 through 24.

         19         MR. TURRILL:   I don't have it up, Your Honor,

         20    but if it's from his deposition and it's two lines,

         21    that's fine.

         22         MR. VAUGHN:   I think it's three, but close

         23    enough.

         24              "Question:   Was there ever a

         25              brand known as Sketchy Tank?

         26              "Answer:   No."

         27    BY MR. VAUGHN:

         28    Q.   Now, you're unsure whether there was a decision

1    ever made to change branding from Sketchy Tank to

2    Lurking Class, correct?

3        A.    Correct.

4        Q.    You don't know if the phrase Sketchy Tank has

5    ever been applied for with the United States Patent

6    Trademark Office, correct?

7        A.    That's correct.

8        Q.    You're unsure if Sketchy Tank as a phrase is

9    currently the subject of an issued trademark, correct?

10        A.    That's correct.

11        Q.    And there was never a business known as Sketchy

12    Tank either, right?

13        A.    That's correct.

14        Q.    Now, let's take a look, please, at what we're

15    going to mark as Exhibit 644.

16        MR. VAUGHN:    These are the documents that we

17    got yesterday.    I have copies for the Court here.    644

18    is going to be the first one right here.    I may as well

19    go with 645 as well.    645 is the later one in time.

20        Your Honor, I would like to offer 644 into

21    evidence.    Basically, the foundation is these are the

22    documents that we received yesterday morning.

23        MR. TURRILL:    Your Honor, lacks foundation.

24        THE COURT:    Lay a foundation.

25    BY MR. VAUGHN:

26        Q.    Mr. Madacsi, look at Exhibit 644, please.    Do

27    you know what it is?

28        A.    No.

```
1                THE COURT:  Here you go, sir.

2                THE WITNESS:  Thank you very much.

3                MR. VAUGHN:  Mr. Madacsi, I miscommunicated.

4                THE COURT:  I gave him one, Counsel.

5                THE WITNESS:  Thank you.  We can share.

6   BY MR. VAUGHN:

7        Q.   Do you recognize this agreement?

8        A.   Let me have a look.  Yes, I do.

9        Q.   You signed it, correct?

10       A.   I did, yes.

11       Q.   On behalf of Class War?

12       A.   I did.

13       Q.   Ms. Leong signed it on behalf of -- can I just

14  call it STFU?

15       A.   Yes, you can.

16       Q.   By the way, what does STFU stand for?

17       A.   I would rather not say it in court.

18       Q.   Shut the F up?

19       A.   It does, yes.

20       Q.   Who created that name?

21       A.   Mr. Dawber did.

22               MR. VAUGHN:  Now, I would offer this agreement

23  now into evidence, Your Honor?

24               MR. TURRILL:  No objection, Your Honor.

25               THE COURT:  Received.

26               (Exhibit No. 644 was received in

27               evidence.)

28
```

1 BY MR. VAUGHN:

2     Q.    Mr. Madacsi, you came in as CEO and sole

3 director of Class War in May and June of 2017, correct?

4     A.    That's correct.

5     Q.    And this agreement was entered into when?

6     A.    On the 5th of June.

7     Q.    So right after you came in?

8     A.    Correct.

9     Q.    This agreement, sir, is intended to license the

10 use of designs created by Mr. Dawber from STFU in

11 Singapore to Class War in California, correct?

12     A.    That's correct.

13     Q.    Now, those same designs had been utilized by

14 Class War before this agreement to print on T-shirts and

15 sell them in the U.S. and elsewhere, correct?

16     A.    That's not correct.

17     Q.    The T-shirts that are to your left there are in

18 evidence.  They're 115 through 121.  We just picked some

19 examples.  Wolves Don't Lose Sleep Over the Opinions of

20 Sheep.  Those were previously sold by Class War before

21 this agreement was entered into, right?

22     A.    That's correct.

23     Q.    So previously Class War sold T-shirts with the

24 art on it that was later licensed back to Class War from

25 STFU, correct?

26     A.    No, that's not correct.

27     Q.    The purpose of this agreement, the one that

28 we're looking at here, 644 in evidence, was to create a

14

```
 1   license, a right to use -- for Class War to use

 2   intellectual property designs that were owned by STFU,

 3   correct?

 4       A.   That's correct.

 5            MR. VAUGHN:  Let's put it up on the screen if

 6   we can, Oliver.  Let's look at the first page, please.

 7   Actually, it's the second page of the exhibit, first one

 8   with information on it.  Let's enlarge that top

 9   paragraph, "This creative agreement."

10   BY MR. VAUGHN:

11       Q.   Was it, in fact, the case that this agreement

12   was entered on or about June 5 of 2017?

13       A.   That's correct.

14       Q.   And the creative partner here is shown as being

15   this STFU company, right?

16       A.   That's correct.

17       Q.   Now, do you have any affiliation with STFU?

18       A.   No.

19       Q.   But on the date this was signed you signed it

20   for Class War, correct?

21       A.   That's correct.

22       Q.   And Ms. Leong signed it for STFU, correct?

23       A.   That's correct.

24       Q.   And at that time both of you were the officers

25   of Class War, correct?

26       A.   No.  That's incorrect.

27       Q.   When did Ms. Leong come onboard?

28       A.   Later in 2017.
```

15

```
1      Q.   And when was STFU created?

2      A.   I don't know, but I would say it would have

3  been May in 2017.

4      Q.   About the time that you came onto Class War,

5  correct?

6      A.   Correct.

7      Q.   Now, what designs were meant to be included in

8  this agreement?

9      A.   New design and artwork.

10     Q.   Made by who?

11     A.   From Jesse Dawber.

12     Q.   For use how?

13     A.   To be licensed internationally.

14     Q.   To be printed on apparel and sold, correct?

15     A.   Correct.

16     Q.   Now, this agreement --

17          MR. VAUGHN:  Let's look at the attachments,

18  please.  Let's look at Exhibit A if we could.  It's the

19  third to last page.  Let's enlarge that.

20  BY MR. VAUGHN:

21     Q.   "Licensed content is as selected and mutually

22  approved as the creative partner's artistic archives,

23  but will not exceed 15 new art pieces per calendar

24  season."

25          Do the creative partner's artistic archives

26  include the designs, for instance, Wolves Don't Lose

27  Sleep Over the Opinions of Sheep, Pie Till I Die, Good

28  Times Bad Friends, or any of those?
```

16

299

1        A.    No, they don't.

2        Q.    So the subject, though, of this agreement was

3    Mr. Dawber's art, correct?

4        A.    Future art, yes, that's correct.

5        Q.    Now turn to the next page, please.  That's

6    Exhibit B.  It's the very next one.

7             The territory was meant to be USA and Canada,

8    correct?

9        A.    Yes, that's correct.

10        Q.    So Class War got the right to use Mr. Dawber's

11    art only in the USA and Canada, correct?

12        A.    That's correct.

13        Q.    And then let's look at Exhibit C, please.  It's

14    the last page.  The consideration payment for the

15    license that's reflected in this agreement is there on

16    Exhibit C, correct?

17        A.    That's correct.

18        Q.    And the amount that Class War pays to STFU in

19    Singapore is 50 percent of the wholesale profit of

20    products sold bearing the creative content, correct?

21        A.    Yes, correct.

22        Q.    And the last sentence there tells us that -- if

23    there was any doubt, it's an example -- if a T-shirt is

24    sold for $12 to a wholesale account, the cost of goods

25    being $6, the payable royalty would account for $3,

26    correct?

27        A.    That's correct.

28        Q.    Now, do you understand the terms of the

partnership agreement between Mr. Schindler and

Mr. Dawber?

     A.   I saw it briefly before I had brought on

counsel, so last year, yeah.

     Q.   That's the same share that a partner in that

Sketchy Tank partnership would be entitled to, correct?

          MR. TURRILL:  Objection, Your Honor.

Mischaracterizes the evidence.

          THE COURT:  Overruled.  If he knows.

          THE WITNESS:  I'm not sure.

BY MR. VAUGHN:

     Q.   Fair enough.  Now, let's look at the next

agreement, please, and that would be 645.

     A.   Excuse me, Mr. Vaughn.  Are you going to keep

putting them up on the screen.

     Q.   I think so.  I have a copy of 645 here.

          THE COURT:  Do you want him to lay a

foundation?

          MR. TURRILL:  Probably.

          MR. VAUGHN:  I won't put it up until I do that.

          THE COURT:  Yeah, you can't put it up on the

screen until after it's in evidence.

BY MR. VAUGHN:

     Q.   Mr. Madacsi, take a look at 645, please?

          MR. TURRILL:  We don't have a copy either.

          MR. VAUGHN:  Would you give him one, please.

We got these yesterday, so pardon me for not being more

organized.

BY MR. VAUGHN:

     Q.   Do you recognize that document, sir?

     A.   No, I don't.

     Q.   How did STFU, if you know, get the right to
license the creative content back to Class War?

     A.   Could you just give me one minute just to --

     Q.   Sure.

     A.   Okay.

     Q.   Do you need the question repeated?

     A.   What's that?

     Q.   Did you need the question repeated, sir?

     A.   Yes, please.

     Q.   How did STFU get the creative content that it
licensed back to Class War?

     A.   By this contract, by the looks of it, from
Mr. Dawber or his artist alias Sketchy Tank.

     Q.   So you signed on behalf of Class War, as we saw
on June 5 of 2017, on the license back to Class War,
correct?

     A.   That's correct.

     Q.   And your understanding of -- first, maybe we
should get it into evidence.  You can't authenticate
this, Exhibit 645?

     A.   I can't.  I haven't seen this.  This is between
STFU and Mr. Dawber.

     Q.   Do you recognize Mr. Dawber's signature?  I'm
sorry.  It isn't on there, is it?

     A.   No.

```
 1      Q.   Do you recognize Ms. Leong's signature?

 2      A.   I do.

 3      Q.   And that is her signature right there, correct?

 4      A.   It is, yes.

 5      Q.   Now, when you signed the license, Exhibit 644,

 6  from STFU back to Class War for this creative content --

 7      A.   Correct.

 8      Q.   -- did you know how STFU ever got the right to

 9  license that content back?

10      A.   I knew that Ms. Leong and Mr. Dawber were in

11  contact about forming an international licensure.

12      Q.   And this Exhibit 645 is, in fact, the document

13  that implemented that, correct?

14      A.   I assume.  It looks like that way, yes.

15           MR. VAUGHN:  Offer it into evidence,

16  Your Honor.

17           MR. TURRILL:  No objection, Your Honor.

18           THE COURT:  Received.

19           (Exhibit No. 645 was received in

20           evidence.)

21           MR. VAUGHN:  So let's now take a look at 645,

22  the first page -- second page of the document.  Let's

23  blow up that date there.

24  BY MR. VAUGHN:

25      Q.   Mr. Madacsi, if the license that you signed for

26  Class War was entered into on June 5, how is it that

27  this agreement where STFU got the right to license that

28  back is June 30, after the fact?
```

1      A.    It's pretty simple, Mr. Vaughn.  That's

          2   obviously when they finalized their internal

          3   relationship.  So these contracts are not the same.

          4      Q.    Oh, I know.  We'll look at that.

          5      A.    Okay.  Cool.

          6      Q.    Now, let's look at Exhibit A to 645 in

          7   evidence.

          8          MR. VAUGHN:  Third-to-the-last page, Oliver.

          9   Blow that up.

         10   BY MR. VAUGHN:

         11      Q.    So that's what the creative content is that

         12   Mr. Dawber is licensing to STFU in Singapore, correct?

         13      A.    Correct.

         14      Q.    Just to pick up one thing real quick.

         15   Mr. Dawber is the sole shareholder of Class War,

         16   correct?

         17      A.    He is.  Correct.

         18      Q.    So he's the one who appointed you as CEO?

         19      A.    No, he didn't.

         20      Q.    Who appointed you as CEO?

         21      A.    Matt Roberts.

         22      Q.    Is Matt Roberts a shareholder of Class War?

         23      A.    No.

         24      Q.    Was Matt Roberts an officer of Class War ever?

         25      A.    He was.  He was a senior executive.

         26      Q.    I didn't see him on any statement of

         27   information.  Do you have information that Mr. Roberts

         28   was somehow an officer of Class War?

1    A.    I believed he was, yeah.

    2    Q.    So it's Mr. Roberts that hired you as CEO of

    3   Class War, not Mr. Dawber?

    4    A.    As I said in my deposition, yes.

    5    Q.    Was there a resolution that you ever saw where

    6   Mr. Roberts did that?

    7    A.    Not that I know of.

    8    Q.    Let's talk about that for a minute.  Are there

    9   corporate meetings of Class War?

   10    A.    Yes, there is.

   11    Q.    And how often?

   12    A.    We have them now half yearly and yearly.

   13    Q.    When you say "we have them now," have there

   14   been regular meetings of Class War among the officers

   15   since you took over as CEO in May --

   16    A.    Yes, there has been.

   17    Q.    Please wait until I finish.

   18          Have there been regular meetings of

   19   shareholders or officers of Class War since you took

   20   over as CEO in May or June of 2017?

   21    A.    Yes, there has.

   22    Q.    And are there minutes for those meetings?

   23    A.    Yes, there are.

   24    Q.    How many?

   25    A.    One.

   26    Q.    When was the first meeting?

   27    A.    First meeting was in April of this year.

   28    Q.    April of 2018?

1    A.  Correct.

           2    Q.  So 11 months or so after you took over?

           3    A.  Correct.

           4    Q.  And there have been meetings of the shareholder

           5   of Class War?

           6    A.  Yes, one.

           7    Q.  And that was also April of 2018?

           8    A.  Same meeting.

           9    Q.  Were resolutions entered into at that time?

          10    A.  There were no need for resolutions at that

          11   time.

          12    Q.  Were resolutions entered into at that time?

          13    A.  No.

          14    Q.  All right.  Now, Mr. Dawber, as you understood

          15   it, owned all the creative content that's the subject of

          16   this agreement, 645, correct?

          17    A.  I'm not sure who owns the content.

          18        MR. VAUGHN:  Let's look again back at the

          19   second page of the agreement, if we could, please,

          20   Oliver, that first paragraph.  Let's enlarge it.

          21   BY MR. VAUGHN:

          22    Q.  This agreement is between Mr. Dawber and STFU,

          23   correct?

          24    A.  That's correct.  That paragraph is, yes.

          25        MR. VAUGHN:  And let's look at the next page,

          26   please, Oliver.  It's page 3 of 10.  And down under

          27   paragraph 5.1, please enlarge that, under intellectual

          28   property ownership rights.  Enlarge that paragraph.

1    Super.

2    BY MR. VAUGHN:

3        Q.    You understood that the creative partner has

4    sole and exclusive ownership of all right, title and

5    interest in the creative content, right?

6        A.    I do now, yes.

7        Q.    And Mr. Dawber was the creative partner, right?

8        A.    Yes.  In this contract he is, yes.

9        Q.    So he was the one who owned the designs that

10   were licensed down to STFU, correct?

11       A.    In this contract, correct.

12       Q.    And he's also the sole shareholder of Class

13   War, correct?

14       A.    Correct.

15       Q.    And so the same content that he owned was

16   licensed to the Singapore company STFU and then licensed

17   back to the company where he's the sole shareholder,

18   correct?

19       A.    Incorrect.

20       Q.    This document Exhibit 645 --

21       A.    Yes.

22       Q.    -- reflects a license from Mr. Dawber to STFU

23   in Singapore, right?

24       A.    Correct.

25       Q.    And let's look at, again, the exhibits here.

26   Let's look now at Exhibit B, Territory.  It's the

27   second-to-last page.

28            The territory of this license is global,

1   correct?

          2        A.   Correct.

          3        Q.   Does STFU license Mr. Dawber's designs to

          4   people or entities other than Class War for territories

          5   other than the U.S. and Canada?

          6        A.   Yes, I believe they do.

          7        Q.   And is the money from that license accounted

          8   for on the Class War profit and loss statement?

          9        A.   No.

         10        Q.   Because Class War isn't making those profits,

         11   right?

         12        A.   That's correct.

         13        Q.   So we don't have here all of the financials

         14   reflecting sales of products with Mr. Dawber's art on

         15   them around the globe, right?

         16        A.   Correct.  Yeah.

         17        Q.   Where else is apparel with Mr. Dawber's art on

         18   it sold other than the U.S. and Canada?

         19        A.   Japan.

         20        Q.   And you have a presence in Japan as well,

         21   correct?

         22        A.   Yes, I do.

         23        Q.   And it's sold in Japan through Charlie Trading

         24   Company, correct?

         25        A.   That's correct.

         26        Q.   How much apparel with Mr. Dawber's art on it

         27   has been sold in Japan?

         28        A.   No idea.

```
 1       Q.   You have no idea?

 2       A.   Absolutely no idea.

 3       Q.   Ms. Leong would know?

 4       A.   She would definitely know.

 5       Q.   She's the sole shareholder of STFU, correct?

 6       A.   That's correct.

 7       Q.   Have you seen the sticker that Mr. Dawber

 8  created that says STFU?

 9       A.   No, I haven't, but that's a common phrase.

10       Q.   Pardon me?

11       A.   No, I haven't, but it's a common phrase.

12       Q.   Did you have any discussion with Mr. Dawber

13  about his creating a sticker with STFU on it, which is

14  the same name as on the Singapore company?

15       A.   No.

16       Q.   So where else is apparel with Mr. Dawber's art

17  on it sold besides the U.S. and Canada through Class War

18  and Japan through Charlie Trading Company?

19       A.   I have no idea, Mr. Vaughn.

20       Q.   You don't know if it's sold in Australia?

21       A.   No idea.

22       Q.   You don't know if it's sold in Brazil?

23       A.   No idea.

24       Q.   You don't know if it's sold in Europe?

25       A.   No idea.

26       Q.   In any event, sales if they existed in those

27  countries would not be on the Class War financials

28  right?
```

1     A.   That's correct.

2     Q.   Because Class War wouldn't be the one that was

3  selling that material, right?

4     A.   That's correct.

5     Q.   Do you have any idea how much apparel with

6  Mr. Dawber's art on it is sold anywhere outside the U.S.

7  and Canada?

8     A.   No idea.

9     Q.   Were you present at the Japan launch party when

10  Mr. Dawber flew down there?

11     A.   No.

12     Q.   You're aware that such a thing occurred, right?

13     A.   I'm aware, yes.

14     Q.   What was the purpose of that launch party as

15  you understood it as CEO of Class War?

16          MR. TURRILL:  Objection.  Relevance,

17  Your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  A launch party in Japan.

20  BY MR. VAUGHN:

21     Q.   To generate interest in selling apparel with

22  Mr. Dawber's art on it in Japan, right?

23     A.   Correct.

24     Q.   All right.

25          MR. VAUGHN:  Now, let's take a look at

26  Exhibit C, the last page of Exhibit 645.  Let's enlarge

27  that, please.

28

1  BY MR. VAUGHN:

2    Q.  The amount that Mr. Dawber is paid for this

3  license to STFU down in Singapore is 39,000 a month,

4  correct?

5    A.  Correct.

6    Q.  It's not 18- or 19,000 a month, is it?

7    A.  No.  It says 39,000.

8    Q.  All right.

9    MR. VAUGHN:  Now, let's take a look, please, at

10  Exhibit 639.

11    I'm sorry, Your Honor, we don't have that in

12  the book because it's too large, but I believe counsel

13  has it.  It's the general ledger, one of the general

14  ledgers.

15    MR. TURRILL:  I don't know --

16    MR. VAUGHN:  You know what, let me handle it

17  this way.

18  BY MR. VAUGHN:

19    Q.  You have an interest in or had an interest in a

20  business known as The House of Machines, correct?

21    A.  I did.

22    MR. TURRILL:  Objection, Your Honor.

23  Relevance.

24    THE WITNESS:  Correct.

25    THE COURT:  I don't know yet, but I'll give it

26  a little bit of room.

27    MR. VAUGHN:  Thanks, Your Honor.

28    THE WITNESS:  Sure.

MR. VAUGHN:  I think it will become clear with
 1

 2  the next question.

 3  BY MR. VAUGHN:

 4      Q.   Has Class War made loans to The House of

 5  Machines?

 6      A.   It has, correct.

 7      Q.   About a quarter million dollars, right?

 8      A.   Incorrect.

 9      Q.   How much?

10      A.   $90,000.

11      Q.   And that loan has not been repaid?

12      A.   It's due to be repaid.

13      Q.   Due to be?

14      A.   Yes.

15      Q.   But not yet?

16      A.   Not yet.  That's correct.

17      Q.   Was there only one loan?

18      A.   There were three installments of 30,000 each,

19  correct.

20      Q.   Is there a promissory note for that?

21      A.   There is.

22      Q.   Where is it?

23      A.   I don't have it.

24      Q.   What are the terms of that promissory note?

25      A.   It had to be paid before the end of October.

26      Q.   Is there any security for that borrowing?

27      A.   Yes.

28      Q.   What's the security?

1     A.   Myself.

2     Q.   I mean real property security, some kind of

3   financial security instrument, anything that would

4   secure the right to make sure that the borrowing party

5   pays it back beyond your say-so.  Does such a document

6   exist?

7     A.   Yes, it does.

8     Q.   What is it?

9     A.   There's a document with Class War to myself on

10  fees due to be paid to me that have not been drawn down

11  by Class War that offsets the amount borrowed.  So Class

12  War owes me a set of consulting fees that haven't been

13  drawn from Class War.  Those fees are offset against the

14  borrowings of The House of Machines.

15    Q.   Consulting fees?

16    A.   That's correct.

17    Q.   For what?

18    A.   Being the CEO.

19    Q.   And how much is owed?

20    A.   About $240,000.

21    Q.   And how much are your consulting fees on an

22  annual basis?

23    A.   Twenty-four and a half thousand dollars a month

24  in year one.  Moves to 34,000 in year two and moves to

25  41,000 in year three.

26    Q.   I see.  And do you know the terms of

27  Ms. Leong's compensation for serving as secretary and

28  chief financial officer of Class War?

```
 1      A.   Zero.

 2      Q.   She's serving for free?

 3      A.   She is.

 4      Q.   At the same time as she is the sole shareholder

 5 of STFU?

 6      A.   Correct.

 7      Q.   Now, there's also loans -- strike that.

 8      A.   Sure.

 9      Q.   Did you approve the loan from Class War to

10 House of Machines?

11      A.   I did, yes.

12      Q.   Did you have an interest in House of Machines

13 at the time?

14      A.   No.

15      Q.   Do you know who created this Exhibit 644, the

16 first agreement we looked at with the Singapore company

17 STFU?

18      A.   I'm not sure.

19      Q.   Do you know who created Exhibit 645, the

20 license back -- pardon me -- the license from Mr. Dawber

21 down to STFU?

22      A.   I'm not sure.  I would imagine Ms. Leong.

23      Q.   Pardon?

24      A.   I would imagine Ms. Leong.

25      Q.   Do you know if Mr. Dawber had separate counsel

26 when he entered into Exhibit 645?

27           MR. TURRILL:  Objection.  Relevance.  Lacks

28 foundation.
```

```
 1              THE WITNESS:  No idea.

 2              THE COURT:  I think the answer confirms that

 3    there's no foundation.

 4              Go ahead.

 5              MR. VAUGHN:  Thank you, Your Honor.

 6    BY MR. VAUGHN:

 7         Q.   Mr. Madacsi, there's other loans from Class War

 8    to businesses you're affiliated with, right?

 9         A.   I'm not aware of any other ones, no.

10         Q.   Lighthouse Strategic Group?

11         A.   That's the consulting company.

12         Q.   That's the company that is paid for your

13    consulting fees?

14         A.   That's correct.

15         Q.   Why is it shown as a loan, if you know, on the

16    general ledger of Class War?

17         A.   I have no idea.

18         Q.   Was there any purchase of automobiles on your

19    behalf with the money of Class War?

20         A.   There was an advance from my -- money

21    outstanding to me, correct.

22         Q.   And you bought what kind of car?

23              MR. TURRILL:  Objection, Your Honor.

24    Relevance.

25              THE COURT:  Sustained on the car.

26    BY MR. VAUGHN:

27         Q.   Are there any other financial transactions

28    between Class War and the company that you are
```

1   affiliated with?

2       A.   Other than Lighthouse that you've mentioned

3   now, no.

4       Q.   And House of Machines?

5       A.   And House of Machines.

6       Q.   Now, are there any loans from Class War to

7   STFU?

8       A.   I'm not sure.

9       Q.   You're the chief executive officer of Class

10  War, correct?

11      A.   Correct.

12      Q.   If there had been such a loan, would you have

13  approved it?

14      A.   I would have, yes, if it was a loan.

15      Q.   Do you remember any such loan?

16      A.   No.  I only know of offsets, commission

17  offsets.

18      Q.   Commission offsets owed from Class War to STFU?

19      A.   That's correct.

20      Q.   For use of Mr. Dawber's art?

21      A.   Correct.

22      Q.   The company that he's the sole owner of?

23      A.   Correct.

24      Q.   Is paid to use his art?

25      A.   Correct.

26      Q.   Understood.  Now, has Class War paid to obtain

27  intellectual property protection for any intellectual

28  property in the U.S.?

```
 1      A.   It has.

 2      Q.   And it's paid to obtain intellectual property

 3  protection for what items?

 4      A.   For certain trademarks.

 5      Q.   What trademarks?

 6      A.   The name Class War, certain.  The name Sketchy

 7  Tank.  It doesn't have -- about two or three other

 8  trademarks.

 9      Q.   Owned by who?

10      A.   Class War.

11      Q.   Has Class War paid to obtain any trademarks for

12  STFU?

13      A.   No.

14      Q.   Who's Tara Pelan?

15      A.   She's our trademark lawyer.

16      Q.   Have you hired her?

17      A.   No.  She was already employed when I came in.

18      Q.   Do you know if she works for STFU?

19           MR. TURRILL:  Objection, Your Honor.  May call

20  for privileged information.

21           MR. VAUGHN:  I'm asking --

22           THE COURT:  Well, that's just if he knows if

23  she's ever done work with the content.

24           THE WITNESS:  I have no idea.

25  BY MR. VAUGHN:

26      Q.   All right, sir.  Have you ever reviewed the

27  financials of Class War?

28      A.   I have.
```

1      Q.   And it's true that the bottom line profit is
2  reduced by a royalty that's paid to STFU, correct?

3      A.   Partially, yes.

4      Q.   And how much in royalties did Class War pay to
5  STFU for using the art of Jesse Dawber, its sole
6  shareholder, in 2017?

7      A.   In 2017 I would say just over a million
8  dollars.

9      Q.   And how much has Class War paid STFU to use the
10 art of Class War's sole shareholder Jesse Dawber in 2018
11 so far?

12     A.   Sorry.  Ask the question again.

13     Q.   Yes, sir.  How much has Class War, the company
14 where you're still CEO --

15     A.   Correct.

16     Q.   -- paid to STFU down in Singapore for using the
17 art of Jesse Dawber, Class War's sole shareholder?

18     A.   I would say it would be over a million dollars
19 so far.

20     Q.   It's about a million three, correct?

21     A.   Okay.  Correct.

22     Q.   And that's through August of 2018?

23     A.   That would sound about right, yes.

24     Q.   So that's about two-thirds of the year?

25     A.   That's correct.

26     Q.   So if it's a million three, we would add about
27 another $650,000 to that to complete 2018?

28     A.   You could approximate that, yes.

1     Q.   That takes us to close to $2 million, correct?

2     A.   Correct.

3          MR. VAUGHN:  Nothing else, Your Honor.

4          THE COURT:  Do you wish to examine?

5          MR. TURRILL:  Yes, briefly.

6

7                    CROSS-EXAMINATION

8     BY MR. TURRILL:

9     Q.   Good morning, Mr. Madacsi.

10    A.   Mr. Turrill.

11    Q.   Just a couple of follow-up questions.  You

12    mentioned -- Mr. Vaughn was asking you whether there was

13    a Sketchy Tank brand and you said you're not aware of a

14    corporate brand and I believe you mentioned something

15    about a personal brand.  Can you just explain what you

16    meant by "personal brand"?

17    A.   Yes.  So generally brands, there's varying

18    degrees of brands.  So there's a difference between a

19    corporate entity, which is a corporate brand registered

20    to be an operating corporate brand, like Nike, for

21    example, or subsidiary Adidas, and personal brands that

22    can be Michael Phelps calling himself Michael Phelps.

23    Q.   In the case of Sketchy Tank, would you consider

24    it to be a personal brand, if you will, of Jesse Dawber?

25    A.   Yes.

26         MR. VAUGHN:  Sorry, Your Honor.  That's

27    leading.

28         THE COURT:  It is, but I'll allow it.

1    BY MR. TURRILL:

2        Q.   The answer is yes?

3        A.   Yes.

4        Q.   Thank you.  Mr. Madacsi, when did you come

5    onboard as CEO at Class War, Inc.?

6        A.   In May.

7        Q.   Of?

8        A.   2017.

9        Q.   Okay.  And can you just briefly tell us why you

10   were brought in to be the CEO of Class War.

11           MR. VAUGHN:  I think, Your Honor, that may lack

12   foundation.

13           THE COURT:  His understanding.  Overruled.

14           THE WITNESS:  Yeah.  So Class War had several

15   corporate issues that were looming.  Some of them were

16   private and Mr. Dawber and Mr. Roberts didn't want to

17   have them disclosed to the current employees of the

18   company.

19           And I was asked to provide assistance to

20   Mr. Roberts to be able to help restructure the company

21   on a going forward basis on some of those positions that

22   he and Mr. Dawber were about to take.

23   BY MR. TURRILL:

24       Q.   Thank you.  Mr. Vaughn asked you on Exhibit 645

25   and Exhibit C to that exhibit --

26           MR. TURRILL:  Can we pull that up?  John, you

27   probably don't have that.

28           VIDEO TECHNICIAN:  I do.

```
 1            MR. TURRILL:  You do.

 2            THE COURT:  He does have it?

 3            MR. TURRILL:  He says he does.  He's very good.

 4   Okay.  And you can blow up that amount.

 5   BY MR. TURRILL:

 6       Q.   Mr. Madacsi, the compensation that's listed

 7   there is a total amount of $39,000 per month.  Do you

 8   know if that is the net amount that Mr. Dawber receives

 9   or is it some amount that's lower than that?

10       A.   I have no idea.

11       Q.   Okay.  Mr. Dawber would be aware of that?

12       A.   I would imagine he would be, yes.

13       Q.   Okay.

14            MR. TURRILL:  Nothing further, Your Honor.

15

16                    REDIRECT EXAMINATION

17   BY MR. VAUGHN:

18       Q.   Mr. Madacsi, how much was Mr. Dawber making off

19   of Class War selling his apparel before this agreement

20   was entered into with the Singapore company?

21       A.   I believe about 14,000 a month.

22       Q.   When Mr. Dawber testified here he couldn't tell

23   us that.  Do you know why?

24       A.   No idea.

25       Q.   All right, sir.  And in these agreements that

26   we've looked at, the one that you signed as well, the

27   law of Singapore applies, correct?

28       A.   Correct.
```

```
1       Q.   And why is that?

2       A.   Because STFU is a controlling corporate party.

3       Q.   Did you enter into any negotiations to try to

4   have the law of California apply?

5       A.   I did actually, yes.

6       Q.   And you weren't able to pull that off?

7       A.   No, because Ms. Leong didn't want it done in

8   California.  She wanted to do it in Singapore.  And I

9   agreed with her.

10      Q.   So you did agree with her?

11      A.   I do agree with her reasoning behind it.

12      Q.   And the two of you, do you have offices in that

13  same suite down in Singapore?

14      A.   Yes.  She provides corporate secretarial

15  services.

16      Q.   Corporate secretarial services.

17      A.   As part of what she does, correct.

18      Q.   Now, you said you were brought in to help

19  restructure the company, correct?

20      A.   Correct.

21      Q.   Have you done that?

22      A.   I believe so successfully, yes.

23      Q.   And you did that during the time this lawsuit

24  was pending, correct?

25      A.   Correct.

26           MR. VAUGHN:  Nothing further.

27           MR. TURRILL:  Very briefly, Your Honor.

28           THE COURT:  Sure.
```

1

2                    RECROSS-EXAMINATION

3  BY MR. TURRILL:

4      Q.   Mr. Madacsi, just one more point of

5  clarification.  I apologize.

6      A.   Sure.

7      Q.   With regard to the license or the creative

8  agreement between STFU and Mr. Dawber and the artist

9  alias Sketchy Tank, Exhibit 645, are you aware of

10  whether that agreement pertains to new art by

11  Mr. Dawber?

12      A.   Yes, it does.  It clearly states when it was

13  shown before that it is new art.

14          MR. TURRILL:  That was it.  Thank you,

15  Mr. Madacsi.

16

17                    REDIRECT EXAMINATION

18  BY MR. VAUGHN:

19      Q.   Under what brand is that new art sold?

20      A.   No idea.

21      Q.   Is it sold under Lurking Class?

22      A.   No, it's not.  I've answered that in the

23  deposition.

24      Q.   Well, thanks very much.  Can you answer it here

25  today.  It's not?

26      A.   No.  It's artwork given to Class War, and Class

27  War creates its own kind of positioning in the market.

28      Q.   You're the CEO of Class War.  Under what brand

1    does Class War sell apparel with that art on it?

2        A.   It doesn't sell it under a brand.

3        Q.   What does the neck label on the apparel that

4    Class War sells with Mr. Dawber's art on it say?

5             MR. TURRILL:  Objection.  Lacks foundation,

6    Your Honor.

7             THE COURT:  Overruled.

8             THE WITNESS:  Lurking Class.

9             MR. VAUGHN:  Nothing further.

10            MR. TURRILL:  Nothing further, Your Honor.

11            THE COURT:  Thank you, sir.

12            (Further proceedings were held but not

13            transcribed.)

14            (10:09 a.m.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF REPORTER

STATE OF CALIFORNIA )
                     )
COUNTY OF SAN DIEGO )


          I, JULIE A. McKAY, CSR NO. 9059, AN OFFICIAL

REPORTER PRO TEMPORE IN THE SUPERIOR COURT OF THE STATE

OF CALIFORNIA, IN AND FOR THE COUNTY OF SAN DIEGO,

HEREBY CERTIFY THAT I REPORTED IN SHORTHAND THE RECORD

OF THE PROCEEDINGS HAD IN THE WITHIN CASE AND LATER

TRANSCRIBED SAID RECORD AND THAT THE FOREGOING

TRANSCRIPT IS A FULL, TRUE, AND CORRECT TRANSCRIPTION OF

THE PROCEEDINGS IN THIS CASE.

          DATED THIS 27th DAY OF OCTOBER, 2018.


_____
JULIE A. McKAY, CSR NO. 9059
OFFICIAL REPORTER PRO TEMPORE

# EXHIBIT 27

## E-mail Correspondence dated August 11, 2017 by Drew Madacsi
## [$20,000,000 business]

| From: | Drew Madacsi | Class War Inc. [drew@classwarinc.com] on behalf of Drew Madacsi | Class War Inc. |
|---|---|
| Sent: | Friday, August 11, 2017 6:07 PM |
| To: | Josh Hartley |
| Cc: | Brad Alband; Christian Ottobre; Ben Gustin; Mr. Bobby Cherry; Matt Roberts | Class War Inc. |
| Subject: | Re: Images for next Pre-Sale |

Agreed Hog.

Balance is an ongoing challenge but I'm really working on a strategy to kind of separate the business. I know its a little confusing to not see it in my mind when I have a clear vision, although I try and explain it the best I can but I see things in the business that over time will create us issues because I'm removed from it. Today we are starting to take from one hand to the other i.e. we've become "safe" or "retail" in my opinion, more like a traditional brand. You guys need to trust I also have a skill level, even if everyday you don't see it.

Please don't think for one moment because I want better process, want us doing a little bit more that I'm the evil corporate CEO that destroys brands. Every brand I'm involved with is against the market trend, its specialty and boutique and I deal with the man but I never sell out to him, I don't need to. Why is this relevant, it applies directly to ST. Where are the vagina's, the pot smoking, the edgy borderline gone? Don't get me wrong, the graphics today are great but there's been a lot of similar feel, repackaged sayings etc because of retail pressure. We aren't Thrasher. Therefore I want to see ST breakaway to online and event edge, and retail safe. But guys, we have one creative guy, no other illustrators, zero back up. Its impossible for Jesse to support a $20m business by himself, thinking of every idea, not one brand doing that turnover does this, if I'm wrong, tell me.

So Blacklight will have elements that get stripped down after its launch, go into other B&W, as its awesome but its completed, onto the next.

Regards,

Drew Madacsi | **CEO**
Class War, Inc.

**C (US)**: (+1) 917 940 2893 | **M (Global)**: +1 (617) 830 1844 (Calls Only)
**S**: drewmadacsi

*NOTICE: This e-mail and any attachments contain information from Class War, Inc. and are intended solely for the use of the named recipient or recipients. This e-mail may contain privileged communications, therefore are "without prejudice". Any dissemination of this e-mail by anyone other than an intended recipient is strictly prohibited. If you are not a named recipient, you are prohibited from any further viewing of the e-mail or any attachments or from making any use of the e-mail or attachments. If you believe you have received this e-mail in error, please notify the sender immediately and permanently delete the e-mail, any attachments, and all copies thereof from any drives or storage media and destroy any printouts of the e-mail or attachments. Thank you.*

On 11 Aug 2017, at 10:10 AM, Josh Hartley <hog@sketchytank.com> wrote:

Right on Drew,
I will gather some concepts and pass them over. Always good to keep the stew full of fresh ideas to pull out when we get hungry!
Could someone forward me the images Christian sent over? I didn't see those original images.

1

# EXHIBIT 28

# Articles of Organization of Lurking Class, LLC, dated September 11, 2017

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

LLC-1

2 0 1 7 2 5 4 1 0 3 7 9

**FILED**
Secretary of State
State of California

**SEP 1 1 2017**

ICC

This Space For Office Use Only

IMPORTANT — Read Instructions before completing this form.

Filing Fee  —  $70.00

Copy Fees  —  First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:*  LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to *https://www.ftb.ca.gov.*

**1.  Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

LURKING CLASS, LLC

**2.  Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 528 2nd Street | Encinitas | CA | 92024 |
| b. Initial Mailing Address of LLC, if different than item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

**3.  Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 3a and 3b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| Matt | | Roberts | | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | | State | Zip Code |
| 528 2nd Street | Encinitas | | CA | 92024 |

CORPORATION – Complete Item 3c.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| |

**4.  Management** (Select only one box)

The LLC will be managed by:
[✓] One Manager  [ ] More than One Manager  [ ] All LLC Member(s)

**5.  Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**6.**  The Information contained herein, including in any attachments, is true and correct.

Organizer sign here

Tara Pelan
Print your name here

LLC-1 (REV 04/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be

329

**Alex Padilla**
**California Secretary of State**

 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Sunday, November 11, 2018. Please refer to document **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity. Not all images are available online.

## 201725410379   LURKING CLASS, LLC

| | |
|---|---|
| **Registration Date:** | 09/11/2017 |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Type:** | DOMESTIC |
| **Status:** | ACTIVE |
| **Agent for Service of Process:** | MATT ROBERTS |
| | 528 2ND STREET |
| | ENCINITAS CA 92024 |
| **Entity Address:** | 528 2ND STREET |
| | ENCINITAS CA 92024 |
| **Entity Mailing Address:** | 528 2ND STREET |
| | ENCINITAS CA 92024 |
| **LLC Management** | One Manager |

A Statement of Information is due EVERY ODD-NUMBERED year beginning five months before and through the end of September.

| Document Type ⇅ | File Date ⬇ | PDF |
|---|---|---|
| SI-COMPLETE | 12/04/2017 | |
| REGISTRATION | 09/11/2017 | |

\* Indicates the information is not contained in the California Secretary of State's database.

**Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- If the image is not available online, for information on ordering a copy refer to **Information Requests**.
- For information on ordering certificates, status reports, certified copies of documents and copies of documents not currently available in the Business Search or to request a more extensive search for records, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Frequently Asked Questions**.

**Modify Search**       **New Search**       **Back to Search Results**

# EXHIBIT 29

# Transcript of First Meeting of Creditors

# October 30, 2018

## TRANSCRIPTION OF AUDIO FROM FIRST CREDITOR'S MEETING OCTOBER 30, 2018

Ortiz: Good afternoon, my name is David Ortiz – I am an attorney with the office of the United States Trustee assigned to the Chapter 11 Bankruptcy of Jesse Wayne Dawber – case number 18-06044-LT11. It is approximately 3:05 in the afternoon on Tuesday October 30, 2018. This is the first meeting of creditors in this case. Anyone wishing to obtain a copy of the recording need only approach me after the meeting and I will provide them with the instructions necessary to obtain that copy of the recording. The purpose of this meeting is to provide a forum for creditors and other parties in interest to ask questions of the debtor. No decisions are made here – all decision are made at the Bankruptcy Court. So with that, may I have appearances of Debtor's counsel followed by the Debtor.

Flahaut: Certainly, Douglas Flahaut from Arent Fox, LLP as Bankruptcy counsel for the debtor and debtor-in-possession in this matter, Mr. Dawber.

Ortiz: Could you spell your last name for the record?

Flahaut: Yes – Flahaut – most of those consonants do not count.

Ortiz: Okay. Mr. Dawber, state your name for the record please.

Dawber: Jesse Wayne Dawber.

Ortiz: Okay, I need to swear you in, you need to raise your right hand. Do you swear or affirm that the testimony you are about to give will be the truth the whole truth and nothing but the truth.

Dawber: I do.

Ortiz: I need to remind you that you are testifying under oath and when you testify under oath you testify subject to the penalty of perjury and the penalties of perjury are a term of imprisonment of five years or a fine of $250,000 or both. I just need you to acknowledge that you understand that?

Dawber: I understand.

Ortiz: Okay - Now there were a number of documents that were filed in the case, the Schedules and the Statement of affairs and so my first question is did you - were you the individual that provided the information to your attorneys that was used to generate the documents that were filed, those documents that were filed in the case?

Dawber: Yes.

Ortiz: Did you have an opportunity to read and review those documents before they were filed with the court?

Dawber: Yes.

1

| | |
|---|---|
| Ortiz: | And you signed those documents yourself? |
| Dawber: | I did. |
| Ortiz: | Okay and in those documents did you list all of your assets? |
| Dawber: | Yes. |
| Ortiz: | And all of your liabilities? |
| Dawber: | Yes. |
| Ortiz: | And as we sit here are you aware of any changes or any amendments that need to be filed? |
| Dawber: | No. |
| Ortiz: | Okay and so are the documents filed with the court true and accurate to the best of your information, knowledge and belief? |
| Dawber: | Yes. |
| Ortiz: | Now let the record reflect that I have verified the Debtor's identification through his California driver's license. I am returning it to him. [you can take that Sir] I don't have proof of social and as I had indicated off the record before we got started, we are going to continue this meeting and Mr. Dawber will provide proof of his social security number at the continued meeting. Um just as a question we ask all individual Debtors, are you subject to any court ordered support for child support or spousal support? |
| Dawber: | No. |
| Ortiz: | Okay. Alright. So just briefly I have a general understanding of the facts that caused this case that had to be filed and the parties are all here but just for the purposes of this record if you could explain what were the facts and circumstances that caused you to have to seek Chapter 11 protection? |
| Dawber: | I was, I had a judgment against me for $5.4 million and lawyer fees and everything, I just fold. I just want a fresh start. |
| Ortiz: | So basically it was the lawsuit that was filed that is in your schedule. |
| Dawber: | Between that and lawyer fees, yeah. |
| Ortiz: | And then in terms of an exit strategy and I understand this is sort of preliminarily to the extent you've had a conversation – do you have a sense of what you intend or want to try to accomplish in the course of emerging from bankruptcy. Is this going to be a plan that you were going to file and were you going to pay creditors from income? |

2

| Flahaut: | Maybe I should handle that at least on a preliminary basis. We've discussed the various exit strategies. I don't know if we fully settled on one, but certainly the plan is to prepare a plan and monetize the assets and get the income over time down to his creditors. So that's what we've discussed, as to the nuances of that, I think we are still working on exactly how that gets done, but... |
|---|---|
| Ortiz: | Sure and I realize we're in the beginning phases. |
| Flahaut: | A lot might have to do with what counsel for Mr. Schindler, consensual plans are easy, contested plans are hard. |
| Ortiz: | Are you going to try to get to a consensual plan? |
| Flahaut: | That would be the goal sir. |
| Ortiz: | Okay, now you've heard your attorney make some statements. Do you adopt that as your testimony? |
| Dawber: | I do, yes. |
| Ortiz: | Do you have a copy of the Schedules with you there? |
| Flahaut: | This is one copy of Docket No. 16 which is the Schedules. I believe there was an amended Schedules filed. The amendment was only to include the requisite cover sheet so the information in these Schedules that is Docket No. 16 should be the exact same as your copy which I believe is a later Docket. |
| Ortiz: | I have Document No. 19. That's the complete Schedules? |
| Flahaut: | Right. The Schedules and Statement of Financial Information, the information contained therein is the same as the amendment that was filed, I think there is a footnote there on your document saying that the amendment was filed to include the cover sheet for the Southern District. |
| Ortiz: | Okay, I'm going to work through these. I just have some questions about some of the disclosures and then I have some more detailed questions about the different businesses that are listed and how things work just so that we can make a record here to understand what the income streams are and what the assets are of the Debtor. |
| | So I guess the first question I have is on Schedule AB you have, you list your residence so if you go to Schedule AB, that's 1.1, it says your residence or your property at 468 Puebla Street in Encinitas. Do you use that as your residence? |
| Dawber: | Yes. |
| Ortiz: | And that's jointly owned with your non-filing spouse. |
| Dawber: | That is correct. |

3

Ortiz:      And you list the value of 1.150 million. How did you arrive at that value?

Dawber:     Umm

Ortiz:      Was that an appraisal?

Flahaut:    I can answer that; we went out and asked for a BPO from someone. We represent a number of trustees and so we asked for a BPO from one of the brokers that regularly works for trustees and he came up with that BPO. So we have a BPO for that amount, Zillow I believe says a bit higher, but we like BPOs when we can get them and we were able to get one here.

Ortiz:      Okay and just for the uninitiated – broker price opinion.

Flahaut:    That is correct.

Ortiz:      Okay, thank you.    And are you current on your mortgage payments on the property?

Dawber:     Yes.

Ortiz:      And that includes current with the property taxes?

Dawber:     Yeah it's included.

Ortiz:      So what is the monthly mortgage payment?

Dawber:     It is around $5,300, I believe.

Ortiz:      $5,300 and that includes the insurance and real estate taxes.

Dawber      Yes.

Ortiz:      I'll get the Schedule J, I have questions about that as well.

Flahaut:    I have been looking at Schedule J because I believe…

Ortiz:      You got a separate line item.

Flahaut:    There is a separate line item for taxes there, although I believe the insurance certainly is escrowed, I am not sure if the taxes are.

Ortiz:      Okay, well he is testifying that – guess he knows. If there is a correction that needs to be made we can correct that.

Flahaut:    Are you positive that the taxes are paid by the, by the bank, Bank of America, pay the property taxes?

Dawber:     Yes, I think it is all lumped in one thing.

Ortiz:      Okay, alright so you may need to modify your insider comp. request.

4

335

| Flahaut: | Yes if that is a separate line item that is in addition to mortgage, although when I'm doing the math, in the back of, well how much is the mortgage? How much do you owe Bank of America? |
|---|---|
| Dawber: | $880,000. |
| Flahaut: | So he could very well have taxes included at 5,000. |
| Ortiz: | Well, we can resolve that, we'll deal with that. You also further down on Item 3.2 there's the Cadillac Fleetwood 1950 and it's your non-filing spouse's separate property – I just have a couple quick questions on that. How did you arrive at the value of that one? |
| Dawber: | I think it was just an estimated value – I don't really know. |
| Ortiz: | Do you know if that's a vehicle that has been restored or unrestored? |
| Dawber: | No, it was my wife's before we got married and she had bought it off of her father and I think that was just the value that she thought it was probably worth if she were to go sell it. |
| Ortiz: | Now if we go down to Number 19 – further down – your interest in the two entities Class War, Inc. and Sketchy Tank, LLC. Here you list 100% ownership interest in Class War, Inc. Is that accurate that you are a 100% owner? |
| Dawber: | Yes. |
| Ortiz: | And have you always owned 100% of Class War, Inc.? |
| Dawber: | Yes. |
| Ortiz: | So you have never transferred shares to anyone else? |
| Dawber: | No. |
| Ortiz: | You have never transferred shares to Drew Madacsi? |
| Dawber: | No. |
| Ortiz: | And you have owned below the 100% since the formation of the company? |
| Dawber: | Yes. |
| Ortiz: | What does Class War or what did Class War do when it was formed or what was the purpose for its formation? |
| Dawber: | It was an S-Corp originally formed for tax purposes, later became like a distribution company. |
| Ortiz: | So when you say distribution company, was it a company that, well, let's put some context here just for the record. You are an artist and I know that correct? |

5

336

| | |
|---|---|
| Dawber: | Yes. |
| Ortiz: | And you create graphics and these graphics are used on apparel and other accessories correct? |
| Dawber: | Yes. |
| Ortiz: | And the graphics that are used in apparel sales is, when you say production or distribution companies, is that what you are referring? |
| Dawber: | Yeah so they would handle all the sales and distribution and also the production of the shirts and stuff like that too. |
| Ortiz: | Okay, so. |
| Dawber: | Everything but making the art I guess. |
| Ortiz: | Okay, so Class War and I'll get to if they are still doing it cause I kind of have heard different things from different people about whether they're still – whether the company still functions or not. So initially it was set up to I guess print T-shirts and hoodies and whatever other things and sell them to [Dawber: Yes] wholesalers as well as direct to consumer retail online? |
| Dawber: | Yes. |
| Ortiz: | So the Class War, Inc. worked with silk screeners and you know T-shirt, I guess, manufacturers and then purchased inventory, had the graphics done – did they generate and maintain inventory as well? |
| Dawber: | Yes. |
| Ortiz: | And did they have a facility like a warehouse or a place where you guys took an inventory or was everything drop ship? |
| Dawber: | Um, originally it was all kind of made to order on like a pre-sale model. And then I would say about a year and a half ago one of our printers let them store some stuff cause they handled the fulfillment and customer service and stuff like that. So later we became – it became more of an inventory thing – yeah. |
| Ortiz: | And did you receive any salary or compensation for any services that you may have provided to Class War, Inc.? |
| Dawber: | Um, not a salary um in the beginning I think there was like a distribution that was taken, but no I cannot remember being like an employee. |
| Ortiz: | So you got at some point you got some I guess a dividend or some sort of distribution from the company? I am using the word dividend don't mean to hold to the legal definition of dividend but you got some distribution from the company? |

| | |
|---|---|
| Dawber: | I'm not sure on that but that was back, that was in 2016. |
| Ortiz: | But no salary? |
| Dawber: | Not that… I don't think so. |
| Ortiz: | And so in 2018 is Class War, Inc. still doing the same thing? |
| Dawber: | As far as what? |
| Ortiz: | What we just talked about? |
| Dawber: | Oh, um |
| Ortiz: | Making T-shirts, selling T-shirts? |
| Dawber: | Yes. |
| Ortiz: | Is it still doing all that? |
| Dawber: | Yeah. |
| Ortiz: | And who runs Class War, Inc.? |
| Dawber: | Drew Madacsi. |
| Ortiz: | I almost got his name right. |
| Dawber: | I think he said it how he says it. |
| Ortiz: | And where does Class War conduct its business from? |
| Dawber: | 528 Second Street, Encinitas, California. |
| Ortiz: | So that's where they're physically located? |
| Dawber: | Yeah. |
| Ortiz: | 528 – say that again. |
| Dawber: | 528 Second Street, Encinitas, California, 92024. |
| Ortiz: | Now is there an agreement between well, let me again put some context here. There's an entity called STFU – help me out here. |
| Dawber: | STFU Global. |
| Ortiz: | Is it Global or…I looked at an agreement – oh yeah -- STFU Global PTE, Ltd. |
| Dawber: | Yeah. |
| Ortiz: | Okay we'll just refer to them as STFU. And if there is a different STFU then let me know for purposes of our discussion here. So is there an agreement between STFU and Class War, Inc.? |

| Dawber: | I believe so. |
| Ortiz: | And do you know what the terms of that agreement is? |
| Dawber: | I don't know. |
| Ortiz: | Do you know if – cause I looked at it and I believe it requires that STFU give Class War, Inc. 15 new art pieces per calendar season. Does that sound about right to you? |
| Dawber: | Sounds right. |
| Ortiz: | And are those art pieces that you would have provided STFU through your agreement with STFU? |
| Dawber: | Most likely, yeah. |
| Ortiz: | Most likely. |
| Dawber: | Yeah, they have, I know they have another artist, other artists they work with too. |
| Ortiz: | Okay. So it's not exclusive to your art it's the 15 new art pieces regardless of whether it is yours or someone else's? |
| Dawber: | I believe so, yes. |
| Ortiz: | Do you, are you active in terms of – I mean you're the 100% shareholder of Class War, Inc., so I'm curious if you are active in sort of the financial management of that entity. |
| Dawber: | Not at all. |
| Ortiz: | And what's the arrangement for Mr. Madacsi's compensation in that company? |
| Dawber: | He came on as like an interim CEO in April 2017 and his deal was the salary was $200,000 plus $40,000 for his travel. |
| Ortiz: | 240? |
| Dawber: | Yeah, it would be 200,000 plus 40,000 for the travel. |
| Ortiz: | Any why so much for travel?  He doesn't live in the United States? |
| Dawber: | Um, |
| Ortiz: | Or he travels abroad a lot? |
| Dawber: | Yeah and working deals and doing what he does ya know. |
| Ortiz: | Do you know if Class War is making money? |
| Dawber: | Class War – I hope so.  Yeah, they are. |

| Ortiz: | When was the last time you met with anyone from Class War to go over their Profit and Loss or financial health? |
|---|---|
| Dawber: | Um, it's been a minute, I would say maybe January. |
| Ortiz: | January of 2018? |
| Dawber: | Maybe even before that. [Ortiz: ten months] December right before that, like the year end. |
| Ortiz: | Does Drew report to you periodically or provide you with any periodic financial reporting on the business operations of Class War, Inc.? |
| Dawber: | No. |
| Ortiz: | So as we sit here today you wouldn't be able to tell us, by pointing to some particular financial that you've looked at, whether or not Class War, Inc. is being operated profitably. |
| Dawber: | I wouldn't know, yeah. |
| Ortiz: | Now you have a number of disclosures regarding intellectual property that are listed on your Schedules, last pages, part of an exhibit... |
| Flahaut: | Schedule AB – but it should be at the end here. |
| Ortiz: | So I'm a little, little bit confused here about who owns what. |
| Dawber: | Right. |
| Ortiz: | So if you look at that chart we just referred to and that's Exhibit 1 Schedule AB there are, if you go starting from the left-hand column, there's Country Name, Literal Mark, Mark Type, Application, Application Date, Registration Number, Registration Date, Publication Date, Applicants – which is the operative column that I want to focus on. |
| | Status, Status Date, Docket and then there are some notes at the end. And so if you look at the column 'Applicants', what does that mean to you? What is applicant, is that the entity that purports to own or have the rights to that Intellectual Property that's described in the Literal Mark column? |
| Flahaut: | And maybe, this is Doug Flahaut, maybe I can try, I'm not trying to take words out of my client's mouth but I know there is some issues here and if... what I understand and I have searched before we did a USPTO search and our understanding is that many of these marks were registered by Class War. They may...there is an issue of course as to who ultimately owns it because you can register a mark without having ownership to it and so I guess at this point I have advised... we are looking into who has the actual ownership interest in some or all of these marks and it's certainly the Debtor's position that the Debtor has the maximum legal ownership he can to these marks. |

9

|  | So I don't want my client to say something that would jeopardize that or jeopardize the estate in that sense. But he is welcome to give his testimony as to what he understands there – I know he wasn't – he had Intellectual Property Class War – these were all done by counsel I believe by various ……. [unintelligible] |
|---|---|
| Ortiz: | Okay, well you've heard your attorney make an explanation regarding why Class War appears in the 'Applicant' column and his view on this estate's, when I say the Debtor, the estate, I mean you, claim of ownership rights and so I guess the question is do you adopt that as your testimony? |
| Dawber: | Yes. |
| Ortiz: | I mean, this is a pretty significant issue in terms of …. |
| Flahaut: | It is and it will be settled legally one way or another [Ortiz: unintelligible], it will be Class War's marks or it will be Jesse's marks. |
|  | I think why we scheduled it this way is that talking to Jesse, he believes he was the artist of these marks, he believes they are his marks, and [Ortiz: well he owns] what he owns and the legalities will be sorted out. |
| Ortiz: | Well…he does own Class War, Inc. but obviously he owns it subject to you know whatever Class War, Inc.'s obligations are. |
| Flahaut: | Correct. |
| Ortiz: | And we don't know what those are. |
| Flahaut: | Correct. So um you know it was disclosed this way in the Schedules because he believes he has a legal or equitable interest in each of those marks. The extent is unknown as this point. |
| Ortiz: | Right. Okay. So let's go to the second entity that is disclosed on the Schedule and that's the Sketchy Tank, LLC. When was Sketchy Tank, LLC formed, do you recall? |
| Dawber: | I think it was December of 2017. |
| Ortiz: | And are you the sole member of Sketchy Tank, LLC? |
| Dawber: | Yes. |
| Ortiz: | What does Sketchy Tank, LLC do for business operations, if any? |
| Dawber: | Ummm produces artwork. |
| Ortiz: | Does it have any employees? |
| Dawber: | Yeah one employee. |
| Ortiz: | And where does Sketchy Tank, LLC operate from? |

| | |
|---|---|
| Dawber: | My home. |
| Ortiz: | And who is the employee? |
| Dawber: | His name is Dillon Schmersal. D-I-L-L-O-N. |
| Ortiz: | How do you spell his last name? |
| Dawber: | I'm gonna take a guess. S-C-H-M-E-R-S-A-L. |
| Ortiz: | Do you actively participate in the management of Sketchy Tank, LLC? |
| Dawber: | Yes, I have like an outside accountant that helps me and stuff. |
| Ortiz: | But you run the company? |
| Dawber: | Yeah. |
| Ortiz: | What are the sources of income for Sketchy Tank, LLC? |
| Dawber: | Umm licensed art and it's a flat retainer. Occasionally I do art shows. |
| Ortiz: | A flat retainer with who? |
| Dawber: | I have a flat retainer with STFU. |
| Ortiz: | So that's that Creative Agreement that you have with STFU? |
| Dawber: | Yes. |
| Ortiz: | And you say you do art shows? |
| Dawber: | Yeah, very rarely but, yes I do. |
| Ortiz: | So you do like autograph signings and things like that or ....... |
| Dawber: | Not so much that – I sell [Ortiz: selling art] art – yeah, original artwork sometimes. So like I have one coming up next month. |
| Ortiz: | Do you do Comic-Con? |
| Dawber: | No, I go to Comic-Con but I don't participate. |
| Ortiz: | So you don't, you or Sketchy Tank, LLC doesn't sell, doesn't have a booth at Comic-Con? |
| Dawber: | No. |
| Ortiz: | Now the agreement we just talked about – the STFU Agreement is actually between you individually and STFU as opposed to Sketchy Tank, LLC., is that correct? |
| Dawber: | Yes. |
| Ortiz: | And it requires you to give them certain number of new graphics over the year? |

11

| | |
|---|---|
| Dawber: | Yeah. |
| Ortiz: | And it's what – 80 new graphics split over four seasons during the year? |
| Dawber: | Yes. |
| Ortiz: | And for your services to provide them with art, they pay you a royalty of $39,000 a month? |
| Dawber: | Correct. |
| Ortiz: | And according to that Agreement you retain ownership of – over the creative content that you provide? |
| Dawber: | Yes. |
| Ortiz: | Is STFU current with their obligations under the contract? |
| Dawber: | Yes. |
| Ortiz: | Are you current with all your obligations under the contract? |
| Dawber: | Yes. |
| Ortiz: | Now there's a… I guess a graphic – I'll refer to it as the lurker or lurking class – it's if you look at the Exhibit 1 to the Schedules, it's sort of like a skull peering over a [Dawber: Yeah, I got it.] So is that the lurker or is that what the…? |
| Dawber: | Yeah it's a version of it. |
| Ortiz: | Okay and so when we talk about the, sort of the trademark would that be the trademark, the registered trademark… that logo? |
| Dawber: | Of… registered trademark of what? |
| Ortiz: | Of Lurking Class. Well, you don't have to answer that. As far as that logo goes does, according to your disclosure here, Class War has an interest in it and then Lurking Class, LLC has an interest in it – is that correct? |
| Dawber: | I believe so, yes. |
| Ortiz: | Ok whether or not ultimately you claim ownership different, we are not resolving that here. I'm just working off your exhibit and so the reference to Lurking Class, LLC, who is or who are the members of Lurking Class, LLC? |
| Dawber: | I believe it's, I actually don't know the answer to that. |
| Flahaut: | Lurking Class, LLC, if I may, is a wholly owned subsidiary of Class War, Inc., from my understanding. |
| Ortiz: | Did that refresh your recollection or do you want to provide an answer at a later time? |

12

| | |
|---|---|
| Dawber: | Uh, that sounds probably right. |
| Ortiz: | Well it can't be probably right. You either have to be certain. |
| Flahaut: | If you don't know, you don't know. |
| Dawber: | I don't know. |
| Ortiz: | Okay well we can get that resolved later on so, but, according to your attorney the Lurking Class, LLC is a wholly owned subsidiary of Class War, Inc? |
| Flahaut: | That is my understanding, correct. |
| Ortiz: | And what does Lurking Class, LLC do? |
| Dawber: | Um, apparel. |
| Ortiz: | So um, on an international scale I guess because there is references to Japan, Taiwan um, would you say that Lurking Class, LLC's apparel business is not in the United States or … |
| Dawber: | I think globally probably, yeah. |
| Ortiz: | So everywhere but the U.S. or including the U.S.? |
| Dawber: | I think including the U.S. |
| Ortiz: | And so when you say they're in the apparel business, now let me back this up. You own 100% of Class War and Class War, Inc. and Lurking Class, LLC is a wholly owned subsidiary of Class War, Inc. Are you involved or do you have any involvement in the business operations of Lurking Class, LLC? |
| Dawber: | No. |
| Ortiz: | And why is that? |
| Dawber: | Cause I stepped away just to do my art and focus on art solely. |
| Ortiz: | So who runs Lurking Class, LLC? |
| Dawber: | Uh, Class War. |
| Ortiz: | Ok so we're back to Drew then. |
| Dawber: | Drew, and there's I think maybe eight or nine employees that were there. |
| Ortiz: | So there are eight or nine employees at Class War, Inc. to your knowledge? |
| Dawber: | Yeah. |
| Ortiz: | Do you have any idea of the sales volume of Lurking Class, LLC |
| Dawber: | I don't. |

| Flahaut: | Excuse me, this is Doug Flahaut, counsel for the Debtor. If you guys want to chat, if counsel for the Creditor Schindler wants to chat, they are welcome to chat outside the room. I know the microphone can only pick up one person talking at a time. |
|---|---|
| Ortiz: | Well let me just say that, I mean they are free to speak as long as it doesn't interrupt or interfere with the examination so I don't see that there is any interference with the examination so just be mindful, counsel, of that. |
| Vaughn: | That's why I'm whispering, you bet. |
| Ortiz: | Thank you... So aside from the trademarks that are disclosed in Exhibit 1, the other intellectual property that's used in the apparel business would be all the various images and graphics correct? That you've created, correct? |
| Dawber: | Yeah. |
| Ortiz: | And are those catalogued in any way? |
| Dawber: | Not organized really but uh... |
| Ortiz: | Do you know how many images you have? |
| Dawber: | I could guess, but I don't know. |
| Ortiz: | And it's your view or is it your view that, that you are, you possess all the rights to all those graphic images? |
| Dawber: | I would say so, yes. |
| Ortiz: | Subject of course to any contractual obligations you have for licensing with any other entities, correct? Cause you have an agreement with STFU to provide them with graphics and you have a licensing agreement with them? |
| Dawber: | Yes. |
| Ortiz: | So aside from that, you retain – under that agreement, you retain the ownership to those images. You've testified to that earlier. |
| Dawber: | Yes. |
| Ortiz: | And so... Now I note that there is a website Zumiez, Z-U-M-I-E-Z, that sells apparel with, the, I guess the images that we've been talking about. Is that correct? |
| Dawber: | Correct. |
| Ortiz: | And do you know who they do business with? Do they do business with you individually or do they do business with ...? |
| Dawber: | Class War. |

| Ortiz: | With Class War. So whatever rights they have to sell apparel or accessories or whatever it is that they sell, that springs from a business relationship that they have with Class War, Inc.? |
|---|---|
| Dawber: | Correct. |
| Ortiz: | I have a question more for your lawyer. Obviously you are not testifying but I just want to understand whether or not a determinations been made whether the Debtor is going to pursue, within the confines of this bankruptcy, to try to resolve these trademark issues with Class War and who owns what? |
| Flahaut: | Yes. The short answer is, to the extent it becomes necessary, absolutely. The real question is, it all comes down to valuation obviously – if this trademark is a major asset of this estate that needs to be used to fund the estate's payment to creditors and somebody else asserts an interest in it, then that's got to be decided right but, either by the bankruptcy judge deciding what property is stayed under 541 or somewhere else, to the extent that it may or may not have, if it is determined it doesn't have significant value or is not necessary to fund the plan, it may be more prudent to kick that down the road – at some level. |
| Ortiz: | Cause, I mean, ya know, I usually don't share thoughts on the record cause - but I guess my concern is we've got two companies here. You've got Class War that's conducting the, I guess significant portion, if not all, of the apparel side of sort of the retail and wholesale end of this business and you have an owner, a 100% owner that's out of the loop with respect to both entities and that is a big concern because… |
| Flahaut: | I think he is in the loop with respect to Sketchy Tank to some extent. He is an artist not a business person but he is running Sketchy Tank, LLC. With respect to Class War, it has an interim CEO that's independent and is running it presumably, although I don't represent Class War or know. Now my understanding is they are attempting to resolve this large judgment that is, I believe, also against Class War and that resolution may very well bring that company into a bankruptcy proceeding. If it does, that may resolve some of your issues because presumably a trustee or somebody would be answering to the assets of Class War and be able to discuss these with us and Mr. Dawber how to – whether Class War has any rights to some or all these trademarks, whether they are worth anything. |
| Ortiz: | Well, I guess 40,000 foot view of things, obviously there is business here that is generating significant revenue, so there is some value. |
| Flahaut: | There is some value. Now whether it comes from the trademarks or from the artwork that Jesse produces, that is to be determined. Right now the money coming into this estate, the 39,000 from STFU are coming from artwork Jesse produces and not from, from these trademarks is my understanding. If I read that agreement correctly. So there may be value there, in fact I hope there is value |

there but I think we'll cross that bridge when we come to it, but I certainly appreciate the U.S. Trustee's office's concerns there and I think that is an important issue that will be resolved – certainly needs to be resolved before liquidation value and plan confirmation.

Ortiz: Let's go to Schedule E/F. I wanted to ask you a little bit about the attorney fees claim of Hogan Lovells and you list it as unknown, and so I guess the first question is, did they provide legal services to you or are you obligated on this because of some guarantee or guarantor relationship that you have with another entity for which they provided legal services to?

Dawber: Um they provided it to Class War.

Ortiz: Okay. So not to you personally but to Class War.

Dawber: I think it was you know both but …

Ortiz: So there may be some …

Flahaut: Again I don't want Mr. Dawber to testify as to anything that would jeopardize his attorney client relationship between him and Hogan Lovells. My understanding is that Hogan Lovells did represent both Class War, Inc. as well as Mr. Dawber individually in the litigation though we have litigation counsel who probably knows better than I do who Hogan Lovells represented.

Ortiz: So I'm not asking what your lawyers told you so I just want to make it clear that I'm not trying to invade the attorney client relationship. I just want to understand the nature of the claim and whether or not the claim is for services they provided to you or to another entity and your attorney just testified the claim relates to services that were provided both for your benefit and for Class War, Inc.'s benefit. Is that your understanding?

Dawber: That's my understanding, yes.

Ortiz: And do you recall when the last time it was that you saw an invoice or a statement from the law firm?

Dawber: I don't.

Ortiz: Did you ever see an invoice or statement from the law firm?

Dawber: I don't believe I did.

Ortiz: Do you know if, do you have any sense of an approximate amount that might have been owed on the date the bankruptcy was filed?

Dawber: I was – I've heard it was somewhere around $600,000 just for the trial.

Ortiz: Again I'm not going to – I'm just trying to get a sense of the magnitude or you know big or small of the claim.

16

Dawber: Right, there's a lot. Yeah.

Ortiz: So you think that it's – you believe it could be around $600,000. And that's for services provided both to Class War, Inc. and to you?

Dawber: Yes.

Ortiz: Okay. And they were the firm that defended both you and Class War, Inc. in the lawsuit that was filed by Mr. Schindler.

Dawber: Yes.

Ortiz: And you've not made any payments to them? Have you made any payments to them?

Dawber: Personally, no.

Ortiz: So the $600,000 would be what you believe is owed or was that the total fee?

Dawber: I, I don't know.

Ortiz: So if you could turn to your Statement of Financial Affairs, and Question Number 4 is a question about your income in this, in this calendar year January. It says from January 1 of the current year until the date you filed bankruptcy you had $24,750 in wages, commission, bonus and tips. What – who would that have been from?

Flahaut: If I may, this is Doug Flahaut again, we were provided the Debtor's tax returns which were prepared by accountant BDO and in consultation with the Debtor on how to divvy up the income reported on his tax returns, we generally followed the tax returns to the best we can so the Debtor can disavow or can testify to the extent he knows, but we were having trouble figuring that out and so we got the copies of the tax return and talked with the accountants and took their break-up of how they were going to classify one piece of income versus another when we prepared the schedules, so if the Debtor seems a little unclear as to that, that's because these were prepared by DBO, his accountant.

Ortiz: Ok. Do you know what the source of that – those – that $24,000 would have been?

Dawber: I don't know.

Ortiz: And then on the following page, there is $155,000 in gross income for operating a business. Would you know what the source of that would have been?

Dawber: I'm – yeah – just say I'm getting my payment.

Ortiz: So that would have been the payments under the agreement with STFU? Is that your understanding or …?

17

| | |
|---|---|
| Dawber: | Yes, I believe so. [Flahaut: It will be 2018] yes, that's correct. |
| Ortiz: | Yes it's just the 2018 ones. |
| Dawber: | Yes. |
| Ortiz: | And then if you could turn to Question Number 16… did you pay or did you direct any entity to pay a retainer to your attorneys for the bankruptcy case? |
| Flahaut: | I can answer that. Arent Fox did not receive a pre-petition retainer in this case. |
| Dawber: | Yes. |
| Ortiz: | You've heard your attorney testify – |
| Dawber: | Yeah. |
| Ortiz: | Is that your answer? |
| Dawber: | That is correct, yeah. |
| Ortiz: | I don't know if you answered this question already but I'll ask it again I guess. So in terms of any and all apparel sales there are there run through, or run through isn't the right word, but they're sold through either Class War, Inc. or Lurking Class LLC? |
| Dawber: | Correct. |
| Ortiz: | You don't individually have any uh, you don't create inventory, you don't sell anything yourself? |
| Dawber: | No. |
| Ortiz: | Okay I'm going to open it up to creditors at this point. I'm going to, like I indicated at the top of the hour, I'm going to continue the meeting one time cause I have received a bunch of documents requested yesterday and I haven't had a chance to look at them. I don't know that I'm going to have questions but I'm going to continue it one time so we'll go, probably go for a half hour, 40 minutes, I'm sorry 15 minutes to a half hour. Um and then we're coming back so, coming back so we'll just leave it at that. Appearances of counsel please. |
| Vaughn: | You bet. I'm Don Vaughn, this is Evan Topol. We are here for the Creditor Jack Schindler and Mr. Dawber, I have some questions for you today too based on the Schedules here. Um, in the document Balance of Schedule Statements and/or Chapter 13 Plan, I don't know if you have a copy or anything, but there are listed unsecured creditors here, American Express being the first, it's Document 19 in the docket, page 18 of 43 there sir. I don't know if you have it handy, but there's credit card debt to American Express and it says in non-filing spouse's name – does that mean that Sarah Dawber is the one who took that credit card debt out? |

| Dawber: | Uhm it's it's like family. We both have credit cards under that. |
|---|---|
| Vaughn: | Right why does it say in non-filing spouse's name? |
| Dawber: | Oh cause that's… |
| Flahaut: | Because it's in her name. Under Section 541 of the Bankruptcy Code, property of the estate consists of both the non-filing spouse and the Debtor… |
| Vaughn: | I just want to ask Mr. Dawber questions. If I have questions for counsel, I'll ask you at a different time. |
| Flahaut: | Yeah, if you have a deposition you want to take, you can notice it up too but go ahead. |
| Vaughn: | You Bet. Or a 2004 examination or take it when we come back. So Mr. Dawber I guess my question is did you file an application for that American Express card? |
| Dawber: | No. |
| Vaughn: | Next page, has unsecured debt to Bank of America there, this is page 19, in Document 19, it says in non-filing spouse's name also, did you file an application to, for that credit card? |
| Dawber: | Page 19? |
| Vaughn: | Yes sir. At the very top there. |
| Flahaut: | He is looking at a different document. He should provide a copy to counsel if he wants to ask questions about documents. |
| Vaughn: | Well Mr. Dawber let me just ask you this way. Did you file any applications for any credit card where money is currently owed? |
| Dawber: | I'm not sure. I can see which ones though, cause they're still on there. |
| Flahaut: | Well your Schedules list an American Express card, a Bank of America credit card, a Discover card. |
| Vaughn: | The Bank of America card is the one I'm asking about. Did you file an application for that credit? |
| Dawber: | No. |
| Vaughn: | And the Discover card, did you file an application for that credit? |
| Dawber: | No. |
| Vaughn: | Now, with regard to Hogan Lovells which is, at least from the document I am looking at, the next purported unsecured Creditor. |

| Flahaut: | Just to clarify, the document the Debtor has in front of him is Document Number 16 of the Bankruptcy Court Docket which is the initial Schedules. I think you're looking at Document No. 19 which is the Amended Schedule. I don't believe any creditors were changed although the page numbers are different so… |
| --- | --- |
| Vaughn: | Mr. Dawber, did you enter into a legal services agreement, you individually, with the Hogan Lovells law firm… |
| Flahaut: | Objection to the extent that calls for attorney client privilege. |
| Vaughn: | I'm sorry, if you could wait till I finish the question, that'd be great. The existence of such an agreement isn't privileged and you can say whatever you want, I'd just like to get my question out before you interrupt, so the question is, sir, did you enter into a contract with Hogan Lovells for legal services, and the only thing I'm asking is yes or no, not the terms of it, not what they told you, not what they told you, just does such an agreement exist? |
| Flahaut: | I would object that it calls for attorney client privilege; instruct the Debtor not to answer. |
| Vaughn: | Now Mr. Dawber, I think we established that, and I just want to make sure I heard this right, you didn't pay anything to Hogan Lovells for any cost of defending Mr. Schindler's lawsuit, would that be true? |
| Dawber: | Personally, no. |
| Vaughn: | And your understanding is Class War paid those fees right? |
| Dawber: | I believe so, yes. |
| Vaughn: | Now, did you know whether or not Class War has loaned any money to anybody? |
| Dawber: | I'm not sure. |
| Vaughn: | Did you ever approve Class War making a loan to Mr. Madacsi? |
| Dawber: | I don't know. |
| Vaughn: | Did you ever approve Class War making a loan to something called The House of Machines? |
| Dawber: | I don't believe so. |
| Vaughn: | Did you ever approve Class War making a loan to an entity known as Strategic, pardon me, Lighthouse Strategic Group? |
| Dawber: | I don't believe so. |
| Vaughn: | Did you ever approve Class War making a loan to STFU. |
| Dawber: | I don't believe so. |

| | |
|---|---|
| Vaughn: | Now the STFU Agreement that I've seen, between you and STFU, you looked at it at trial, it didn't have a signature by you. Did you sign a license agreement between you and STFU? |
| Dawber: | Yes. |
| Vaughn: | And the one that I looked at had payment of $39,000 a month to you. And I think I heard you testify that's how much they're paying you, is that correct? |
| Dawber: | That's correct. |
| Vaughn: | In the documents that I looked at I only saw an accounting of $19,000 a month that you are making. Why the difference? |
| Dawber: | Umm cause money gets pulled out for taxes. My accountant, my employee and cost of running business. |
| Vaughn: | Ok, so how much a month is STFU paying you? |
| Dawber: | 39. |
| Vaughn: | And what account are they paying it into? |
| Dawber: | ST LLC. |
| Vaughn: | The ST LLC bank account? |
| Dawber: | Correct. |
| Vaughn: | And what bank account is that, sir? |
| Dawber: | The ST LLC account. |
| Vaughn: | And where is it? |
| Dawber: | City National. |
| Vaughn: | And do you know the account number? |
| Dawber: | I don't. |
| Vaughn: | And so the money that your, you yourself are taking out is 19,000 from ST LLC? |
| Dawber: | Yes. |
| Vaughn: | So, as far as you understand, pursuant to your license agreement with STFU, they're paying 39,000 a month into ST LLC that you are the sole member of and then ST LLC is disbursing 19,000 to you? |
| Dawber: | Yes. |
| Flahaut: | For the record I'm not aware of an entity known as ST LLC. Is counsel referring to Sketchy Tank LLC? |

| Vaughn: | Yes it's Sketchy Tank LLC. Did you understand that when I said that? |
|---|---|
| Dawber: | I did, yes. |
| Vaughn: | Okay good. So who determines where the money that STFU pays to Sketchy Tank LLC goes? |
| Dawber: | Who determines where the money goes? |
| Vaughn: | Yes. |
| Dawber: | I do. |
| Vaughn: | So STFU is paying Sketchy Tank LLC 39,000 a month. |
| Dawber: | Uh huh. |
| Vaughn: | And Sketchy Tank LLC is paying you 19,000 a month, right? |
| Dawber: | Yeah. |
| Vaughn: | So there is $20,000 a month coming into Sketchy Tank, LLC that's not going to you? |
| Dawber: | Correct. |
| Vaughn: | And where does it go? |
| Dawber: | Like I said before it goes to pay my employee. It goes to pay my accountant and then I think 25% of it goes to withhold for taxes. |
| Vaughn: | Okay, so is it you who determined that it would be I guess, $240,000 per year that Sketchy Tank, LLC would need to spend on expenses? |
| Dawber: | Uh, I'm not sure. |
| Vaughn: | And it will take me a minute to find it here but there was a disclosure of where the money that Sketchy Tank, LLC is getting goes. There is a designation here on the Sketchy Tank, LLC Profit and Loss for contractors. Who are the contractors that Sketchy Tank, LLC pays? |
| Dawber: | Probably accounting. |
| Vaughn: | I'm looking at, in April 2018, 19,000 and for subsequent months going out, is that you? |
| Dawber: | Yes. |
| Vaughn: | So are you a contractor for Sketchy Tank, LLC? |
| Dawber: | Yes. |

22

| Vaughn: | I'm noticing also there are sales indicated for Sketchy Tank, LLC starting in April of $34,500 a month. Same amount each month. Where does that come from? |
| Dawber: | $34,000 a month in sales? |
| Vaughn: | 34,500, yes sir I can show you it's page 9 of 39 of Document 18. It's right at the top there. It's highlighted. |
| Dawber: | Is that the incoming from STFU maybe? |
| Vaughn: | If it was, why isn't it 39,000? |
| Dawber: | I'm not sure. |
| Vaughn: | Could I have the document back, please? |
| Flahaut: | You may. |
| Vaughn: | Sir, do you know of an LLC that's called Five the Hard Way? |
| Dawber: | No. |
| Vaughn: | You had a prior home that you owned before moving to Puebla Street correct? |
| Dawber: | Yes. |
| Vaughn: | And to whom was that home sold? |
| Dawber: | I'm not sure. |
| Vaughn: | Did you sell the home? |
| Dawber: | Yes. |
| Vaughn: | But you don't know to whom? |
| Dawber: | Some investor guy I think, I don't know. |
| Vaughn: | Do you presently hold any interest in that home? |
| Dawber: | No. |
| Vaughn: | Do you presently have any interest in any PayPal accounts? |
| Dawber: | I don't believe so. |
| Vaughn: | And all of the bank accounts that you have an interest in are disclosed in your Schedules here? |
| Dawber: | Yes. |
| Vaughn: | Are you a signatory on any other bank accounts other than as disclosed on your Schedules here? |
| Dawber: | No. |

| | |
|---|---|
| Vaughn: | Are you a signatory on the Class War bank account? |
| Dawber: | I…Probably. |
| Vaughn: | When is the last time you wrote a check on the Class War bank account? |
| Dawber: | Years. |
| Vaughn: | When is the last time that Class War Incorporated distributed any money to you? |
| Dawber: | I don't know. |
| Vaughn: | Was it in 2018? |
| Dawber: | No. |
| Vaughn: | 2017? |
| Dawber: | Maybe. |
| Vaughn: | How much did Class War distribute in 2017? |
| Dawber: | I don't know. |
| Vaughn: | You are the sole shareholder of Class War Incorporated, a California Corporation, correct? |
| Dawber: | Yes. |
| Vaughn: | Alright sir.  Does Class War have profits? |
| Dawber: | Yes. |
| Vaughn: | To whom do the profits go? |
| Dawber: | I think they just stay within the company. |
| Vaughn: | How much in profits does Class War have at the current time? |
| Dawber: | I don't know. |
| Vaughn: | How much in profits has Class War made in 2018? |
| Dawber: | I don't know. |
| Vaughn: | Have you ever asked Mr. Madacsi or anybody else on behalf of Class War to distribute any of the profits from that entity to you? |
| Dawber: | No. |
| Vaughn: | Why not? |
| Dawber: | I chose to step away and do my art and not – I don't want to deal with any of that stuff. |

| | |
|---|---|
| Vaughn: | Okay. Do you do art for Class War? |
| Dawber: | No. |
| Vaughn: | Where does Class War get the art that it utilizes? |
| Dawber: | They get it from STFU. |
| Vaughn: | So you license art to STFU? Correct? |
| Dawber: | Yes. |
| Vaughn: | And STFU licenses art to Class War? |
| Dawber: | Yes. |
| Vaughn: | Is any of it the same art? |
| Dawber: | What do you mean? |
| Vaughn: | What I mean is – is any art that you – the sole owner of Class War – licensed to STFU licensed back from STFU to Class War, your company? |
| Dawber: | Is it the same art that…? |
| Vaughn: | I want to know if any single piece of art that you have licensed to STFU [Dawber: Yes] has ever been licensed back to Class War. |
| Dawber: | Yes. |
| Vaughn: | Why did you decide to do that rather than having your artwork sold through your wholly owned company, Class War? |
| Dawber: | Cause STFU is just one entity that can represent me on a global scale. |
| Vaughn: | And STFU also sells your artwork in countries other than the USA, correct? |
| Dawber: | Yes. |
| Vaughn: | It sells artwork in Japan, correct? |
| Dawber: | Yes. |
| Vaughn: | It sells artwork in Brazil, correct? |
| Dawber: | I'm not sure. |
| Vaughn: | What other countries does STFU sell your artwork in? |
| Dawber: | I only know of Japan and Taiwan right now. |
| Vaughn: | Alright, how much of your artwork has STFU, in monetary value, sold in Japan? |
| Dawber: | I don't know. |

| | |
|---|---|
| Vaughn: | How much has it sold in Taiwan? |
| Dawber: | I don't know. |
| Vaughn: | Who would you ask to find out? |
| Dawber: | Probably STFU. |
| Vaughn: | Would you ask Mr. Madacsi? |
| Dawber: | No. |
| Vaughn: | Does Mr. Madacsi have any connection with STFU? |
| Dawber: | No, I mean he introduced me to them but he has no affiliation. |
| Vaughn: | Mr. Madacsi is still CEO of Class War? |
| Dawber: | Yeah. |
| Vaughn: | He spends three or four days per month here in California working on that company? |
| Dawber: | Yes. |
| Vaughn: | And Jeslyn Leong, how did you meet her? |
| Dawber: | Through Drew. |
| Vaughn: | Drew Madacsi? |
| Dawber: | Yes. |
| Vaughn: | And she is the CFO and Corporate Secretary for Class War, Inc., correct? |
| Dawber: | I believe so. |
| Vaughn: | And it was Mr. Madacsi's idea that she assume that role? |
| Dawber: | I am not sure. |
| Vaughn: | Why did you hand over all of the officerships of your wholly owned company to two people who are foreign citizens? |
| Dawber: | I don't know the answer to that. |
| Vaughn: | Well whose idea was it? |
| Dawber: | I made a choice to focus on art so I don't go crazy and I do not want to be a business person, I don't want anything to do with any of this except for doing art and living my life. |
| Vaughn: | Right, Matt Roberts though was running Class War before you met Mr. Madacsi, correct? |

| | |
|---|---|
| Dawber: | Yes. |
| Vaughn: | And so did you make Matt Roberts all of the officers of your California corporation, Class War? |
| Dawber: | No. |
| Vaughn: | Well why did you make Mr. Madacsi the CEO but not Matt Roberts? |
| Dawber: | Cause Mr. Madacsi is well qualified for that. |
| Vaughn: | How do you know he is well qualified? |
| Dawber: | From his background. |
| Vaughn: | Do you have any connection with Mr. Madacsi other than him being the CEO of Class War? |
| Dawber: | No. |
| Vaughn: | Do you have any connection with Jeslyn Leong other than her being the CFO and Secretary of Class War? |
| Dawber: | No. |
| Vaughn: | How often is Ms. Leong in California working on Class War's business, if you know? |
| Dawber: | Never. |
| Vaughn: | How often do you go into the Class War offices in Encinitas? |
| Dawber: | Rarely. |
| Vaughn: | So do you have any involvement whatsoever in the operations of Class War? |
| Dawber: | No. |
| Vaughn: | Do you make any financial decisions for Class War? |
| Dawber: | No. |
| Vaughn: | Do you receive periodic updates on the business of Class War from anyone? |
| Dawber: | No. |
| Flahaut: | These questions, some of these questions have been asked by the Trustee. I understand you weren't here. |
| Vaughn: | If you asked Mr. Madacsi, Ms. Leong at Class War to distribute profits to you – you could receive money from Class War, correct? |
| Dawber: | I'm not sure. |

| | |
|---|---|
| Vaughn: | If it had profits, as the sole shareholder, you could receive that money, correct? |
| Dawber: | I would assume so, I don't know. |
| Vaughn: | Did you hire, you yourself hire Hogan Lovells to defend Mr. Schindler's lawsuit? |
| Dawber: | It was recommended to me through Drew. |
| Vaughn: | Mr. Madacsi recommended Hogan Lovells, correct? |
| Dawber: | Yes. |
| Vaughn: | Did Mr. Madacsi also recommend Arent Fox? |
| Dawber: | Yes. |
| Vaughn: | Now you listed on your Schedules, there is a Toyota, I think it is a Tundra truck that you drive. Is that correct? |
| Dawber: | Correct. |
| Vaughn: | But Class War has over a hundred thousand dollars in vehicles, correct? |
| Dawber: | Yes. |
| Vaughn: | Do you drive any of Class War's vehicles? |
| Dawber: | No. |
| Vaughn: | What vehicles does Class War have? |
| Dawber: | They have a Cadillac CTS-V. |
| Vaughn: | And who drives it? |
| Dawber: | Drew when he comes to town. |
| Vaughn: | So it's owned by Class War so that Mr. Madacsi can drive it three or four days a month? |
| Dawber: | Yes. |
| Vaughn: | How much is Mr. Madacsi paid by Class War for his CEO position? |
| Flahaut: | This has been asked earlier in the 341(a). |
| Vaughn: | You know I already know the answer anyway. How much is Ms. Leong paid for her role as CFO and Corporate Secretary of Class War? |
| Dawber: | I don't know. |
| Vaughn: | Is she paid anything? |
| Dawber: | I don't know. |

| | |
|---|---|
| Vaughn: | Who hired her to be the officer of your wholly owned company? |
| Dawber: | I believe Drew. |
| Vaughn: | You did not retain Ms. Leong, it was Mr. Madacsi who did so? |
| Dawber: | Yes. |
| Vaughn: | Is Ms. Leong also the owner of STFU to your understanding? |
| Dawber: | Yes. |
| Vaughn: | Was Ms. Leong made the CFO and Secretary of Class War before or after you entered into any transaction with STFU? |
| Dawber: | One more time please. |
| Vaughn: | What happened first? You making your license deal with STFU or Ms. Leong being the Secretary and Chief Financial Officer of Class War. Which one happened first? |
| Dawber: | I am not sure. |
| Vaughn: | Was it about the same time? |
| Dawber: | I don't know. |
| Flahaut: | Asked and answered. |
| Vaughn: | What's JD Creative? |
| Dawber: | Um, it was I guess a dba of mine a long time ago. |
| Vaughn: | When did you last do business under JD Creative? |
| Dawber: | Uh, 2015. |
| Vaughn: | And I heard some testimony that you gave that I just want to make sure we are accurate on this. The only member of Lurking Class, LLC is Class War. True? |
| Dawber: | I think so. |
| Vaughn: | And Class War assigned a trademark to Lurking Class, LLC. Correct? |
| Dawber: | I don't know. |
| Vaughn: | That Lurker trademark – the skull figure peering over the fence – is it okay to call him the Lurker? |
| Dawber: | Yeah. |
| Vaughn: | Yeah, the Lurker was a registered trademark of Class War at one point in time, correct? |

| | |
|---|---|
| Dawber: | Yes. |
| Vaughn: | And who now owns that registered trademark to your knowledge? |
| Dawber: | I don't know. I mean I think Class War still. |
| Vaughn: | I heard you say that Lurking Class sells apparel. Did I hear that correctly? |
| Dawber: | No, Class War sells apparel. |
| Vaughn: | Well what does Lurking Class do in terms of business operations? |
| Dawber: | Um, [speaking with counsel] it's a subsidiary, it's a holding, I don't know. |
| Flahaut: | It's been asked and answered. |
| Vaughn: | What does it do? |
| Dawber: | What does it do? |
| Vaughn: | Lurking Class? |
| Dawber: | It's an entity that represents something I guess, I don't know. |
| Vaughn: | What does it represent? |
| Dawber: | Artwork and I don't know. |
| Vaughn: | Whose artwork? |
| Dawber: | Mine. |
| Vaughn: | What does it do when representing your artwork? |
| Dawber: | It sells clothes. |
| Vaughn: | So Lurking Class sells clothes. |
| Dawber: | No, Class War does. |
| Vaughn: | What does Lurking Class do in representing your artwork? |
| Dawber: | Um, some of the clothes, most of the clothes it sells has my artwork on them. |
| Vaughn: | Most of the clothes that who sells? |
| Dawber: | Class War. |
| Vaughn: | What does Lurking Class do in representing your artwork, I will ask again? |
| Dawber: | I don't know how to answer that, I'm sorry. |
| Vaughn: | Does Lurking Class, LLC do anything in terms of business operations? |
| Dawber: | Not to my knowledge, no. |

| Vaughn: | Okay, so why was Lurking Class, LLC then created? |
|---|---|
| Dawber: | I don't know. |
| Vaughn: | What does Lurking Class, LLC own? |
| Dawber: | I don't know. |
| Vaughn: | Do you see any financial updates on the operations, if any, of Lurking Class, LLC? |
| Dawber: | No. |
| Vaughn: | Who does the accounting for Lurking Class, LLC? |
| Dawber: | I don't know – I think BDO or Gina. |
| Vaughn: | Gina Piskur? |
| Dawber: | Yes. |
| Vaughn: | What is Gina Piskur's role in Class War? |
| Dawber: | She is an accountant, or a bookkeeper. |
| Vaughn: | She is the in-house bookkeeper? |
| Dawber: | Yeah. |
| Vaughn: | And is she also the in-house bookkeeper for Sketchy Tank, LLC. |
| Dawber: | Yes. |
| Vaughn: | And is she also the in-house booker for Lurking Class, LLC? |
| Dawber: | I believe so, but I am not sure. |
| Vaughn: | I saw in your Bankruptcy Schedules, I think right up front but it said that you do not have any alias that you have done business under. |
| Flahaut: | Can you reference that for us? |
| Vaughn: | Yeah, it's the first page of the actual Schedules themselves, first ones that were filed before they were updated or modified and it is Document 1 and I am looking at Questions 3, pardon me, Questions 2 and Questions 4 there. Question 4 said I have not used any business name or EINs. That's not accurate, is it sir? |
| Dawber: | I have never; I don't have another entity. |
| Vaughn: | You registered the fictitious business name Sketchy Tank with the County of San Diego in 2014, correct? |
| Dawber: | Yes. |

| | |
|---|---|
| Vaughn: | Okay and that's within the last eight years, right? |
| Dawber: | Yeah. |
| Vaughn: | And you did business using that fictitious business name for at least a year, correct? |
| Dawber: | Yeah, but it wasn't an alias it wasn't another name for me or whatever at the time. |
| Vaughn: | Right it was a business name though that you did business under, right? |
| Dawber: | Yes. |
| Vaughn: | Yeah and until Class War was formed, you did business under the Sketchy Tank dba, true? |
| Dawber: | Yes. |
| Vaughn: | Alright, and so after Class War was formed it registered the dba Sketchy Tank, correct? |
| Dawber: | I'm not sure. |
| Vaughn: | Okay, and you've in biographies that you have authorized be published online, you have indicated that Sketchy Tank is your artist's alias, correct? |
| Dawber: | Um it is my artist name, yeah. |
| Vaughn: | Your artist name. And that is a name that you have used as an artist, right? |
| Dawber: | Yes. |
| Vaughn: | Alright. Now who sells any art created by you besides Class War? |
| Dawber: | I do personally. |
| Vaughn: | And when you say you do personally, do you mean you Jesse Dawber do so personally or do you mean Sketchy Tank, LLC does so personally, or do you mean both? |
| Dawber: | Sketchy Tank, LLC. |
| Vaughn: | And what types of things does Sketchy Tank, LLC sell that you have created? |
| Dawber: | Um, I don't know of anything to date but I do have an art show coming up and the art that's sold will go to Sketchy Tank, LLC. |
| Vaughn: | Dillon Schmersal – is he a full time employee? |
| Dawber: | Yes. |
| Vaughn: | Well what does he do if you're not selling anything? |

32

| | |
|---|---|
| Dawber: | He helps me, helps me with pre-production post art, he helps me, he painted the paintings, he helped me paint them. |
| Vaughn: | How did he help you paint them? |
| Dawber: | We project them on to canvases and he helps me paint. |
| Vaughn: | Okay and how much is Mr. Schmersal paid? |
| Dawber: | I am not sure exactly, right around I think around 40 grand a year. |
| Vaughn: | And how much in product artwork that you've created has Sketchy Tank, LLC sold since it was created? |
| Dawber: | I would say zero. |
| Vaughn: | So you have a full time employee of a business that has zero sales? |
| Dawber: | Yes, but he helps me with all my art needs, everything I do. |
| Vaughn: | Well has his helping you with your art needs translated into sales in any respect? |
| Dawber: | Sales with licensing art, yes. |
| Vaughn: | Sales with licensing art. What do you mean sir? |
| Dawber: | When I license art, I get money in return for that. |
| Vaughn: | Are you saying that Mr. Schmersal helps you create the artwork designs that you licensed to STFU? |
| Dawber: | Yes. |
| Vaughn: | And who today owns the rights to distribute the shirt, the T-shirt, that has the phrase 'Pie Till I Die' on it? |
| Dawber: | Who owns the rights to it? |
| Vaughn: | Yeah. |
| Dawber: | I believe myself. |
| Vaughn: | And that is a top selling T-shirt, correct? |
| Dawber: | Not so much anymore but it was at one time, yes. |
| Vaughn: | And 'Good Times Bad Friends' is a shirt that you have also produced previously correct? |
| Dawber: | Yes. |
| Vaughn: | Who owns the rights to sell shirts with the phrase 'Good Times Bad Friends' on it today? |

| | |
|---|---|
| Dawber: | I would say myself as well. |
| Vaughn: | Okay and how do you go about selling those shirts you, yourself? |
| Dawber: | I don't sell them myself. |
| Vaughn: | Okay, so who sells those shirts? |
| Dawber: | Class War. |
| Vaughn: | So if you have the rights but Class War sells them, how did Class War get the rights to the t-shirt for instance 'Good Times Bad Friends'? |
| Dawber: | Through STFU. |
| Vaughn: | I see. |
| Dawber: | That's my guess. |
| Vaughn: | You are guessing. |
| Dawber: | Yep. |
| Vaughn: | Alright. |
| Flahaut: | Then don't guess. If you don't know, you don't know. |
| Vaughn: | You are under oath and we don't want you to guess. |
| Dawber: | Okay, I won't. I won't. |
| Vaughn: | So before STFU was created by Ms. Leong down in Singapore the t-shirt 'Good Times Bad Friends' was sold by Class War without having to license it from anybody, correct? |
| Dawber: | I would say I don't know the answer to that. |
| Vaughn: | Alright, when you first sold the t-shirt 'Good Times Bad Friends,' who sold it? |
| Flahaut: | Asked and answered. |
| Dawber: | I don't know how to answer that, or I don't know what the answer is. |
| Vaughn: | Well when you first created the design and a t-shirt was sold, who sold it? You? |
| Dawber: | When I first created it I sold it personally, yeah. |
| Vaughn: | Okay personally, you personally. Then who next, if anyone, sold that t-shirt 'Good Times Bad Friends' after you personally did so? |
| Dawber: | Um, Class War. |
| Vaughn: | Okay, and did you have any sort of agreement where you contributed that particular design to Class War so Class War could sell that t-shirt? |

34

| | |
|---|---|
| Flahaut: | Isn't it - the testimony has been given as to the various IPs but go ahead. |
| Dawber: | Um, I don't know if, I don't recall. |
| Vaughn: | 'Good Times Bad Friends' isn't on your list of Intellectual Property that's registered with the United States Patent and Trademark office, correct? |
| Dawber: | I'm not sure. |
| Vaughn: | Well, have you ever registered that shirt as a trademark or copyrighted it or received any sort of Intellectual Property protection from the US government? |
| Dawber: | I thought it was at some point, yeah. |
| Vaughn: | Alright, so who owns that trademark, copyright or whatever on 'Good Times Bad Friends' today? |
| Dawber: | I don't know. |
| Vaughn: | When Class War sold, right after you did personally, the t-shirt 'Good Times Bad Friends,' where did Class War get the right to do so? |
| Flahaut: | Assumes facts not in evidence that Class War has the right to sell it. You are putting words in my witness' mouth. |
| Dawber: | I don't know how to answer, I don't know. |
| Vaughn: | Alright. I guess what I'm asking – these are – what is the best-selling t-shirt that you have ever created? |
| Dawber: | I don't know. |
| Vaughn: | Is 'Good Times Bad Friends' one of the top ten? |
| Dawber: | I would definitely say that. |
| Vaughn: | Is 'Pie Till I Die' one of the top ten? |
| Dawber: | I don't know. |
| Vaughn: | What other t-shirts are in the top ten? |
| Dawber: | I … |
| Vaughn: | Okay we'll just stick with 'Good Times Bad Friends'. |
| Ortiz: | Counsel, just so you know timewise – [Flahaut: yeah this sounds] – we're going to wrap it up in like three minutes. |
| Vaughn: | Okay. |
| Ortiz: | So just … we'll come back but um, just if you have ……. |
| Vaughn: | Hit the high points. |

| | |
|---|---|
| Ortiz: | Well you got four minutes to hit whatever points you want. |
| Vaughn: | Okay, thank you. Do you drive any vehicles that are owned by Class War? |
| Dawber: | Um, no. |
| Vaughn: | As far as you know, Zumiez is still the company that contracts with Class War to distribute products with your artwork on it, correct? |
| Dawber: | Yes. |
| Vaughn: | And Zumiez at one point in time also entered into a license agreement with Class War, correct? |
| Dawber: | Yes. |
| Vaughn: | And is that agreement still in force. |
| Dawber: | I don't know. |
| Vaughn: | Are there any discussions that you're aware of with Zumiez to change the contractual relationship whereby that company distributes apparel with your art on it? |
| Dawber: | No. |
| Vaughn: | So there's no discussions you're aware of to change the contractual arrangement. |
| Flahaut: | Asked and answered. |
| Dawber: | I had said no. |
| Vaughn: | Are you aware of – I asked you about some specifics – let me just ask you generally – are you aware of any loans that Class War has made to any person or entity? |
| Dawber: | No. |
| Vaughn: | And no one asked you for approval of any such loans? |
| Dawber: | I never had to approve. |
| Vaughn: | Now who are the Directors of Class War? |
| Dawber: | I don't know. Me? I don't know. Drew, I don't know the answer to that. |
| Vaughn: | Have you pledged or otherwise given your shares in Class War as security to any person or entity? |
| Dawber: | No. |
| Vaughn: | As far as you know, your shares in Class War are unencumbered, in other words, they're not pledged or liened in any way, correct? |

| | |
|---|---|
| Dawber: | No. |
| Vaughn: | I am correct, they are not? |
| Dawber: | You are correct. |
| Vaughn: | You own them. |
| Dawber: | I own them. |
| Vaughn: | And there is no discussion for you to sell any of those shares to anybody, correct? |
| Dawber: | No. |
| Ortiz: | It's a good place to end it. |
| Vaughn: | Yeah, that's a good spot. |
| Ortiz: | Okay so … |
| Flahaut: | When are you thinking for a continued date – hopefully we can get you the documents you need but I know I have got some trials – I just had – I've got a three week old at home so we're trying to visit the in-laws for the holidays and my parents as well. |
| Ortiz: | Um, probably… I was looking at dates earlier today. So we can come back either real soon or we can come back in December. |
| Flahaut: | What are the two dates that would be available? |
| Ortiz: | So… |
| Flahaut: | Then we'll check our calendars. |
| Ortiz: | We could come back next Tuesday. |
| Flahaut: | A week from today. |
| Ortiz: | Or we're going to kick it out to December 4 because everything intervening puts us too close to the Thanksgiving Holiday. |
| Vaughn: | Next Tuesday works for me. |
| Flahaut: | Let me, what does your – do you prefer one of those dates or the November 6th or December – what was the December date? |
| Ortiz: | December 4. |
| Flahaut: | December 4 – I have another 341(a) on November 6th now I can't – I am not a solo shop so I can't really say that I couldn't find a lawyer to come down here but I do have another 341(a) on Tuesday in Los Angeles. |
| Vaughn: | What about time of day? |

37

| | |
|---|---|
| Ortiz: | Well it has to be in the afternoon [3:00] because I have a conflict in the morning. |
| Vaughn: | Okay. |
| Flahaut: | Can we go off the record and just discuss ......? |
| Ortiz: | Yeah if you want to go with your client outside and talk time. |
| Flahaut: | Well we also have to produce some documents soon so we'll see whether, I think it is pretty well done, but if we need more time. |
| Ortiz: | Yeah, we'll go off the record for a couple moments. |
| Flahaut: | Thank you. |
| Ortiz: | Okay we're back on the record in the Dawber matter. We have decided on a continued date so we are going to continue this Creditors' Meeting to Tuesday, December 4, 2018 at 3:00 in the afternoon. With that, this meeting is continued. Thank you. |
| Vaughn: | Thank you. |
| Flahaut: | Thank you. |

369

# EXHIBIT 30

**E-mail correspondence between Donald A. Vaughn and Douglas Flahaut commencing November 5, 2018 and ending November 9, 2018**

| | |
|---|---|
| **From:** | DAV@vv-law.com |
| **Sent:** | Friday, November 09, 2018 7:38 PM |
| **To:** | 'Flahaut, M. Douglas' |
| **Cc:** | Ordubegian, Aram |
| **Subject:** | RE: In re Jesse Dawber |

Just let me know on the stipulation.

With respect to the new "chief restructuring officer" that is not at all what we had envisioned. There was certainly no discussion of adding – rather than replacing – personnel at Class War. As we discussed on Wednesday, at least from our perspective, the problem is that the purported "expenses" are grossly excessive. I thought we talked about replacing Mr. Madaesi; instead, it looks like you folks have **added** to the payroll. This business purportedly sought bankruptcy protection because it couldn't pay its debts, so you add more expense? The business doesn't need "restructuring;" Class War has existing, ongoing, contracts which require nothing more than fulfillment. It's not much of an overstatement to say it's on autopilot – produce the product and ship it through established channels to long time customers. Ever heard the old saying "if it isn't broken don't fix it?"

As I discussed on the telephone when referencing the perfunctory financial statements provided to us, sales have been in excess of $4 million per year for an appreciable period of time, and I have multiple items of evidence which establish that the appropriate profit margin is (and was) 50%. However, based upon the 2018 Class War Profit and Loss as of September 30, 2018, which you filed with the Court, operations year to date have generated a *loss* of $275,000. Hiring another out – of – town" big firm" lawyer to "restructure" a business he knows nothing about where the problem is expenses not revenue is counterproductive, and seems calculated to drive this business further into the red. For the record, and to the extent it makes any difference, the idea of hiring someone to "restructure" was never discussed in our telephone conference earlier this week. If you have raised that concept at all, I would have said the same things I am saying and now.

What about Mr. Madaesi? Is he still CEO? What about Ms. Leong, does she still hold the Secretary and CFO positions? What about the royalties to STFU? Are they still being paid? I can't help but observe this development looks a lot more like the full employment act for highly paid hourly billers than a legitimate effort to return a profitable business to income generation. Perhaps you folks took this step so you can tell the Court a trustee doesn't need to be appointed, because "we are addressing the problem Mr. Schindler is complaining about." I certainly don't agree. In fact, from where I sit, this only bolsters the case for independent management, because you folks are driving it further into insolvency.

While we are at it, if you could provide the information I asked for in my email at the beginning of this week – **or at least some of it** – that would be great. Where is the supposed agreement between Mr. Dawber and STFU which resulted in $250,000 going into your trust account? When we talked on the telephone, you said it was a two-page agreement, and I had the impression it was right in front of you. Will you send it please (third request)? The bottom line is that you are doing what you wish, and transparency is utterly absent. Mentioning "fiduciary duties" while doing nothing to effectuate the disclosure we seek is pure lip service and you can bet the substanceless platitudes I am hearing will not go unchallenged.

Finally, only because it's Friday night and I don't want to waste your time or mine, how much is this Mr. Rosenthal being paid and what amount (if any) is his retainer?

DAV

**Donald A. Vaughn Esq.**
VAUGHN & VAUGHN
501 WEST BROADWAY ST., Suite 1770
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 237-1717
FAX (619) 237-0447
E-mail DAV@vv-law.com

The information contained in this electronic mail transmission is confidential and
intended to be read only by the stated recipient of the transmission. It is therefore
protected from unauthorized use or dissemination by the attorney-client and/or attorney
work-product privileges. If you are not the intended recipient or the intended
recipient's agent, you are hereby requested to notify the Law Firm of Vaughn & Vaughn
immediately by telephone and to delete this transmission with any attachments and destroy
all copies in any form. Any unauthorized review, use, dissemination, distribution or
copying of this communication or its attachments, if any, is strictly prohibited and may
result in legal action or prosecution by appropriate authorities. Thank you in advance
for your cooperation.



**From:** Flahaut, M. Douglas [mailto:Douglas.Flahaut@arentfox.com]
**Sent:** Friday, November 09, 2018 6:55 PM
**To:** DAV@vv-law.com
**Cc:** Ordubegian, Aram
**Subject:** RE: In re Jesse Dawber

Thank you, Don! As discussed, your edits don't seem offensive and therefore this should work on our end. With respect to timing, let's try to get this stip re relief from stay executed early next week such that we can file a motion to have it approved by Wed. or Thurs and get the clock running on that.

Additionally, while I hope to be able to provide you with more information soon, I did want you to know that Aram and I have been working on this matter. Today Jeremy Rosenthal was hired as an independent chief restructuring officer by Class War. Jeremy has significant bk / turnaround experience and Aram and I have worked with him before. He certainly understands the fiduciary duties that Class War owes to creditors as well as to Jesse's bankruptcy estate (as Class War's sole shareholder) and we expect him to get a handle on things quickly and provide us the sort of financial information and forecasts that will be needed for us to build the framework for a possible consensual resolution, whether it be through a plan of reorganization and/or some other exit strategy. Indeed, once Mr. Rosenthal has got up to speed with respect to Class War, Aram and I think the next step may be for the three parties (you, Mr. Rosenthal, and us) to meet in person, with the goal being to discuss the options going forward and try to agree on a global solution and course of action.

Best,

--Doug

**M. Douglas Flahaut**

372

Counsel

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7559 DIRECT | 213.620.7401 FAX
douglas.flahaut@arentfox.com | www.arentfox.com

**From:** DAV@vv-law.com <dav@vv-law.com>
**Sent:** Friday, November 9, 2018 5:38 PM
**To:** Flahaut, M. Douglas <Douglas.Flahaut@arentfox.com>
**Cc:** Ordubegian, Aram <Aram.Ordubegian@arentfox.com>
**Subject:** RE: In re Jesse Dawber

Gentlemen:

I understood from our conversation earlier this week that the revised stipulation was acceptable. Accordingly, I have converted it into a PDF, and attach it to this email.

Please advise.

Thank you very much.

DAV

**Donald A. Vaughn Esq.**
VAUGHN & VAUGHN
501 WEST BROADWAY ST., Suite 1770
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 237-1717
FAX (619) 237-0447
E-mail DAV@vv-law.com

The information contained in this electronic mail transmission is confidential and intended to be read only by the stated recipient of the transmission. It is therefore protected from unauthorized use or dissemination by the attorney-client and/or attorney work-product privileges. If you are not the intended recipient or the intended recipient's agent, you are hereby requested to notify the Law Firm of Vaughn & Vaughn immediately by telephone and to delete this transmission with any attachments and destroy all copies in any form. Any unauthorized review, use, dissemination, distribution or copying of this communication or its attachments, if any, is strictly prohibited and may result in legal action or prosecution by appropriate authorities. Thank you in advance for your cooperation.



**From:** Flahaut, M. Douglas [mailto:Douglas.Flahaut@arentfox.com]
**Sent:** Wednesday, November 07, 2018 11:29 AM
**To:** DAV@vv-law.com

**Cc:** Ordubegian, Aram
**Subject:** RE: In re Jesse Dawber

Here's a draft stipulation re limited relief from stay for your review. I have not reviewed it with my client so this is being circulated with the caveat that this has not yet been agreed to by the debtor/client. However, I wanted to get it into your hands sooner rather than later so that we can discuss at 2:00.

Of course if/when we reach an agreement, it will still be subject to bk court approval and we will have to give notice to the other creditors and file an appropriate motion... but I believe we discussed that aspect as well.

Best,

-Doug


**M. Douglas Flahaut**
Counsel

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7559 DIRECT | 213.629.7401 FAX
douglas.flahaut@arentfox.com | www.arentfox.com


**From:** Flahaut, M. Douglas
**Sent:** Wednesday, November 7, 2018 6:40 AM
**To:** DAV@vv-law.com
**Cc:** Ordubegian, Aram <Aram.Ordubegian@arentfox.com>
**Subject:** RE: In re Jesse Dawber

Sounds good. Let's plan on a call at 2:00 p.m. today. Feel free to just call my office directly at 213 443 7559. Aram can walk down the hall or I can join him telephonically.

I'll also circulate the draft stip re relief from stay later this morn when I get into the office so that you can have that in front of you when we speak as well.

--Doug


**M. Douglas Flahaut**
Counsel

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7559 DIRECT | 213.629.7401 FAX
douglas.flahaut@arentfox.com | www.arentfox.com

**From:** DAV@vv-law.com <dav@vv-law.com>
**Sent:** Tuesday, November 6, 2018 5:18 PM
**To:** Flahaut, M. Douglas <Douglas.Flahaut@arentfox.com>
**Cc:** Ordubegian, Aram <Aram.Ordubegian@arentfox.com>
**Subject:** RE: In re Jesse Dawber

Tomorrow (Wednesday) at 2:00 PM works for me.

Please confirm.

DAV

**From:** Flahaut, M. Douglas [mailto:Douglas.Flahaut@arentfox.com]
**Sent:** Tuesday, November 06, 2018 10:48 AM
**To:** DAV@vv-law.com
**Cc:** Ordubegian, Aram
**Subject:** RE: In re Jesse Dawber

Thanks for reaching out and nice talking on Friday. I appreciate your willingness to engage and, because of your historical knowledge, I believe your ideas regarding how to maximize the value of this estate deserve to be heard and considered.

While I'm out of the office much of the day today, I will endeavor to have a draft stipulation re limited relief from stay over to you sometime this afternoon / evening once I get back to my computer. As to your list of questions, we can go through them when we speak. As concerns the possible IP deal that I adumbrated to the Court on Friday, I believe I've represented to the Court the offer from STFU is to pay $250,000 for a three-year license of certain older images. As to whether the Debtor will accept the offer and seek to have it approved by the Court, subject to overbid, that remains to be determined. At the moment Aram and I are talking with potential brokers and, if one is chosen by the Debtor, we will then file an application with the Court to employ the broker as an estate professional to market and advise with respect to the IP. As to the nuances of how the IP will be marketed and the length of such marketing, the debtor is likely to defer to the recommendation of his broker as to what is anticipated to be best for the estate. However, once this process is commenced, you are certainly welcome to provide your thoughts as well as encouraged to bring interested parties to the broker's attention as well.

I'm not sure re Aram's schedule, but I should be available for a telephone call tomorrow (Wed) afternoon (say 2:00 p.m.) or Thursday morning (say 10:00 a.m.).

--Doug

**M. Douglas Flahaut**
Counsel

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street 48th Floor
Los Angeles, CA 90013
213.443.7559 DIRECT | 213.629.7401 FAX
douglas.flahaut@arentfox.com , www.arentfox.com

**From:** DAV@vv-law.com <dav@vv-law.com>
**Sent:** Monday, November 5, 2018 11:21 AM
**To:** Flahaut, M. Douglas <Douglas.Flahaut@arentfox.com>

Dear Mr. Flahaut:

I am following up on our conversation after the informal status conference this past Friday. We look forward to receiving your proposed draft stipulation for relief from stay with respect to Mr. Dawber to allow judgment on the jury verdict to be entered.

With regard to the potential sale of intellectual property to Singapore corporation STFU, which possibility you identified to the Court and we also discussed after the hearing, I have some questions. Please provide the following information on this and a couple other subjects:

- What exact assets are being contemplated for sale? Who owns those assets now?
- Who is negotiating the transaction? At what stage are the negotiations with respect to issues such as price?
- What exact materials does STFU already purport to license from Mr. Dawber pursuant to the "Creative Agreement" between those parties?
- What exact designs does Class War purportedly license back from STFU pursuant to the "Creative Agreement" between those parties?
- How, specifically, has the seven figure "Royalty" being paid by Class War to STFU been calculated?
- What designs has STFU sold outside the United States as a result of the claimed license in the Dawber – STFU "Creative Agreement?"
- Do you have a fully – executed copy of the supposed "Creative Agreement" between Dawber and STFU? [The one I received during trial in September of 2018 was not signed by Mr. Dawber.]
- While the "Creative Agreement" between Mr. Dawber and STFU provides for payment to Mr. Dawber of $39,000 per month, the financials you filed on behalf of Sketchy Tank, LLC show only $34,500 per month coming in, and only since April 2018. Where is the balance since that time? In other words, to whom has it been paid and where has that money gone?
- To whom was the $39,000 per month under the "Creative Agreement" between Mr. Dawber and STFU paid prior to April of 2018.
- Why is the $39,000 per month stipulated in the "Creative Agreement" between Dawber and STFU being paid to Sketchy Tank, LLC, instead of to the debtor directly, under the terms of the Agreement?
- Where has the balance of the money paid to Sketchy Tank, LLC by STFU gone? As you probably recall from the 341(a) first meeting of creditors, Mr. Dawber testified that $20,000 dollars of the $39,000 sum was necessary to pay Sketchy Tank, LLC expenses. The claimed expenses of that entity as per the financials you filed do not even come close to this sum.
- Are there more specific financial statements concerning Sketchy Tank, LLC and Class War, Inc. (and, for that matter, Lurking Class, LLC which has provided **no** financials whatsoever)? Those which were filed appear generalized and imprecise. Because BDO are the accountants, better – and more complete – documentation should exist. We ask that it please be provided.
- What is the status of the supposed IRS debt? As you know, the IRS filed a Proof of Claim but when we discussed the matter following the hearing, you were not able to offer much information on the subject. We heard something about a supposed debt owed to the IRS in July of 2017; it is now over fifteen months later. We would like to know what has been going on with respect to any claimed tax issues between Mr. Dawber and the IRS in the meantime. If you client has documentation to that affect – or has professionals who possess that documentation – we respectfully request that it be provided to us. Also, have 2017 tax returns been filed? If so, we request copies of them, as well as state and federal returns of the debtor, Class War Inc., and Lurking Class, LLC for prior years.

Finally, after out Court appearance on Friday I suggested that we perhaps engage in a telephone call this week. Tuesday the 6th (i.e. tomorrow) is probably best for me. Do you and Oram have time for a discussion that day? Please let me know.

Thank you very much.

DAV

**Donald A. Vaughn, Esq.**
VAUGHN & VAUGHN
501 WEST BROADWAY ST., Suite 1770
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 237-1717
FAX (619) 237-0447
E-mail DAV@vv-law.com

The information contained in this electronic mail transmission is confidential and intended to be read only by the stated recipient of the transmission. It is therefore protected from unauthorized use or dissemination by the attorney-client and/or attorney work-product privileges. If you are not the intended recipient or the intended recipient's agent, you are hereby requested to notify the Law Firm of Vaughn & Vaughn immediately by telephone and to delete this transmission with any attachments and destroy all copies in any form. Any unauthorized review, use, dissemination, distribution or copying of this communication or its attachments, if any, is strictly prohibited and may result in legal action or prosecution by appropriate authorities. Thank you in advance for your cooperation.



CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

# EXHIBIT 31

## Photographs of Trial Exhibits 115 and 117

## [Sketchy Tank/Lurking Class products]



379



In Re Jesse Wayne Dawber
Bankruptcy No.: 18-06044-LT11

## PROOF OF SERVICE

I, Tatiana Tomacelli, DECLARE AS FOLLOWS:

I am a resident of and employed in the State of California, County of San Diego. I am over the age of 18 years and not a party to the above-entitled action. On November 15, 2018, I served a true copy of the following document(s):

**DECLARATION OF DONALD A. VAUGHN IN SUPPORT OF MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE**

on the parties in this action as follows:

[X] BY CM/ECF NOTICE OF ELECTRONIC FILING by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth below as identified on the service list obtained from this Court on the Electronic Mail Notice List.

Douglas Flahaut on behalf of Debtor Jesse Wayne Dawber
flahaut.douglas@arentfox.com

Aram Ordubegian on behalf of Debtor Jesse Wayne Dawber
ordubegian.aram@arentfox.com

Todd S. Garan on behalf of Creditor BANK OF AMERICA, N.A.
ch11ecf@aldridgepite.com, tgaran@aldridgepite.com, TSG@ecf.courtdrive.com

David Ortiz on behalf of Debtor Jesse Wayne Dawber
david.a.ortiz@usdoj.gov

United States Trustee
ustp.region15@usdoj.gov

1

All other interested parties in this action that are not a registered ECF User are served as follows:

## SEE ATTACHED SERVICE LIST

[X]   By U.S. Mail by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Diego, California addressed as set forth below.

[ ]   BY OVERNIGHT DELIVERY by causing such envelope(s) to be deposited in a box or other facility regularly maintained by Federal Express overnight delivery with fees paid.

[ ]   BY ELECTRONIC SERVICE by causing document(s) to be electronically served on the interested parties in the above-referenced action.  The transmission was reported as complete without error and a copy of the report will be maintained with the document by the sender.

[ ]   BY FACSIMILE by causing the foregoing document(s) via facsimile transmission.  The transmission was reported as complete without error and a copy of the report will be maintained with the document by the sender.

I declare under penalty of perjury that the documents were served by methods indicated above and the foregoing is true and correct.  Executed on November 15, 2018 at San Diego, California.

*Tatiana Tomacelli*

Tatiana Tomacelli

| Internal Revenue Service<br>Post Office Box 7346<br>Philadelphia, PA 19101-7346 | Franchise Tax Board<br>ATTN: Bankruptcy<br>Post Office Box 2952<br>Sacramento, CA 95812-2952 | Bankruptcy Counsel<br>United States Security &<br>Exchange Commission<br>444 South Flower St., Ste. 900<br>Los Angeles, CA 90071-9591 |
|---|---|---|
| Discover<br>P.O. Box 51908<br>Los Angeles, CA 90051-6208 | American Express<br>National Bank<br>c/o Beckett & Lee LLP<br>P.O. Box 3001<br>Malvern, PA 19355-0701 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3